SIDLEY AUSTIN LLP
Samuel A. Newman (*pro hac vice* pending)
555 West Fifth Street
Los Angeles, California 90013
Telephone:      (213) 896-6000
Facsimile:      (213) 896-6000
Email:          sam.newman@sidley.com


SIDLEY AUSTIN LLP
Jackson T. Garvey (*pro hac vice* pending)
One South Dearborn
Chicago, IL 60603
Telephone:      (312) 853-7000
Facsimile:      (312) 853-7036
Email:          jgarvey@sidley.com

SIDLEY AUSTIN LLP
Rakhee V. Patel (TX Bar No. 00797213)
Nathan C. Elner (*pro hac vice* pending)
Parker G. Embry (TX Bar No. 24126826)
Chelsea M. McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:      (214) 981-3300
Facsimile:      (214) 981-3400
Email:          rpatel@sidley.com
                nelner@sidley.com
                parker.embry@sidley.com
                cmcmanus@sidley.com

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| IMPEL PHARMACEUTICALS INC., et al.[1] | Case No. 23-80016 (SGJ) |
| Debtors. | (Joint Administration Requested)<br>(Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF**
**INTERIM AND FINAL ORDERS (I) AUTHORIZING THE**
**DEBTORS TO USE CASH COLLATERAL; (II) GRANTING**
**ADEQUATE PROTECTION TO PREPETITION TERM LOAN**
**SECURED PARTIES; (III) MODIFYING AUTOMATIC STAY;**
**(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 9:30 a.m. prevailing Central Time on December 21, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

---

[1] The Debtors in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, are:  Impel Pharmaceuticals Inc. (8238) and Impel NeuroPharma Australia Pty Ltd (N/A).  The Debtors' service address is 201 Elliot Avenue West, Suite 260, Seattle, WA 98119.

> **A hearing will be conducted on this matter on December 21, 2023 at 9:30 am prevailing Central Time in Courtroom 1, floor 14, 1100 Commerce Street, Dallas, TX 75242-1496.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 1.650.479.3207. Video communication will be by use of the Cisco WebEx platform. Connect via the Cisco WebEx application or click the link on Judge Jernigan's home page. The meeting code is 479 393 582. Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of electronic hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jernigan's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

1.      The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") state as follows in support of this motion:

## **Preliminary Statement**

2.      The Debtors require access to and use of cash collateral (the "Cash Collateral") to maintain operations and to administer these chapter 11 cases, both of which will preserve value for all stakeholders.  The Debtors are a commercial-stage biopharmaceutical company with a mission to develop transformative therapies for people suffering from diseases with high unmet medical needs, including the acute treatment of migraine headaches via Impel's flagship drug—Trudhesa.  In this role, the Debtors are responsible for the payment of all operational expenses, including, but not limited to, employee wages, taxes, insurance, vendors or other general unsecured creditors creditor costs, repair costs, and other capital expenditure costs, and failure to pay these obligations could affect the ability of the operational company to continue doing business.  Thus, absent authority to use Cash Collateral the Debtors could be forced to undertake drastic measures, such as shuttering operations, which would result in the loss of virtually all of the Debtors' income and cause irreparable harm to the Debtors' estates.  Because the Debtors' use of Cash Collateral during the pendency of these chapter 11 cases is essential to preserve and maintain the going-

concern value of their business, the Debtors respectfully request the Court grant them the authority

to use Cash Collateral according to the terms set forth herein.

## Relief Requested

3.      The Debtors seek entry of an interim order, substantially in the form of the proposed

interim order filed with this Motion (the "Interim Order") and, after a Final Hearing, the Final

Order (each as defined below), granting, among other things, the following relief:

a)   authorizing the Debtors, pursuant to sections 105, 361, 362, 363, 503 and 507 of the Bankruptcy Code, to (i) use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code, in accordance with the terms of the Interim Order and (ii) grant adequate protection to the Prepetition Term Loan Secured Parties (as defined below);

b)   modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order;

c)   subject to entry of a Final Order, the waiver of all rights to surcharge any Prepetition Collateral or Collateral under section 506(c) of the Bankruptcy Code;

d)   subject to entry of a Final Order, for the "equities of the case" exception under section 552(b) of the Bankruptcy Code to not apply to any of the Prepetition Term Loan Secured Parties with respect to the proceeds, products, offspring, or profits of any of the Prepetition Collateral or Collateral under section 552(b) of the Bankruptcy Code or any other applicable principle of equity or law;

e)   waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order (including a waiver pursuant to Bankruptcy Rule 6004(h));

f)   granting related relief, granting related relief, including scheduling a final hearing (the "Final Hearing") within thirty-five (35) calendar days after the Petition Date to consider entry of the Final Order granting the relief requested in the Motion on a final basis.

## Jurisdiction

4.      The United States Bankruptcy Court for the Northern District of Texas (the

"Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core

3

proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the Court's entry of a final order in connection with this motion.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a), 361, 362, 363, and 507 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rule 4001, rules 4001-1 and 9013-1 of the Bankruptcy Local Rules for the Northern District of Texas (the "Bankruptcy Local Rules"), and section B of the Procedures for Complex Chapter 11 Cases in the Northern District of Texas.

## Background of the Debtors

7.      Impel Pharmaceuticals Inc. ("Impel") is a commercial-stage biopharmaceutical company with a mission to develop transformative therapies for people suffering from diseases with high unmet medical needs, including the acute treatment of migraine headaches via Impel's flagship drug—Trudhesa.

8.      On December 20, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors and their business, including facts and circumstances giving rise to these chapter 11 cases is set forth in the First Day Declaration,[2] filed contemporaneously with this motion and incorporated by reference herein.

---

[2] Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the *Declaration of Brandon Smith, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Proceedings* (the "First Day Declaration").

9.      The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

10.      The Debtors have worked expeditiously with the Prepetition Term Loan Secured Parties (as defined below) to negotiate the consensual Interim Order.  Through the Interim Order, the Prepetition Term Loan Secured Parties have consented to the use of their cash collateral to fund the Debtors' in-court sale process and these chapter 11 cases.  Notably, the Prepetition Term Loan Secured Parties and Debtors have agreed that following the consummation of the Debtors' contemplated sale of all or substantially all of their assets, a portion of the sale proceeds shall be distributed to the Prepetition Term Loan Secured Parties, and a portion shall be retained by the Debtors to fund a liquidating chapter 11 plan on terms to be agreed by the Debtors and Prepetition Term Loan Secured Parties.

### Summary Use of Cash Collateral[3]

11.      Pursuant to, and in accordance with, Bankruptcy Rule 4001(c) and the Procedures for Complex Cases in the Northern District of Texas, the following is a concise statement of certain material provisions of the Interim Order:

| Material Term | Summary |
| --- | --- |
| **Parties with an Interest in Cash Collateral**<br>**Interim Order ¶ E(2)** | Oaktree Fund Administration, LLC, as Administrative Agent (the "Prepetition Term Loan Administrative Agent") and the lenders from time to time party thereto (such lenders, the "Prepetition |

---

[3] Capitalized terms used but not otherwise defined in this summary shall have the meanings ascribed to them in the Interim Order.

| Material Term | Summary |
|---|---|
| | Term Loan Lenders" and, together with the Prepetition Term Loan Administrative Agent, the "Prepetition Term Loan Secured Parties"). |
| **Purposes for Use of Cash Collateral**<br>**Interim Order ¶ H** | The Debtors seek to use Cash Collateral in accordance with the terms set forth in the Interim Order to, among other things, (A) pay certain adequate protection payments; (B) pay the costs of administration of their estates, including the payment of professional fees and expenses; and (C) to satisfy other working capital and general corporate needs of the Debtors |
| **Approved Budget**<br>**Exhibit 1 to the Interim Order; ¶ 3** | The Debtors seek authorization to use Cash Collateral for the purposes set forth in the forecast attached to the Interim Order as Exhibit 1 (the "Approved Budget") for the initial two-week (2-week) period set forth in the Approved Budget, and each rolling two-week period thereafter (the "Budget Period").<br><br>*Budget Testing.* Except as otherwise provided herein, the Debtors may only use Cash Collateral in accordance with the Approved Budget, subject to Permitted Variances (as defined below), and in accordance with the Interim Order. Variances for each week shall be reported by no later than the subsequent Thursday following such week (each such date, a "Testing Date"). On or before 8:00 p.m. (prevailing Central time) on each Testing Date, the Debtors shall prepare and deliver to the Prepetition Term Loan Administrative Agent and its advisors, for the benefit of itself and the Prepetition Term Loan Secured Parties, in form and substance reasonably satisfactory to the Prepetition Term Loan Advisors (as defined below), a variance report and reconciliation (the "Variance Report") setting forth for the week just ended: (i) the Debtors' actual disbursements (the "Actual Disbursements") on a line-by-line and aggregate basis; (ii) the Debtors' actual cash receipts (the "Actual Cash Receipts") on a line-by-line and aggregate basis; (iii) a comparison (whether positive or negative, in dollars and expressed as a percentage) for the Actual Cash Receipts (and each line item thereof) and the Actual Disbursements (and each line item thereof) to the amount of the Debtors' projected cash receipts (and each line item thereof) and projected disbursements (and each line item thereof), respectively, as set forth in the Approved Budget for the applicable week; (iv) a comparison (whether positive or negative, in dollars and expressed as a percentage) covering the applicable testing period, as set forth in Paragraph 3(e) of the Interim Order, setting forth the Actual Cash Receipts (and each line item thereof) and the Actual Disbursements (and each line item thereof) against the amount of the Debtors' projected cash receipts (and each line item thereof) and projected disbursements (and each line item |

