SIDLEY AUSTIN LLP
Samuel A. Newman (*pro hac vice* pending)
555 West Fifth Street
Los Angeles, California 90013
Telephone:    (213) 896-6000
Facsimile:    (213) 896-6600
Email:        sam.newman@sidley.com


SIDLEY AUSTIN LLP
Jackson T. Garvey (*pro hac vice* pending)
One South Dearborn
Chicago, IL 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        jgarvey@sidley.com

SIDLEY AUSTIN LLP
Rakhee V. Patel (TX Bar No. 00797213)
Nathan Elner (TX Bar No. 24123173)
Parker G. Embry (TX Bar No. 24126826)
Chelsea McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        rpatel@sidley.com
              nelner@sidley.com
              parker.embry@sidley.com
              cmcmanus@sidley.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| IMPEL PHARMACEUTICALS INC., et al.[1] | Case No. 23-80016 (SGJ) |
| Debtors. | (Joint Administration Requested) (Emergency Hearing Requested) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I)(A) APPROVING THE BID PROCEDURES; (B) AUTHORIZING THE
DEBTORS TO SELECT JN BIDCO LLC AS THE STALKING HORSE PURCHASER
SUBSTANTIALLY ALONG THE TERMS DEFINED IN THE STALKING
HORSE APA AND APPROVING BID PROTECTIONS;
(C) ESTABLISHING BID DEADLINES, AN AUCTION, AND
A SALE HEARING; (D) APPROVING THE FORM AND MANNER OF SALE
NOTICE; (E) APPROVING ASSIGNMENT AND ASSUMPTION PROCEDURES;
(F) APPROVING THE FORM AND MANNER OF POTENTIAL ASSUMPTION AND
ASSIGNMENT NOTICE; (II)(A) AUTHORIZING THE SALE OF THE ASSETS FREE
AND CLEAR; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT
OF DESIGNATED CONTRACTS; AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, are:  Impel Pharmaceuticals Inc. (8238); and Impel NeuroPharma Australia Pty Ltd (N/A).  The Debtors' service address is 201 Elliot Avenue West, Suite 260, Seattle, WA 98119.

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") state as follows in support of this motion:

### Relief Requested

1.      The Debtors seek entry of an order, substantially in the form attached hereto (the "Bid Procedures Order"):

a.      approving the proposed bid procedures attached to the Bid Procedures Order as **Exhibit 1** (the "Bid Procedures") in connection with the Sale (as defined below) of the Assets (as defined below);

b.      authorizing the Debtors' to select JN Bidco LLC or its designee as the Stalking Horse Purchaser substantially along the terms defined in the *Asset Purchase Agreement Between Impel Pharmaceuticals Inc. and JN Bidco LLC* (the "Stalking Horse APA"), attached as **Exhibit 2** to the Bid Procedures Order;

c.      Authorizing and approving, if and to the extent payable pursuant to the terms of the Bid Procedures and the Stalking Horse APA, (i) a break-up fee (the "Break-up Fee" equal to $450,000 (i.e. approximately 2.6 % of the $17.5 million purchase price)); and (ii) the reimbursement from the Debtors of reasonable, documented out of pocket fees, costs, and expenses of the Stalking Horse Bid (as defined below) up to an amount equal to $300,000, in each of (i) and (ii), as more fully set forth in the Stalking Horse APA (the "Expense Reimbursement" and together with the Break-Up Fee, the "Bid Protections");

d.      establishing the dates and deadlines relating to the Bid Deadline, an auction for the Sale (the "Auction"), and, if necessary, a hearing to consider approval of the Sale (the "Sale Hearing");

e.      approving the form of notice of the Sale, the Bid Deadline, the Auction, and the Sale Hearing, substantially in the form attached to the Bid Procedures Order as **Exhibit 3** (the "Sale Notice");

f.      approving the assumption and assignment procedures attached to the Bid Procedures Order as **Exhibit 4** (the "Assumption and Assignment Procedures") for any executory contract or unexpired lease to be assumed by the Debtors and assigned to the bidder who submitted the highest or otherwise best bid (the "Winning Bidder") pursuant to section 365 of the Bankruptcy Code (defined below) (if any) (the "Designated Contracts");

g.      approving the form of notice to each non-Debtor counterparty to Designated Contracts (if any), substantially in the form attached to the Bid Procedures Order as **Exhibit 5** (the "Assignment Notice"); and

h.      granting related relief.

2.      In the event the Debtors determine to pursue consummation of a Sale in accordance with the Bid Procedures, the Debtors further seek entry of an order authorizing and approving (a) the sale of the Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests except to the extent otherwise set forth in the purchase agreement executed by the Debtors and the Winning Bidder, (b) the assumption and assignment of Designated Contracts (if any), and (c) granting related relief (the "Sale Order").

## Jurisdiction and Venue

3.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the Court's entry of a final order in connection with this motion.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The bases for the relief requested herein are sections 105(a) and 363 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and Section E of the Procedures for Complex Chapter 11 Cases in the Northern District of Texas (the "Complex Procedures").

## Background

6.      Impel Pharmaceuticals Inc. ("Impel") is a commercial-stage biopharmaceutical company with a mission to develop transformative therapies for people suffering from diseases

with high unmet medical needs, including the acute treatment of migraine headaches via Impel's flagship drug—Trudhesa.

7.      On December 19, 2023 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors and their business, including facts and circumstances giving rise to these chapter 11 cases is set forth in the First Day Declaration,[2] filed contemporaneously with this motion and incorporated by reference herein.

8.      The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors have requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these cases, and no statutory committee has been appointed.

**Declining Liquidity and Failed Efforts to Sell the Company**

9.      Since its inception, Impel has incurred losses from operations and generated negative cash flows from operating activities.  In 2022, Impel achieved 55% of its corporate sales goals and the trend continued into the first half of 2023.  Impel has therefore been dependent on its ability to raise additional capital to continue business operations.  *See* First Day Declaration ¶ 54.

10.      As more fully detailed in the First Day Declaration, Impel has consummated a number of successful capital raise efforts.  *See* First Day Declaration ¶ 51.  Impel has raised a total

---

[2] Capitalized terms used but not otherwise defined in this motion shall have the meanings ascribed to them in the *Declaration of Brandon Smith, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Proceedings* (the "First Day Declaration").

of $405.3 million in proceeds from issuance of its common stock, proceeds pursuant to the RIFA (as defined in the First Day Declaration), sale and issuance of redeemable convertible preferred stock, convertible notes, debt, and warrants as of September 30, 2023.  *See* First Day Declaration ¶ 56.