| Material Term | Summary |
|---|---|
| | thereof) for the applicable testing period and any permitted carry-forward of variances as permitted by Paragraph 3(e) of the Interim Order, respectively, as set forth in the Approved Budget for such Budget Period; and (v) as to each variance contained in the Variance Report, an indication (on a line item basis) as to whether such variance is temporary or permanent and an analysis and explanation in reasonable detail for any variance.<br><br>*Professional Fee Reserve Account*.  Upon entry of the Interim Order, the Debtors are authorized and directed to fund a segregated account of the Debtors designated by the Debtors for such purpose for the sole purpose of reserving for and paying unpaid Allowed Professional Fees (as defined in paragraph 5(b) in the Interim Order) (the "Professional Fee Reserve Account"). The Professional Fee Reserve Account shall be held for the benefit of Estate Professionals (defined below) and shall not be property of the Debtors' estates.  On a weekly basis and solely up to the amounts set forth for Estate Professionals (as defined below) for each such week in the Approved Budget, the Debtors shall fund the Professional Fee Reserve Account (such amounts, the "Reserve Amounts"), and such Reserve Amounts may be applied from time to time to pay the Allowed Professional Fees prior to any and all other claims.  If, after payment in full of all Reserve Amounts on account of Allowed Professional Fees, the Professional Fee Reserve Account has not been reduced to zero, all remaining funds shall be returned to the Debtors for distribution in accordance with a further order of this Court.  For the avoidance of doubt, the Debtors' obligation to pay Allowed Professional Fees shall not be limited or deemed limited to funds held in the Professional Fee Reserve Account.<br><br>*Permitted Variance.* The Debtors shall not permit, (i) during any week prior to the closing date of a sale transaction for all or a substantial portion of the Debtors' assets,  the Total Outflows (as defined in the Approved Budget) to have a negative variance in excess of 10% (with negative variance meaning, for the avoidance of doubt, that Total Outflows are greater than the projected Total Outflows for the applicable period on a cumulative basis), (ii) during any week following the closing date of a sale transaction for all or a substantial portion of the Debtors' assets, the Total Outflows (as defined in the Approved Budget) to have a negative variance in excess of 15% (with negative variance meaning, for the avoidance of doubt, that Total Outflows are greater than the projected Total Outflows for the applicable period on a cumulative basis) or (iii) Total Inflows (as defined in the |

| Material Term | Summary |
|---|---|
| | Approved Budget) to have a negative variance in excess of 10% (with negative variance meaning, for the avoidance of doubt, that Total Inflows is less than the projected Total Inflows on a cumulative basis for the three-week period prior to the applicable Testing Date (with the first such Testing Date for Total Inflows occurring in week 4 of the Initial Approved Budget for the first three weeks of the Initial Approved Budget) (such deviations, the "Permitted Variances"); *provided* that, any positive disbursements variance may be carried over to the immediately subsequent (but not any other) week to offset any negative disbursements variance for such week.  For the avoidance of doubt, the cash disbursements considered for determining compliance with the variance requirements hereunder shall exclude the Debtors' disbursements in respect of (x) the restructuring professional fees of the Debtors, any Committee, and the Prepetition Term Loan Secured Parties on account of professional fees under paragraph 4(d) of the Interim Order and (y) the fees of the Office of the United States Trustee (the "U.S. Trustee"); *provided* that the aggregate payments on account of such restructuring professional fees and U.S. Trustee fees shall not exceed the aggregate amounts for such fees provided in the Approved Budget through the applicable budget period. <br><br> *Update of Budget.*  By no later than 8:00 p.m. (prevailing Central Time) on the second (2nd) business day before the end of each Budget Period (or as otherwise consented to by the Prepetition Term Loan Administrative Agent), the Debtors shall deliver to the Prepetition Term Loan Advisors (as defined below), for the benefit of itself and the Prepetition Term Loan Secured Parties, a rolling 13-week cash flow forecast of the Debtors in the form of the Initial Approved Budget (each, a "Proposed Budget"), which Proposed Budget (including any subsequent revisions to any such Proposed Budget), upon written approval by the Prepetition Term Loan Administrative Agent in its sole discretion, shall become the Approved Budget.  In the event the conditions for the most recently delivered Proposed Budget to constitute the Approved Budget are not met as set forth herein, the prior Approved Budget shall remain in full force and effect; *provided*, *however*, in the event the Prepetition Term Loan Administrative Agent does not approve a Proposed Budget within three (3) business days of its delivery, the Debtors may request an emergency hearing with the Court (but on not less than three (3) business days' written notice to the Prepetition Term Loan Administrative Agent) to seek Court approval of the Proposed Budget for purposes of the Interim Order.  When required under the terms of the Interim Order, the |

| Material Term | Summary |
|---|---|
| | consent or approval of the Prepetition Term Loan Administrative Agent may be communicated via email to the Debtors or their professionals by the Prepetition Term Loan Advisors.<br><br>*Miscellaneous.*  For the avoidance of doubt, except as otherwise set forth in the Approved Budget, Cash Collateral may not be used by, or to pay the fees, costs, or expenses of, any of the Debtors' affiliated non-debtor entities. |
| **Events of Default and Termination**<br>**Interim Order ¶ 7** | a) A Final Order acceptable to the Debtors and the Prepetition Term Loan Administrative Agent is not entered by the Court by 11:59 p.m. on the date that is 35 days after the Petition Date;<br><br>b) The violation of any material term of the Interim Order by the Debtors that is not cured within five (5) business days of receipt by the Debtors of notice from the Prepetition Term Loan Administrative Agent of such default, violation, or breach (which may be provided to the Debtors by email);<br><br>c) Entry of any order modifying, reversing, revoking, staying, rescinding, vacating, or amending the Interim Order without the express written consent of the Prepetition Term Loan Administrative Agent;<br><br>d) These Chapter 11 Cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or without the express written consent of the Prepetition Term Loan Administrative Agent, a trustee under chapter 11 of the Bankruptcy Code, an examiner with expanded powers or a responsible officer or similar person is appointed in these Chapter 11 Cases, or these Chapter 11 Cases are transferred or there is a change of venue, or the Debtors file any motion, pleading or proceedings (or supports any such motion, pleading or proceeding filed by a third party) seeking or consenting to the granting of any of the foregoing relief, or any order is entered granting any of the foregoing relief;<br><br>e) Other than with respect to the Bid Protections, and except in connection with a motion for debtor in possession financing or any order entered in connection therewith, in each case, on terms acceptable to the Prepetition Term Loan Administrative Agent, the Debtors file any motion, pleading, or proceeding (or solicits, supports, or encourages any other party to file any motion, pleading, or proceeding) seeking or consenting to the granting of, or an order is entered granting, any lien or other interest pari passu with or senior to any of the Prepetition Term Loan Liens, Adequate Protection Liens or Adequate |

| Material Term | Summary |
|---|---|
| | Protection Superpriority Claims granted to the Prepetition Term Loan Secured Parties under the Interim Order, or any order of the Court is entered reversing, staying for a period in excess of three (3) business days, vacating or otherwise amending, supplementing, or modifying the Interim Order in a manner adverse to the Prepetition Term Loan Secured Parties, in each case without the written consent of the Prepetition Term Loan Administrative Agent; |
| | f) The Debtors file any motion, pleading, or proceeding (or support any motion, pleading or proceeding filed by a third party) seeking or consenting to, or an order is entered granting, (i) the invalidation, subordination, or other challenge to the Prepetition Term Loan Secured Indebtedness, the Prepetition Term Loan Liens, the Adequate Protection Liens, or the Adequate Protection Superpriority Claims or (ii) any relief under sections 506(c) or 552 of the Bankruptcy Code with respect to any Prepetition Collateral or any Collateral, including the Cash Collateral, or against any of the Prepetition Term Loan Secured Parties, in each case without the written consent of the Prepetition Term Loan Administrative Agent; |
| | g) Other than as expressly permitted in the Interim Order, the Debtors file any motion, pleading or proceeding (or support any motion, pleading or proceeding filed by a third party) seeking or consenting to the granting of, or an order is entered granting, relief which could reasonably be expected to result in a material impairment of the rights or interests of the Prepetition Term Loan Secured Parties (except any motion or other pleading otherwise expressly permitted by the Interim Order) and such motion, pleading, proceeding or order is not withdrawn or vacated within three (3) business days after notice thereof is delivered to the Debtors; |
| | h) The entry by this Court of an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code to any entity other than the Prepetition Term Loan Secured Parties (i) with respect to the Prepetition Collateral or the Collateral having a value greater than $350,000 without the written consent of the Prepetition Term Loan Administrative Agent or (ii) authorizing any party to proceed against any asset having a fair market value of at least $350,000 of the Debtors (other than insurance) or that would adversely affect in any material respect the Debtors' ability to operate their businesses in the ordinary course, without the |

| Material Term | Summary |
|---|---|
| | written consent of the Prepetition Term Loan Administrative Agent; |
| | i) Unless consented to by the Prepetition Term Loan Administrative Agent, the entry of a subsequent order of the Court (i) terminating the Debtors' use of Cash Collateral or (ii) authorizing the use of Cash Collateral by any non-Debtor affiliate of the Debtors; |
| | j) The failure by the Debtors to make any payment required pursuant to the Interim Order when due that is not cured within three (3) business days of receipt by the Debtors of notice from the Prepetition Term Loan Administrative Agent or the Prepetition Term Loan Advisors of such failure (which may be provided to the Debtors by email); |
| | k) The failure by the Debtors to deliver to the Prepetition Term Loan Administrative Agent or the Prepetition Term Loan Advisors any of the documents or other information required to be delivered to such applicable party pursuant to the Interim Order when due, or any such documents or other information shall contain a material misrepresentation, and in either case, such failure or misrepresentation is not cured within three (3) business days after notice thereof is delivered to the Debtors; |
| | l) The failure by the Debtors to comply in any material respect with the Approved Budget, subject to the Permitted Variances, or the Interim Order that is not cured within three (3) business days of receipt by the Debtors of notice from the Prepetition Term Loan Administrative Agent or the Prepetition Term Loan Advisors of such default, violation, or breach (which may be provided to the Debtors by email); |
| | m) The Debtors, without the written consent of the Prepetition Term Loan Administrative Agent, enter into a restructuring support or similar agreement which contemplates the filing of a chapter 11 plan that would impair any Prepetition Term Loan Secured Parties, but only if the relevant provisions in the restructuring support or similar agreement have not been removed or the restructuring support or similar agreement has not been terminated as to all parties within five (5) business days upon the Debtors' execution of such restructuring support or similar agreement; provided, however, that after a Termination Declaration Date arising as a result of paragraph 7(m) of the Interim Order, but before the Termination Date in connection therewith, the Debtors shall be permitted to cure a Termination Event pursuant to paragraph 7(m) of the Interim Order; provided, further, that nothing shall prejudice the rights |