11.     Beginning in August 2022, Impel began talks with a potential strategic purchaser of Impel's assets.  Those discussions continued until approximately January 2023 and the potential acquirer submitted a letter of intent to acquire Impel.  However, as discussions continued, the potential acquirer terminated discussions and the transaction did not close.  *See* First Day Declaration ¶ 57.

12.     At the time of the collapse of the contemplated sale, Impel had less than 12 months of cash on hand.  Impel's Board determined to pursue an additional round of financing to meet liquidity needs in September 2022.  *See* First Day Declaration ¶ 58.  After extensive discussions and consideration of several presentations from Impel's advisors, the Board determined that it was in the best interest of Impel to continue investing in sales and marketing efforts to support growth of Trudhesa and demonstrate the attractiveness of the product to potential financing sources and strategic partners.  *See* First Day Declaration ¶ 59.

13.     In June 2023, Impel and its advisors progressed in its financing search with a number of interested parties.  However, the indications of interests were contingent on finding a "lead" investor.   When none materialized, the Debtors were ultimately unable to secure incremental financing.  *See* First Day Declaration ¶ 60.

14.     In July 2023, Impel was not in compliance with the minimum liquidity covenant of its Senior Credit Documents  (as defined in the First Day Declaration).  As such, in July 2023, the Board met to consider next steps to address the ongoing liquidity crisis.  In August 2023, Impel's

cash flow forecast indicated that its liquidity runway would run out by the first week of September 2023, particularly in light of lower than expected net sales of Trudhesa, tightening of the equity markets, and declining stock prices. The Board instructed management to engage advisors and establish a process whereby Impel and its advisors would review and evaluate various strategic alternatives available to the Company so that the Company could maintain its optionality while preserving assets and maximizing value for creditors and other parties in interest. *See* First Day Declaration ¶ 63–64.

15.     On August 7, 2023, the Board engaged Teneo, to serve as financial advisor to Impel. On August 16, 2023, Impel engaged Sidley Austin LLP ("Sidley Austin"), as legal counsel, to assist it in evaluation of potential restructuring transactions, including through a section 363 sale, strategic alternative process, or the amendment of its existing debt. On September 15, 2023, the Board approved the retention of Moelis & Company LLC ("Moelis"), as investment banker, to assist in marketing the Debtors' assets and soliciting potential purchasers. *See* First Day Declaration ¶ 65.

16.     Given Impel's liquidity position, the Board tasked Impel's management team and advisors with the evaluation of all strategic alternatives, including potential bridge financing, alternative capital raises, and a sale of the Debtors' assets so that Impel could maintain its optionality while preserving assets and maximizing value for creditors and other parties in interests. *See* First Day Declaration ¶ 66.

**The Debtors' Marketing Process**

17.     The Debtors, in consultation with Moelis, launched a prepetition marketing process for a sale of substantially all of the Debtors' assets (the "Assets") under section 363 of the Bankruptcy Code (the "Sale") on September 19, 2023. The Debtors conducted a robust prepetition marketing process (the "Marketing Process") primarily run by Moelis. Prior to the Petition Date,

Moelis contacted approximately 93 potential purchasers.  Of those ninety-three (93) potential purchasers, twenty-two (22) parties entered into nondisclosure agreements with the Debtors in order to gain access to the virtual data room.  Moelis shared teasers, a confidential information memorandum, financial models, other related financial and operational information, and a process letter with potential bidders.  Relevant information regarding the Debtors' business has been made available in the virtual data room, which includes more than 1,200 files comprising more than 46,500 pages of diligence.  The process letter provided to potential bidders included a deadline to submit an initial non-binding proposal by November 8, 2023.  Two (2) parties made non-binding offers by this bid deadline, two (2) additional parties submitted proposals following the bid deadline but prior to the Petition Date, and each of these parties engaged in negotiations and further diligence on a potential purchase.  Several additional parties articulated a desire to monitor the Debtors' in-court sale process and re-engage on a potential purchase.  No additional parties have come forward with a proposal since the bid deadline.

18.    After extensive discussions with potential purchasers and engaging with their key stakeholders, the Debtors, in an exercise of their business judgment, named JN Bidco LLC as stalking horse bidder for the Assets (the "Stalking Horse Purchaser"), on the terms and subject to the conditions more fully described under the Stalking Horse APA attached to the proposed Bid Procedures Order as **Exhibit 2** (the "Stalking Horse Bid") and in paragraphs 27 and 29 below.

19.    The Marketing Process was robust and appropriate to identify potential bidders for the Assets and, at this juncture, entry into the Stalking Horse Bid presents the best means to achieve the best available value of the Debtors' estates for all stakeholders.  *See* Contractor Declaration (as defined below) at ¶ 12.  Moelis continues to engage with additional potential bidders, and will

continue to do so until a transaction for a sale of a material portion of the Debtors' assets (a "Sale Transaction") is approved by this Court.  *Id.*

### The Bid Procedures and Sale Notice

20.      The Debtors seek approval of the Bid Procedures, attached to the Bid Procedures Order as **Exhibit 1**, to establish a clear and open process for the solicitation, receipt, and evaluation of bids on a timeline that would allow the Debtors to consummate a sale of the Assets.  The Debtors are seeking approval of a sale prior to February 12, 2024.

21.      The Bid Procedures set forth: (a) the requirements for participation in the bidding and sale process, including the criteria to be designated as a Qualified Bid (as defined in the Bid Procedures and to include the Stalking Horse Bid), (b) the process for the submission and evaluation of bids, (c) the requirements for participation in, and rules governing the conduct of, the Auction, (d) the process for approval of the Sale of the Assets to the Winning Bidder and the designation of a Backup Bidder (as defined in the Bid Procedures), and (e) all related dates and deadlines.

22.      The Bid Procedures recognize and comport with the Debtors' fiduciary obligations to maximize sale value, do not impair the Debtors' ability to consider all Qualified Bids made at or prior to the Auction, and preserve the Debtors' right to modify the Bid Procedures as necessary or appropriate to maximize value for the Debtors' estate.  *See Declaration of Ashish Contractor in Support of the Debtors' Motion for Entry of an Order (I)(A) Approving the Bid Procedures; (B) Authorizing the Debtors to select JN Bidco LLC as the Stalking Horse Purchaser Substantially Along the Terms Defined in the Stalking Horse APA and Approving Bid Protections; (C) Establishing Bid Deadlines, an Auction, and a Sale Hearing; (D) Approving the Form and Manner of Sale Notice; (E) Approving Assignment and Assumption Procedures; (F) Approving the Form and Manner of Potential Assumption and Assumption Notice; (II)(A) Authorizing the*

*Sale of the Assets Free and Clear; and (B) Approving the Assumption and Assignment of Designated Contracts; and (III) Granting Related Relief* attached hereto as **Exhibit B**. (the "Contractor Declaration") at ¶ 13–20.