| Material Term | Summary |
|---|---|
| | of the Prepetition Term Loan Secured Parties to object to any chapter 11 plan that provides for the reinstatement of the Prepetition Term Loan Secured Indebtedness pursuant to section 1124 of the Bankruptcy Code, which rights shall be fully preserved (for the avoidance of doubt, the Debtors' entry into a restructuring support or similar agreement that contemplates the filing of a chapter 11 plan seeking reinstatement of the Prepetition Term Loan Secured Indebtedness pursuant to section 1124 of the Bankruptcy Code would not trigger a Termination Event pursuant to paragraph 7(m) of the Interim Order); |
| | n)  The Debtors, without the written consent of the Prepetition Term Loan Administrative Agent, shall file, amend, pursue, or support (either directly or indirectly) any chapter 11 plan that proposes treatment that would impair any Prepetition Term Loan Secured Parties, but only if such plan, amendment thereto, or support thereof, is not withdrawn within five (5) business days; provided, however, that after a Termination Declaration Date arising as a result of paragraph 7(n) of the Interim Order, but before the Termination Date in connection therewith, the Debtors shall be permitted to cure a Termination Event pursuant to paragraph 7(n) of the Interim Order; provided, further, that nothing shall prejudice the rights of the Prepetition Term Loan Secured Parties to object to any chapter 11 plan that provides for the reinstatement of the Prepetition Term Loan Secured Indebtedness pursuant to section 1124 of the Bankruptcy Code, which rights shall be fully preserved (for the avoidance of doubt, the Debtors' filing of a chapter 11 plan seeking reinstatement of the Prepetition Term Loan Secured Indebtedness pursuant to section 1124 of the Bankruptcy Code would not trigger a Termination Event pursuant to this paragraph 7(n)); |
| | o)  The entry of an order of this Court approving the terms of any senior secured or pari passu debtor in possession financing that is entered into by the Debtors without the written consent of the Prepetition Term Loan Administrative Agent; |
| | p)  The Debtors file any motion, pleading or proceeding seeking approval for the sale of any material portion of its assets without the consent of the Prepetition Term Loan Administrative Agent and such motion, pleading, proceeding or order is not withdrawn or vacated within three (3) business days after notice thereof is delivered to the Debtors; |

| Material Term | Summary |
|---|---|
| | q) Any stalking horse asset purchase agreement (the "Stalking Horse APA"), or any asset purchase agreement of a bidder who is approved as the winning bidder following an auction for a material portion of the assets subject to the Stalking Horse APA, is terminated in accordance with its terms on account of the termination or non-renewal of a different material contract of the Debtors; |
| | r) The Debtors file any motion, pleading, or proceeding seeking to assume or reject any material executory contract or unexpired lease without the prior written consent of the Prepetition Term Loan Administrative Agent; |
| | s) The entry of any post-petition judgment against the Debtors in excess of $350,000 in the aggregate (not including amounts covered by insurance) the enforcement of which is not otherwise stayed by the Bankruptcy Code or otherwise; |
| | t) The Debtors shall be enjoined from conducting any material portion of their businesses, any material disruption of the business operations of the Debtors shall occur (other than as a result of these Chapter 11 Cases), or any material damage to or loss of material assets of the Debtors shall occur that is not otherwise covered by insurance; |
| | u) The Debtors file any motion, pleading, or proceeding (or support any motion, pleading, or proceeding filed by a third party) seeking or consenting to the granting of, or an order is entered granting, any termination and/or shortening, reduction of, or other modification to, the Debtors' exclusive period to file and/or solicit a chapter 11 plan pursuant to the Bankruptcy Code (collectively, the "Exclusive Periods") or the Debtors otherwise do not seek to extend the Exclusive Periods if and when applicable, in each case, unless otherwise agreed by the Prepetition Term Loan Administrative Agent; |
| | v) Any (i) entry by the Debtors into any settlement or other agreement or (ii) motion, proceeding, or other action is commenced or supported by the Debtors seeking, or otherwise consenting to any settlement or other agreement without the consent of the Prepetition Term Loan Administrative Agent; |
| | w) Any of the applicable Debtors fail to satisfy their reporting obligations under the Interim Order that is not cured within five (5) business days of receipt by the Debtors of notice from the Prepetition Term Loan Administrative Agent of such default, violation or breach (which may be provided to the Debtors by email); and |

| Material Term | Summary |
|---|---|
| | x) (x) The failure of the Debtors to meet any of the deadlines (or such later dates as may be approved by the Prepetition Term Loan Administrative Agent) set forth on Exhibit 2 to the Interim Order (collectively, the "Milestones"). |
| **Adequate Protection** <br> **Interim Order ¶ 4** | The Prepetition Term Loan Administrative Agent, for the benefit of itself and the other the Prepetition Term Loan Parties, are granted the following through the Interim Order: <br><br> • *Adequate Protection Liens.* Pursuant to Bankruptcy Code sections 361(2) and 363(c)(2), and subject in all cases to the Carve Out, effective as of the Petition Date and in each case perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or by possession or control by the Prepetition Term Loan Administrative Agent or any other party, the Debtors are authorized to grant, and hereby are deemed to have granted, to the Prepetition Term Loan Administrative Agent, for the benefit of itself and the other Prepetition Term Loan Secured Parties, Adequate Protection Liens on (i) the Prepetition Collateral and (ii) Collateral, subject only to the Permitted Prior Liens and the Carve Out, in which case the Adequate Protection Liens shall be immediately junior in priority to such Permitted Prior Liens and to the Carve Out; notwithstanding the foregoing, the Collateral shall exclude the Professional Fee Reserve Account (other than with respect to the residual interest therein provided in the Interim Order) and all claims and causes of action arising under any section of chapter 5 of the Bankruptcy Code (other than claims and causes of action arising under section 549 of the Bankruptcy Code) (the "Avoidance Actions"), but, subject to entry of a Final Order, shall include any and all proceeds of and other property that is recovered or becomes unencumbered as a result of (whether by judgment, settlement, or otherwise) any Avoidance Action ("Avoidance Proceeds"). <br><br> • *Adequate Protection Superpriority Claims.* To the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code, the Debtors are authorized to grant, and hereby are deemed to have granted effective as of the Petition Date, to the Prepetition Term Loan Administrative Agent, for the benefit of itself and the Prepetition Term Loan Secured Parties, allowed superpriority administrative expense |

| Material Term | Summary |
|---|---|
| | claims in these Chapter 11 Cases ahead of and senior to any and all other administrative expense claims in these Chapter 11 Cases to the extent of any Diminution in Value (the "Adequate Protection Superpriority Claims"), junior only to the Carve Out and the termination fee and expense reimbursement approved by the Court in favor of JN Bidco LLC (the "Stalking Horse Bidder") in substantially the forms included in Sections 9.3(a) and 9.3(b), respectively, of that certain Asset Purchase Agreement dated as of December 18, 2023 by and between the Stalking Horse Bidder and Impel Pharmaceuticals Inc. (the "Bid Protections"). Subject to the Carve Out and the Bid Protections, the Adequate Protection Superpriority Claims shall not be junior or *pari passu* to any other administrative claims against the Debtors and shall have priority over all now or hereinafter incurred administrative expense claims against the Debtors, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code; *provided* that any recovery against Avoidance Proceeds shall be subject to entry of a Final Order.<br><br>• *Fees and Expenses.* As additional adequate protection, the Debtors shall, and are authorized and directed to, pay in full in cash and in immediately available funds: (i) within five (5) business days after the Debtors' receipt of invoices therefor, (a) the professional fees, expenses and disbursements (including, but not limited to, the professional fees, expenses and disbursements of counsel and other third-party consultants and/or experts, including financial advisors) incurred prior to the Petition Date by the Prepetition Term Loan Administrative Agent (including, without limitation, reasonable fees, expenses and disbursements incurred by Sullivan & Cromwell LLP, as primary counsel, and Bracewell LLP, as local counsel, collectively, the "Prepetition Term Loan Advisors") and (b) the reasonable fees, expenses and disbursements of Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), as counsel to certain of the Prepetition Term Loan Secured Parties, incurred prior to the Petition Date, (ii) subject to the notice provisions in paragraph 26 of the Interim Order, (a) the reasonable fees and expenses incurred on and after the Petition Date by the Prepetition |

| Material Term | Summary |
|---|---|
| | Term Loan Administrative Agent, including the fees and expenses of the Prepetition Term Loan Advisors (including, without limitation, professional fees, expenses and disbursements of counsel) and (b) the reasonable fees, expenses and disbursements of Paul, Weiss incurred on and after the Petition Date; *provided* that the aggregate amount of the fees, expenses and disbursements of Paul, Weiss authorized and payable pursuant to the Interim Order (including under subparagraph (i)(b) above) shall not exceed $25,000. (i) and (ii) collectively, the "Adequate Protection Payments"). None of the foregoing fees, expenses and disbursements shall be subject to separate approval by this Court or require compliance with the U.S. Trustee guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments. <br>• *Reporting*. The Debtors shall use reasonable best efforts to comply with those reporting requirements described *infra Reporting Interim Order* ¶ (4)(d). <br>• *Other Covenants*. The Debtors shall maintain their cash management arrangements in a manner consistent with this Court's order(s) granting the Debtors' cash management motion unless otherwise consented to by the Prepetition Term Loan Lenders. The Debtors shall continue ordinary course practices to maintain good standing under the jurisdiction in which each Debtor and each of its subsidiaries is incorporated or organized and continue to operate the business in the ordinary course of business customary in the normal course of ordinary operations consistent with past practice taking into account these Chapter 11 Cases and the funding available under the Approved Budget unless otherwise consented to by the Prepetition Term Loan Lenders. The Debtors shall not sell, lease (other than existing leases) or otherwise dispose of any assets with an aggregate fair market value in excess of $50,000 in any single transaction or series of related transactions outside the ordinary course of business, without the prior written consent of the Prepetition Term Loan Administrative Agent (with email from the Prepetition Term Loan Advisors to Debtors' counsel being sufficient) or order of the Bankruptcy Court. The Debtors shall not assume or reject any material contract, or seek authority of the Bankruptcy Court to assume or reject any material contract, without first |