23.     The Debtors urge that a prompt schedule for the sale of the Assets be established in these chapter 11 cases in order to maximize the value of the Debtors' estates.  *See* Contractor Declaration at ¶ 18–19.  Accordingly, the proposed Bid Procedures provide the following timeline for the marketing and bid process for each of the propose of the proposed Sale Transaction as follows:

| *SALE TRANSACTION MILESTONES* | |
| --- | --- |
| **EVENT OR DEADLINE** | **DATE AND TIME** (ALL IN PREVAILING CENTRAL TIME) |
| Petition Date | P = 0 (Tuesday, December 19, 2023) |
| Bid Procedures Objection Deadline | 7 days prior to the hearing to approve the Bid Procedures, at 4:00 pm CT |
| Initial Cure Notice Deadline | P + 17 (January 5, 2024) |
| Bid Procedures Hearing | P + 22 (January 10, 2024) at [TBD] |
| Service and Publication of Sale Notice | 1 business day after entry of the Bid Procedures Order or as soon as reasonably practicable thereafter |
| Bid Deadline[3] | P + 35 (January 23, 2024) at 4:00 pm |
| Sale Objection Deadline | P + 37 (January 25, 2024) at 4:00 pm |
| Cure Objection Deadline | P + 38 (January 26, 2024) at 4:00 pm |
| Determination of Qualified Bids | As soon as reasonably practicable following the Bid Deadline |
| Auction (if necessary) | P + 41 (January 29, 2024) at 9:00 am |
| Deadline to File Notice of Winning Bid | As soon as reasonably practicable following the Auction |
| Post-Auction Objection Deadline | P + 42 (January 30, 2024) at 4:00 pm |
| Sale Hearing | P + 44 (February 1, 2024) at [TBD] |
| Anticipated Closing Date | P + 55 (February 12, 2024) |

24.     The Debtors have an urgent need to sell the Assets quickly and efficiently.  The Budget attached as Exhibit 1 to the proposed interim order filed with the *Debtors' Emergency*

---

[3] The Debtors reserve their right, in their own discretion, to move the deadline for the submission of qualified bids.

*Motion for Entry of Interim and Final Orders Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Term Loan Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) and Granting Related Relief* filed contemporaneously herewith projects that, without the proceeds from the sale to the Stalking Horse Bid, the Debtors will deplete their remaining cash on hand by approximately the end of March. As a result, the Debtors are seeking approval of an expedited timeline for the Sale in an effort to ensure that the Debtors have sufficient cash reserves to reach consummation of the Sale.   The approximately five (5)-week postpetition marketing and bid process strikes an appropriate balance under the facts that exist here, including that the Debtors have extensively marketed the Assets prior to these chapter 11 cases and that the Debtors entered into the Stalking Horse APA with the Stalking Horse Purchaser to establish a floor for the purchase price of the Assets. *Id.* ¶ 19.

25.     The Debtors also request approval of the Sale Notice, substantially in the form attached to the Bid Procedures Order as **Exhibit 3**.  The Debtors propose to serve the Sale Notice on all known parties-in-interest in the chapter 11 case, and publish the sale notice on the Debtors' claims, noticing, and solicitation agent's website for the case.  The Debtors submit that service of the Sale Notice as set forth in the Bid Procedures is proper and sufficient to provide notice of the Auction, the deadline to object to the Sale Transaction, the deadline to object to the Cure Amounts, the deadline to object to the assumption and assignment of any desired contracts, and the Sale Hearing to all known and unknown parties.

### Stalking Horse Bidder and Bid Protections

26.     The Debtors and the Stalking Horse Purchaser have agreed upon the Stalking Horse APA, attached to the proposed Bid Procedures Order as **Exhibit 2**, whereby the Stalking Horse Purchaser will purchase the Assets.  The Debtors submit that the Stalking Horse APA promotes

competitive bidding and maximization of the value of the Assets by establishing a baseline bid in connection with the Bid Procedures.  *See* Contractor Declaration ¶ 24.

27.    The material terms of the Stalking Horse APA are summarized in the following table:[4]

| SUMMARY OF STALKING HORSE APA | |
|---|---|
| **Parties** | The Stalking Horse APA is entered into by and between JN Bidco LLC ("Buyer") and Impel Pharmaceuticals Inc. (the "Seller"). |
| **Purchase Price**<br><br>(Stalking Horse APA, Section 2.9) | At the Closing, Buyer will pay to Seller an amount equal to US $17,500,000. (the "Purchase Price").<br><br>For purposes of calculating the Break-Up Fee as a percentage of the Purchase Price, the Purchase Price includes only the $17,500,000 upfront purchase price and excludes any post-closing contingent consideration, which likely has significant option value.<br><br>As provided by Section 2.13 of the Stalking Horse APA, the Buyer is provided certain Additional Consideration, including Earn-out Payments, both as defined by the Stalking Horse APA.  These Earn-out Payments include:<br>• Ten percent (10%) of the amount, if any, by which the annual products Product Net Sales (as defined in the Stalking Horse APA) for each fiscal year exceeds $20,000,000 but are less than or equal to $45,000,000 during each fiscal year of the Earn-out Period (as defined in the Stalking Horse APA);<br>• Fifteen percent (15%) of the amount, if any, by which the annual Product Net Sales for each fiscal year exceeds $45,000,000 during each fiscal year of the Earn-out Period;<br>• A $4,000,000 one-time payment when the annual Product Net Sales equal or exceed $65,000,000 for a fiscal year during the Earn-out Period; and a $8,000,000 one-time payment when the annual Product Net Sales equal or exceed $100,000,000 for a fiscal year during the Earn-out Period. |
| **Purchased Assets**<br><br>(Stalking Horse APA, Section 2.1) | As more fully detailed in the Stalking Horse APA attached hereto, the Transferred Assets consist of the following assets, properties and rights of Seller and its Subsidiaries:<br>• The Trudhesa Assets;<br>• The POD Technology Assets;<br>• all supplies and other inventories Used in the Business;<br>• to the extent transferable, the Seller Permits (including any applications that are in process) Used in the Business; |

---

[4] The following summary is provided for convenience purposes only.  All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings ascribed such terms in the Stalking Horse APA attached to the Bid Procedures Order as Exhibit B.  To the extent any of the terms below are inconsistent with the Stalking Horse APA, the Stalking Horse APA shall control in all respects.