| Material Term | Summary |
|---|---|
| | consulting with the Prepetition Term Loan Advisors. The Debtors shall continue to comply in all respects with those covenants contained in the Prepetition Term Loan Credit Agreement, in each case as in effect on the Petition Date, solely with respect to the preservation of rights, qualifications, licenses, permits, privileges, franchises, governmental authorizations and intellectual property rights, in each case, that are material to the conduct of the business and the maintenance of properties and insurance. Without the prior written consent of the Prepetition Term Loan Secured Parties (email being sufficient) or a prior order of the Bankruptcy Court (provided that the Debtors shall first consult with the Prepetition Term Loan Administrative Agent and Prepetition Term Loan Secured Parties prior to seeking such order), the Debtors shall not (i) enter into, terminate, or otherwise modify any material operational contract, lease or other arrangement other than in the ordinary course of business, (ii) make any payment to any officer or employee of the Debtors out of the ordinary course of business, (iii) agree to, or incur, any material increase in the compensation payable or to become payable to any officer or employee of the Debtors, or (iv) materially increase the benefits of any such officer or employee. The Debtors shall cooperate in good faith and coordinate with the Prepetition Term Loan Secured Parties with respect to any transactions to be taken in these Chapter 11 Cases and provide counsel to the Prepetition Term Loan Secured Parties (including, for the avoidance of doubt, the Prepetition Term Loan Advisors and Paul Weiss) with a reasonable opportunity under applicable circumstances to review draft copies of all substantive pleadings and proposed orders to be filed in these Chapter 11 Cases. <br><br> • *Miscellaneous*. <br>     o Except for (i) the Carve Out, (ii) Bid Protections, and (iii) as otherwise provided as Adequate Assurance, the Adequate Protection Liens and Adequate Protection Superpriority Claims granted to the Prepetition Term Loan Secured Parties pursuant to the Adequate Assurance provided for in the Interim Order shall not be subject, junior, or *pari passu*, to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under the Bankruptcy Code, including, without limitation, pursuant to |

| Material Term | Summary |
|---|---|
| | section 551 or otherwise, and shall not be subordinated to or made *pari passu* with any lien, security interest or administrative claim under the Bankruptcy Code, including, without limitation, pursuant to section 364 or otherwise in these Chapter 11 Cases or any Successor Case. |
| | o The Adequate Protection Liens are deemed automatically perfected as of the Petition Date without the necessity of recording same and without further notice or order. The Prepetition Term Loan Administrative Agent shall not be required to file any UCC financing statements or other instruments (or to take any other action) to perfect such Adequate Protection Liens. |
| | o The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified to the extent necessary to permit the Prepetition Term Loan Administrative Agent to perform any act authorized or permitted under or by virtue of the Interim Order including, without limitation, to take any act to create, validate, evidence, attach or perfect any of the Adequate Protection Liens and to receive any payments expressly authorized by the Interim Order with respect to the Prepetition Term Loan Secured Indebtedness or adequate protection. |
| | • *Right to Seek Additional Adequate Protection.* The Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of any of the Prepetition Term Loan Secured Parties to request further or alternative forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request. Subject to the Carve Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Term Loan Secured Parties is insufficient to compensate for any Diminution in Value of their interests in the Prepetition Collateral during these Chapter 11 Cases or any Successor Case. Nothing contained herein shall be deemed a finding by the Court, or an acknowledgment by any of the Prepetition Term Loan Secured Parties that the adequate protection granted herein does in fact adequately protect any of the Prepetition Term Loan Secured Parties against |

| Material Term | Summary |
|---|---|
| | any Diminution in Value of their interests in the Prepetition Collateral (including the Cash Collateral) |
| **507(b) Superpriority Claim**<br>**Interim Order ¶ 4(b)** | The Debtors are authorized to grant to the Prepetition Term Loan Administrative Agent, for the benefit of itself and the Prepetition Term Loan Secured Parties, allowed superpriority administrative expense claims in these Chapter 11 Cases ahead of and senior to any and all other administrative expense claims in these Chapter 11 Cases to the extent of any Diminution in Value (the "Adequate Protection Superpriority Claims"), junior only to the Carve Out. Subject to the Carve Out, the Adequate Protection Superpriority Claims shall not be junior or *pari passu* to any other administrative claims against the Debtors and shall have priority over all now or hereinafter incurred administrative expense claims against the Debtors, including, without limitation, administrative expense claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 726, 1113 and 1114 of the Bankruptcy Code; *provided* that any recovery against Avoidance Proceeds shall be subject to entry of a Final Order. |
| **Cash Management**<br>**Interim Order ¶ 4(e)** | The Debtors shall maintain their cash management arrangements in a manner consistent with the Court's order(s) granting the Debtors' cash management motion unless otherwise consented to by the Prepetition Term Loan Lenders. |
| **Interim Carve-Out**<br>**Interim Order ¶ 5** | Notwithstanding anything to the contrary herein, the Debtors' obligations to the Prepetition Term Loan Secured Parties, and the liens, security interests and superpriority claims granted by the Interim Order or under the Prepetition Term Loan Documents, and the payment of all such obligations, shall be subject and subordinate in all respects to payment of the following fees and expenses: (a) the payment of unpaid fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (b) reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code; (c) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals"), and any official Committee (the "Committee Professionals" and, together with the Debtor Professionals, the "Estate Professionals") at any time before the delivery by the Prepetition Term Loan Administrative Agent of a Carve-Out Trigger Notice (defined below) and without regard to whether such fees and expenses are provided for in any |

| Material Term | Summary |
|---|---|
| | Approved Budget or were invoiced after the Carve-Out Trigger Notice Date (the amounts set forth in this clause (c) being the "Pre Carve-Out Trigger Notice Cap"); and (d) the Allowed Professional Fees of Debtor Professionals in an aggregate amount not to exceed $350,000, less the amount of any retainer held by such Estate Professional and not previously returned or applied to fees and expenses, incurred on or after the first business day following delivery by the Prepetition Term Loan Administrative Agent of the Carve-Out Trigger Notice to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court, (the amount set forth in this clause (d) being the "Debtor Post Carve-Out Trigger Notice Cap"); (e) Allowed Professional Fees of Committee Professionals in an aggregate amount not to exceed $75,000 incurred on or after the first business day following delivery by the Prepetition Term Loan Administrative Agent of the Carve-Out Trigger Notice to the extent allowed at any time, whether by interim order, procedural order, or otherwise, but subject to final allowance by the Court (the amount set forth in this clause (e) being the "Committee Post Carve-Out Trigger Notice Cap" and together with the Debtor Post Carve-Out Trigger Notice Cap, such amount, the "Post Carve-Out Trigger Notice Cap" and the Pre Carve-Out Trigger Notice Cap together with the Post Carve-Out Trigger Notice Cap and the amounts set forth in clauses (a) and (b), the "Carve-Out Cap") (the foregoing clauses (a) through (e), collectively, the "Carve-Out"). The term "Carve-Out Trigger Notice" shall mean a written notice stating that the Post-Carve-Out Trigger Notice Cap has been invoked, delivered by hard copy or email by the Prepetition Term Loan Administrative Agent or the Prepetition Term Loan Advisors to lead bankruptcy counsel for the Debtors, the U.S. Trustee, Prepetition Term Loan Secured Parties, and counsel to the Committee, if any, which notice may be delivered following the occurrence and during the continued existence of a Termination Event (as defined herein) under the terms of the Interim Order. The term "Carve-Out Trigger Notice Date" shall mean the day on which a Carve-Out Trigger Notice is delivered by the Prepetition Term Loan Administrative Agent or Prepetition Term Loan Advisors, as applicable. On the Carve-Out Trigger Notice Date, the Carve-Out Trigger Notice shall constitute a demand to the Debtors to transfer cash in an amount equal to the Carve-Out Cap (which shall be determined by the applicable Estate Professional in its reasonable discretion based on the amount of then-unpaid Allowed Professional Fees plus a reasonable estimate of fees and expenses not yet allowed) less any amount then held in the |

| Material Term | Summary |
|---|---|
| | Professional Fee Reserve Account to the Professional Fee Reserve Account. |
| | Immediately following receipt of a Carve-Out Trigger Notice, and prior to the payment of any Prepetition Term Loan Secured Indebtedness or Adequate Protection Superpriority Claims, Bid Protections, or Adequate Protection Payments, the Debtors shall be required to deposit into the Professional Fee Reserve Account cash in an amount equal to the difference between the Carve-Out Cap and the balance held in the Professional Fee Reserve Account as of the Carve-out Trigger Notice Date.  Notwithstanding anything to the contrary herein or in the Prepetition Term Loan Documents, following delivery of a Carve-Out Trigger Notice, the Prepetition Term Loan Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fee Reserve Account has been fully funded as permitted above in an amount equal to all applicable obligations benefitting from the Carve-Out.  Any payment or reimbursement made to any Estate Professional in respect of any Allowed Professional Fees prior to the delivery of the Carve-Out Trigger Notice shall not reduce the Carve-Out. |
| | The Debtors shall use funds held in the Professional Fee Reserve Account to pay Estate Professional fees as they become allowed and payable pursuant to interim or final orders from the Court; <u>provided</u>, that the Debtors' obligations to pay the allowed fees and expenses of the Estate Professionals shall not be limited or deemed limited to funds held in the Professional Fee Reserve Account.  The amounts in the Professional Fee Reserve Account shall be available only to satisfy Allowed Professional Fees and other amounts included in the Carve-Out until such amounts are paid in full.  Notwithstanding anything to the contrary herein, (i) the failure of the Professional Fee Reserve Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out and (ii) in no way shall the Carve-Out, the Professional Fee Reserve Account, or any Approved Budget be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).  All funds in the Professional Fee Reserve Account shall be used first to pay all obligations benefitting from the Pre Carve-Out Trigger Notice Cap, until paid in full, and then the obligations benefitting from the Post Carve-Out Trigger Notice Cap.  The amount in the Professional Fee Reserve Account |

| Material Term | Summary |
|---|---|
| | shall be reduced on a dollar-for-dollar basis for Allowed Professional Fees that are paid after the delivery of the Carve-Out Trigger Notice, and the Professional Fee Reserve Account shall not be replenished for such amounts so paid.