| SUMMARY OF STALKING HORSE APA |
| --- |

|  | • all Contracts to which a member of the Seller Group is a party and which are Used in the Business, all of which are listed on <u>Schedule 2.1(e)</u> to the Stalking Horse APA excluding Contracts that expire or are terminated prior to the Closing and all Designated Contracts that Purchaser elects to assume pursuant to <u>Section 5.3(b)</u> of the Stalking Horse APA; <br>• all material original books and records, documents, data and information of the Seller Group solely related to the Business, other than the Excluded Books and Records; <u>provided</u>, <u>however</u>, that the Seller Group shall be entitled to retain copies of any such materials; <br>• all rights to receive mail and other correspondences and communications (including electronic mail) addressed to Seller relating solely to the Product (including any such mail and other correspondence and communications (including electronic mail) from the FDA or any other Governmental Authority, customers, advertisers, suppliers, distributors, agents and others and payments with respect to the Product); <br>• the Owned Intellectual Property Assets, including that Intellectual Property set forth on <u>Schedule 2.1(g)</u> and all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to any member of the Seller Group with respect to such Intellectual Property, and (ii) claims and causes of action with respect to such Intellectual Property, whether accruing before, on, or after the Agreement Date, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation, or other violation thereof; <br>• all equipment, and other tangible personal property, including carts, dollies, office furniture and fixtures, computers, security systems, telephone and internet equipment and maintenance equipment and supplies, Used in the Business and owned by the Seller Group listed on <u>Schedule 2.1(h)</u>: <br>• all of the Seller Group's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller Group with respect to the Business, the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of the Seller Group or any their Affiliates to the extent solely related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities; <br>• all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent used in or held for use for the Transferred Assets listed in the clauses above or the Assumed Liabilities; <br>• all accounts receivable, intercompany obligations and other amounts receivable by the Seller Group; and |

| SUMMARY OF STALKING HORSE APA | |
|---|---|
| | • all inventory of the Seller Group. |
| **Excluded Assets**<br><br>(Stalking Horse APA, Section 2.2) | Notwithstanding anything to the contrary set forth in this Agreement or in any of the other Transaction Documents, the Parties expressly acknowledge and agree that nothing in this Agreement shall be construed to obligate any Seller to Transfer to Buyer any assets, properties or rights of Seller other than the Transferred Assets, that are not listed in Section 2.1 of the Stalking Horse APA, including the following (the "Excluded Assets"), which shall be excluded from the Transferred Assets.  The Excluded Assets of the Stalking Horse APA, include, but are not limited to:<br>• all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;<br>• all records, documents or other information exclusively relating to current or former employees of the Seller Group that are not hired by Purchaser, and any materials to the extent containing information about any employee, disclosure of which would violate Applicable Law or such employee's reasonable expectation of privacy;<br>• any interest of the Seller Group under this Agreement or the Related Documents, including the right to receive the Purchase Price and to enforce the Seller's rights and remedies thereunder;<br>• all Excluded Contracts (including all prepaid assets relating to the Excluded Contracts), other than the Assigned Contracts, to which any member of the Seller Group or any of their respective Affiliates is a party;<br>• any (i) Attorney-Client Information arising from communications prior to the Closing Date between a member of the Seller Group (including any one or more officers, directors or stockholders of such Seller Group member), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies;<br>• any rights of the Seller Group to Asset Tax refunds (or credits for overpayment of Taxes in lieu of a refund) attributable to any Pre-Closing Tax Period;<br>• all Permits (including applications therefor and any trade or import/export Permits) that (i) are not materially related to the Business or (ii) are not transferable to Purchaser under Applicable Law;<br>• the Excluded Books and Records;<br>• any assets not otherwise designated as Transferred Assets or from time to time designated by the parties hereto as Excluded Assets;<br>• the Avoidance Actions;<br>• all of the Seller Group's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller Group (including all guaranties, warranties, indemnities and similar rights in favor of the Sellers Group or any of their Affiliates) to the extent |

14

| SUMMARY OF STALKING HORSE APA | |
|---|---|
| | arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date; |
| | • all of the Seller Group's right, title and interest to any the assets set forth on Schedule 2.2(n) to the Stalking Horse APA; and |
| | • all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in the clauses above (APA § (a)-(m)). |
| **Assumed Liabilities**<br><br>(Stalking Horse APA, Section 2.3(a)) | The Purchaser is required to assume and agree to perform and discharge, when due, the following Assumed Liabilities: |
| | • all Liabilities relating to the Transferred Assets, whether incurred or arising prior to, at or after the Closing (other than those Liabilities relating to any breach, tort including any tort based on a failure to warn, failure to comply with law, failure to comply with industry standards, Nitrosamine Liabilities, or other wrongful conduct); |
| | • subject to Section 2.4 of the Stalking Horse APA, all Liabilities arising under the Assigned Contracts, whether incurred or arising prior to, at or after the Closing (other than those Liabilities relating to any breach, tort including any tort based on a failure to warn, failure to comply with law, failure to comply with industry standards, Nitrosamine Liabilities, or other wrongful conduct), and all of the Determined Cure Costs; |
| | • all Taxes for which Purchaser is liable pursuant to this Agreement; |
| | • all accounts payable and other intercompany obligations of the Seller Group to the extent related to the Business and arising following the Petition Date; and |
| | • other Liabilities that are listed on Schedule 2.3(d) to the Stalking Horse APA. |
| **Excluded Liabilities**<br><br>(Stalking Horse APA, Section 2.4) | Notwithstanding Section 2.3 of the Stalking Horse APA, Purchaser is assuming only the Assumed Liabilities of the Seller Group and will not assume or be liable for any Excluded Liabilities (including Seller Group Taxes), and the Seller Group shall retain and shall be responsible for, all Liabilities of that are not Assumed Liabilities, including all Liabilities related to Excluded Assets or any other liabilities of the Business (all such Liabilities not being assumed herein referred to as the "**Excluded Liabilities**"). |
| **Bid Protections**<br><br>(Stalking Horse APA, Section 9.3) | The Bid Protections consist of (i) a termination fee equal to $450,000 (i.e. approximately 2.6% of the $17.5 million purchase price); and (ii) the reimbursement from the Debtors of reasonable, documented out of pocket fees, costs, and expenses of the Bid up to an amount equal to $300,000, in each of (i) and (ii), as more fully set forth in the Stalking Horse APA. |