Payments from the Carve-Out shall be subject to any terms and conditions of the engagement agreements and appurtenant orders for the employment of each Estate Professional. The Debtors shall be permitted to pay compensation and reimbursement of expenses incurred prior to a Termination Declaration Date to the extent allowed and payable under sections 330 and 331 of the Bankruptcy Code.

Until such time as the Prepetition Term Loan Secured Indebtedness shall have been indefeasibly paid and satisfied in full in accordance with the Prepetition Term Loan Documents, any remaining unapplied retainer funds at the conclusion of an Estate Professional's engagement shall be immediately returned to the Prepetition Term Loan Agent. If, after paying all amounts set forth in the definition of Carve-Out, the Professional Fee Reserve Account has not been reduced to zero, all remaining funds in the Professional Fee Reserve Account shall be distributed to the Prepetition Term Loan Agent on account of the Prepetition Term Loans, unless the Prepetition Term Loans have been indefeasibly paid in full in cash.

The Prepetition Term Loan Secured Parties reserve the right to object to the allowance of any fees and expenses, whether or not such fees and expenses were incurred in accordance with the Approved Budget. Except for permitting the funding of the Carve-out as provided herein, the Prepetition Term Loan Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or expenses of any Estate Professionals incurred in connection with the Chapter 11 Cases or any successor case(s) under any chapter of the Bankruptcy Code (a "Successor Case") under any chapter of the Bankruptcy Code, regardless of whether payment of such fees or disbursement has been allowed by the Court. Nothing in the Interim Order or otherwise shall be construed to obligate any of the Prepetition Term Loan Secured Parties in any way to pay compensation to or reimburse expenses of any Estate Professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or expense reimbursement. |
| **Stipulations**<br>**Interim Order ¶ E** | The Debtors stipulate to the following: |

| Material Term | Summary |
|---|---|
| | • The Debtors borrowed, and were liable to, and the Prepetition Term Loan Guarantors unconditionally and irrevocably guaranteed for the benefit of, the Prepetition Term Loan Secured Parties pursuant to the Prepetition Term Loan Documents (x) an aggregate principal amount of not less than $101,505,257,60 of Tranche A Term Loans and $20,020,022.95 of Tranche B Term Loans (the "Prepetition Term Loans"), subject to the relative rights, rankings, and priorities set forth in the Prepetition Term Loan Credit Agreement, plus (y) all accrued and unpaid interest (clauses (x) and (y), collectively, the "Prepetition Term Loan Secured Indebtedness").<br><br>• The Prepetition Term Loan Secured Indebtedness is secured, in favor of the Prepetition Term Loan Secured Parties, by valid, binding, properly perfected, continuing and enforceable security interests in and liens on all "Collateral" as defined in the Prepetition Term Loan Credit Agreement subject to the relative rights, rankings, and priorities of the Tranche A Term Loans and the Tranche B Term Loan set forth in the Prepetition Term Loan Credit Agreement.<br><br>• The Prepetition Term Loan Liens encumber all of the Prepetition Collateral, as the same existed on the Petition Date; (ii) the Prepetition Term Loan Liens are valid, binding, enforceable, non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral; (iii) the Prepetition Term Loan Liens were granted to or for the benefit of the Prepetition Term Loan Secured Parties for fair consideration and reasonably equivalent value and were granted contemporaneously with, or covenanted to be provided as an inducement for, the making of the loans and/or commitments and other financial accommodations secured thereby; (iv) the Prepetition Term Loan Secured Indebtedness constitutes legal, valid, binding, and non-avoidable obligations of the Debtors and is enforceable in accordance with the terms of the Prepetition Term Loan Documents; (v) the Prepetition Term Loan Liens are subject and subordinate only to Permitted Prior Liens;[4] (vi) no offsets, challenges, |

---

[4] As used herein, "Permitted Prior Liens" shall mean any legal, valid, binding, perfected, enforceable liens on or security interests in the Prepetition Collateral in existence as of the Petition Date, or which are perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, in each case which have priority over the Prepetition Term Loan Liens and that are not subject to

| Material Term | Summary |
|---|---|
| | objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Term Loan Liens or Prepetition Term Loan Secured Indebtedness exist, and no portion of the Prepetition Term Loan Liens or Prepetition Term Loan Secured Indebtedness is subject to any challenge, cause of action, or defense, including impairment, set-off, right of recoupment, avoidance, attachment, disallowance, disgorgement, reduction, recharacterization, recovery, subordination, attack, offset, contest, defense, counterclaims, cross-claims, or "claim" (as defined in the Bankruptcy Code), pursuant to the Bankruptcy Code or applicable nonbankruptcy law or regulation, including in any Successor Cases; and (vii) the Debtors and their estates have no claims, objections, challenges, causes of actions, recoupments, counterclaims, cross-claims, setoff rights, and/or choses in action, including "lender liability" causes of action or avoidance claims under chapter 5 of the Bankruptcy Code, whether arising under applicable state law or federal law (including any recharacterization, subordination, avoidance, disgorgement, recovery, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), against the Prepetition Term Loan Secured Parties or any of their affiliates, agents, representatives, attorneys, advisors, professionals, officers, directors, and employees in such capacity arising out of, based upon, or related to the Prepetition Term Loan Documents, the Prepetition Term Loan Secured Indebtedness, or the Prepetition Term Loan Liens.<br>• None of the Prepetition Term Loan Secured Parties (i) control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Interim Order or the Prepetition Term Loan Documents, (ii) owe any fiduciary duty to the Debtors, their creditors, or estates or (iii) are deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management |

---

avoidance, recharacterization, offset, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law or other challenge.

| Material Term | Summary |
|---|---|
|  | of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act of 1980 or any similar federal or state statute).<br>• All of the Debtors' cash constitutes cash collateral of the Prepetition Term Loan Secured Parties within the meaning of Bankruptcy Code section 363(a).<br>• The Debtors do not maintain any bank accounts other than those accounts covered by any motion or order authorizing the Debtors to continue to use the Debtors' existing cash management system |
| **Reporting**<br>**Interim Order ¶ 4(d)** | The Debtors shall use reasonable best efforts to comply with those reporting requirements set forth in the Prepetition Term Loan Credit Agreement in a manner consistent with prior practices (other than the reporting requirements pursuant to Section 8.01(l) of the Prepetition Term Loan Credit Agreement) and shall further provide, subject to any applicable limitations set forth below, to (i) the Prepetition Term Loan Administrative Agent, (ii) the Prepetition Term Loan Advisors and (iii) Paul Weiss:<br>• weekly (or with such other frequency as may be agreed to between the Debtors and the Prepetition Term Loan Administrative Agent) calls with the Prepetition Term Loan Administrative Agent and the Prepetition Term Loan Advisors with respect to (a) business updates, (b) the Debtors' discussions with any potential financing party, strategic partner, or acquirer, (c) the status of any material litigation, litigation claims, and other claims, and (d) any other updates in form and scope reasonably agreed by the Debtors and the Prepetition Term Loan Administrative Agent;<br>• at the times specified in the Variance Report;<br>• in-person or teleconference presentations by the Debtors and/or their advisors to the Prepetition Term Loan Secured Parties, at mutually agreeable times, and at mutually agreeable places (to the extent such presentations are in-person);<br>• timely delivery of each Proposed Budget as set forth in the Interim Order;<br>• promptly provide notice to the Prepetition Term Loan Secured Parties of the Debtors' failure to maintain unrestricted cash of at least $2,600,000 at the end of any day;<br>• promptly, all written demands or claims related to or asserting any liens in respect of property or assets of the |

| Material Term | Summary |
|---|---|
| | Debtors (including liens imposed by law, such as landlord's, vendors', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers' and mechanics' liens and other similar liens) if the amount demanded or claimed exceeds $20,000 individually or $100,000 in the aggregate;<br>• promptly upon request after the end of each prior month, the amount of postpetition accrued and unpaid expenses and professional fees and expenses;<br>• promptly upon request after the end of each prior month, in form and detail reasonably acceptable to the Prepetition Term Loan Administrative Agent, (a) net receivables/payables due to third parties, (b) account payables and payments, and (c) accounts payable aging;<br>• as soon as reasonably practicable after written request from the Prepetition Term Loan Advisors, the Debtors will provide the Prepetition Term Loan Administrative Agent and the Prepetition Term Loan Advisors with reasonable access to any consultant, turnaround management, broker or financial advisory firm retained by the Debtors in these Chapter 11 Cases, and if requested, copies of all retention agreements for each such consultant; and<br>• all reasonable requests made by the Prepetition Term Loan Secured Parties. |
| **Waiver or Modification of the Automatic Stay** Interim Order ¶¶ 12; 4(f)(3) | The Debtors are authorized and directed to perform all acts and to make, execute, and deliver any and all instruments as may be necessary to implement the terms and conditions of the Interim Order and the transactions contemplated hereby. The stay of section 362 of the Bankruptcy Code will be modified to permit the parties to accomplish the transactions contemplated by the Interim Order.<br><br>The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified to the extent necessary to permit the Prepetition Term Loan Administrative Agent to perform any act authorized or permitted under or by virtue of the Interim Order including, without limitation, to take any act to create, validate, evidence, attach or perfect any of the Adequate Protection Liens and to receive any payments expressly authorized by the Interim Order with respect to the Prepetition Term Loan Secured Indebtedness or adequate protection. |