| SUMMARY OF STALKING HORSE APA | |
|---|---|
| | For purposes of calculating the Break-Up Fee as a percentage of the Purchase Price, the Purchase Price includes only the $17,500,000 upfront purchase price and excludes any post-closing contingent consideration which likely has significant option value. |
| **Termination Events**<br><br>(Stalking Horse APA, Section 9.1) | The Stalking Horse Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:<br><br>• by mutual written consent of Purchaser and Seller;<br><br>• automatically, upon (i) the consummation of a sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser (each, an "Alternate Transaction"), (ii) if, at close of the Auction, Purchaser's bid has not been selected as either the winning bid or the Back-Up Bid or (iii) if, at the close of the Auction, Purchaser's bid was selected as the Back-Up Bid, upon the consummation of a Competing Bid or Alternative Transaction;<br><br>• by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;<br><br>• by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if Purchaser is not selected as having the winning bid or Back-Up Bid at Auction, if any;<br><br>• by Purchaser if the Seller (i) withdraws the motion for the Sale Order, or publicly announces its intention to withdraw such motion, (ii) moves to voluntarily dismiss the Bankruptcy Cases, (iii) moves for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code, or (iv) moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases;<br><br>• by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in Section 8.1 or Section 8.2 of the Stalking Horse APA are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) 20 Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate the Stalking Horse APA pursuant to Section 9.1(f) of the Stalking Horse APA shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.3 of the Stalking Horse APA are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;<br><br>• by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured |

| SUMMARY OF STALKING HORSE APA | |
|---|---|
| | by Purchaser prior to the earlier of (i) 20 Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to Section 9.1(g) of the Stalking Horse APA shall not be available to the Seller if the failure of the Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.31 of the Stalking Horse APA are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in of the Stalking Horse APA; |
| | • by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; provided, however, that the right to terminate the Stalking Horse APA pursuant to Section 9.1(h) of the Stalking Horse APA shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement; or |
| | • by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on or prior to March 13, 2023 (the "Outside Date"); provided, however, that the party exercising the right to terminate this Agreement pursuant to Section 9.1(i) of the Stalking Horse APA shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement. |
| | • By Purchaser by written notice to the Seller if the Bankruptcy Court does not approve the Bid Procedures Order without any material modifications (other than such modifications reasonably acceptable to Purchaser) to the protections to Purchaser set forth in Section 9.3(a) or Section 9.3(b) of the Stalking Horse APA. |

28.    The Debtors submit that the purchase price agreed upon for the Assets in the Stalking Horse APA is the result of extensive, good-faith, arm's-length negotiations, and is currently the highest and best proposal.  The Debtors' proposed entry into the Stalking Horse APA for the Assets is in the best interest of the Debtors' estates and constitutes a good exercise of the Debtors' business judgment.  *See* Contractor Declaration Decl. ¶ 25.

17

29.     The Stalking Horse APA contains (a) a provision for expense reimbursement (the "Expense Reimbursement") not to exceed $300,000 following the termination of the Stalking Horse APA under certain circumstances, and (b) the Break-Up Fee equal to $450,000, which equates to approximately 2.6% of the cash Purchase Price,[5] payable in the event that the Stalking Horse APA is terminated under certain circumstances and the Debtors consummate an alternative transaction. *Id.* ¶ 26.  Based on the marketing process and arms'-length negotiations between the Debtors and the Stalking Horse Purchaser, the Debtors have determined that Bid Protections are necessary to retain the Stalking Horse Purchaser's commitment to the consummation of the Sale Transaction. *Id.* ¶ 27–29.  The Bid Protections, if earned, are deemed earned upon the occurrence of the specific events described in Sections 9.3(a) and 9.3(b) of the Stalking Horse APA. Additionally, for the avoidance of doubt, the Stalking Horse Purchaser shall not be required to include an amount in cash necessary to satisfy the Bid Protections as part of any Overbid (as defined in the Bid Procedures).

30.     The Debtors have agreed that their obligation to pay the Bid Protections pursuant to the Stalking Horse APA shall, upon entry of the Bid Procedures Order, constitute an allowed superpriority administrative expense of the Debtors with priority over any and all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code.

**The Assumption and Assignment Procedures and Assignment Notice**

31.     The Debtors are seeking approval of the Assumption and Assignment Procedures attached to the Bid Procedures Order as **Exhibit 4** in the event the Winning Bidder designates any contract or lease for assignment in the Winning Bid in accordance with the Bid Procedures.  In

---

[5] For purposes of calculating the Break-Up Fee as a percentage of the Purchase Price, the Purchase Price includes only the $17,500,000 upfront purchase price and excludes any post-closing contingent consideration.

such instance, the Assumption and Assignment Procedures (including service of the Assignment

Notice) will notify the counterparties to any Designated Contracts of the intended assumption and

assignment of their contracts and the Debtors' calculation of any cure cost.  The Debtors also

request approval of the Assignment Notice, substantially in the form attached to the Bid Procedures

Order as **Exhibit 5**.

**Bid Procedures and Sale Motion Key Terms**

32.     In accordance with Sections 17 and 19 of the Complex Procedures, below is a chart

highlighting the inclusion of certain key terms in the Motion, proposed Bid Procedures Order,

proposed Sale Order, or other documents.

| RELEVANT COMPLEX PROCEDURES PROVISION | SUMMARY[6] | LOCATION IN MOTION, BID PROCEDURES, OR ORDER |
|---|---|---|
| **Complex Procedures, Part E Section 17(c)**<br><br>*Releases, Exculpations and Indemnifications* | Section 10.6 of the Stalking Horse APA provides general releases effective as of the closing.  Those releases generally provide that the Seller and Purchaser, upon closing, are provided irrevocable and unconditional releases for all claims, Actions, causes of action, suits, rights, agreements, Liabilities and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. | Stalking Horse APA § 10.16 |
| **Complex Procedures, Part E Section 17(e)** | The Stalking Horse APA provides for an Outside Date of March 13, 2024.  The proposed order approving the Debtors' use of their secured lenders' cash collateral includes a milestone that | Stalking Horse APA § 9.1(i) |

---

[6] The summaries contained in herein are qualified in their entirety by the provision of the documents referenced.  To the extent anything in this summary is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the Motion, Bid Procedures Motion, or Proposed Sale Order, as applicable.