| Material Term | Summary |
|---|---|
| | Following the delivery of a Termination Declaration, unless the Court has determined after the procedures set forth in the Interim Order that a Termination Event has not occurred and/or is not continuing or the Court orders otherwise, the automatic stay, as to all of the Prepetition Term Loan Secured Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order |
| **Milestones**<br>**Interim Order Exhibit 2** | The Debtors and the Prepetition Term Loan Secured Parties have agreed to the following milestones:<br><ul><li>No later than one (1) calendar day following the Petition Date, the Debtors shall have filed all first day motions, including (i) a motion seeking entry of the Interim Order and (ii) a motion for approval of bidding procedures for the marketing and sale of all of any or all their assets pursuant to section 363 of the Bankruptcy Code, including approval of a stalking horse purchaser acceptable to the Prepetition Term Loan Lenders (the "<u>Sale Motion</u>" and such bidding procedures, the "<u>Bidding Procedures</u>"), in each case which motions and all related documents shall be in form and substance reasonably acceptable to the Prepetition Term Loan Lenders.</li><li>No later than three (3) calendar days following the Petition Date (subject to extension to the extent necessary to accommodate the Court's availability), the Bankruptcy Court shall have entered the Interim Order, which order shall provide that, subject to paragraphs 19 and 24 of the Interim Order or any applicable corresponding paragraphs of the Final Order, entry of the Final Order, and agreement between the Prepetition Term Loan Administrative Agent and the Debtors on the principal terms of a chapter 11 liquidating plan for the Debtors, the Debtors are authorized and directed, upon the closing of a sale of any of the Prepetition Collateral, to immediately pay all proceeds of any such sale (net of all transaction costs and expenses reasonably acceptable to the Prepetition Term Loan Administrative Agent or approved in any order of this Court) to the Prepetition Term Loan Administrative Agent to satisfy the Prepetition Term Loan Secured Indebtedness until paid in full, and any order approving the sale of such Prepetition Collateral shall provide that the sale is conditioned upon the payment of such Prepetition Term Loan Secured Indebtedness until paid in full (except in each case to the extent otherwise agreed in writing by the Prepetition Term Loan Administrative Agent); provided that notwithstanding the foregoing, a</li></ul> |

| Material Term | Summary |
|---|---|
| | portion of such sale proceeds shall be retained by the Debtors and used to fund the cost of the Chapter 11 Cases pursuant to a budget (i) to be agreed by the Debtors and the Prepetition Term Loan Administrative Agent or (ii) otherwise approved by the Court.<br>• No later than twenty-three (23) calendar days after the Petition Date (subject to extension to the extent necessary to accommodate the Court's availability), the Bankruptcy Court shall have entered an order approving the Bidding Procedures, which order shall be in form and substance acceptable to the Prepetition Term Loan Lenders.<br>• The Bankruptcy Court shall have held the Final Hearing and entered the Final Order no later than thirty-five (35) calendar days following the Petition Date (subject to extension to the extent necessary to accommodate the Court's availability).<br>• No later than forty-seven (47) calendar days after the Petition Date (subject to extension to the extent necessary to accommodate the Court's availability), the Bankruptcy Court shall have entered an order(s) approving the sale(s) under the Sale Motion (the "Sale Order(s)"), which order(s) shall be in form and substance acceptable to the Prepetition Term Loan Lenders.  The Sale Order(s) shall provide that, subject to paragraphs 19 and 24 of the Interim Order or any applicable corresponding paragraphs of the Final Order, entry of the Final Order, and agreement between the Prepetition Term Loan Administrative Agent and the Debtors on the principal terms of a chapter 11 liquidating plan for the Debtors, the Debtors are authorized and directed, upon the closing of a sale of any of the Prepetition Collateral, to immediately pay all proceeds of any such sale (net of all transaction costs and expenses reasonably acceptable to the Prepetition Term Loan Administrative Agent or approved in any order of this Court) to the Prepetition Term Loan Administrative Agent to satisfy the Prepetition Term Loan Secured Indebtedness until paid in full, and any order approving the sale of such Prepetition Collateral shall provide that the sale is conditioned upon the payment of such Prepetition Term Loan Secured Indebtedness until paid in full (except in each case to the extent otherwise agreed in writing by the Prepetition Term Loan Administrative Agent); provided that notwithstanding the foregoing, a portion of such sale proceeds shall be retained by the Debtors and used to fund the cost of the Chapter 11 Cases |

28

| Material Term | Summary |
|---|---|
| | pursuant to a budget (i) to be agreed by the Debtors and the Prepetition Term Loan Administrative Agent or (ii) otherwise approved by the Court. <br>• If applicable, no later than fifty-seven (57) calendar days after the Petition Date, the Debtors shall have consummated the sale(s) approved pursuant to the Sales Motion. <br>• No later than seventy (70) calendar days after the Petition Date (subject to extension to the extent necessary to accommodate the Court's availability), the Debtors shall have obtained conditional approval of a disclosure statement (the "<u>Disclosure Statement</u>") in accordance with a chapter 11 plan reasonably acceptable to the Prepetition Term Loan Lenders (the "<u>Plan</u>"). <br>• No later than one hundred and five (105) calendar days after the Petition Date (subject to extension to the extent necessary to accommodate the Court's availability), the Court shall have entered an order granting final approval of both the Disclosure Statement and the Plan. <br>• No later than one hundred and twenty (120) calendar days after the Petition Date, the effective date of the Plan shall have occurred. |
| **Cross-collateralization** | None. |
| **Rollup** | None. |
| **Releases** <br> **Interim Order ¶ 15** | Effective upon entry of the Interim Order, the Debtors shall, to the maximum extent permitted by applicable law, unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge each of the Prepetition Term Loan Secured Parties (each in their roles as such), and each of their affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, agents, and predecessors in interest, each in their capacity as such, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating |

29

| Material Term | Summary |
|---|---|
| | to the Prepetition Term Loans, the Prepetition Term Loan Liens, the Prepetition Term Loan Secured Indebtedness, the Prepetition Term Loan Documents, or the Interim Order, as applicable, and/or the transactions contemplated hereunder or thereunder, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the Prepetition Term Loan Secured Parties; *provided, however*, that no such parties will be released to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such parties' gross negligence, fraud, or willful misconduct. |
| **Surcharge** **Interim Order ¶ 10** | Except to the extent of the Carve Out, subject to entry of the Final Order, all rights to surcharge the interests of the Prepetition Term Loan Secured Parties in any Prepetition Collateral or any Collateral under section 506(c) of the Bankruptcy Code or any other applicable principle or equity or law shall be and are hereby finally and irrevocably waived, and such waiver shall be binding upon the Debtors and all parties in interest in these Chapter 11 Cases. |
| **Marshaling** **Interim Order ¶ 26** | Subject to entry of the Final Order granting such relief, the Prepetition Term Loan Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral or the Collateral. |
| **Equities of the Case** **Interim Order ¶ 25** | Subject to entry of the Final Order, (i) the Prepetition Term Loan Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and (ii) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the Prepetition Term Loan Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral or the Collateral. |
| **Sale Proceeds** **Interim Order ¶ 28** | Subject to paragraphs 19 and 24 of the Interim Order, entry of the Final Order, and agreement between the Prepetition Term Loan Administrative Agent and the Debtors on the principal terms of a chapter 11 liquidating plan for the Debtors, the Debtors are authorized and directed, upon the closing of a sale of any of the Prepetition Collateral, to immediately pay all proceeds of any such sale (net of all transaction costs and expenses reasonably acceptable to the Prepetition Term Loan Administrative Agent or approved in any order of this Court) to the Prepetition Term Loan Administrative Agent to satisfy the Prepetition Term Loan Secured Indebtedness until paid in full, and any order approving |

| Material Term | Summary |
|---|---|
| | the sale of such Prepetition Collateral shall provide that the sale is conditioned upon the payment of such Prepetition Term Loan Secured Indebtedness until paid in full (except in each case to the extent otherwise agreed in writing by the Prepetition Term Loan Administrative Agent); *provided* that notwithstanding the foregoing, a portion of such sale proceeds shall be retained by the Debtors and used to fund the cost of the Chapter 11 Cases pursuant to a budget (i) to be agreed by the Debtors and the Prepetition Term Loan Administrative Agent or (ii) otherwise approved by the Court. |
| **Final Hearing** Interim Order ¶ 35 | The Debtors request the scheduling of a final hearing (the "Final Hearing") to consider entry of an order granting the relief requested in the Motion on a final basis (the "Final Order"). |

**The Debtors' Prepetition Capital Structure**

12.    As of the Petition Date, the Debtors' prepetition funded indebtedness consisted of

the following:

| Name | Principal Amount (approx.) | Lien Priority and Collateral |
|---|---|---|
| **Tranche A** | $101,505,257.60 | Substantially all of the Debtors' assets. |
| **Tranche B** | $20,020,022.95 | Substantially all of the Debtors' assets. |
| **Trade and Related Debt** | $2,078,144.65 | None |
| **Equity** | 23.9 million shares of common stock issued and outstanding | None |
| **Total** | $123,603,425.20 | |

31

A. **Prepetition Term Loans**

13.     On March 17, 2022, Impel entered into that certain Credit Agreement and Guaranty (as from time to time amended and restated, the "Prepetition Term Loan Credit Agreement" and the loans made thereunder, the "Prepetition Term Loans") and related security agreements (together with the Prepetition Term Loan Credit Agreement, the "Prepetition Term Loan Documents"), dated as of March 17, 2022, with Oaktree Fund Administration, LLC ("Oaktree"), as Administrative Agent (as defined in the Prepetition Term Loan Credit Agreement and, in such capacity and including any successors thereto, the "Prepetition Term Loan Administrative Agent"), the subsidiary guarantors from time to time party thereto (the "Prepetition Term Loan Guarantors") and the lenders from time to time party thereto (such lenders, the "Prepetition Term Loan Lenders" and, together with the Prepetition Term Loan Administrative Agent, the "Prepetition Term Loan Secured Parties") in the original principal amount of $50.0 million.  The Prepetition Term Loans mature on March 17, 2027, and bear interest at a rate of the Secured Overnight Financing Rate ("SOFR") + 10.75% (with a SOFR floor of 1.00%).[5]  Under the Prepetition Term Loan Documents, Impel is required to make quarterly interest-only payments, with the remaining balance of principal and interest due on maturity.  Under the Prepetition Term Loan Documents, Impel is subject to a minimum liquidity requirement of $12.5 million unrestricted cash balance at all times (the "Minimum Liquidity Covenant").

14.     The Prepetition Term Loans are secured by substantially all real, personal, and mixed property of Impel, including equity interests.  The Prepetition Term Loan have no guarantors or other obligors other than Impel.

---

[5] As more fully described below, prior to the First Senior Credit Agreement Amendment, the Prepetition Term Loan Loans bore interest at a rate of SOFR + 8.00% (with a SOFR floor of 1.00%).