| *Closing and Other Deadlines* | the sale of the Debtors' assets must be completed by no later than February 14, 2024, and the Debtors anticipate closing the sale by no later than February 12, 2024 | |
|---|---|---|
| **Complex Procedures, Part E Section 17(f)**<br><br>*Good Faith Deposit* | The Stalking Horse APA required the Stalking Horse Purchaser to deposit $1,500,000 into the Deposit Escrow Account upon execution of the Stalking Horse APA, which occurred on December 18, 2023.<br><br>The Bid Procedures contemplate that to be deemed a Qualified Bid, a bid must be accompanied by a cash deposit by wire transfer to an escrow agent selected by the Debtors in an amount equal to 2.6% of the bidder's Proposed Purchase Price. A defaulting Winning Bidder's or Back-Up Bidder's Good Faith Deposit shall be forfeited to the Debtors.<br><br>This provision was included to ensure the good faith of prospective bidders. | Stalking Horse APA recitals; § 2.9<br><br>Bid Procedures § X |
| **Complex Procedures, Part E Section 17(i)**<br><br>*Record Retention* | Purchaser shall keep, for so long as required under Purchaser's internal records retention policies, books and records pertaining to the Product Net Sales of the Products with respect to each fiscal year. | Stalking Horse APA § 2.13(f) |
| **Complex Procedures, Part E Section 17(j)**<br><br>*Sale of Avoidance Actions* | Avoidance Actions are **Excluded Assets** from the Sale Transaction and shall be retained by the Seller pursuant to Section 2.2 of the Stalking Horse APA. | Stalking Horse APA § 2.2 |
| **Complex Procedures, Part E Section 17(k)**<br><br>*Requested Findings as to Successor Liability* | The Stalking Horse APA requires that the order of this Court approving consummation of the Stalking Horse APA shall provide that the sale is free and clear of any successor liability, liens, claims, end encumbrances, except for the Assumed Liabilities set forth in the APA.<br><br>The Stalking Horse Purchaser would not have entered into the Stalking Horse APA and would not consummate the transactions contemplated thereby if the Sale Transaction were not, except as otherwise provided in the APA, free and clear of all liens, claims, encumbrances, and successor liability of any kind or nature whatsoever, or if the Stalking Horse Purchaser were not free of all successor liability with respect to Debtors' liabilities, except as expressly assumed in the APA. | Stalking Horse APA § 5.2 |

| | Further, other Bidders may not make Qualified Bids for the Debtors' assets or consummate the transactions contemplated thereby if the sale of the Assets to the Winning Bidder were not, except as otherwise provided in the purchase agreement for such bids, free and clear of all liens, claims, or encumbrances of any kind or nature whatsoever, or if the Winning Bidder were not free of all successor liability with respect to Debtors' liabilities, except as expressly assumed in the relevant asset purchase agreement. | |
|---|---|---|
| **Complex Procedures, Part E Section 17(n)**<br><br>*Relief from Bankruptcy Rule 6004(h)* | The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion. | Motion ¶ 45; Bid Procedures Order ¶ 18 |
| **Complex Procedures, Part E Section 19(a)(ii)**<br><br>*Break-Up/Topping Fees and Expense Reimbursement* | The Bid Protections consist of (i) a termination fee equal to $450,000 (i.e. approximately 2.6% of the $17.5 million purchase price); and (ii) the reimbursement from the Debtors of reasonable, documented out of pocket fees, costs, and expenses of the Bid up to an amount equal to $300,000, in each of (i) and (ii), as more fully set forth in the Stalking Horse APA. 30.  The Debtors have agreed that their obligation to pay the Bid Protections pursuant to the Stalking Horse APA shall, upon entry of the Bid Procedures Order, constitute an allowed superpriority administrative expense of the Debtors with priority over any and all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code. | Stalking Horse APA § 9.3; Bid Procedures XI |
| **Complex Procedures, Part E Section 19(a)(iii)**<br><br>*Bidding Increments* | The Auction will begin at the Initial Highest Bid, and each Qualified Bidder may submit subsequent Bids for the Proposed Purchase Price in minimum overbid increments of at least $250,000 over the amount of the Proposed Purchase Price in the highest or otherwise best Bid at that time | Bid Procedures XII |
| **Complex Procedures, Part E Section 19(a)(iv)**<br><br>*Treatment of Break-Up and Topping Fees and Expense Reimbursement at Auction* | If the Stalking Horse Bid is the Initial Highest Bid, the initial overbid amount shall be also include an amount necessary, in the Debtors' determination, to satisfy the Stalking Horse Purchaser's Bid Protections in cash. | Bid Procedures §§ XI-XIII |

| | | |
|---|---|---|
| | The Stalking Horse Purchaser shall not be required to include an amount in cash necessary to satisfy the Bid Protections as part of any Overbid. | |
| **Complex Procedures, Part E Section 19(b)** <br><br> *Provisions Governing Qualification of Bidders* | A Qualified Bidder is one who submits a Qualified Bid, as defined in § IX of the Bid Procedures and summarized below. | Bid Procedures § IX |
| **Complex Procedures, Part E Section 19(c)** <br><br> *Provisions Governing Qualified of Bids* | The requirements of a Qualified Bid can be found § IX of the Bid Procedures. By way of summary, these the Bid Procedures required that a Bid, to be considered a Qualified Bid, must: (i) be submitted timely; (ii) disclose the bidder's identity and include a delivery of an executed NDA; (iii) propose a Sale Transaction for all the Debtors' assets or identify the assets to be a part of the Bid; (iv) provide that the Qualified Bidder is prepared to consummate the transaction promptly following entry of the purchase and sale agreement; (v) not be subject to any contingencies, (vi) set forth each regulatory and third-party approval required for the bidder to consummate the proposed Sale Transaction; (vii) include financial and other information sufficient for the Debtors to make a reasonable determination as to the bidder's ability to consummate the Sale Transaction; (viii) identify any and all executory contracts and unexpired leases to which the Debtors are a party that the bidder wishes to have assumed and assigned in connection with the Sale Transaction; (ix) indicate whether the Bidder intends to hire all or some of the employees who are employed primarily in connection with the Assets subject to the Sale Transaction; (x) include a written As-is, Where-Is acknowledgement; (xi) state the expected closing date; (xii) not request any bid protections; and (xiii) include contact information for specific person(s) the Debtors should contact in the event they have questions regarding the Bid. | Bid Procedures § IX |
| **Complex Procedures, Part E Section 19(d)** <br><br> *Modification of Bidding and Auction Procedures* | The Debtors reserve their rights to modify these Bid Procedures in their business judgment, subject to the consent of the Administrative Agent, not to be unreasonably withheld, and in consultation with the Committee, if any, in any manner that will best promote the goals of these | Bid Procedures XVI |