### i.      Impel's Breach of the Minimum Liquidity Covenant

15.      On July 19, 2023, Impel provided notice to Oaktree that Impel was in breach of the Minimum Liquidity Covenant.  Impel's breach of the Minimum Liquidity Covenant constituted an event of default under the Senior Secured Credit Agreement and triggered, among other things, the application of a higher default rate of interest on the Senior Secured Loans.

### ii.      Amendments to the RIFA and Prepetition Term Loan Credit Documents

16.      Subsequently, Impel, Oaktree, the Revenue Purchasers, and the Prepetition Term Loan Lenders entered into two amendments to both the Prepetition Term Loan Credit Agreement and the Revenue Interest Financing Agreement and related security agreements (as from time to time amended and restated, the "RIFA")[6], the second of which resulted in the termination of the RIFA.  After the RIFA was terminated, Impel, Oaktree, and the Prepetition Term Loan Lenders entered into two additional amendments to the Prepetition Term Loan Credit Agreement and four letter agreements granting Impel certain relief and modifying the terms of the Prepetition Term Loan Credit Agreement.[7]

17.      Pursuant to the *First Amendment to Credit Agreement and Guaranty and Revenue Interest Financing Agreement*, dated as of August 21, 2023 (the "First Prepetition Term Loan Credit Agreement Amendment"), the Prepetition Term Loan Lenders provided an incremental $12 million of aggregate principal amount of Prepetition Term Loan Loans, of which (i) $3 million consisted of a new money Senior Secured Term Loans and (ii) $9 million was made pursuant to

---

[6] The RIFA was terminated on September 5, 2023 in connection with the Second Prepetition Term Loan Credit Agreement Amendment.

[7] Impel, Oaktree, and the Prepetition Term Loan Lenders entered into a letter agreement dated as of October 19, 2023, a letter agreement dated as of November 7, 2023, a letter agreement dated as of December 14, 2023 and a letter agreement dated as of December 16, 2023.

an exchange of $9 million of obligations owed to the Purchasers under the RIFA for $9 million of

Prepetition Term Loans.  Under the First Prepetition Term Loan Credit Agreement Amendment,

the parties agreed that the Default Rate would no longer apply and the non-default interest rate

under the Prepetition Term Loan Credit Agreement would be increased to SOFR + 10.75%.

18.    On September 5, 2023, Impel entered into the *Second Amendment to Credit Agreement and Guaranty and Revenue Interest Financing Agreement* with Oaktree, the Revenue Purchasers, and the Prepetition Term Loan Lenders (the "Second Prepetition Term Loan Credit Agreement Amendment").  In connection with the Second Prepetition Term Loan Credit Agreement Amendment:

- The Prepetition Term Loan Lenders agreed to provide Impel with up to $20 million of Tranche B Term Loans (as defined in the Prepetition Term Loan Credit Agreement) under the Prepetition Term Loan Credit Agreement;

- Impel drew down $4.5 million of Tranche B Term Loans, which amount was placed into a blocked account, to be released to Impel upon Impel's board of directors (the "Board") notifying Oaktree that Impel in good faith expected to commence proceedings under chapter 11 of the Bankruptcy Code and required such amounts to finance preparations for such chapter 11 filing (the "Blocked Account");

- Certain Prepetition Term Loan Lenders exchanged $3.0 million of previously-existing Prepetition Term Loan Loans on a dollar-for-dollar basis for Tranche B Term Loans;

- The Prepetition Term Loan Lenders exchanged (i) all of the then-accrued $51.4 million of Prepetition Term Loan Loans (inclusive of interest) attributable to the initial funding under the Prepetition Term Loan Credit Agreement and (ii) $9.1 million of Prepetition Term Loan Loans (inclusive of interest) made in connection with the First Prepetition Term Loan Credit Agreement Amendment, in each case on a dollar-for-dollar basis for Tranche A Term Loans (as defined in the Prepetition Term Loan Credit Agreement);

- The Revenue Purchasers exchanged $36.0 million of obligations under the RIFA on a dollar-for-dollar basis for Tranche A Term Loans, and the RIFA, including all remaining obligations of Impel as well as any rights of the Revenue Purchasers to future revenue interest payments, was terminated;

- Oaktree and the Prepetition Term Loan Lenders agreed to forbear from remedies with respect to Impel's failure to comply with the Minimum Liquidity Covenant until December

31, 2023, unless earlier terminated under the terms of the Prepetition Term Loan Credit Agreement (the "Forbearance Period") in exchange for Impel's payment to the Senior Secured Lenders of an in-kind $5 million forbearance fee in the form of Tranche A Term Loans;

- The Prepetition Term Loan Credit Agreement was amended to permit all interest on the Prepetition Term Loan Loans to be paid in kind through the Forbearance Period; and

- The as-amended Prepetition Term Loan Credit Agreement provided for up to an additional $12.5 million of Tranche B Loans to be made available to Impel over the remainder of 2023, subject to the satisfaction of certain strategic milestones and covenants (the "Prepetition Milestones" and the Prepetition Term Loan Loans to be made in connection therewith the "Milestone Payments").

19.     On October 2, 2023, Impel entered into that certain *Third Amendment to Credit Agreement and Guaranty* with Oaktree and the Prepetition Term Loan Lenders (the "Third Prepetition Term Loan Credit Agreement Amendment").  Pursuant to the Third Prepetition Term Loan Credit Agreement Amendment, Oaktree and the Prepetition Term Loan Lenders waived certain events of default under the Prepetition Term Loan Credit Agreement and modified the terms of the Prepetition Milestones, including to permit $5 million of Milestone Payments to be made concurrently therewith, notwithstanding such events of default, and to modify the terms of certain later Prepetition Milestones.

20.     On October 19, 2023, Impel entered into that certain letter agreement with Oaktree and the Prepetition Term Loan Lenders (the "October 19 Letter Agreement").  Pursuant to the October 19 Letter Agreement, Impel, Oaktree and the Prepetition Term Loan Lenders agreed to modify terms of the Prepetition Term Loan Credit Agreement relating to a requirement that Impel cause an independent director to be appointed to the board of directors of Impel.

21.     On November 3, 2023, Impel entered into that certain *Fourth Amendment to Credit Agreement and Guaranty* with Oaktree and the Prepetition Term Loan Lenders (the "Fourth

Prepetition Term Loan Credit Agreement Amendment"). Pursuant to the Fourth Prepetition Term Loan Credit Agreement Amendment, the timing of certain Prepetition Milestones was modified.

22. On November 7, 2023, Impel entered into that certain letter agreement with Oaktree and the Prepetition Term Loan Lenders (the "November 7 Letter Agreement"). Pursuant to the November 7 Letter Agreement, Impel, Oaktree and the Prepetition Term Loan Lenders agreed to modify certain terms of the Prepetition Term Loan Credit Agreement restricting Impel from making payments to any directors, officers, equityholders or other persons who are "insiders" pursuant to Section 101(31) of the Bankruptcy Code or any affiliates thereof.

23. On December 14, 2023, Impel entered into that certain letter agreement with Oaktree and the Prepetition Term Loan Lenders (the "December 14 Letter Agreement"). Pursuant to the December 14 Letter Agreement, Impel, Oaktree and the Prepetition Term Loan Lenders agreed to further modify certain terms of the Prepetition Term Loan Credit Agreement restricting Impel from making payments to any directors, officers, equityholders or other persons who are "insiders" pursuant to Section 101(31) of the Bankruptcy Code or any affiliates thereof.

24. On December 16, 2023, Impel entered into that certain letter agreement with Oaktree and the Prepetition Term Loan Lenders (the "December 16 Letter Agreement" and, together with the First Prepetition Term Loan Credit Agreement Amendment, Second Prepetition Term Loan Credit Agreement Amendment, Third Prepetition Term Loan Credit Agreement Amendment, October 19 Letter Agreement, Fourth Prepetition Term Loan Credit Agreement Amendment, November 7 Letter Agreement, and December 14 Letter Agreement, the "Prepetition Term Loan Credit Agreement Amendments"). Pursuant to the December 16 Letter Agreement, Impel, Oaktree and the Prepetition Term Loan Lenders agreed that the Prepetition Term Loan Lenders would fund an additional $2.5 million in Tranche B Term Loans notwithstanding (i) the

36

occurrence and continuation of certain Events of Default (as defined in the Prepetition Term Loan

Credit Agreement) and (ii) the non-satisfaction of certain conditions precedent to the availability

of such Tranche B Term Loans.

**B.**      **Trade and Related Debt**

25.      As of the Petition Date, the Debtors estimate that they have approximately

$2,078,144.65 in obligations to trade and other general unsecured creditors.  These amounts consist

primarily of accounts payable to various trade creditors and other third-party service providers as

of the Petition Date.

**C.**      **Equity**

26.      Impel's equity is publicly traded, with Impel authorized to issue 10 million shares

of preferred stock and 300 million shares of common stock.  As of December 14, 2023, Impel had

no preferred shares issued or outstanding and approximately 23.9 million shares of common stock

issued and outstanding.

### The Prepetition Term Loan Secured Parties Consent to the Interim Order

27.      The Debtors and Prepetition Term Loan Secured Parties have agreed to the terms

of the Interim Order, which will provide the Debtors with sufficient operating and non-operating

liquidity to continue operations in the ordinary course and fund these chapter 11 cases until entry

of the Final Order.  No other parties have an interest in or right to the Cash Collateral under the

various loan documents.

### Debtors' Urgent Need for Use of Cash Collateral

28.      As discussed in the First Day Declaration, the Debtors urgently need to use the

Cash Collateral for both the ongoing operation of their business and to fund the administration of

these chapter 11 cases.  The income from the sale of Trudhesa continues to accrue in the Debtors'

bank accounts, which the Debtors estimate holds approximately $5,158,362 as of the Petition Date.

Without access to these funds, the Debtors will not have sufficient liquidity to pay employee wage

costs, insurance or taxes on the real property, pay vendors or other general unsecured creditors for

necessary services, manage repairs and other capital expenditures at the properties, or pay the

administrative expenses of these chapter 11 cases.  All of the foregoing expenditures are necessary

to preserve the value of the Debtors' estates as a going concern.