| | | |
|---|---|---|
| | Bid Procedures or impose additional customary terms and conditions on the Sale, including extending the deadlines set forth herein, adjourning the Auction or the Sale Hearing, adding procedural rules that are reasonably necessary or advisable under the circumstances to conduct the Auction, cancelling the Auction, and rejecting any or all Bids or Qualified Bids. | |
| **Complex Procedures, Part E Section 19(e)**<br><br>*Closing with Alternative Backup Bidders* | If, for any reason, a Winning Bidder fails to timely consummate the purchase of the Assets, the Debtors, in consultation with the Committee, if any, and with the Administrative Agent's consent, not to be unreasonably withheld, may seek to consummate a Sale to the Backup Bidder in accordance with the terms of the Backup Bid and pursuant to the Proposed APA associated therewith without further approval by the Court (in which case the Backup Bidder shall be deemed the Winning Bidder).<br><br>The Backup Bid(s) and the obligation of the Backup Bidder(s) to consummate the purchase of the Assets shall remain open and in full force, including with respect to the Backup Bidder's Good Faith Deposit, until the earlier of (a) the closing of a Sale of the Assets to a Winning Bidder or Backup Bidder or (b) 45 days after the conclusion of the Auction (or, if no Auction is held, 45 days after the date on which the Debtors file a notice of cancellation of Auction). | Bid Procedures § XIV |
| **Complex Procedures, Part E Section 19(f)**<br><br>*Provisions Governing the Auction* | If the Debtors receive more than one timely Qualified Bid, the Debtors shall conduct an auction (the "<u>Auction</u>") at **9:00 A.M. (prevailing Central Time) on [January 29, 2024]** (which date may be modified by the Debtors in their business judgment with the consent of the Administrative Agent) virtually or at such other place as agreed by the Debtors, the Administrative Agent, and Committee, or approved by order of the Court, and of which the Debtors will notify the Auction Participants.<br><br>Each Qualified Bidder will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the bidding or Sale and (b) its Qualified Bid and any subsequent Bid, is a good-faith bona fide offer | Bid Procedures XIII |

| | and it intends to consummate the proposed sale if selected as a Winning Bidder. | |
|---|---|---|

### Basis for Relief

**I.     The Bid Procedures Are Fair, Designed to Maximize the Value Received for the Assets, and Are Consistent with the Debtors' Reasonable Business Judgment.**

33.     Bankruptcy Code section 363 and Bankruptcy Rule 6004(f)(1) authorize a debtor to sell property outside the ordinary course of business by private sale or by auction.  Bankruptcy Code section 363(b) provides that "[t]he [debtor in possession], after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a) empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

34.     The procedures used in selling estate assets are subject to the debtor's business judgment, which is entitled to substantial deference, as long as the debtor articulates an adequate business justification.  *See, e.g.*, *In re Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside of the ordinary course of business."); *In re Asarco, L.L.C.*, 650 F.3d 593, 601 (5th Cir. 2011) *aff'g* 441 B.R. 813, 824 (S.D. Tex. 2010) ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate and incorporates a business judgment standard.").

35.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g.*, *In re Bigler, LP*, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010).  Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are

appropriate in the context of bankruptcy transactions. *See, e.g.*, *In re Integrated Res., Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

36.     The Debtors carefully designed the Bid Procedures to attract active bidding from potential purchasers and to maximize the sale value for the Assets in the current market, based on the Debtors' advisors' experience with similar sales.  The Debtors developed the Bid Procedures to allow the Debtors to solicit offers and conduct a sale in a controlled, fair, and open fashion that will encourage participation by financially capable bidders.

37.     The Bid Procedures provide the Debtors with an opportunity to consider competing bids and select the highest or otherwise best offers for the completion of the sale.  All creditors can be assured that the consideration obtained will be fair and reasonable, and at or above market.  The Bid Procedures will maximize the value of the Assets and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.  The Bid Procedures should be approved.

## II.     The Court Should Authorize Entry into the Stalking Horse APA and Approve the Bid Protections.

38.     The Debtors seek authority to pay the Bid Protections included in the Stalking Horse APA to the Stalking Horse Purchaser in the event such obligations are triggered in accordance with the terms of the Stalking Horse APA.  Courts have acknowledged that the approval of expenses in connection with sales under section 363 of the Bankruptcy Code can be warranted to compensate an unsuccessful acquirer whose initial offer served as the basis and catalyst for higher and better offers.  *See In re ASARCO*, 650 F.3d at 593, 597-98, 601-03 & n.9. To warrant court approval of expenses, the Fifth Circuit requires a showing that the requested fees and expenses must be supported by a sound business justification.  *Id.* at 593, 602-03 (favoring

business judgment standard governing use of assets outside the ordinary course of business, rather than the standard for administrative expenses, in assessing propriety of fees and expenses incurred by bidders).

39.      Here, the Bid Protections are a product of extensive arm's-length, good faith negotiations in connections with the Stalking Horse APA.  Under the terms of the Stalking Horse APA, the Break-Up Fee is $450,000 and the Expense Reimbursement will not exceed $300,000. This is consistent with bid protections of similar stalking horse agreements commonly observed and approved in complex chapter 11 cases.  Given the size and complexity of the transaction and the amount of work required by the Stalking Horse Purchaser, the Bid Protections are fair, reasonable, and appropriate.

40.      The Bid Protections are necessary to induce the Stalking Horse Purchaser to engage in diligence review and serve as the stalking horse.  Indeed, the Debtors' failure to obtain approval of the Bid Protections will entitle the Stalking Horse Purchaser to terminate the Stalking Horse APA.  In such event, the Debtors will lose the benefit of a committed and fair purchase price for the Assets as well as risk losing the ability to maximize the value of its estates and pursue an orderly wind-down process.

41.      The Debtors request this Court to authorize entry into the Stalking Horse APA and, pursuant to the proposed Bid Protections Order, approve the Bid Protections included therein.

## III.    The Form and Manner of the Sale Notice Should Be Approved.

42.      Bankruptcy Rules 2002(a)(2) and 2002(i) generally require a debtor to provide creditors with a minimum of 21-days' notice of a proposed sale of property outside the ordinary course of business under Bankruptcy Code section 363(b)(1) by mail to "the debtor, the trustee, all creditors and indenture trustees" and any committee appointed under Bankruptcy Code section 1102.  Bankruptcy Rule 2002(c) requires any such notice to include the time and place of

the auction, the hearing, and the deadline for filing any objections to the relief requested.  Courts

are authorized to limit notice of a proposed sale to the United States Trustee, any official committee

appointed under Bankruptcy Code 1102, and any other creditor or equity holder who requests

notice.

43.    The Debtors seek approval of the Sale Notice as proper and sufficient notice of the

Auction, the Sale Hearing, and the deadline to object to the Sale.  Notice of this Motion and the

related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale

Notice, constitutes good and adequate notice of the Auction and the related proceedings in

compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.