29.     Without immediate access to the Cash Collateral, the Debtors would be forced to

shutter operations and dismiss these chapter 11 cases, damaging the Debtors' prospects as a going

concern and denying creditors with the right to fair and impartial distribution of the Debtors' assets

in accordance with the principles of bankruptcy law.  Any delay in the Debtors' ability to access

Cash Collateral beyond such date would irreparably harm the Debtors and their estates.

Accordingly, the Debtors respectfully request that the Court authorize the use of Cash Collateral

on the terms and conditions set forth in the Interim Order.

## Basis For Relief Requested

30.     A debtor's use of property of the estate, including cash collateral, is governed by

section 363 of the Bankruptcy Code, which provides, in pertinent part, as follows:

> If the business of the debtor is authorized to be operated under
> section . . . 1108 . . . of [the Bankruptcy Code] and unless the court
> orders otherwise, the [debtor] may . . . use property of the estate in
> the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  A debtor may use cash collateral (a) with the consent of the secured party

or (b) without the consent of the secured party if the court, after notice and a hearing, authorizes

the debtor to use cash collateral in accordance with the provisions of section 363 of the Bankruptcy

Code.

31.     Section 363 of the Bankruptcy Code further provides that a debtor must "provide adequate protection" of the secured party's interest in the property against any diminution in value of such interest resulting from the debtor's use of the property.  *See* 11 U.S.C. § 363(3).  Notably, the Bankruptcy Code does not define "adequate protection." Instead, section 361 of the Bankruptcy Code provides a non-exhaustive list of examples of adequate protection, including cash payments, additional or replacement liens and other relief that will "result in the realization by such [secured party] of the indubitable equivalent of such entity's interest in such property."  *See* 11 U.S.C. § 361.  Generally, courts decide what constitutes adequate protection on a case-by-case basis.  *See In re Braniff Airways, Inc.*, 783 F.2d 1283, 1286 (5th Cir. 1986*); see also In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01 [1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding"); *In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis").

32.     The focus of the adequate protection requirement is to preserve the secured party's position at the time of the bankruptcy filing and protect the secured party from diminution in the value of its collateral during the reorganization process. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d at 564 ("The whole purpose of adequate protection for a creditor is to insure that the creditor

receives the value for which he bargained prebankruptcy") (quoting *In re O'Connor*, 808 F.2d
1393, 1396 (10th Cir. 1987)); *see also In re WorldCom, Inc.*, 304 B.R. 611, 618–19 (Bankr.
S.D.N.Y. 2004) ("The legislative history for section 361 of the Bankruptcy Code, which sets forth
how adequate protection may be provided under section 363, makes clear that the purpose . . . is
to insure that the secured creditor receives the value for which the creditor bargained for prior to
the debtor's bankruptcy."). "However, neither the legislative history nor the Bankruptcy Code
require the Court to protect a creditor beyond what was bargained for by the parties." *In re
WorldCom, Inc.*, 304 B.R. at 619.

33.     Furthermore, the Bankruptcy Code mandates that a secured party be protected
against diminution in the value of its interest in cash collateral only during the period of use. *See
In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding that if
there is no diminution in the value of the secured party's collateral and the debtor can operate
profitably postpetition, then the secured creditor is adequately protected against the use of cash
collateral); *In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539–40 (Bankr. D. Del. 1992) (noting that a
secured party is only entitled to adequate protection to the extent the collateral declined in value);
*see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal
of adequate protection is to safeguard the secured creditor from diminution in the value of its
interest during the chapter 11 reorganization."). The preservation of a debtor's business as a going
concern itself provides "adequate protection" under the Bankruptcy Code. *See In re 495 Cent.
Park Ave. Corp.*, 136 B.R. at 631 (noting that whether the value of a debtor's property will increase
as a result of the use of collateral is part of considering whether a party is adequately protected).

34.     Here, in the interest of reaching a consensual Interim Order with the Prepetition
Term Loan Secured Parties, the Debtors have offered as additional adequate protection:

(a) replacement liens and security interests on any post-petition property acquired by the Debtors; (b) amounts necessary to reimburse the Prepetition Term Loan Administrative Agent for the fees, costs, and charges incurred on and after the Petition Date; and (c) an Adequate Protection Superpriority Claim junior to only the Carve Out. Courts in this and other districts have approved similar adequate protection provisions in recent chapter 11 cases. *See, e.g., In re Tuesday Morning*, Case No. 23-90001 (ELM) (Bankr. N.D. May 19, 2023 [ECF No. 1100]; *In re Tuesday Morning*, Case No. 20-31476 (HDH) (Bankr. N.D. Tex. May 28, 2020) [ECF No. 67] (authorizing use of cash collateral); *In re J. Hilburn, Inc.*, Case No. 20-31308 (HDH) (Bankr. N.D. Tex. May 6, 2020) [ECF No. 25] (same); *In re PFO Global, Inc.*, Case No. 17-30355 (HDH) (Bankr. N.D. Tex. Feb. 3, 2017] [ECF No. 23] (same); *In re Forest Park Medical Center at Fort Worth, LLC*, Case No. 16-40198 (RFN) (Bankr. N.D. Tex. Feb. 1, 2016) [ECF No. 41] (same); *In re TPP Acquisition, Inc.*, Case No. 16-33437 (HDH) (Bankr. N.D. Tex. Sep. 8, 2016) [ECF No. 68] (same); *In re BFN Operations LLC*, Case No. 16-32435 (BJH) (Bankr. N.D. Tex. Jul. 25, 2016) [ECF No. 49] (same). In light of the adequate protection offered herein, the Debtors submit that the Prepetition Term Loan Secured Parties' interests in the Collateral will be protected through the pendency of these chapter 11 cases.

35.     The use of Cash Collateral will permit the Debtors to continue operating their business and administer these chapter 11 cases for the benefit of all creditors and other parties in interest.  In addition, the Adequate Protection provided for herein is fair and reasonable under the circumstances of these cases.  Therefore, the Debtors submit that the terms of the Interim Order and Final Orders are reasonable and in the best interests of the Debtors' estates and creditors and request that the Court authorize the use of Cash Collateral according to the terms set forth herein.

**D.      Modification of the Automatic Stay Is Warranted.**

36.      The relief requested herein contemplates a modification of the automatic stay to (a) permit the Debtors to grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens and (b) as otherwise, and to the extent necessary, to effectuate the terms of the Interim Order.  These provisions were part of the quid pro quo for the Debtors' ability to use cash collateral as provided in the Interim Order.  Notably, the exercise of remedies (including remedies with respect to prepetition claims and collateral) will be subject to five (5) business days' notice to allow the Debtors to cure or seek other relief.  *See* Interim Order ¶ 7(b).  Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the Interim Order is reasonable and should be approved.

**E.      Immediate Access to Cash Collateral Should Be Approved.**

37.      The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See In re Ames Dep't Stores*, 115 B.R. at 36.

38.      Here, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.  The Debtors have an immediate need for continued access to cash collateral, and any disruption in the use of cash collateral would cause a severe decrease in the value of the Debtors' estates by preventing the Debtors from making necessary disbursements necessary and otherwise operating in the ordinary course.  First Day

Dec. ¶ 158.   As set forth in the Approved Budget, the Debtors expect that they will need approximately $7.5 million during the interim period and approximately $10.4 million through the course of these cases.  First Day Dec. ¶ 159.  Absent interim relief, the Debtors will be unable to, among other things, fund payroll for employees, satisfy their other working capital and general corporate requirements, and continue operating their business.  First Day Dec. ¶ 158.  As noted, particularly given short shelf life of Trudhesa, even a short-term shut down of the Debtors' operations could result in a significant deterioration in the value of the Debtors' businesses to the detriment of all stakeholders.  First Day Dec. ¶ 160.  Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avoid the value destruction that would otherwise result in immediate and irreparable harm to the Debtors' estates.

## Emergency Consideration

39.      Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  Failure to receive the relief requested in this motion during the first twenty-one days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture, jeopardizing the Debtors' ability to run a value maximizing sale process for the benefit of its creditors and parties in interest.  The Debtors have satisfied the "immediate and irreparable" harm standard in Bankruptcy Rule 6003 and request that the Court approve the relief requested on an emergency basis.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

40.      The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to

exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion.

## Reservation Of Rights

41.    Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any party in interest's rights to dispute any claim or interest on any grounds; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (f) a request for or approval to assume, adopt, or reject any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

## Notice

42.    The Debtors will provide notice of this motion to the following: (a) the U.S. Trustee for the Northern District of Texas; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) Oaktree Fund Administration, LLC as agent to the Debtors' secured lenders, and counsel thereto; (d) counsel to the Secured Lenders; (e) the United

44

States Attorney's Office for the Northern District of Texas; (f) the Food and Drug Administration;

(g) the Internal Revenue Service; (h) the United States Securities and Exchange Commission;

(i) the state attorneys general for states in which Debtors conduct business; and (j) any party that

has requested notice pursuant to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No

other or further notice is needed in light of the nature of the relief requested.

*[Remainder of page intentionally left blank.]*

The Debtors request entry of an order, substantially in the form attached hereto, granting

the relief requested herein and granting such other relief as is just and proper.

Dated: December 20, 2023
Dallas, Texas

**SIDLEY AUSTIN LLP**

/s/ *Rakhee V. Patel*
Samuel A. Newman (*pro hac vice* pending)
555 West Fifth Street
Los Angeles, California 90013
Telephone:     (213) 896-6000
Facsimile:     (213) 896-6600
Email:          sam.newman@sidley.com

Rakhee V. Patel (TX Bar No. 00797213)
Nathan C. Elner (*pro hac vice* pending)
Parker G. Embry (TX Bar No. 24126826)
Chelsea M. McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:          rpatel@sidley.com
               nelner@sidley.com
               parker.embry@sidley.com
               cmcmanus@sidley.com

Jackson T. Garvey (*pro hac vice* pending)
One South Dearborn
Chicago, IL 60603
Telephone:     (312) 853-7000
Facsimile:     (312) 853-7036
Email:          jgarvey@sidley.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## Certificate of Service

I certify that on December 20, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Rakhee V. Patel*
Rakhee V. Patel