## IV.    The Assumption and Assignment Procedures and the Assignment of Any Designated Contracts Should Be Approved.

44.    Bankruptcy Code section 365(a) provides that a debtor-in-possession "subject to

the court's approval, may assume or reject any executory contract or unexpired lease of the

debtor."  11 U.S.C. § 365(a).  The standard governing approval of a debtor's decision to assume

or reject an executory contract is whether the debtor's reasonable business judgment supports

assumption or rejection.  *Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.)*, 378

F.3d 511, 524-25 & n.5 (5th 2004).  Under the business judgment test, a court should approve a

debtor's proposed assumption if such assumption will benefit the estate.  *In re Food City, Inc.*, 94

B.R. 91, 93-94 (Bankr. W.D. Tex. 1988).

45.    The Assumption and Assignment Procedures are reasonable under the

circumstances and are necessary to notify parties to Designated Contracts of the assumption and

assignment of their contract, the related proposed cure amount, and the Winning Bidder's adequate

assurance of future performance.  The Debtors will be prepared to demonstrate at the Sale Hearing

that the requirements for assumption and assignment of any Designated Contracts to a Winning

Bidder will be satisfied.  The Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder or Winning Bidder, including as it relates to such Qualified Bidder's willingness and ability to perform under the Designated Contracts.

46.    The Assumption and Assignment Procedures provide the Court and other interested parties opportunity to evaluate and, if necessary, challenge the ability of a Winning Bidder to provide adequate assurance of future performance and object to the assumption of the Designated Contracts or proposed cure amounts.  The Court will have a sufficient basis to authorize the Debtors to assume and assign the Designated Contracts as set forth in the definitive agreement of a Winning Bidder.

47.    The Assumption and Assignment Procedures, including the form and manner of the Assignment Notice, should be approved as reasonable and necessary measures to adequately notify parties in interest and assume and assign Designated Contracts in a fair, efficient, and proper manner.

## V.    The Assets May Be Sold Free and Clear of Liens, Claims, Interests and Encumbrances under Bankruptcy Code Section 363(f).

48.    Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances provided that one of the following conditions is met:

a.    applicable non-bankruptcy law permits sale of such property free and clear of such interests;

b.    such entity consents;

c.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

d.    such interest is in bona fide dispute; or

e.    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  This provision is supplemented by Bankruptcy Code section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the [Bankruptcy Code]."  11 U.S.C. § 105(a).

49.     Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets free and clear of the interests.  *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007).  The Debtors anticipate satisfying one or more of the conditions under section 363(f).

50.     To the extent that the Court finds that the Sale satisfies section 363(f), the Debtors request that the Court also hold that the Sale is free and clear of successor liability relating to the Debtors' business.  The purpose of a free and clear sale under section 363(f) would be frustrated if claimants could thereafter assert claims arising from the debtors' pre-sale conduct against the eventual purchaser.  The absence of such assurance may chill bidding or result in reduced bids.

## VI.     Credit Bidding Should Be Authorized Under Bankruptcy Code Section 363(k)

51.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Bankruptcy Code section 363(k) provides, in relevant part, that unless the court for cause orders otherwise for cause, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with Bankruptcy Code section 506(a), section 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value.  *See In re Submicron Sys. Corp.*, 432 F.3d 448, 459-60 (3d Cir. 2006).

52.    The Bid Procedures provide that Secured Creditors have the right to credit bid all or any portion of the Secured Creditor's claim on a dollar-for-dollar basis pursuant to section 363(k) with respect to the collateral by which such Secured Creditor is secured; provided, however, that any credit bid must include a cash component equal to or exceeding the amount of the Bid Protections.  A credit bid is permitted only to the extent such credit bid is permitted the Bankruptcy Code and nonbankruptcy law.

## VII.    The Winning Bidder Should be Entitled to the Protections of Bankruptcy Code Section 363(m)

53.    Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014). If the Debtors seek to consummate a Sale pursuant to a Winning Bid obtained through the Bid Procedures, such Sale will have been negotiated at arm's length or through a fair and open auction process.  The Debtors request that the Sale Order include a provision that the Winning Bidder for the Assets is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m). Providing the Winning Bidder with such protection will ensure that the maximum price will be received by the Debtors for the Assets and the Sale closing will occur promptly.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

54.    The Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the fourteen-day stay period under Bankruptcy Rule 6004(h), which is necessary to implement the relief requested in this motion.

**Reservation of Rights**

55.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any party in interest's rights to dispute any claim or interest on any grounds; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (f) a request for or approval to assume, adopt, or reject any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

**Notice**

56.     The Debtors will provide notice of this motion to the following: (a) the U.S. Trustee for the Northern District of Texas; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) Oaktree Fund Administration, LLC as agent to the Debtors' secured lenders, and counsel thereto; (d) the United States Attorney's Office for the Northern District of Texas; (e) the Food and Drug Administration; (f) the Internal Revenue Service; (g) the United States Securities and Exchange Commission; (h) the state attorneys general for states in which Debtors conduct business; and (i) any party that has requested notice pursuant

to Bankruptcy Rule 2002 and Bankruptcy Local Rule 9013-1(d).  No other or further notice is

needed in light of the nature of the relief requested.

*[Remainder of page intentionally left blank.]*

The Debtors request entry of the Order, granting the relief requested herein and granting

such other relief as the Court deems appropriate under the circumstances.

Dated: December 20, 2023
Dallas, Texas

**SIDLEY AUSTIN LLP**

/s/ *Rakhee V. Patel*

Samuel A. Newman (*pro hac vice* pending)
555 West Fifth Street
Los Angeles, California 90013
Telephone:     (213) 896-6000
Facsimile:      (213) 896-6600
Email:           sam.newman@sidley.com

Rakhee V. Patel (TX Bar No. 00797213)
Jeri Leigh Miller (TX Bar No. 24102176)
Nathan Elner (TX Bar No. 24123173)
Parker G. Embry (TX Bar No. 24126826)
Chelsea McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:      (214) 981-3400
Email:           rpatel@sidley.com
                    jeri.miller@sidley.com
                    nelner@sidley.com
                    parker.embry@sidley.com
                    cmcmanus@sidley.com

Jackson T. Garvey (*pro hac vice* pending)
One South Dearborn
Chicago, IL 60603
Telephone:     (312) 853-7000
Facsimile:      (312) 853-7036
Email:           jgarvey@sidley.com

*Proposed Counsel to the Debtors and Debtors in Possession*

### **Certificate of Service**

I certify that on December 20, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Rakhee V. Patel*
Rakhee V. Patel