

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 11, 2024**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| IMPEL PHARMACEUTICALS INC., et al.[1] | Case No. 23-80016 (SGJ) |
| Debtors. | (Jointly Administered) |

**ORDER (I)(A) APPROVING THE BID
PROCEDURES; (B) AUTHORIZING THE
DEBTORS TO SELECT JN BIDCO LLC  AS THE STALKING
HORSE PURCHASER SUBSTANTIALLY ALONG
THE TERMS DEFINED IN THE STALKING HORSE
APA AND APPROVING BID PROTECTIONS;
(C) ESTABLISHING BID DEADLINES, AN AUCTION,
AND A SALE HEARING; (D) APPROVING THE FORM AND
MANNER OF SALE NOTICE; (E) APPROVING ASSIGNMENT
AND ASSUMPTION PROCEDURES; (F) APPROVING THE FORM
AND MANNER OF POTENTIAL ASSUMPTION AND ASSIGNMENT
NOTICE; (II)(A) AUTHORIZING THE SALE OF THE ASSETS FREE
AND CLEAR; AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT
OF DESIGNATED CONTRACTS; AND (III) GRANTING RELATED RELIEF**

---

[1] The Debtors in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, are:  Impel Pharmaceuticals Inc. (8238); and Impel NeuroPharma Australia Pty Ltd (N/A).  The Debtors' service address is 201 Elliot Avenue West, Suite 260, Seattle, WA 98119.

Upon the motion ("Motion")[2] of the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), for entry of an order (this "Order") (i)(a) approving the proposed bid procedures attached hereto as **Exhibit 1** (the "Bid Procedures") in connection with the Sale of all or substantially all of the Debtors' Assets, (b) authorizing the Debtors' to select JN Bidco LLC or its designee as the Stalking Horse Purchaser substantially along the terms defined in the Stalking Horse APA, attached hereto as **Exhibit 2** and approving the Bid Protections; (c) establishing the dates and deadlines relating to the Bid Deadline, the Auction, and the Sale Hearing, (d) approving the form and manner of the notice of the Sale, the Auction, and the Sale Hearing, substantially in the form attached hereto as **Exhibit 3** (the "Sale Notice"), (e) approving the assumption and assignment procedures of executory contracts or unexpired leases in connection with the Sale (the "Designated Contracts"), substantially in the form attached hereto as **Exhibit 4** (the "Assignment and Assumption Procedures"), and (f) approving the form and manner of the potential assignment and assumption notice, substantially in the form attached hereto as **Exhibit 5** (the "Assignment Notice"), and (ii) authorizing and approving (a) the sale of the Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests except to the extent otherwise set forth in the purchase agreement executed by the Debtors and the Winning Bidder, and (b) the assumption and assignment of Designated Contracts (if any), and (iii) granting related relief, each as more fully set forth in the Motion; and upon consideration of the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and the Court being able to issue a final

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Motion.

order consistent with Article III of the United States Constitution; and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and opportunity for a hearing on the Motion having been given; and the relief requested in the Motion being in the best interests of the Debtors' estates, their creditors and other parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is HEREBY FOUND THAT:

A.      The findings and conclusions set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      The Bid Procedures attached as **Exhibit 1** are fair, reasonable, and appropriate, and are designed to promote participation and active bidding and ensure that the highest or otherwise best value is generated for the Assets.   The Bid Procedures were negotiated at arm's length, in good faith, and without collusion.

C.      The Stalking Horse APA, attached as **Exhibit 2**, is the result of extensive, good-faith, arm's-length negotiations.  The approval of the Stalking Horse Bidder as a "stalking-horse" bidder and the Stalking Horse APA as a "stalking-horse" sale agreement is in the best interests of the Debtors and their estates and creditors, and the Debtors have demonstrated compelling and sound justifications for such relief.  The Stalking Horse APA will enable the Debtors to secure a fair baseline price for the Assets and accordingly will provide a clear benefit to the Debtors' estates, their creditors and all other parties in interest.  The Bid Protections are justified to retain

the Stalking Horse Purchaser's commitment to the consummation of the Sale Transaction and to enable the Debtors to maximize the ultimate purchase price of the Assets.

D.    The Bid Protections, to the extent due and payable under the Stalking Horse APA, (i) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code and treated as an allowed superpriority administrative expense claim against the Debtors' estates pursuant to section 503(b) of the Bankruptcy Code; (ii) are reasonable and appropriate, including in light of the size and nature of the sale of the Assets and the commitments that have been made, and efforts that have been and will be expended by, the Stalking Horse Purchaser notwithstanding that the proposed transaction may be subject to better and higher offers; (iii) have been negotiated by the parties and their respective advisors at arm's-length and in good faith, and (iv) are necessary to ensure that the Stalking Horse Purchaser will continue to pursue the proposed Sale Transaction.   The Bid Protections under the Stalking Horse APA were a material inducement for, and a condition of the Stalking Horse Purchaser's entry into the Stalking Horse APA.   The Stalking Horse Purchaser has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Assets will be realized.

E.    The Sale Notice attached as **<u>Exhibit 3</u>** and Assignment Notice attached as **<u>Exhibit 5</u>** are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bid Procedures (including the Bid Deadline, the Auction, and the Sale Hearing), the Assumption and Assignment Procedures, the Sale, the Designated Contracts (if any) and related cure amounts, and all relevant and important dates and deadlines with respect to the foregoing.   No other or further notice of the Sale, the Auction, or the assumption and assignment of Designated Contracts shall be required.

F.      The Assumption and Assignment Procedures attached as **Exhibit 4** are fair, reasonable, and appropriate and comply with the provisions of Bankruptcy Code 365.

G.      The Debtors demonstrated a compelling and sound business justification for this Court to enter this Order, to approve the Bid Procedures and the Assumption and Assignment Procedures, and to establish the dates and deadlines set forth in the Bid Procedures.

IT IS HEREBY ORDERED THAT:

1.      The relief requested in this Motion is GRANTED as set forth herein.

2.      Any and all objections to the relief granted that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, are overruled, and denied on the merits with prejudice.

3.      The Bid Procedures attached hereto as **Exhibit 1** are fully incorporated and approved in their entirety.  All dates and deadlines set forth in the Bid Procedures are hereby established.  The failure to specifically include or reference a particular provision of the Bid Procedures in this Bid Procedures Order shall not diminish or impair the effectiveness of such provision.

4.      The Bid Procedures shall govern the submission, receipt, and analysis of all bids relating to any proposed sale of the Assets and the conduct of the Auction and sale of the Assets. Any party desiring to bid on the Assets shall comply with this Order, including the Bid Procedures. The Debtors are authorized to take all actions as are necessary or appropriate to implement the Bid Procedures and otherwise effectuate the relief granted in this Order.

5.      Credit bids shall be permitted to the extent any such credit bid is permitted the Bankruptcy Code and nonbankruptcy law; provided, however, that any credit bid must include a cash component equal to or exceeding the amount of the Bid Protections.

Case 23-80016-sgj11   Doc 137   Filed 01/11/24   Entered 01/11/24 17:23:31   Desc
Main Document      Page 6 of 125

6.      The Bid Protections are approved and are justified to retain the Stalking Horse Purchaser's commitment to the consummation of the Sale Transaction enable the Debtors to maximize the ultimate purchase price of the Assets.  Any amounts that become due and payable, pursuant to the Bid Protections in accordance with the Stalking Horse APA and this Order shall constitute a superpriority administrative expense of the Debtors' estates pursuant to section 503(b) of the Bankruptcy Code, with priority over any and all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code.  For the avoidance of doubt, the Stalking Horse Purchaser shall not be required to include an amount in cash necessary to satisfy the Bid Protections as part of any Overbid.

7.      Absent further order of the Court, no person or entity, other than the Stalking Horse Bidder (solely to the extent set forth in this Order), shall be entitled to any expense reimbursement or break-up fee or similar protection by the Debtors for submitting a Bid or in any way participating in the sale process for the Assets.

8.      The form of the Sale Notice attached as **Exhibit 3** is approved.  The failure to specifically include a reference to any particular provision of the Bid Procedures in the Sale Notice shall not diminish or impair the effectiveness of such provision.   The Debtors are authorized to serve the Sale Notice on all known parties in interest in the chapter 11 case and post the Sale Notice on the Debtors' claims, noticing, and solicitation agent's website for the case.

9.      Objections to any Sale, including any objection to (a) the Sale of any Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests pursuant to Bankruptcy Code section 363(f), (b) the proposed assumption and assignment of any executory contract or unexpired lease (including any proposed cure amount), and/or (c) entry of any Sale Order, must (x) be in writing and specify the nature of such objection, (y) comply

with the Bankruptcy Code, Bankruptcy Rules, Bankruptcy Local Rules and all orders of the Court, and (z) be filed with the Court by **January 25, 2024, at 4:00 p.m. (prevailing Central Time)**; *provided, however* that any objections solely on the basis of adequate assurance of further performance by the Winning Bidder or Backup Bidder must be filed in the same manner described by the foregoing and served on the Objection Notice Parties, as defined in the Assumption and Assignment Procedures, no later than **January 30, 2024, at 4:00 p.m. (CT)**.

10.     If any party fails to file an objection by the foregoing deadline, such party shall be (a) barred from asserting any objection to the relief requested in the Motion or to the consummation of the Sale, including the transfer of the Assets to the Winning Bidder free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests pursuant to Bankruptcy Code section 363(f) and (b) deemed to consent to such "free and clear" sale for purposes of Bankruptcy Code section 363(f).

11.     The Assumption and Assignment Procedures attached as **<u>Exhibit 4</u>** are approved.

12.     As set forth in the Assumption and Assignment Procedures, the Debtors will file with the Court and serve the Cure Notice on or before January 5, 2024, (the "<u>Initial Cure Notice Deadline</u>").   Any objections to the Initial Cure Notice, including the Cure Amount or the assumption and assignment of any contract or lease included on the Cure Notice must be filed and served by **January 26, 2024, at 4:00 p.m. (prevailing Central Time)** (the "<u>Cure Objection Deadline</u>").

13.     As set forth in the Assumption and Assignment Procedures, the Debtors may file with the Court and serve the Supplemental Cure Notice until such time as the closing of the Sale. Any objection to the Supplemental Cure Notice, including the Cure Amount, must be filed within

fourteen (14) days following the date of service of such Supplemental Cure Notice (the "Supplemental Cure Objection Deadline").

14.     The form of the Assignment Notice attached as **Exhibit 5** is approved.  The Debtors are authorized to serve the Assignment Notice on all non-Debtor counterparties to Designated Contracts (if any) as soon as reasonably practicable after the Debtors file the Notice of Winning Bid.   The inclusion of a contract in any list of Designated Contracts or an Assignment Notice, Cure Notice (as defined in the Assumption and Assignment Procedures), or Supplemental Cure Notice (as defined in the Assumption and Assignment Procedures) shall not (a) obligate the Debtors to assume or assign such contract or (b) constitute any admission or agreement by the Debtors that such contract is an executory contract.   Only those contracts that are included on a schedule of assumed and acquired contracts attached to definitive documentation in the Sale that is approved by the Sale Order will be assumed and assigned.

15.     All persons or entities (whether or not a Qualified Bidder) that participate in the bidding process shall be deemed to have knowingly and voluntarily (a) consented to the entry of a final order by this Court in connection with the Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution and (b) waived any right to jury trial in connection with any disputes relating to the any of the foregoing matters.

16.     Notwithstanding the relief granted herein and any actions taken pursuant to such relief, nothing in this Order shall be deemed (a) an admission as to the amount of, basis for, or validity of any claim against a Debtor entity under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any party in interest's rights to dispute any claim or interest on any grounds; (c) a promise or requirement to pay any claim; (d) a waiver of

the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (e) an implication or admission that any particular claim is of a type specified or defined in this order or any other order granting the relief requested in this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (f) an approval to assume, adopt, or reject any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code; or (g) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates. Any payment made pursuant to this order is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

17.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion, and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

18.    Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

19.    The Debtors are authorized to take all such reasonable actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

20.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

**# # # END OF ORDER # # #**

Submitted By:

**SIDLEY AUSTIN LLP**

Samuel A. Newman (admitted *pro hac vice*)
555 West Fifth Street
Los Angeles, California 90013
Telephone:     (213) 896-6000
Facsimile:     (213) 896-6600
Email:         sam.newman@sidley.com

Rakhee V. Patel (TX Bar No. 00797213)
Nathan C. Elner (admitted *pro hac vice*)
Parker G. Embry (TX Bar No. 24126826)
Chelsea M. McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:         rpatel@sidley.com
               nelner@sidley.com
               parker.embry@sidley.com
               cmcmanus@sidley.com

Jackson T. Garvey (admitted *pro hac vice*)
One South Dearborn
Chicago, IL 60603
Telephone:     (312) 853-7000
Facsimile:     (312) 853-7036
Email:         jgarvey@sidley.com

*Proposed Counsel to the Debtors and Debtors
in Possession*

## Exhibit 1

**Bid Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| IMPEL PHARMACEUTICALS INC., et al.[1] | Case No. 23-80016 (SGJ) |
| Debtors. | (Jointly Administered) |

## BID PROCEDURES

On December 19, 2023 (the "<u>Petition Date</u>"), the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>").

On December 20, 2023, the Debtors filed a motion [Docket No. 18] (the "<u>Bid Procedures Motion</u>") with the Court seeking entry of orders, among other things: (i)(a) approving procedures for the solicitation of bids in connection with the proposed sale of substantially all of the Debtor's assets, (these "<u>Bid Procedures</u>"), (b) authorizing the Debtors to select JN Bidco LLC as the Stalking Horse Purchaser substantially along the terms defined in the Stalking Horse APA and approving the Bid Protections, (c) establishing the dates and deadlines set forth in these Bid Procedures, including the Bid Deadline, Auction, and Sale Hearing, (d) approving the form of Sale Notice, (e) approving the Assumption and Assignment Procedures for the Designated Contracts (if any), (f) approving the form of Assignment Notice, and (ii)(a) authorizing the sale of the Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests except to the extent otherwise set forth in the purchase agreement executed by the Debtors and the Winning Bidder and (b) approving the assumption and assignment of Designated Contracts (if any), and (iii) granting related relief.

On [●], 2024, the Court entered the *Order (I)(A) Approving the Bid Procedures; (B) Authorizing the Debtors to Selection JN Bidco LLC as the Stalking Horse Purchaser Substantially Along the Terms Defined in the Stalking Horse APA and Approving Bid Protections; (C) Establishing Bid Deadlines, an Auction, and a Sale Hearing; (D) Approving the Form and Manner of Sale Notice; (E) Approving Assignment and Assumption Procedures; (F) Approving the Form and Manner of Potential Assumption and Assignment Notice; and (II)(A) Authorizing the Sale of Assets Free and Clear; (B) Approving the Assumption and Assignment of Designated Contracts; and (III) Granting Related Relief* [Docket No. [●]] (the "<u>Bid Procedures Order</u>"),[2]

---

[1] The Debtors in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, are: Impel Pharmaceuticals Inc. (8238); and Impel NeuroPharma Australia Pty Ltd (N/A).  The Debtors' service address is 201 Elliot Avenue West, Suite 260, Seattle, WA 98119.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion, the Bid Procedures, and the Bid Procedures Order, as applicable.

which approved, among other things, the procedures set forth below pursuant to which the Debtors are authorized to sell all of substantially all of the Debtors' assets (the "Assets").

The Bid Procedures Order also authorized, among other things, the Debtors' entry into that certain Asset Purchase Agreement, dated as of December 19, 2023 (as amended, supplemented, or otherwise modified by the parties thereto, the "Stalking Horse APA")[3] between the Debtors and JN Bidco LLC ("JN Bidco" or the "Stalking Horse Purchaser"), pursuant to which, after a comprehensive marketing and sale process initiated before the commencement of these chapter 11 cases, the Stalking Horse Purchaser has agreed to purchase substantially all of the Assets and to assume certain liabilities of the Debtors, each as specifically enumerated in the Stalking Horse APA and subject to the terms and conditions set forth therein. The Stalking Horse APA shall serve as the stalking horse bid (the "Stalking Horse Bid") for Assets, subject to higher and better bids in accordance with the terms and conditions of these Bid Procedures.

The Debtors are offering interested parties the opportunity to acquire some or all of the Debtors' Assets. The Debtors' representatives shall oversee the Sale (defined below) process.

---

ANY PARTY INTERESTED IN PROPOSING A POTENTIAL TRANSACTION SHOULD CONTACT THE DEBTORS' PROPOSED INVESTMENT BANKER, MOELIS & COMPANY LLC, IF THEY HAVE ANY QUESTIONS OR NEED ADDITIONAL INFORMATION:

**ASHISH CONTRACTOR** (Ashish.Contractor@moelis.com)
**GABOR SZABO** (Gabor.Szabo@moelis.com)
**BARAK KLEIN** (Barak.Klein@moelis.com)
**ANDREW CARLSON** (Andrew.Carlson@moelis.com)
**PETER WITTWER** (Peter.Wittwer@moelis.com)

---

## I.    KEY DATES

These Bid Procedures provide interested parties with the opportunity to qualify for, and participate in, one or more potential Auctions (as defined below) to be conducted by the Debtors and to submit competing bids (each, a "Bid") for some or all the Assets. In accordance with these Bid Procedures, the Debtors will (a) coordinate with each Potential Bidder (as defined below) regarding the conduct of their respective due diligence, (b) evaluate bids from Potential Bidders, (c) negotiate any Bid made, and (d) make such other determinations as are provided for in these Bid Procedures (collectively, the "Bidding Process").

The key dates for the sale process are as follows. The Debtors, after consultation with the Consultation Parties, may extend any of the deadlines in these Bid Procedures.

---

[3] A copy of the Stalking Horse APA is attached to the Bid Procedures Order as Exhibit 2.

| *SALE TRANSACTION MILESTONES* | |
|---|---|
| **EVENT OR DEADLINE** | **DATE AND TIME** (ALL IN PREVAILING CENTRAL TIME) |
| Petition Date | P = 0 (Tuesday, December 19, 2023) |
| Bid Procedures Objection Deadline | 7 days prior to the hearing to approve the Bid Procedures, at 4:00 pm CT |
| Initial Cure Notice Deadline | P + 17 (January 5, 2024) |
| Bid Procedures Hearing | P + 22 (January 10, 2024) at 9:30 am |
| Service and Publication of Sale Notice | 1 business day after entry of the Bid Procedures Order or as soon as reasonably practicable thereafter |
| Bid Deadline[4] | P + 35 (January 23, 2024) at 4:00 pm |
| Sale Objection Deadline | P + 37 (January 25, 2024) at 4:00 pm |
| Cure Objection Deadline | P + 38 (January 26, 2024) at 4:00 pm |
| Determination of Qualified Bids | As soon as reasonably practicable following the Bid Deadline |
| Auction (if necessary) | P + 41 (January 29, 2024) at 9:00 am |
| Deadline to File Notice of Winning Bed | As soon as reasonably practicable following the Auction |
| Post-Auction Objection Deadline | P + 42 (January 30, 2024) at 4:00 pm |
| Sale Hearing | P + 44 (February 1, 2024) at 9:30 am |
| Anticipated Closing Date | P + 55 (February 12, 2024) |

## II.    SUBMISSIONS TO THE DEBTORS; CONSULTATION PARTIES

All submissions to the Debtors required or permitted to be made under these Bid Procedures must be directed to each of the following persons or entities unless otherwise provided (collectively, the "Notice Parties"):

A.    Debtors: Impel Pharmaceuticals Inc. and Impel NeuroPharma Australia Pty Ltd (attn: Brandon Smith (brandon.smith@teneo.com)).

B.    Debtors' Proposed Counsel: Sidley Austin LLP (attn: Rakhee Patel (rpatel@sidley.com) and Jackson T. Garvey (jgarvey@sidley.com));

C.    Debtors' Proposed Special Corporate Counsel: Fenwick & West LLP (attn: Alan Smith (acsmith@fenwick.com), Ethan Skerry (eskerry@fenwick.com), and Matthew McCabe (mmccabe@fenwick.com));

D.    Debtors' Proposed Investment Banker: Moelis & Company LLC (attn: Ashish Contractor (Ashish.Contractor@moelis.com), Gabor Szabo (Gabor.Szabo@moelis.com), Andrew Carlson (Andrew.Carlson@moelis.com), and Peter Wittwer (Peter.Wittwer@moelis.com); and

---

[4] The Debtors reserve their right, in their own discretion, to move the deadline for the submission of qualified bids.

      E.      <u>Debtors' Interim Management Personnel</u>: Brandon Smith of Teneo Capital LLC (attn: Nathan Cook (nathan.cook@teneo.com); Jeremy Burr (jeremy.burr@teneo.com)).

The "<u>Consultation Parties</u>" as used in these Bid Procedures are: (A) Oaktree Fund Administration, LLC, in its capacity as administrative agent under the Senior Secured Credit Agreement (as defined in the First Day Declaration) (the "<u>Administrative Agent</u>") and its advisors, including Sullivan & Cromwell LLP (the "<u>Secured Creditor Advisors</u>"), so long as no prepetition secured party has become a bidder in the sale process, and (B) advisors to the Official Committee of Unsecured Creditors, if any (the "<u>Committee Advisors</u>")

If a Consultation Party, in its capacity as such, receives material information in connection with Bids or bidders in a Sale Transaction process, which information is not provided to all Potential Bidders in such Sale Transaction process, such party shall be prohibited from being deemed a Qualified Bidder in connection with such Sale Transaction process, unless such information is provided to all other Potential Bidders in such Sale Transaction process by the applicable bid deadline or promptly following receipt of such information by such party.

In the event that any Consultation Party or an affiliate of the foregoing submits a bid that is a Qualified Bid, any obligation of the Debtors to consult with the bidding party or its affiliates established under these Bid Procedures will be waived, discharged, and released without further action; *provided* that the bidding party will have the same rights as any other Qualified Bidder set forth above.

## III.    MARKETING PROCESS

To facilitate a value-maximizing exit from these chapter 11 cases, the Debtors are conducting a marketing process for the sale or disposition of all or any portion of the Assets under section 363 of the Bankruptcy Code (the "<u>Sale</u>"). The Debtors retained Moelis & Company LLC ("<u>Moelis</u>"), a leading international investment banking and financial advisory firm, in September 2023 to serve as its proposed investment banker. After conducting initial due diligence, the Debtors, in consultation with Moelis, conducted an extensive prepetition marketing process for sale of the Debtors' Assets, as more fully described in the Contractor Declaration.

Moelis continues to engage with additional potential bidders, and will continue to do so until a Sale Transaction is approved by this Court. The Debtors may distribute (if not already distributed) to a person or entity (other than the Stalking Horse Bidder) interested in purchasing any or all of the Assets (a "<u>Potential Bidder</u>") an "Information Package" consisting of:

      a.      a copy of the Bid Procedures, the Bid Procedures Order, and the Bid Procedures Motion;

      b.      a form of non-disclosure agreement ("<u>NDA</u>"), substantially in the form attached as **Schedule 1**, and acceptable to the Debtors; and

      c.      any other materials appropriate under the circumstances.

## IV.    OVERVIEW

The Debtors seek to sell substantially all of the Debtors' Assets.  Except as otherwise provided in any Winning Bidder's purchase agreement, all of the Debtors' right, title, and interest in and to the Assets shall be sold free and clear of all liens, claims, encumbrances and interests (collectively, the "Encumbrances") to the maximum extent permitted by section 363 of the Bankruptcy Code (other than Permitted Liens and Assumed Liabilities), with these Encumbrances to attach to the proceeds of the Sale with the same validity and priority as such Encumbrances applied against the Assets.

## V.    POTENTIAL BIDDER REQUIREMENTS

To receive due diligence information, including full access to the Debtors' electronic data room and to additional non-public information regarding the Debtors, or otherwise participate in the bidding process or be considered for any purpose under the Bidding Procedures, a Potential Bidder must deliver the following documents (collectively, the "Preliminary Bid Documents") by email to the Notice Parties (unless the Debtors, in their business judgment and in consultation with the Consultation Parties, choose to waive any of the following requirements for any Potential Bidder):

a.    an executed NDA on terms acceptable to the Debtors;

b.    identity of the Potential Bidder, including its legal name, jurisdiction and form of organization, and details regarding the ownership and capital structure of the Potential Bidder, including details related to the Potential Bidder's beneficial owners, ultimate beneficial owners, and controlling entities, and any of the principals, corporate officers, or other representatives that are authorized to appear for and act on behalf of the Potential Bidder with respect to the contemplated transaction; and description of the nature and extent of any due diligence the Potential Bidder wishes to conduct; and

c.    a description of the due diligence the Potential Bidder seeks to conduct;

d.    sufficient information, as reasonably determined by the Debtors, in consultation with the Consultation Parties, that the Potential Bidder (i) has or may reasonably obtain the financial capacity to close the Sale (including current audited or verified financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the property to be sold, the party that will bear liability for a breach) as well as an overview of any recent transactions), the adequacy of which must be acceptable to the Debtors; and

e.    sufficient information, as reasonably determined by the Debtors, that the Potential Bidder has the ability to receive any and all necessary governmental, licensing, regulatory, and other approvals.

Promptly after a Potential Bidder delivers Preliminary Bid Documents, the Debtors shall (i) determine and notify each Potential Bidder as to whether such Potential Bidder has submitted acceptable Preliminary Bid Documents, (ii) provide copies of any such notices to the Notice Parties and the Stalking Horse Purchaser, and (iii) provide copies of any such Preliminary Bid Documents to the Consultation Parties.   Only those Potential Bidders that have submitted acceptable preliminary documentation (each, an "Acceptable Bidder") to the reasonable satisfaction of the Debtors and their advisors, in consultation with the Consultation Parties, may submit bids to purchase the Assets.

## VI.    DUE DILIGENCE

The Debtors will provide instructions to Acceptable Bidders for accessing the virtual data room established by Moelis in connection with the Sale Transaction process (the "Data Room"). The Debtors will address all reasonable requests for additional information and due diligence access.   The Debtors may refuse any party access to due diligence information, including access to the Data Room, in whole or in part and at any time, if the Debtors determine in their reasonable business judgment after consultation with counsel that (i) access by such party may be harmful to the Debtors or their estates or (ii) such party has not established that it intends or has the capacity to consummate a Sale Transaction for the Assets in good faith.

The due diligence period and the Data Room shall be open until the Bid Deadline (as defined below).   After the Bid Deadline, the Debtors shall have no obligation to furnish due diligence information.   The Debtors may, in the exercise of their reasonable business judgment and in consultation with their counsel and the Consultation Parties, extend a party's time to conduct due diligence.

The Debtors make no representation or warranty as to the information provided through this due diligence process or otherwise, including the documents in the Data Room, except as set forth in any executed definitive documents for the Sale.

Each Acceptable Bidder and Bidder (as defined below) shall comply with all reasonable requests with respect to information and due diligence access by the Debtors or their advisors regarding such Acceptable Bidder or Bidder, as applicable, and its contemplated Sale Transaction.

## II.    NO COMMUNICATIONS AMONG BIDDERS

There shall be no communications regarding potential Bids, a potential Sale Transaction, or another potential transaction between or among any bidders, including the Stalking Horse Purchaser, unless the Debtors have previously authorized such communication in writing (such authorization, for the avoidance of doubt, email from the Debtors' counsel being sufficient). The Debtors reserve the right, in their reasonable business judgment, to disqualify any bidder that the Debtors believe in their reasonable judgment has communicated with another bidder in violation of these Bid Procedures.

For the avoidance of doubt, the joining of Bids between Potential Bidders or Acceptable Bidders is permitted; *provided* that, if any Potential Bidders or Acceptable Bidders are interested in joining Bids, the Debtors' advisors will facilitate the communications between such parties and the potential joining of Bids.

## VII.    INDICATIONS OF INTEREST

The Debtors reserve the right to require Acceptable Bidders to submit written indications of interest prior to the Bid Deadline specifying, among other things, the Assets proposed to be acquired, the amount and type of consideration to be offered, and any other material terms to be included in a bid by such party; provided that the Consultation Parties shall have the right to review any indications of interest received by the Debtors.  If an Acceptable Bidder fails to comply with any such request by the Debtors, the Debtors may deny such Acceptable Bidder further diligence access or deny such Acceptable Bidder further participation in the Auction process.  The Debtors also reserve the right to exclude any Acceptable Bidder (prior to its submission of a Qualified Bid) from continuing in the Auction process if the Debtors determine that the consideration proposed to be paid by such Acceptable Bidder is insufficient.

## VIII.   BID DEADLINES

Bids (including all requirements to be considered a Qualified Bid (defined below)) must be submitted in writing to the Notice Parties so as to be actually received by no later than January 23, 2024 at 4:00 pm (prevailing Central Time) (the "Bid Deadline").

## IX.    QUALIFIED BID REQUIREMENTS

Only bids ("Bids") and bidders that satisfy the following conditions will be considered or permitted to participate in the bidding, Auction, or Sale (each, a "Qualified Bid") and the bidder(s) submitting a Qualified Bid, a "Qualified Bidder"):

    a.    **Timeliness.**  The Bid must be in writing and timely and properly submitted in accordance with the Bid submission process set forth below, including successful and timely delivery of the Good Faith Deposit (defined below).

    b.    **Identity of Bidder.**  The Bid must fully disclose the identity of each person or entity that is participating in the Bid (and the complete terms of such participation) and each such person or entity shall have delivered an executed NDA to the Debtors in accordance with the instructions set forth above.    "Participation" in a Bid includes persons or entities that are equity holders in an entity specially formed for the purpose of effectuating a Sale Transaction for the Assets.

    c.    **Proposed Transaction Perimeter and Purchase Price.**  The Bid must propose a Sale Transaction for substantially all of the Debtors' Assets or identify with the precision customary for a sale of this type the Assets included in such Bid and identify (a) the cash consideration to be paid (or the amount of any credit bid as allowed herein) for the Assets included in the Bid and (b) any liabilities to be assumed as part of the proposed acquisition, including a reasonable estimate of the cash value thereof (clauses (a) and (b) together, the "Proposed Purchase Price").

    d.    **Proposed APA.**  The Bid must state that the bidder is prepared to consummate the transaction promptly following entry of an order approving the Sale and be

accompanied by (a) a purchase and sale agreement executed by the bidder (the "<u>Proposed APA</u>"), a form of which will be available in the Data Room (the "<u>Form APA</u>"), (b) a redline of the Proposed APA against the Form APA, and (c) evidence of authorization and approval from the board (or comparable governing body) of each person or entity participating in the Bid with respect to the submission, execution, delivery, and performance of the Bid and Proposed APA.

e. **Lack of Contingencies; Binding Bid.** The Bid must be (a) unqualified and not subject to any contingencies or conditions (including any further due diligence, material financing conditions, internal approval (such as but not limited to board approval)) and (b) include a written commitment by the applicable Potential Bidder to serve as Backup Bidder in the event that such Bid is not selected as the Winning Bid and will be binding and irrevocable until (i) if such bid is the Winning Bid or a Backup Bid, the earlier of (x) the closing of the Sale or (y) 45 days after the conclusion of the Auction (or, if no Auction is held, 45 days after the date on which the Debtors file a notice of cancellation of Auction) or (ii) two (2) business days after entry of an order approving the Winning Bid and (if applicable) the Backup Bid for the applicable Assets (such order, a "<u>Sale Order</u>").

f. **Regulatory and Third-Party Approvals.** The Bid must set forth each regulatory and third-party approval required for the bidder to consummate the proposed Sale Transaction(s), if any, and the date by which the bidder expects to receive such approvals, and those actions the bidder will take to ensure receipt of such approvals as promptly as possible.

g. **Adequate Assurance Information.** The Bid must include financial and other information sufficient for the Debtors, in consultation with the Consultation Parties, to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Proposed APA by no later than February 12, 2024, including (a) the availability of funds to satisfy the Proposed Purchase Price and (b) information constituting adequate assurance of future performance under contracts and leases to be assumed pursuant to section 365 of the Bankruptcy Code (if any) ("<u>Adequate Assurance Information</u>"), which information the Debtors may request be supplemented or altered such that it can be served on counterparties to any contracts or leases to be assumed and assigned in connection with the Sale that request such information. Provision of the Adequate Assurance Information to the Debtors shall, and shall be deemed to, constitute consent by the bidder for the Debtors to share such Adequate Assurance Information with the counterparties under Potential Assumed Contracts and Designated Contracts on a confidential basis; <u>provided</u> that the Debtors shall not be required to enter into any nondisclosure or similar agreement with such counterparties to provide the Adequate Assurance Information and shall not be liable for such counterparties' failure to abide by the confidentiality of the Adequate Assurance Information.

h. **Identification of Assigned Contracts.** The Bid must identify any and all

executory contracts and unexpired leases to which the Debtors are a party that the bidder wishes to have assumed and assigned to it in connection with the Sale (if any).   The bidder shall be solely responsible for the payment of any cure costs required pursuant to section 365 of the Bankruptcy Code.

i.     **Management and Employee Obligations**.  Each Bid must indicate whether the bidder intends to hire all or some of the employees who are primarily employed in connection with the Assets to be included in the proposed Sale Transaction.

j.     **As-is, Where-is.**   Each Bid must include a written acknowledgement and representation that the bidder: (1) has had an opportunity to conduct any and all due diligence regarding the proposed Sale Transaction(s) prior to making its offer; (2) has relied solely upon its own independent review, investigation, or inspection of any documents in making its Bid; (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or their advisors or other representatives regarding the Sale Transaction or the completeness of any information provided in connection therewith or the Auction (if any); and (4) did not engage in any collusive conduct and acted in good faith in submitting its Bid.

k.     **Expected Closing Date**.  Each Bid must state the Acceptable Bidder's expected date of closing the applicable Sale.

l.     **Lack of Bid Protections.**   Unless consented to in writing by the Debtors and approved by the Court (and excluding the Stalking Horse Bid), the Bid must not request or entitle the bidder to any break-up fee, topping fee, expense reimbursement, or similar type of payment (and by submitting a bid, a bidder shall be deemed to have waived its right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code in any way related to the submission of its bid or these Bid Procedures) or indemnification by the Debtors in favor of the bidder.

m.     **Bidder's Contact Information.**  The Bid must include contact information for the specific person(s) the Debtors should contact in the event they have questions regarding the bid.

By submitting a Bid, a bidder is deemed to acknowledge (and shall represent in any definitive document) that (i) it has had an opportunity to inspect and examine the Assets and to conduct any and all due diligence prior to submitting its bid, (ii) it has relied solely upon its own independent review, investigation, and/or inspection of the Assets and any documents in submitting its bid, (iii) it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied by operation of law or otherwise, regarding the Debtors' business, the Assets, or the completeness of any information provided in connection with the Bid Procedures or the Sale process.

By submitting a Bid, each bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bid Procedures and to refrain from (A) submitting a Bid after

conclusion of the Auction (if any) or (B) seeking to reopen the Auction (if any) once closed. **The submission of a Bid shall constitute a binding and irrevocable offer (a) for the Winning Bidder(s), until consummation of the Sale Transaction(s), (b) for the Backup Bidder (if any), as provided in these Bid Procedures, as provided herein, and (c) for any Bidder other than the Winning Bidder(s) and Backup Bidder, until two (2) business days after entry of an order approving the Winning Bid and (if applicable) the Backup Bid for the applicable Assets (such order, a "<u>Sale Order</u>"), and each Bid must include a written acknowledgement and representation to such effect.**

As soon as reasonably practicable following the Bid Deadline, the Debtors, in consultation with the Consultation Parties, shall determine which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction. Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; provided that if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified Bid, the Debtors may provide the Acceptable Bidder with the opportunity to remedy any deficiencies prior to the Auction. The Stalking Horse Purchaser shall be deemed to be a Qualified Bidder, the Stalking Horse Bid shall be deemed a Qualified Bid, and the Stalking Horse Purchaser may participate in the Auction with respect to the Assets.

The Debtors and their advisors shall maintain in confidence in accordance with the applicable executed NDA any information provided by a bidder that is designated as confidential, except as otherwise set forth in these Bid Procedures, and shall use such confidential information only in connection with the evaluation of Bids or otherwise in connection with the chapter 11 case or in accordance with the executed NDA. Notwithstanding the foregoing and any provisions in an executed NDA, the Debtors and Debtors' advisors may disclose confidential information (i) with the prior written consent of the applicable bidder, (ii) to the applicable bidder, and (iii) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court, or other governmental order, or regulation, including, as appropriate, regulatory agencies.

## X.   BID SUBMISSION AND EVALUATION PROCESS; GOOD FAITH DEPOSITS

Concurrent with the submission of its Bid, and in no event later than the Bid Deadline, a bidder must deposit with the Debtors in cash 2.6% of the bidder's Proposed Purchase Price (the "<u>Good Faith Deposit</u>"), which shall be refundable as described below. Bank information for the Debtors will be included in the Data Room. The Debtors, in their business judgment, after consultation with the Consultation Parties, may elect to waive or modify the requirement of a Good Faith Deposit on a case-by-case basis.

Each bidder shall comply with all reasonable requests by the Debtors for additional information and due diligence access regarding the ability of a bidder to consummate the Sale. A bidder's failure to comply with such requests may be a basis for the Debtors to determine such bidder is not a Qualified Bidder and the associated Bid is not a Qualified Bid.

Notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, reserve the right to work with (A) Potential Bidders and Acceptable Bidders

to aggregate two or more Bids into a single consolidated Bid prior to the applicable Bid Deadline and (B) Qualified Bidders to aggregate two or more Qualified Bids into a single Qualified Bid prior to the conclusion of the Auction (if any).  The Debtors reserve the right to cooperate with any Acceptable Bidder to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid.  The Debtors may accept a single Qualified Bid or multiple Bids that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid (in which event those multiple bidders shall be treated as a single Qualified Bidder and their Bid a single Qualified Bid for purposes of the Auction (if any)).

The Debtors shall determine, in their reasonable business judgment, in consultation with the Consultation Parties, (i) which Bids meet the criteria to qualify as a Qualified Bid and (ii) if there is more than one Qualified Bid, which Qualified Bid will serve as the baseline Bid at the commencement of the Auction to facilitate obtaining the highest and best value for the Debtors' estates.  Any Bid that does not meet the criteria for a Qualified Bid set forth above shall be rejected as a non-conforming bid.

The Debtors shall determine, in their reasonable judgment after consultation with the Debtors' financial and legal advisors, and the Committee, if any, and with the Administrative Agent's consent, so long as no prepetition secured party has submitted a Qualified Bid and with such consent not to be unreasonably withheld, which of the Qualified Bids is likely to result in the highest and best value to the Debtors' estates (the "Initial Highest Bid").

Not later than 24 hours before the commencement of the Auction, to the extent feasible, the Debtors will provide to those participating in the Auction (the "Auction Participants") and the Consultation Parties a copy of the Initial Highest Bid.  To allow the Auction Participants to evaluate the Initial Highest Bid, the Debtors shall use commercially reasonable efforts to disclose the value that, in their business judgment, and with the Administrative Agent's consent, so long as no prepetition secured party has submitted a Qualified Bid and with such consent not to be unreasonably withheld, and in consultation with the Committee, if any, they place on the Initial Highest Bid.  The Debtors shall also use commercially reasonable efforts to disclose to each Auction Participant the value that, in their business judgment, they place on such Auction Participant's Qualifying Bid.

## XI.    STALKING HORSE AND BID PROTECTIONS

Notwithstanding anything herein to the contrary, the Stalking Horse Purchaser shall not be required to submit an additional Qualified Bid prior to the Auction.  To provide the Stalking Horse Purchaser with an incentive to participate in a competitive process and to compensate the Stalking Horse Purchaser for (i) performing substantial due diligence and incurring the expenses related thereto and (ii) entering in the Stalking Horse APA with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to, pursuant to the terms of the Bid Protections Order and the Stalking Horse APA, (x) a break-up fee (the "Break-Up Fee") equal to $450,000 and (y) the reimbursement from the Debtors of reasonable, documented out of pocket fees, costs and expenses of the Stalking Horse Purchaser incurred in connection with the Stalking Horse APA up to an amount equal to $300,000, each as and to the extent more fully described in the Stalking Horse APA (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections").

## XII.    NO QUALIFIED BIDS

If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, then the Debtors shall cancel the Auction and designate the Stalking Horse Bid as the Winning Bid, and pursue entry of a Sale Order approving the Sale to the Stalking Horse.  If the Debtors make such a determination, the Debtors shall file a notice with the Bankruptcy Court within one (1) business day of making such determination**.**

## XIII.    AUCTION

If the Debtors receive more than one timely Qualified Bid, the Debtors shall conduct an auction (the "Auction") at **9:00 A.M. (prevailing Central Time) on January 29, 2024** (which date may be modified by the Debtors in their business judgment with the consent of the Administrative Agent) virtually or at such other place as agreed by the Debtors, the Administrative Agent, and Committee, or approved by order of the Court, and of which the Debtors will notify the Auction Participants.  The Auction will be subject to the following rules:

a.    **Attendance and Participation.**  Only Qualified Bidders may participate in or make subsequent Bids at the Auction.  Only the Debtors, Qualified Bidders, Consultation Parties, the United States Trustee, and such parties' representatives and advisors may attend the Auction; *provided* that Qualified Bidders may appear through a duly authorized representative bearing a valid and enforceable power of attorney or other written proof evidencing their ability to bind the applicable Qualified Bidder, which document(s) shall be delivered to the Debtors prior to the commencement of the Auction.

b.    **Confirmation of Good Faith.**  Each Qualified Bidder will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the bidding or Sale and (b) its Qualified Bid and any subsequent Bid, is a good-faith bona fide offer and it intends to consummate the proposed sale if selected as a Winning Bidder.

c.    **Transcript.** The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Winning Bid (and Backup Bid, as applicable).

d.    **Terms of Overbids.**

a.    Minimum Overbid Requirement.  The Auction will begin at the Initial Highest Bid, and each Qualified Bidder may submit subsequent Bids for the Proposed Purchase Price in minimum overbid increments of at least $250,000 over the amount of the Proposed Purchase Price in the highest or otherwise best Bid at that time ("Overbids"); provided that if the Stalking Horse Bid is the Initial Highest Bid, the initial overbid amount shall be also include an amount necessary, in the Debtors' determination, to satisfy the Stalking Horse Purchaser's Bid Protections in cash; and provided further that

the Debtors, in consultation with their advisors and the Consultation Parties, shall retain the right to modify the overbid increment at the Auction without any additional or prior notice.

b. <u>Conclusion of Each Overbid Round</u>. Upon the solicitation of each round of Overbids, the Debtors may announce a deadline by which time any Overbids must be submitted to the Debtors (an "<u>Overbid Round Deadline</u>"); provided that the Debtors, in their reasonable business judgment and in consultation with the Consultation Parties, may extend any Overbid Round Deadline.

c. <u>Overbid Alterations</u>. An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, in consultation with the Consultation Parties, but shall otherwise comply with the terms of the Bid Procedures. For the avoidance of doubt, the Stalking Horse Purchaser shall not be required to include an amount in cash necessary to satisfy the Bid Protections as part of any Overbid.

d. <u>Announcing Highest Bid</u>. Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors, with the Administrative Agent's consent, so long as no prepetition secured party has submitted a Qualified Bid and with such consent not to be unreasonably withheld, have identified an Overbid as being higher or otherwise better than the Starting Bid, in the initial Overbid round, or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Debtors shall describe to all applicable Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid.

e. **Consideration of Overbids**. The Debtors reserve the right, in their business judgment, in consultation with the Consultation Parties, to adjourn the Auction one or more times, to, among other things (1) facilitate discussions between the Debtors and Qualified Bidders, (2) allow Qualified Bidders the opportunity to consider how they wish to proceed, and (3) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent financing commitments to consummate the proposed Sale Transaction(s) at the prevailing Overbid amount.

f. **No Round-Skipping**. To remain eligible to participate in the Auction, in each round of bidding, each Qualified Bidder must submit an Overbid with respect to such round of bidding and to the extent a Qualified Bidder fails to submit an Overbid with respect to such round of bidding, such Qualified Bidder shall be

disqualified from continuing to participate in the Auction; provided that the Debtors may waive such requirement in their business judgment.

g.  **Reimbursable Expenses for the Stalking Horse Purchaser**.  For the Auction, the Debtors will take into account the Bid Protections in each round of bidding.  The Bid Protections shall be payable as set forth in the Bid Procedures Order.

h.  **Closing the Auction**.  The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their business judgment and in consultation with their advisors and the Committee, if any, and with the consent of the Administrative Agent, so long as no prepetition secured party has submitted a Qualified Bid and with such consent not to be unreasonably withheld, to be the highest or otherwise best Qualified Bid for the applicable Assets. Such Qualified Bid shall be designated the "<u>Winning Bid</u>" for such Assets and the Qualified Bidder submitting such Qualified Bid shall be designated the "<u>Winning Bidder</u>," at which time the Auction with respect to such Assets shall be closed.  The Debtors, in consultation with their advisors and the Consultation Parties, may also designate a bid that is the next highest or otherwise best after the Winning Bid (the "<u>Backup Bid</u>") and the Qualified Bidder submitting the Backup Bid shall be the backup bidder (the "<u>Backup Bidder</u>").  In no case shall such Auction close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  The Debtors' designation of a Qualified Bid as a Winning Bid (or Backup Bid, as applicable) shall be subject to and conditioned on the Bankruptcy Court's approval of such Winning Bid (or Backup Bid, as applicable) and the Sale Transaction(s) contemplated thereby.  As soon as reasonably practicable after the designation of a Winning Bid (or Backup Bid, as applicable), the Debtors shall finalize definitive documentation to implement the terms of such Winning Bid (or Backup Bid, as applicable) and cause such definitive documentation to be filed with the Bankruptcy Court.

i.  **Credit Bidding.**  Any party that has a valid and perfected lien on any of the Assets (a "<u>Secured Creditor</u>") shall have the right to credit bid all or any portion of the Secured Creditor's claim on a dollar-for-dollar basis pursuant to section 363(k) of the Bankruptcy Code; <u>provided</u> that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured and only to the extent such credit bid is permitted under any relevant agreements and the Bankruptcy Code; provided further, however, that any credit bid must include a cash component equal to or exceeding the amount of the Bid Protections.  Subject to Section II of these Bid Procedures, any Secured Creditor shall be deemed to be a Qualified Bidder, shall be deemed to have submitted a Qualified Bid, and may participate in the Auction with respect to the assets, provided that no other party other than the Administrative Agent may credit bid on the Collateral (as defined in the Cash Collateral Order) unless the entire amount of the allowed prepetition term loan secured indebtedness will be paid in full in cash on the closing of such credit bid transaction.

j.  **Rejection of Bids.**  The Debtors in their reasonable business judgment, in

consultation with the Consultation Parties, may reject, at any time before entry of an order of the Bankruptcy Court approving a Successful Bid (or Backup Bid, as applicable), any Bid that the Debtors determine is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bankruptcy Code and/or the Bid Procedures, or (3) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders.

    k.    **Adjustment of Deposit.**  The Winning Bidder(s) and Backup Bidder(s) shall have one (1) business day from the announcement of the Winning Bid and Backup Bid to deposit with the Debtors in cash an amount sufficient to increase such bidder's Good Faith Deposit to 10% of the Proposed Purchase Price provided for in the Winning Bid or Backup Bid, as applicable.

    l.    **Announcement of Winning Bid and Backup Bid.**  As soon as reasonably practicable after conclusion of the Auction, the Debtors shall file with the Court a notice of the results of the Auction (the "Notice of Winning Bid"), which shall include (i) a copy of the Winning Bid and Backup Bid, (ii) the identities of the Winning Bidder(s) and Backup Bidder(s), and (iii) a list of all executory contracts and unexpired leases proposed to be assumed and assigned as part of the Sale (if any) and the cure cost pursuant to section 365(b) associated with each.

The Debtors, in consultation with the Consultation Parties, may adopt such other rules for the Auction (including procedural rules and rules that may depart from those set forth herein) that they reasonably determine will result in the highest or otherwise best value for the Debtors' estates and that are not inconsistent with any Court order; *provided* that any changed or additional rules of the Auction are not materially inconsistent with these Bid Procedures, do not favor one Qualified Bidder over another, and are communicated to all participants substantially simultaneously at or prior to the Auction.

## XIV.  SALE

A hearing to approve the Sale of the Assets to the Winning Bidder(s) in accordance with the terms of the Winning Bid and pursuant to the Proposed APA associated therewith (the "Sale Hearing") will take place on **February 1, 2024 at 9:30 A.M. (prevailing Central time)**.

    a.    If, for any reason, a Winning Bidder fails to timely consummate the purchase of the Assets, the Debtors, in consultation with the Committee, if any, and with the Administrative Agent's consent, not to be unreasonably withheld, may seek to consummate a Sale to the Backup Bidder in accordance with the terms of the Backup Bid and pursuant to the Proposed APA associated therewith without further approval by the Court (in which case the Backup Bidder shall be deemed the Winning Bidder).

    b.    If a Winning Bidder fails to timely consummate the purchase of the Assets due to a breach or failure to perform on the part of the Winning Bidder, the defaulting Winning Bidder's Good Faith Deposit shall be forfeited to the Debtors and the Debtors specifically reserve the right to seek all available damages from the

defaulting Winning Bidder.

c.  The Backup Bid(s) and the obligation of the Backup Bidder(s) to consummate the purchase of the Assets shall remain open and in full force, including with respect to the Backup Bidder's Good Faith Deposit, until the earlier of (a) the closing of a Sale of the Assets to a Winning Bidder or Backup Bidder or (b) 45 days after the conclusion of the Auction (or, if no Auction is held, 45 days after the date on which the Debtors file a notice of cancellation of Auction).

d.  The Winning Bidder(s) and Backup Bidder(s) shall appear at the Sale Hearing personally or through a duly authorized representative who shall be prepared to testify in support of the Winning Bid(s) and the Winning Bidder's, or Backup Bid(s) and Backup Bidder's, ability to close the Sale in a timely manner and provide adequate assurance of future performance under any and all executory contracts and unexpired leases to be assumed and assigned as part of the Sale.

Any objections to the proposed Sale, including objections to the proposed assumption and assignment of any executory contract or unexpired lease (including any proposed cure cost), must be filed with the Court no later than **January 25, 2024 at 4:00 pm (prevailing Central time)**; *provided, however* that any objections solely on the basis of adequate assurance of future performance by the Winning Bidder or Backup Bidder must be filed no later than **January 30, 2024, at 4:00 p.m. (CT)**.

The Debtors and the Winning Bidder(s) shall consummate the Sale no later than February 12, 2024.  At the closing of the Sale, the Winning Bidder(s) will be entitled to a credit for the amount of its Good Faith Deposit.

## XV.    RETURN OF GOOD FAITH DEPOSITS

The Good Faith Deposits shall be held in a non-interest-bearing account established and held by, and in the name of, the Debtors.   The Good Faith Deposits are not property of the Debtors or their estates.

Within five (5) business days of determining a Bid does not qualify as a Qualified Bid, the Debtors shall return by check or wire the full amount of the Good Faith Deposit submitted in connection with such non-qualified Bid.  Within five (5) business days of the conclusion of the Auction, the Debtors shall return by check or wire the full amount of each Good Faith Deposit submitted by a party that is not selected as the Winning Bidder(s) or Backup Bidder(s).

Unless a Sale is consummated with such bidder or the Good Faith Deposit is forfeited as provided above, the full amount of the Winning Bidder's or Backup Bidder's Good Faith Deposit, as applicable, shall be returned by check or wire within five business days of earlier of (i) the closing of the Sale or (ii) 45 days after the conclusion of the Auction (or, if no Auction is held, 45 days after the date on which the Debtors file a notice of cancellation of Auction).

All Good Faith Deposits shall be returned within five business days of the entry of an order dismissing or converting the chapter 11 case under section 1112 of the Bankruptcy Code if such dismissal or conversion occurs prior to the consummation of a Sale.

## XVI.   BID PROTECTIONS

No bidder, whether or not a Qualified Bidder, shall be entitled to bid protections, other than those Bid Protections provided for in the Stalking Horse APA for the Stalking Horse Purchaser, unless consented to in writing by the Debtors and approved by the Court.   The Debtors reserve the right to seek, in consultation with their advisors and the Consultation Parties, approval of bid protections from the Court on emergency notice to the extent the Debtors determine, in their business judgment, that such bid protections are necessary or advisable under the circumstances to facilitate obtaining the highest and best value for the Debtors' estates.

## XVII.  RESERVATION OF RIGHTS

The Debtors reserve their rights to modify these Bid Procedures in their business judgment, subject to the consent of the Administrative Agent, not to be unreasonably withheld, and in consultation with the Committee, if any, in any manner that will best promote the goals of these Bid Procedures or impose additional customary terms and conditions on the Sale, including extending the deadlines set forth herein, adjourning the Auction or the Sale Hearing, adding procedural rules that are reasonably necessary or advisable under the circumstances to conduct the Auction, cancelling the Auction, and rejecting any or all Bids or Qualified Bids.

## XVIII. CONSENT TO JURISDICTION

All Qualified Bidders at the Auction shall be deemed to have consented to the jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction or the construction and enforcement of these Bid Procedures.

## XIX.   FIDUCIARY DUTIES

Notwithstanding anything to the contrary in the Bid Procedures or any document filed with or entered by the Bankruptcy Court, nothing in the Bid Procedures or the Bid Procedures Order shall require a Debtor or its board of directors, board of managers, or similar governing body to take any action or to refrain from taking any action with respect to any Sale Transaction(s) or the Bid Procedures to the extent such Debtor or governing body determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in the Bid Procedures or any document filed with or entered by the Bankruptcy Court, until the closing of the Auction (if any), the Debtors and their respective directors, managers, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (A) consider, respond to, and facilitate unsolicited alternate proposals for sales or other transactions involving any or all of the Assets (each, an "Alternate Proposal"); (B) provide access to non-public information concerning the Debtors to any entity or enter into reasonable and customary confidentiality agreements or nondisclosure agreements with any entity; (C) maintain or continue discussions or negotiations with respect to Alternate Proposals; (D) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (E) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposals.

Dated: January 9, 2024
Dallas, Texas

**SIDLEY AUSTIN LLP**

/s/ *Rakhee V. Patel*

Samuel A. Newman (admitted *pro hac vice*)
555 West Fifth Street
Los Angeles, California 90013
Telephone:    (213) 896-6000
Facsimile:    (213) 896-6600
Email:        sam.newman@sidley.com

Rakhee V. Patel (TX Bar No. 00797213)
Nathan C. Elner (admitted *pro hac vice*)
Parker G. Embry (TX Bar No. 24126826)
Chelsea M. McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        rpatel@sidley.com
              nelner@sidley.com
              parker.embry@sidley.com
              cmcmanus@sidley.com

Jackson T. Garvey (admitted *pro hac vice*)
One South Dearborn
Chicago, IL 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        jgarvey@sidley.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## __SCHEDULE 1__

Form NDA

[DATE]

**<u>CONFIDENTIAL</u>**

[Interested Party]
[Address Line 1]
[Address Line 2]

Ladies and Gentlemen:

In connection with the consideration of a possible negotiated transaction (a "***Transaction***") between [Interested Party] ("*[Name]*" or "***you***") and Impel Pharmaceuticals, Inc., a Delaware corporation (and/or Impel NeuroPharma Australia Pty Ltd (each, a "Debtor," collectively the "Debtors" or the "Company," and, together with [Name], the "***Parties***" and each of them, a "***Party***")), the Company has furnished or may furnish to you certain information that is proprietary, non-public and/or confidential concerning it, its affiliates or subsidiaries and/or its business, including Confidential Information (as defined below in Section 1).

1.      As a condition to furnishing such information to you, the Company requires that you agree to treat, and direct your Representatives (as defined below in this Section 1) to treat, confidentially any information, data, forecasts, financial or business plans and affairs, projections, products and product development plans, marketing plans, information regarding customers, clients, employees, contracts and contract terms, inventions, processes, intellectual property or know-how (whether prepared by a party, its affiliates, subsidiaries, agents, advisors or otherwise, and whether oral, written or electronic) that the Company or any of its Representatives has furnished or may hereafter furnish to you or your Representatives, or is otherwise received by you or your Representatives through due diligence investigation or discussions with employees or other Representatives of the Company, together with all analyses, summaries, notes, forecasts, studies, data and other documents and materials in whatever form maintained, whether prepared by the Company or you or their respective Representatives or others, which contain or reflect, or are generated from, any such information (being collectively referred to herein as "***Confidential Information***"), and to take or abstain from taking certain other actions set forth herein. As used herein, the term "***Representative***" means, when used with respect to any party, such party's subsidiaries and affiliates and its and its subsidiaries' and affiliates' respective directors, officers, employees, affiliates, consultants, attorneys, agents, counsel, advisors and other representatives; <u>provided</u> that the term "Representative" with respect to you shall <u>not</u> include (a) any potential co-investors, equity partners or participants in a Transaction, or any other equity financing sources (including any of your investors, equity holders or limited partners), in each case without our prior written consent (and, upon such consent, shall be so included), (b) any potential debt financing sources without our prior written consent (and, upon such consent, shall be so included) or (c) any of your portfolio companies, including the directors, officers or employees of any such portfolio companies (in their capacity as such), without our prior written consent (and, upon such consent, shall be so included).

2.      The term "Confidential Information" does not include information that (a) is already in your possession as shown by your files and records immediately prior to the time of disclosure; <u>provided</u> that such information is not known by you to be subject to a legal, contractual or fiduciary obligation of confidentiality to the Company or any other party with respect to such

[Interested Party]
[DATE], 2024

information, (b) is or becomes generally available to the public other than as a result of a breach of the terms hereof by you or your Representatives, (c) is received by you on a non-confidential basis from a source other than the Company or its Representatives; <u>provided</u> that such source is not known by you to be bound by a legal, contractual or fiduciary obligation of confidentiality to the Company or any other party with respect to such information, or (d) is independently developed by you or your Representatives without reference to, reliance on or use of any Confidential Information.

3.      You hereby agree that the Confidential Information will be used by you and your Representatives solely for the purpose of evaluating, proposing or negotiating a possible Transaction and for no other purpose, and will be kept confidential by you and your Representatives and will not be disclosed to any other person; <u>provided</u> that any of such information may be disclosed to your Representatives who need to know such information solely for the purpose of evaluating any such possible Transaction and who have been advised of this letter agreement and the confidential nature of the Confidential Information and the Transaction Information (as defined below in Section 7) and have agreed in writing to comply with the terms hereof (other than <u>Section 11</u>) to the same extent as if such Representative were a party hereto. Any action by any of your Representatives that would constitute a breach of this letter agreement if taken by you (other than <u>Section 11</u>) shall be deemed to constitute a breach of this letter agreement by you. Furthermore, you hereby agree, at your sole expense, to take all reasonable measures (including court proceedings) to restrain your Representatives from prohibited or unauthorized disclosure or use of such Confidential Information. You understand that the Company reserves the right to adopt additional specific procedures to protect the confidentiality of the Confidential Information and may seek to limit the disclosure or use of, and may establish additional specific procedures with respect to the access of, competitively sensitive Confidential Information. The Confidential Information shall remain the property of the Company, and disclosure to you shall not confer on you any rights (including any intellectual property rights) with respect to such Confidential Information, other than limited use rights specifically set forth in this letter agreement. You agree that you will take all reasonable measures to protect the secrecy of and avoid disclosure or use of Confidential Information in order to prevent it from falling into the public domain or the possession of any person or entity other than those persons or entities authorized hereunder to have any such information, which measures shall include the highest degree of care that you utilize to protect your own Confidential Information of a similar nature. You also agree to notify the Company in writing promptly of any unauthorized disclosure, misuse or misappropriation of the Confidential Information that comes to your attention.

4.      You hereby acknowledge that you are aware, and that you will advise your Representatives who are informed or, to your knowledge, become aware of the matters that are the subject of this letter, that the United States securities laws prohibit any person who has received from an issuer material, nonpublic information from purchasing or selling securities of such issuer or from communicating such information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.

5.      In the event that you or any of your Representatives receives a request, or is legally required, to disclose all or any part of the information contained in the Confidential Information under the terms of a subpoena or order issued by a court or governmental or regulatory body of competent jurisdiction or under any applicable law, governmental proceeding or stock exchange rule, you agree to (a) except to the extent prohibited by applicable law, immediately notify the Company of the existence, terms and circumstances surrounding such a request or requirement so

[Interested Party]
[DATE], 2024

that the Company may, at its expense, seek an appropriate protective order or other remedy and/or waive compliance with the applicable provisions of this letter agreement (and, if the Company seeks such an order or other remedy, you agree to provide such cooperation as the Company may reasonably request at its expense) and (b) if disclosure of such information is legally permitted, notify the Company in writing of such information to be disclosed as far in advance of its disclosure as practicable, exercise reasonable best efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such of the disclosed information that the Company so designates and then disclose only that portion of the Confidential Information that is legally required to be disclosed.  Without limiting the foregoing, you will not oppose any action by the Company to obtain an appropriate protective order or other remedy with respect to such information.

6.      Without the prior written consent of the Company, you will not, and will cause your Representatives not to, enter into any agreement, arrangement or understanding with any other person that limits, restricts or otherwise impairs in any manner, directly or indirectly, such person from making a proposal for, or engaging in discussions, conducting due diligence or entering into an agreement with respect to, any potential transaction between such person and the Company or the provision of financing in connection with a potential transaction involving the Company.  You represent and warrant that, except as disclosed to the Company or its legal advisors prior to your execution of this letter agreement, neither you nor any Representative of yours have, prior to your execution of this letter agreement, taken any of the actions referred to in this Section 6; provided that, subject to obtaining the Company's prior written consent with respect to including any potential equity or debt financing source as your Representative as provided in Section 1, nothing shall prohibit or restrict you from entering into customary "tree" arrangements with such financing institutions by which a deal team at each institution works on obtaining or providing potential debt financing for you for the Transaction (and is not permitted to work on obtaining or providing potential debt financing for any other bidder pursuing the Transaction, but other deal teams at such institution may do so).

7.      Without the prior written consent of the Company, you will not, and will cause your Representatives not to, disclose to any person (other than to your Representatives who need to know such information solely for the purpose of a possible Transaction and who have been advised of this letter agreement and the confidential nature of such information and have agreed in writing to comply with the terms hereof (other than Section 11) to the same extent as if they were a party hereto): (a) the fact that investigations, discussions or negotiations between the Parties are taking place or have taken place concerning a possible Transaction, (b) any of the terms, conditions or other facts with respect to any such possible Transaction, including the status thereof or the other Party's consideration of a possible Transaction, or (in your case) any opinion or view with respect to the Confidential Information or the Company, (c) that the Parties or any of their respective affiliates or subsidiaries are or have been considering or reviewing a transaction involving or relating to the other Party or (d) that this letter agreement exists or that Confidential Information has been requested or made available to you or your Representatives (clauses (a) through (d) collectively, "**Transaction Information**").

8.      This letter agreement does not constitute or create any obligation of the Company to provide any information to you.  The Company may at any time in its sole discretion decline to provide you with any Confidential Information, deny your access to any electronic data room or terminate further discussions with you regarding a Transaction.  You understand that neither the Company nor any of its Representatives have made or make any express or implied representation

[Interested Party]
[DATE], 2024

or warranty as to the accuracy or completeness of any Confidential Information, and agree that neither the Company nor its Representatives shall have any liability to you or your Representatives or stockholders on any basis (including in contract, tort, under federal or state securities laws or otherwise), and neither you nor your Representatives will make any claims whatsoever against such other persons, with respect to or arising out of the review of or use or content of any Confidential Information or any errors therein or omissions therefrom, or any action taken or any inaction occurring in reliance on any Confidential Information, in each case, except as may be expressly provided in any definitive agreement with respect to any Transaction. You and your Representatives agree not to assert any claim of title or ownership to the Confidential Information, nor does this Agreement grant you or your Representatives any licenses in respect of any such information. If Confidential Information that is software is provided in object code form, you will not, and will not permit your Representatives or any third party to, reverse engineer, decompile, or disassemble such object code or take any other steps to derive a source code equivalent thereof. You shall be liable for any losses or damages incurred by the Company as a result of a breach or violation by you or your Representatives of any export control laws or regulations that apply to any of the Confidential Information.

9.     At the request of the Company, you and your Representatives shall promptly, at your election, either (a) return to the Company all of the written or electronic Confidential Information received from the Company or (b) destroy all of the written or electronic Confidential Information then in your or your Representatives' possession. In either event, you shall also destroy all written or electronic data developed or derived from the Confidential Information, and shall cause your Representatives to do likewise. All return and/or destruction pursuant to this Section 9 shall be certified in writing to the Company by an authorized representative supervising such destruction. In such event, all of the oral Confidential Information and the Transaction Information shall remain subject to the terms of this letter agreement. Notwithstanding anything to the contrary in the foregoing, such obligation to return or destroy the Confidential Information shall not cover information (1) to the extent required to be retained by a regulator, bank examiner or pursuant to applicable law or regulation or (2) that is automatically maintained on routine computer system backup tapes, disks or other backup storage devices as long as such backed-up information is not used, disclosed, accessed or otherwise recovered from such backup devices; provided that such materials referenced in this sentence shall remain indefinitely subject to the terms of this letter agreement applicable to Confidential Information (irrespective of the termination of this letter agreement).

10.     Neither you nor any of your Representatives will initiate or cause to be initiated any (a) communication concerning the Confidential Information, (b) requests for meetings with management in connection with a possible Transaction (including, for the avoidance of doubt, any equity or employment agreements to be entered into in connection therewith) or (c) any other communication relating to the Company (other than in the ordinary course of business) or a possible Transaction, in each case with any director, officer or employee of the Company or any of its subsidiaries who has not been designated by the Company to receive such communications. Any requests for information, meetings or discussions relating to a possible Transaction should be directed solely to Moelis & Company, LLC, unless otherwise specified in writing by the Company.

11.     You agree that, for a period of 12 months from the date of this letter agreement, neither you nor your controlled affiliates will, directly or indirectly, solicit for employment any employee of the Company or any of its subsidiaries, or otherwise solicit, induce or encourage any such person to discontinue or refrain from entering into any employment or consulting relationship

[Interested Party]
[DATE], 2024

(contractual or otherwise) with the Company or any of its subsidiaries; provided that this sentence shall not prohibit (a) general advertising or other general solicitation through newspaper advertisements or Internet posting services not targeted at the employees of the Company or its subsidiaries or (b) any broad based recruitment efforts conducted by a recruitment agency not directed by you or your affiliates at the Company or any of its subsidiaries.

12.    You acknowledge that the Company may be entitled to the protections of the attorney work-product doctrine, attorney-client privilege or similar protections or privileges with respect to portions of the Confidential Information.  The Company is not waiving, and will not be deemed to have waived or diminished, any of its attorney work-product protections, attorney-client privileges or similar protections or privileges as a result of the disclosure of such Confidential Information pursuant to this letter agreement.  In furtherance of the foregoing, you will not claim or contend, in proceedings involving either Party, that the Company waived the protections of the attorney work-product doctrine, attorney-client privilege or similar protections or privileges as a result of the disclosure of such Confidential Information pursuant to this letter agreement.

13.    You acknowledge and agree that the Confidential Information has competitive value and is of a confidential and proprietary nature.  Furthermore, you acknowledge and agree that the Company would be irreparably injured by a breach of this letter agreement by you or your Representatives and that money damages are an inadequate remedy for an actual or threatened breach of this letter agreement because of the difficulty of ascertaining the amount of damage that will be suffered by the Company in the event that this letter agreement is breached.  Therefore, you agree to the granting of specific performance of this letter agreement and injunctive or other equitable relief in favor of the Company as a remedy for any such breach, without proof of actual damages.  You further waive any requirement for the securing or posting of any bond in connection with any such remedy.  Such remedy shall not be deemed to be the exclusive remedy for your breach of this letter agreement, but shall be in addition to all other remedies available at law or equity to the other Party.  In the event of an order by a court of competent jurisdiction relating to a breach of this letter agreement, the non-prevailing Party shall reimburse the prevailing Party for all reasonable attorneys' fees incurred by the prevailing Party incurred in connection with any litigation relating to such breach.

14.    No failure or delay by either Party in exercising any right, power or privilege under this letter agreement shall operate as a waiver thereof, and no single or partial exercise thereof shall preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

15.    No contract or agreement providing for a Transaction shall be deemed to exist unless and until a definitive agreement has been executed and delivered by each of the parties thereto.  Accordingly, each Party agrees that unless and until any definitive agreement with respect to a Transaction has been executed and delivered by the Parties, neither of the Parties nor any of their affiliates or subsidiaries will be under any legal obligation of any kind whatsoever with respect to such a Transaction by virtue of this or any written or oral expression with respect to such Transaction by any of its directors, officers, employees, agents or any other Representatives, except for the matters specifically agreed in this letter agreement and as may be set forth in any such definitive agreement.  Each Party further acknowledges and agrees that (a) the other Party shall have no obligation to authorize or pursue with it any Transaction, (b) it understands that the other Party has not, as of the date hereof, authorized or made any decision to pursue any such Transaction and (c) the Company reserves the right, in its sole and absolute discretion and without giving any

[Interested Party]
[DATE], 2024

reason therefor, to reject all proposals and to terminate discussions, negotiations and access to the Confidential Information, in each case at any time.  For purposes of this letter agreement, the term "***definitive agreement***" does not include an executed letter of intent, this letter agreement or any other preliminary written agreement, nor does it include any written or oral offer or bid or any written or oral acceptance thereof.

16.     This letter agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns, or to the extent applicable, such Party as debtor-in-possession or reorganized debtor in connection with a bankruptcy or insolvency proceeding of such Party, or the purchaser of such Party.  This letter agreement contains the entire agreement between the Parties concerning the subject matter hereof and supersedes all previous agreements, written or oral, between the Parties or their respective affiliates, relating to the subject matter hereof.  No waiver of the terms and conditions hereof will be binding unless approved in writing by the Party against whom such waiver is sought to be enforced.  No amendment of this letter agreement will be binding unless approved in writing by both Parties.  You will not assign or transfer any rights or obligations under this Agreement without the prior written consent of the Company and any attempted assignment, subcontract, delegation, or transfer in violation of the foregoing will be null and void (without limiting this Section 16).

17.     If any term, provision, covenant or restriction of this letter agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this letter agreement shall remain in full force and effect to the fullest extent permitted by law and shall in no way be affected, impaired or invalidated.

18.     This letter agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements entered into and performed solely within the State of Delaware, without regard to any principles of conflicts of law that would refer a matter to another jurisdiction. EACH PARTY ALSO HEREBY IRREVOCABLY AND UNCONDITIONALLY CONSENTS TO SUBMIT TO THE JURISDICTION OF THE CHANCERY COURT OF THE STATE OF DELAWARE LOCATED IN WILMINGTON, DELAWARE, AND RELATED APPELLATE COURTS, AND OF THE UNITED STATES OF AMERICA LOCATED IN DELAWARE, for any actions, suits or proceedings arising out of, or relating to, this letter agreement or the transactions contemplated hereby, and each Party agrees not to commence any action, suits or proceeding relating thereto except in such courts; provided that to the extent the Company is a debtor in a bankruptcy or insolvency proceeding, such court shall have exclusive jurisdiction over this letter agreement to the fullest extent of applicable law.  Each Party further agrees that service of any process, summons, notices or documents by U.S. registered mail, postage prepaid, to its address set forth in this letter agreement shall be effective service for process for any action, suit or proceeding brought against such Party in any such court.  Each Party irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this letter agreement or the transactions contemplated hereby, in the courts of the State of Delaware or the United States of America located in the State of Delaware or the bankruptcy court or other court of competent jurisdiction overseeing the Company's bankruptcy or insolvency proceeding, as applicable.  Each Party hereby further irrevocably and unconditionally waives any right to trial by jury and waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

19.     For purposes of this letter agreement, (a) the term "***person***" means any individual,

[Interested Party]
[DATE], 2024

corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, governmental or regulatory body or other entity; (b) the term "***affiliate***" means, when used with respect to any party, a person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such party; (c) the term "***subsidiary***" means, when used with respect to any party, (i) a person that is directly or indirectly controlled by such party, (ii) a person of which such party beneficially owns, either directly or indirectly, more than 50% of the total combined voting power of all classes of voting securities of such person, the total combined equity interests of such person or the capital or profit interests, in the case of a partnership or (iii) a person of which such party has the power to vote, either directly or indirectly, sufficient securities to elect a majority of the board of directors or similar governing body of such person and; (d) the term "***control***" means, when used with respect to any specified person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities or other interests, by contract, agreement or otherwise.

20.    This letter agreement may be executed in counterparts, each of which shall be deemed to be an original, but both of which shall constitute the same agreement.  Signatures to this letter agreement transmitted by facsimile transmission, by electronic mail in "portable document format" (.pdf) form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

21.    Except as otherwise explicitly stated above, your obligations under this letter agreement shall terminate three years after the date of this letter agreement, except such obligations under <u>Sections 8</u>, <u>9</u> and <u>12</u> through <u>18</u>, which shall have no expiration period.  The termination of this letter agreement shall not relieve you from your responsibilities in respect of any breach of this letter agreement prior to such termination.

*[Signature Page Follows]*

[Interested Party]
[DATE], 2024

      If you are in agreement with the foregoing, please so indicate by signing and returning one copy of this letter agreement, which will constitute our agreement with respect to the matters set forth herein.

      Very truly yours,


      IMPEL PHARMACEUTICALS, INC.


      By: _____

      _____
      Name: _____
      Title: _____



Accepted, Confirmed and Agreed:

[Interested Party]


By: _____
Name: _____
Title: _____

## Exhibit 2

**Stalking Horse APA**

*Execution Version*

# ASSET PURCHASE AGREEMENT

**by and between**

**JN BIDCO LLC, as Purchaser,**

**and**

**IMPEL PHARMACEUTICALS INC., as Seller**

**Dated as of December 18, 2023**

50307134.17

## Table of Contents

**Page**

ARTICLE 1.      DEFINED TERMS ................................................................................................2

    1.1    **Defined Terms** ................................................................................2

    1.2    **Other Definitional and Interpretive Matters** ................................13

ARTICLE 2.      THE PURCHASE AND SALE; CLOSING ................................................15

    2.1    **Purchase and Sale** ................................................................15

    2.2    **Excluded Assets** ................................................................17

    2.3    **Assumption of Liabilities** ................................................18

    2.4    **Excluded Liabilities** ................................................................19

    2.5    **Excluded Contracts** ................................................................19

    2.6    **Nontransferable Assets and Liabilities** ........................19

    2.7    **Closing** ................................................................20

    2.8    **Closing Deliveries of the Parties** ................................20

    2.9    **Purchase Price; Assumed Liabilities; Deposits** ..........21

    2.10    **Transfer Taxes** ................................................................22

    2.11    **Allocation of Purchase Price** ........................................22

    2.12    **Escrow Accounts** ................................................................23

    2.13    **Additional Consideration.** ................................................23

ARTICLE 3.      REPRESENTATIONS AND WARRANTIES OF THE SELLER .................26

    3.1    **Organization, Good Standing and Other Matters; Subsidiaries** ....................26

    3.2    **Authority and Enforceability** ................................26

    3.3    **No Conflict; Required Filings and Consents** ..........26

    3.4    **Compliance With Laws** ................................................27

    3.5    **Permits** ................................................................27

    3.6    **Litigation** ................................................................28

    3.7    **Real Property; Personal Property** ................................28

    3.8    **Assigned Contracts** ................................................28

    3.9    **Financial Statements.** ................................................28

    3.10    **Absence of Material Developments.** ............................29

    3.11    **Customers and Suppliers.** . ................................29

i

3.12 **Intellectual Property** ...................................................................................29

3.13 **Inventories.** ..........................................................................................................31

3.14 **Taxes** .....................................................................................................................31

3.15 **Product Liability** ................................................................................................31

3.16 **Product Warranties; Product Return** ...........................................................31

3.17 **Accounts Payable** ..............................................................................................31

3.18 **Brokers and Finders** .........................................................................................31

3.19 **No Other Representations or Warranties** ...................................................32

ARTICLE 4.      REPRESENTATIONS AND WARRANTIES OF PURCHASER .................32

4.1 **Organization, Good Standing and Other Matters** ......................................32

4.2 **Authority and Enforceability** .........................................................................32

4.3 **No Conflict: Required Filings and Consents** ...............................................33

4.4 **Financing** .............................................................................................................33

4.5 **Solvency** ...............................................................................................................33

4.6 **Litigation** .............................................................................................................33

4.7 **Brokers and Finders** .........................................................................................33

4.8 **Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties** ...................................34

4.9 **No Other Representations or Warranties** ...................................................35

ARTICLE 5.      BANKRUPTCY COURT MATTERS .....................................................35

5.1 **Competing Transaction** ....................................................................................35

5.2 **Bankruptcy Court Filings** ...............................................................................35

5.3 **Assumption of Assigned Contracts** ................................................................37

ARTICLE 6.      PRE-CLOSING COVENANTS ..............................................................38

6.1 **Conduct of Business** ..........................................................................................38

6.2 **Access to Information; Confidentiality** .........................................................39

6.3 **Efforts to Consummate** .....................................................................................40

6.4 **Notices and Consents** ........................................................................................40

6.5 **Regulatory Matters** ...........................................................................................41

6.6 **Public Announcements** ......................................................................................41

6.7 **Update of Schedules; Knowledge of Breach** .................................................41

ARTICLE 7.      POST-CLOSING COVENANTS ............................................................42

7.1 **Access to Information; Books and Records** ...................................................42

50307134.17

7.2    **Post-Closing Receipt and Possession of Assets** ...................................................42

7.3    **Tax Matters** ...................................................43

ARTICLE 8.    CONDITIONS PRECEDENT ...................................................45

8.1    **Conditions to Each Party's Obligation** ...................................................45

8.2    **Conditions to Obligation of Purchaser** ...................................................45

8.3    **Conditions to Obligations of the Seller** ...................................................46

8.4    **Waiver of Condition; Frustration of Conditions** ...................................................46

ARTICLE 9.    TERMINATION ...................................................46

9.1    **Events of Termination** ...................................................46

9.2    **Effect of Termination** ...................................................48

9.3    **Termination Fee and Expense Reimbursement** ...................................................48

ARTICLE 10.    GENERAL PROVISIONS ...................................................49

10.1    **Survival of Representations, Warranties and Covenants** ...................................................50

10.2    **Entire Agreement** ...................................................50

10.3    **Amendment; No Waiver** ...................................................50

10.4    **Severability; Specific Versus General Provisions** ...................................................51

10.5    **Expenses and Obligations** ...................................................51

10.6    **Notices** ...................................................51

10.7    **Counterparts** ...................................................53

10.8    **Governing Law** ...................................................53

10.9    **Submission to Jurisdiction; Consent to Service of Process** ...................................................53

10.10    **Waiver of Jury Trial** ...................................................53

10.11    **Rights Cumulative** ...................................................54

10.12    **Assignment** ...................................................54

10.13    **Specific Enforcement; Remedies** ...................................................55

10.14    **Third-Party Beneficiaries** ...................................................55

10.15    **No Personal Liability of Directors, Officers and Owners** ...................................................55

10.16    **General Release** ...................................................56

10.17    **Legal Representation** ...................................................57

**SCHEDULES**

50307134.17

Schedule A                    Subsidiaries


**EXHIBITS**

Exhibit A                        Form of Escrow Agreement
Exhibit B                        Form of Bill of Sale and Assignment and Assumption
                                 Agreement

iv

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of December 18, 2023 (the "**Agreement Date**") is entered into by and between JN Bidco LLC, a Puerto Rico limited liability company ("**Purchaser**") and Impel Pharmaceuticals Inc., a Delaware corporation (the "**Seller**").

## RECITALS

**WHEREAS**, on or about December 20, 2023 (the "**Petition Date**") the Seller and the Subsidiary intend to file voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**"), thereby commencing chapter 11 cases (collectively, the "**Bankruptcy Cases**");

**WHEREAS**, the Seller is a debtor-in-possession under the Bankruptcy Code and manages its properties and assets pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Seller is engaged in the Business and owns, directly or indirectly, all of the Transferred Assets;

**WHEREAS**, the Seller desires to sell (or cause to be sold) to Purchaser, and Purchaser desires to purchase from the Seller, all of the Transferred Assets Free and Clear, and the Seller desires Purchaser to assume, and Purchaser desires to assume from the Seller, all of the Assumed Liabilities, in each case upon the terms and subject to the conditions hereof, pursuant to a Sale Order and Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

**WHEREAS**, the Transactions contemplated by this Agreement are subject to approval by the Bankruptcy Court and will only be consummated pursuant, among other things, to the Sale Order to be entered in the Bankruptcy Cases; and

**WHEREAS**, concurrently with the execution of this Agreement, Purchaser shall deposit (or cause to be deposited) an aggregate amount equal to the Deposit Escrow Amount into an escrow account (the "**Deposit Escrow Account**") to be established and maintained by Escrow Agent pursuant to the Escrow Agreement.

**WHEREAS**, concurrently with the execution of this Agreement, an affiliate of Purchaser (the "**Guarantor**") will enter into that certain letter agreement pursuant to which the Guarantor will guarantee the payment and performance obligations of Purchaser under this Agreement.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual representations, warranties, covenants, agreements and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

50307134.17

## ARTICLE 1.
## DEFINED TERMS

1.1     **Defined Terms**. The following terms shall have the following meanings in this Agreement:

"**Action**" means any action, proceeding, arbitration or litigation (whether civil, criminal or administrative) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"**Affiliate**" of any particular Person means any other Person, directly or indirectly, controlling, controlled by, or under common control with, such particular Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Agreement Date**" has the meaning set forth in the preamble.

"**Allocation Schedule**" has the meaning set forth in Section 2.11(a).

"**Alternate Transaction**" has the meaning set forth in Section 9.1(b).

"**Applicable Law**" means, with respect to any Person, any federal, provincial, state, local law, ordinance, principle of common law, code, regulation or statute applicable to such Person or such Person's subsidiaries or to any of their respective securities, assets, properties or businesses.

"**Asset Tax Return**" means any Tax Return relating to Asset Taxes.

"**Asset Taxes**" means any Taxes with respect to the ownership or operation of the Transferred Assets other than (a) Taxes based on net or gross income, and (b) Transfer Taxes.

"**Assigned Contracts**" has the meaning set forth in Section 2.1(e).

"**Assumed Liabilities**" has the meaning set forth in Section 2.3.

"**Assumption Notice**" has the meaning set forth in Section 5.3(a).

"**Attorney-Client Information**" has the meaning set forth in Section 10.17.

"**Auction**" has the meaning set forth in Section 5.2(i).

"**Avoidance Actions**" means any and all avoidance, recovery, subordination, or other claims, actions, rights, or remedies that may be brought by or on behalf of the Seller or its estate or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including, but not limited to, actions or remedies under sections 510, 542, 543, 544, 545, and 547 through and including 553 of the Bankruptcy Code.

2

50307134.17

"**Back-Up Bid**" means the second highest or otherwise best bid if the successful bidder fails to consummate its bid in accordance with the Bid Procedures.

"**Back-up Termination Date**" means the first to occur of (a) thirty (30) days after the entry of the Sale Order, (b) consummation of the Transactions with the winning bidder at the Auction, (c) Purchaser's receipt of notice from the Seller of the release by the Seller of Purchaser's obligations under Section 5.2(i) and (d) March 13, 2024.

"**Bankruptcy Cases**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bid Procedures**" means those certain bidding procedures for the Sale of the Seller's assets approved by the Bankruptcy Court.

"**Bid Procedures Motion**" means a motion filed by Seller with the Bankruptcy Court to seek approval of the Bid Procedures.

"**Bid Procedures Order**" means an Order of the Bankruptcy Court approving the Bid Procedures.

"**Bill of Sale and Assignment and Assumption Agreement**" means the bill of sale and assignment and assumption agreement, dated as of the Closing Date, by and between the Seller and Purchaser, substantially in the form attached hereto as Exhibit B.

"**Business**" means the business as presently conducted of the Seller Group related to (i) the development, manufacture, sale, maintenance, and commercialization of the Trudhesa drug product, the Trudhesa I123 POD device, and the Trudhesa Assets and (ii) the development, manufacture, sale, maintenance, and commercialization of the INP105 drug product, the POD devices, and the POD Technology Assets.

"**Business Day**" means any day other than (a) a Saturday, Sunday or federal holiday or (b) a day on which commercial banks in Seattle, Washington are authorized or required to be closed.

"**Business Intellectual Property**" means all Owned Intellectual Property Assets together with all other Intellectual Property used in, held for use in, or necessary for the conduct of the Business.

"**Buyer's FDA Transfer Letters**" means the letter to FDA in form and substance reasonably agreed by Purchaser and the Seller, accepting the transfer of rights to the NDA issued by FDA for Product from Seller.

"**Closing**" has the meaning set forth in Section 2.7.

"**Closing Date**" has the meaning set forth in Section 2.7.

3

50307134.17

"**Code**" means the Internal Revenue Code of 1986, as amended, or any successor law.

"**Competing Bid**" has the meaning set forth in Section 5.1.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of October 17, 2023 by and between the Seller and Purchaser.

"**Consent**" means any consent, approval, authorization, waiver or license.

"**Contract**" means any written agreement, mortgage, indenture, lease (whether for real or personal property), contract or subcontract.

"**Contracting Parties**" has the meaning set forth in Section 10.15

"**Cure Costs**" means any and all costs, expenses or actions that Purchaser is required to pay or perform to assume any of the Assigned Contracts pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code.

"**Deposit Escrow Account**" has the meaning set forth in the Recitals.

"**Deposit Escrow Amount**" means $1,500,000.

"**Designated Contracts**" has the meaning set forth in Section 5.3(b).

"**Designation Deadline**" has the meaning set forth in Section 5.3(b).

"**Determined Cure Costs**" means all Cure Costs for Assigned Contracts, as determined by a final order of the Bankruptcy Court.

"**Enforceability Exceptions**" means applicable bankruptcy, insolvency, reorganization, moratorium, receivership and similar Applicable Laws affecting the enforcement of creditors' rights generally and general equitable principles.

"**Environmental Laws**" means any Applicable Law relating to pollution or protection of the environment or worker health and safety (in respect of exposure to Hazardous Substances), including such Applicable Laws relating to the use, treatment, storage, disposal, Release or transportation of Hazardous Substances.

"**Escrow Agent**" means PNC Bank, National Association.

"**Escrow Agreement**" means the escrow agreement, dated as of the Agreement Date, by and among Purchaser, the Seller and the Escrow Agent in substantially the form attached hereto as Exhibit A.

"**Excluded Assets**" has the meaning set forth in Section 2.2.

"**Excluded Books and Records**" means the following originals and copies of those books and records, documents, data and information (in whatever form maintained) of the Seller Group and the Business: (i) all corporate minute books (and other similar corporate records) and stock

50307134.17

records of the Seller Group, (ii) any books and records relating to the Excluded Assets or (iii) any books, records or other materials that any member of the Seller Group (x) is required by Applicable Law to retain (copies of which, to the extent permitted by Applicable Law, will be made available to Purchaser upon Purchaser's reasonable request), (y) reasonably believes is necessary to enable it to prepare and/or file Tax Returns (copies of which will be made available to Purchaser upon Purchaser's reasonable request) or (z) are prohibited by Applicable Law from delivering to Purchaser.

"**Excluded Contracts**" has the meaning set forth in <u>Section 2.5</u>.

"**Excluded Liabilities**" has the meaning set forth in <u>Section 2.4</u>.

"**Expense Reimbursement**" means the reimbursement by the Seller of Purchaser's actual and reasonable out-of-pocket legal, accounting, and other third-party advisory or service costs and expenses incurred in connection with the Transactions, as evidenced by invoice(s) provided to the Seller, on the terms and subject to the conditions of <u>Section 9.3</u>.

"**FDA**" means the United States Food and Drug Administration.

"**Final Order**" means an Order, judgment or other decree of the Bankruptcy Court or any other Governmental Authority of competent jurisdiction that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect; <u>provided</u>, that such Order shall be considered a Final Order only after the time period for third parties seeking appeal has expired without the filing of any appeal or motion for reconsideration.

"**Free and Clear**" means free and clear of all Liens (other than the Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code.

"**GAAP**" means generally accepted accounting principles in the United States as of the Agreement Date.

"**Governmental Authority**" means any domestic or foreign national, provincial, state, multi-state or municipal or other local government, any subdivision, agency, commission or authority thereof, any court (including the Bankruptcy Court) or tribunal or any quasi-governmental or private body exercising any regulatory or taxing authority thereunder (including the IRS and the FDA).

"**Hazardous Substances**" means any substances, materials or wastes which are defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "toxic substances", "pollutants" or "contaminants" under any Environmental Law, including any petroleum or refined petroleum products, radioactive materials, friable asbestos or polychlorinated biphenyls.

"**Intellectual Property**" means any and all intellectual property and proprietary rights in any jurisdiction throughout the world, including rights arising from the following: (i) patents and patent applications, design rights, industrial design registrations and applications therefor, divisions, continuations, continuations-in-part, reissues, substitutes, renewals, registrations, confirmations, reexaminations, extensions and any provisional applications, and any foreign or

50307134.17

international equivalent of any of the foregoing; (ii) trademarks (whether registered, unregistered or applied for), service marks, trade dress, service names, trade names, brand names, product names, slogans, logos, business names, corporate names, and other source or business identifiers, all registrations and applications for registration thereof, and, in each case, together with all of the goodwill associated therewith; (iii) works of authorship, copyrights and all registrations and applications for registration thereof; (iv) trade secrets and know-how; (v) rights in formulae, methods, techniques, processes, assembly procedures, software, software code (in any form, including source code and executable or object code), subroutines, test results, test vectors, user interfaces, protocols, schematics, specifications, drawings, prototypes, molds and models, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing), and (vi) social media accounts, social media identifiers, internet domain name registrations.

"**Intellectual Property Assignment Agreement**" means the assignment agreement assigning the Intellectual Property to Purchaser, in a form reasonably acceptable to Purchaser and the Seller and executed and delivered at Closing.

"**Intellectual Property Registrations**" means, as to any Owned Intellectual Property Assets, any issuance, registration, application or other filing by, to or with any Governmental Authority or authorized private registrar in any jurisdiction, including domain names, registered trademarks and copyrights, issued and reissued patents and pending applications for any of the foregoing.

"**IRS**" means the United States Internal Revenue Service.

"**Knowledge**" means (a) with regard to the Seller, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of Len Paolillo, Michael Kalb and John Hoekman, in each case as of the Agreement Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate) and (b) with regard to Purchaser, the actual knowledge, without any implication of verification or investigation concerning such knowledge, of David Risk, Ray Canole and Nirav Patel as of the Agreement Date (or, with respect to a certificate delivered pursuant to this Agreement, as of the date of delivery of such certificate).

"**Law Firms**" means Fenwick & West LLP, Sidley Austin LLP and each of their respective successors.

"**Liabilities**" shall mean debts, liabilities, duties, obligations or commitments of any nature whatsoever, whether direct or indirect, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise, whenever or however arising (including whether arising out of any Contract or in a tort claim based on negligence or strict liability).

"**Lien**" means all forms of lien (including mechanic's, contractor's or other similar liens arising under or relating to the provision of goods or services on or to any Transferred Assets, and liens arising under the Bankruptcy Code), encumbrance, defect or irregularity in title, pledge, mortgage, deed of trust, deed to secure debt, security interest, charge, transfer restriction or similar

agreement or encumbrance, including any dedication under any gathering, transportation, treating, processing, fractionating, purchase, sale or similar agreements, or any other rights granted or consensual as or against any Transferred Assets including but not limited to easements, encroachments, rights of first refusal, options, or any other interest or right in property that constitutes a lien or interest within the definition or adjudication of such terms under Section 101(37) of the Bankruptcy Code.

"**Material Adverse Effect**" means a material adverse effect on the business, financial condition or results of operations of the Business (including the Transferred Assets and Assumed Liabilities) taken as a whole; provided, however, that none of the following shall be deemed (either alone or in combination) to constitute, and none of the following shall be taken into account in determining whether there has been or may be, a Material Adverse Effect: (a) any change in, or effects arising from or relating to, general business or economic conditions affecting any industry in which the Business operates; (b) any change in, or effects arising from or relating to, the United States or foreign economies, or securities, banking or financial markets in general, or other general business, banking, financial or economic conditions (including (i) any disruption in any of the foregoing markets, (ii) debt defaults or other restructuring events of any country with respect to which bondholders take a discount to the debt of any country or any increases in the interest rates for any country's debt, (iii) any change in currency exchange rates, (iv) any decline or rise in the price of any security, commodity, contract or index and (v) any increased cost, or decreased availability, of capital or pricing or terms related to any financing for the Transactions); (c) any change from, or effects arising from or relating to, the occurrence, escalation or material worsening of any act of God or other calamity, natural disaster, pandemic or disease, outbreak, hostility, act of war, sabotage, cyber-attack or terrorism or military action; (d) any action taken by Purchaser or its Affiliates with respect to the Transactions or with respect to the Business; (e) any action taken, or failed to be taken, by the Seller at the request of or with the consent of Purchaser or otherwise in compliance with the terms of this Agreement or any change from, or effects arising from or relating to, Purchaser's failure to consent to any action restricted by Section 6.1; (f) any change in, or effects arising from or relating to changes in, Applicable Law or accounting rules (including GAAP) or any interpretation thereof; (g) the failure of the Business to meet any of its projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics or the inputs into such items (whether or not shared with Purchaser or its Affiliates or representatives); (h) national or international political, labor or social conditions; (i) the public announcement of, entry into or pendency of, actions required or contemplated by or performance of obligations under, this Agreement and the Transactions or the identity of the parties to this Agreement, including any termination of, reduction in or similar adverse impact on relationships, contractual or otherwise, with any customers, suppliers, financing sources, licensors, licensees, distributors, partners, employees or others having relationships with the Business; (j) the sale of any assets other than the Transferred Assets to any third parties by a member of the Seller Group or any of their Affiliates; (k) any effect arising or resulting from or related to the filing of the Bankruptcy Cases; (l) any action required to be taken under any Applicable Law or Order or any existing Contract by which any member of the Seller Group's (or any of their properties) are bound; (m) seasonal changes in the results of operations of the Seller Group; (n) any epidemic, pandemic, outbreak of disease or other public health emergency (including COVID-19) or any escalation or worsening of any such conditions or (o) any objections made in the Bankruptcy Court to this Agreement, the Transactions, the Sale Order or the reorganization, any orders of the Bankruptcy Court and any actions or omissions of the Seller in compliance with any order of the Bankruptcy

7

Court and the assumption or rejection of any Assigned Contract; except in the cause of clauses (a) through (c), (h) and (n), to the extent such conditions, events, changes, crises and disasters, as applicable, do not have a material and disproportionate impact on the Business, taken as a whole, compared to other industry participants (in which case, only the extent of such disproportionate effect shall be taken into account when determining whether there is a Material Adverse Effect).

"**New Drug Application**" or "**NDA**" means new drug application as approved by the FDA.

"**Nitrosamine Liabilities**" means those Liabilities resulting from nitrosamine impurities as discussed in the FDA's February 2021 Guidance on Control of Nitrosamine Impurities in Human Drugs with respect to the Trudhesa drug product.

"**Non-Transferred Asset**" has the meaning set forth in Section 2.6(a).

"**Nonparty Affiliates**" has the meaning set forth in Section 10.14.

"**Open Source Software**" means any software that is licensed pursuant to a license approved by the Open Source Initiative and listed at http://www.opensource.org/licenses/alphabetical or that is considered "free" or "open source software" by the Free Software Foundation.

"**Order**" means any award, decision, injunction, judgment, ruling or verdict entered, issued, made or rendered by any Governmental Authority or arbitrator.

"**Organizational Documents**" means (a) the articles or certificates of incorporation and the by-laws of a corporation, (b) the partnership agreement and any statement of partnership of a general partnership, (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership, (d) the operating or limited liability company agreement and the certificate of formation of a limited liability company, (e) any charter, joint venture agreement or similar document adopted or filed in connection with the creation, formation or organization of a Person not described in clauses (a) through (d), and (f) any amendment to or equivalent of any of the foregoing.

"**Outside Date**" has the meaning set forth in Section 9.1(i).

"**Owned Intellectual Property Assets**" means the Intellectual Property owned or purported to be owned by any of member of the Seller Group that is used in, held for use in, or related to, the conduct of the Business as currently conducted or proposed to be conducted.

"**Parent**" has the meaning set forth in the preamble.

"**Permit**" means all permits, authorizations, certificates, franchises, consents and other approvals from any Governmental Authority.

"**Permitted Liens**" means (a) Liens for Taxes, assessments or other governmental charges not yet due and payable or being contested in good faith by appropriate proceedings as set forth on Schedule 1.1(a); (b) mechanics', carriers', workers', repairers' and other similar Liens arising or incurred in the ordinary course of business for obligations that are not overdue or are being contested in good faith by appropriate proceedings; (c) zoning, entitlement and building

50307134.17

regulations and land use restrictions; (d) purchase money Liens and Liens securing rental payments under capital lease arrangements; (e) Liens arising under leases of property or equipment in favor of the owner thereof; (f) pledges or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security; (g) deposits to secure the performance of bids, Contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; (h) licenses of Intellectual Property granted in the ordinary course of business; (i) gaps in the chain of title of Intellectual Property applications or registrations that are evident from the records of the relevant Governmental Authority maintaining such applications or registrations; (j) Liens arising under or created by this Agreement or any of the Related Documents; (k) Liens arising in the ordinary course of business which would not reasonably be expected to have a Material Adverse Effect; and (l) Liens set forth on Schedule 1.1(b).

"**Person**" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or any other entity or Governmental Authority.

"**Personal Information**" means any information in the possession or control of the Seller Group (solely as related to the Business) about an identifiable individual other than the name, title or business address, business email address or telephone number of any employee of the Seller Group.

"**Petition Date**" has the meaning set forth in the Recitals.

"**POD Technology Assets**" means (a) all Intellectual Property, Technology, and know-how related to manufacturing and development for the POD devices and INP105 drug product, (b) all clinical, non-clinical and combination product testing datasets related to the development stage POD devices and INP105 drug product, (c) device manufacturing and fill-and-finish equipment related to the development stage POD technology and (d) current inventory of preclinical POD devices and associated production equipment and know-how.

"**POD Technology Licensing Revenue**" means the total amount generated, if any, by the Purchaser in a fiscal year from licensing or sales or other transfers or dispositions of the POD Technology Assets to any third party.

"**Pre-Closing Tax Period**" means any taxable period ending on or prior to the Closing Date and the portion of any Straddle Period through the Closing Date.

"**Product**" means the pharmaceutical product currently approved, marketed, distributed and/or sold in the Territory as Trudhesa (dihydroergotamine mesylate) under New Drug Application No. 213436 filed with the FDA, including any supplements, amendments and modifications submitted to or required by the FDA or any successor application

"**Product Net Sales**" means the total gross amount invoiced on sales of any product sold, disposed of or distributed by through the operation of the Transferred Assets (other than the POD Technology Assets), which shall be deemed to include, milestones, upfronts and other similar payments, (the "**Items**"), less, without duplication, the following deductions to the extent actually

incurred or allowed or accrued and not otherwise recovered or reimbursed to Purchaser: (a) actually given rebates, allowance, customary discounts in the trade for quantity purchased, for prompt payment or for wholesalers and distributors, (b) credits or refunds for claims or returns that do not exceed the original invoice amount, and (c) sales, value added, consumption, excise and use taxes and other fees imposed by a Governmental Authority, each to the extent actually paid and borne by Purchaser or its Affiliates, to the extent such items are included in the gross invoice price of the Items and actually borne by Purchaser without reimbursement from a third party. Product Net Sales shall include the amount or fair market value of all other consideration received by Purchaser in respect of the Products, whether such consideration is in cash, payment in kind, exchange or other form.  For purposes of this definition, "sale" shall include any transfer or other disposition of the Items other than transfers or other dispositions of the Items, at no charge or at a nominal charge, for pre-clinical, clinical or regulatory purposes or to physicians or hospitals for promotional purposes, provided such transfer, distribution or disposition is not made in exchange for lower prices on other products sold by or on behalf of Purchaser or its Affiliates, as applicable, or for other noncash consideration.  Product Net Sales shall be calculated in accordance with GAAP.

If any Item is sold in the form of a combination product (whether co-formulated or copackaged) with another product or therapy that is not an Item (each a "**Combination Product**"), then the Product Net Sales for any such Combination Product shall be calculated by multiplying actual Product Net Sales of such Combination Product by the fraction A/(A+B) where "A" is the weighted average invoice price of the Item, as applicable, when sold separately during the applicable accounting period in which the sales of the Combination Product were made, and "B" is the combined weighted average invoice prices of all of the active ingredients and delivery technologies and systems other than price of the Product contained in such Combination Product sold separately during such same accounting period. If the Product contained in such Combination Product is not sold separately in finished form, the Company and Seller shall mutually determine on Product Net Sales for the Product based on the relative contribution of the Product in good faith and shall take into account in good faith any applicable allocations and calculations that may have been made for the same period in other countries. If the Company or any of its Affiliates recover monetary damages, settlement amounts or other monetary recovery with respect to the Product from a Third Party in a Claim brought for infringement, misappropriation or other violation of any Intellectual Property relating to the Product, (A) such damages will be allocated first to the reimbursement of any expenses incurred by the Company or such Affiliates, as applicable, for bringing such action (including reasonable attorney's fees) not already reimbursed from other damages awarded under the same action, and (B) any remaining amount of such damages will be reduced, if and to the extent applicable, to allocate recovered damages to Third Party licensors of such Intellectual Property (other than damages for lost royalties), only as legally required under pre-existing Contract with such Licensor, then any remaining amount of such damages, settlement amounts or other monetary recovery after application of (A) and (B) will be included as Product Net Sales.

"**Public Health Measures**" means any closures, "shelter-in-place," "stay at home," workforce reduction, social distancing, shut down, closure, curfew or other restrictions or any other Applicable Law, Orders, directives, guidelines or recommendations issued by any Governmental Authority, the Centers for Disease Control and Prevention, the World Health Organization, or any

10

industry group in connection with COVID-19 or any other epidemic, pandemic, or outbreak of disease, or in connection with or in response to any other public health conditions.

"**Purchase Price**" means $17,500,000.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Group Members**" has the meaning set forth in Section 10.17.

"**Purchaser Releasing Party**" has the meaning set forth in Section 10.16(b).

"**Purchaser Schedules**" has the meaning set forth in ARTICLE 4.

"**Related Claims**" means all claims or causes of action (whether in contract or tort, in law or in equity, or granted by statute or otherwise) that may be based upon, arise out of or relate to this Agreement, the Related Documents and any other document or instrument delivered pursuant to this Agreement or the Related Documents, or the negotiation, execution, termination, validity, interpretation, construction, enforcement, performance or nonperformance of this Agreement or the Related Documents or otherwise arising from the Transactions or the relationship between the parties (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with, or as an inducement to enter into, this Agreement or the Related Documents).

"**Related Documents**" means the Escrow Agreement, the Bill of Sale and Assignment and Assumption Agreement and Intellectual Property Assignment Agreement; provided, however, that the Escrow Agreement and the Bill of Sale and Assignment and Assumption Agreement and Intellectual Property Assignment Agreement shall not be a Related Document solely for purposes of applying the provisions in ARTICLE 10 to the extent, and only to the extent, that any such document expressly conflicts with ARTICLE 10.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment of any Hazardous Substances.

"**Sale Motion**" means the motion of the Seller seeking entry of the Sale Order approving the terms herein, to be filed on or about December 20, 2023 in the Bankruptcy Cases.

"**Sale Order**" means an Order of the Bankruptcy Court issued pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code in form and substance acceptable to Purchaser and the Seller, in each party's commercially reasonable discretion, approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Seller to consummate the Transactions contemplated hereby Free and Clear and containing a finding that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code.

"**Schedules**" has the meaning set forth in ARTICLE 3.

"**Seller**" has the meaning set forth in the preamble.

50307134.17

"**Seller Group**" means the Seller and each of its Subsidiaries.

"**Seller Group Members**" has the meaning set forth in Section 10.17.

"**Seller Group Taxes**" means any (i) Liability of Seller Group for Taxes other than Asset Taxes for the portion of any Straddle Period beginning after the Closing Date, (ii) any Liability for Asset Taxes attributable to any Pre-Closing Tax Period, and (iii) any Liability of Seller Group for the unpaid Taxes of any Person under Treasury Regulation §1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

"**Seller Permits**" has the meaning set forth in Section 3.5(a).

"**Seller Releasing Party**" has the meaning set forth in Section 10.16(a)

"**Seller Tax Claim**" has the meaning set forth in Section 7.3(e).

"**Solvent**" when used with respect to any Person, means that, as of any date of determination, (a) the fair salable value (determined on a going concern basis) of its assets and property will, as of such date, exceed the amounts required to pay its debts as they become absolute and mature, as of such date, (b) such Person will have adequate capital to carry on its business and (c) such Person will be able to pay its debts as they become absolute and mature, in the ordinary course of business, taking into account the timing of and amounts of cash to be received by it and the timing of and amounts of cash to be payable on or in respect of its indebtedness.

"**Subsidiaries**" means the entities listed on Schedule A.

"**Tax**" means any tax of any kind whatsoever (including any income tax, franchise tax, branch profits tax, capital gains tax, value-added tax, unclaimed property, escheat, sales tax, use tax, property tax, transfer tax, payroll tax, social security tax or withholding tax), and any related fine, penalty, interest, or addition to tax with respect thereto, imposed, assessed or collected by or under the authority of any Governmental Authority.

"**Tax Return**" means any return (including any information return), report, statement, schedule, notice, form, or other document or information (whether in tangible, electronic or other form), including any amendments, schedules attachments, supplements, appendices and exhibits thereto, filed with or submitted to, or required to be filed with or submitted to, any Governmental Authority in connection with the determination, assessment, collection, or payment, of any Tax.

"**Technology**" means algorithms, applied programming interfaces, apparatus, designs, drawings, data collections, diagrams, systems, procedures, processes, methods, methodologies, models, formulas, inventions (whether or not patentable), discoveries, improvements, know-how, methods, network configurations and architectures, processes, proprietary information, protocols, schematics, specifications, software, software code (in any form, including source code and executable or object code), subroutines, techniques, tools, user interfaces, technical engineering and manufacturing information and materials including engineering plans and bills of materials, web sites, works of authorship and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries).

12

"**Termination Fee**" means a fee equal to $450,000.

"**Territory**" means the United States of America, including the states, territories, possessions and protectorates thereof, the District of Columbia and the Commonwealth of Puerto Rico.

"**Transactions**" means the transactions contemplated by this Agreement and the Related Documents.

"**Transfer Taxes**" has the meaning set forth in Section 2.10.

"**Transferred Assets**" has the meaning set forth in Section 2.1.

"**Trudhesa Assets**" means (a) all Intellectual Property, Technology, and know-how related to manufacturing processes for the Trudhesa drug product and Trudhesa I123 POD devise, (b) all marketing Permits gained from any Governmental Authority for Trudhesa including the NDA for Trudhesa obtained from FDA along with any and all permits, licenses, certifications, registrations, qualifications, authorizations, consents or approvals of the FDA or any other Governmental Authority, currently used in, necessary for and material to the operation of sale of the Product, and (c) all clinical, non-clinical and combination product testing datasets related to Trudhesa.

"**Used in the Business**" has the meaning set forth in Section 2.1.

1.2   **Other Definitional and Interpretive Matters.**

(a)   Unless otherwise expressly provided, for purposes of this Agreement and the Related Documents, the following rules of interpretation shall apply:

(i)   Calculation of Time Period. All references to a day or days shall be deemed to refer to a calendar day or days, as applicable, unless otherwise specifically provided. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)   Dollars. Any reference to $ shall mean U.S. dollars, which is the currency used for all purposes in this Agreement and the Related Documents. The specification of any dollar amount in the representations and warranties or otherwise in this Agreement, the Related Documents or the Schedules is not intended and shall not be deemed to be an admission or acknowledgement of the materiality of such amounts or items, nor shall the same be used in any dispute or controversy between the parties hereto to determine whether any obligation, item or matter (whether or not described herein or included in any schedule) is or is not material for purposes of this Agreement, the Related Documents or the Schedules.

(iii)   Exhibits/Schedules. The Exhibits and Schedules to this Agreement are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set

forth in full herein. Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule. Disclosure of any item on any Schedule shall not constitute an admission or indication that any such item is required to be disclosed, or that such item or matter is material or has resulted in or will result in a Material Adverse Effect or that the included items or actions are not in the ordinary course of business. No disclosure on a Schedule relating to a possible breach or violation of any Contract, Applicable Law or Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    <u>Gender and Number</u>. Any reference to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    <u>Headings</u>. The provision of a table of contents, the division of this Agreement or Related Documents into articles, sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement or Related Document, as applicable. Unless otherwise specified, all references in this Agreement to any "Section" or other subdivision are to the corresponding section or subdivision of this Agreement, and all references in a Related Document to any "Section" or other subdivision are to the corresponding section or subdivision of such Related Document.

(vi)    <u>Herein</u>. The words such as "herein," "hereinafter," "hereof" and "hereunder" that are used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. Uses of such words in the Related Documents shall refer to such Related Document as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    <u>Or</u>. The word "or" shall be construed in the inclusive sense of "and/or" unless otherwise specified.

(viii)    <u>Including</u>. The word "including" or any variation thereof means (unless the context of its usage otherwise requires) "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(ix)    <u>Successors</u>. A reference to any party to this Agreement, any Related Document or any other agreement or document shall include such party's successors and permitted assigns.

(x)    <u>Legislation</u>. A reference to any legislation or to any provision of any legislation shall include any amendment thereto, and any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

50307134.17

(xi)   <u>Reflected On or Set Forth In</u>. An item arising with respect to a specific representation or warranty shall be deemed to be "reflected on" or "set forth in" a balance sheet or financial statement, to the extent any such phrase appears in such representation or warranty, if (a) there is a reserve, accrual or other similar item underlying a number on such balance sheet or financial statement that relates to the subject matter of such representation, (b) such item is otherwise specifically set forth on the balance sheet or financial statement or (c) such item is set forth in the notes to the balance sheet or financial statement.

(xii)   <u>Made Available</u>. Any reference in this Agreement to "made available" means a document or other item of information that was provided or made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions.

(b)   All representations and warranties set forth in this Agreement or the Related Documents are contractual in nature only and subject to the sole and exclusive remedies set forth herein. No Person is asserting the truth of any representation and warranty set forth in this Agreement or the Related Documents; rather, the parties have agreed that should any representations and warranties of any party prove untrue, the other parties shall have the specific rights and remedies herein specified as the exclusive remedy therefor, but that no other rights, remedies or causes of action (whether in law or in equity or whether in contract or in tort or otherwise) are permitted to any party hereto as a result of the untruth of any such representation and warranty. The phrase "to Seller's Knowledge" and phrases of similar import or effect are used herein to qualify and limit the scope of any representation or warranty in which they appear and are not affirmations of any Person's "superior knowledge" that the representation or warranty in which they are used is true.

(c)   The parties hereto have participated jointly in the negotiation and drafting of this Agreement and the Related Documents and, in the event an ambiguity or question of intent or interpretation arises, this Agreement and the Related Documents shall be construed as jointly drafted by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement and the Related Documents. The parties hereto agree that changes from earlier drafts to the final version of this Agreement do not necessarily imply that the party agreeing to such change is agreeing to a change in meaning (as the party agreeing to such change may believe the change is stylistic and non-substantive); consequently, no presumption should exist by virtue of a change from a prior draft.

## ARTICLE 2.
## THE PURCHASE AND SALE; CLOSING

2.1   **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, in exchange for an aggregate payment from Purchaser to the Seller equal to the Purchase Price, Purchaser shall purchase, assume and accept from the Seller, and the Seller shall sell, transfer, assign, convey and deliver (or shall cause the sale, transfer, assignment, conveyance and delivery) to Purchaser, Free and Clear (except for

Permitted Liens), all of the rights, title and interests in, to and under the following assets and interests used in the Business ("**Used in the Business**") as the same shall exist on the Closing Date (collectively, the "**Transferred Assets**"):

      (a)     the Trudhesa Assets;

      (b)     the POD Technology Assets;

      (c)     all supplies and other inventories Used in the Business;

      (d)     to the extent transferable, the Seller Permits (including any applications that are in process) Used in the Business;

      (e)     all Contracts to which a member of the Seller Group is a party and which are Used in the Business, all of which are listed on Schedule 2.1(e), excluding Contracts that expire or are terminated prior to the Closing and all Designated Contracts that Purchaser elects to assume pursuant to Section 5.3(b) (collectively, the "**Assigned Contracts**");

      (f)     all material original books and records, documents, data and information of the Seller Group solely related to the Business, other than the Excluded Books and Records; provided, however, that the Seller Group shall be entitled to retain copies of any such materials;

      (g)     all rights to receive mail and other correspondences and communications (including electronic mail) addressed to Seller relating solely to the Product (including any such mail and other correspondence and communications (including electronic mail) from the FDA or any other Governmental Authority, customers, advertisers, suppliers, distributors, agents and others and payments with respect to the Product);

      (h)     the Owned Intellectual Property Assets, including that Intellectual Property set forth on Schedule 2.1(h) and all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to any member of the Seller Group with respect to such Intellectual Property, and (ii) claims and causes of action with respect to such Intellectual Property, whether accruing before, on, or after the Agreement Date, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for past, present, or future infringement, misappropriation, or other violation thereof;

      (i)     all equipment, and other tangible personal property, including carts, dollies, office furniture and fixtures, computers, security systems, telephone and internet equipment and maintenance equipment and supplies, Used in the Business and owned by the Seller Group listed on Schedule 2.1(i);

      (j)     all of the Seller Group's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller Group with respect to the Business, the Transferred Assets and the Assumed Liabilities (including all guaranties, warranties, indemnities and similar rights in favor of the Seller Group or any their Affiliates to the extent solely related to the Transferred Assets or the Assumed Liabilities), in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring

50307134.17

prior to, on or after the Closing Date, except for such rights, claims and causes of related to the Excluded Assets or Excluded Liabilities;

(k)     all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, choses in action, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent used in or held for use for the Transferred Assets listed in clauses (a) through (j) above or the Assumed Liabilities;

(l)     all accounts receivable, intercompany obligations and other amounts receivable by the Seller Group (the "***Receivables***"); and

(m)     all inventory of the Seller Group.

2.2     **Excluded Assets**. Notwithstanding the provisions of Section 2.1 or anything to the contrary herein, any and all assets, rights and properties of the Seller Group that are not specifically identified in Section 2.1 as Transferred Assets, including the following (collectively, the "**Excluded Assets**"), shall be retained by the Seller Group, and Purchaser and its designees shall acquire no right, title or interest in the Excluded Assets in connection with the Transaction:

(a)     all (i) cash and cash equivalents, wherever located, including bank balances and bank accounts or safe deposit boxes, monies in the possession of any banks, savings and loans or trust companies and similar cash items, (ii) escrow monies and deposits in the possession of landlords and utility companies, and (iii) investment securities and other short- and medium-term investments;

(b)     all records, documents or other information exclusively relating to current or former employees of the Seller Group that are not hired by Purchaser, and any materials to the extent containing information about any employee, disclosure of which would violate Applicable Law or such employee's reasonable expectation of privacy;

(c)     any interest of the Seller Group under this Agreement or the Related Documents, including the right to receive the Purchase Price and to enforce the Seller's rights and remedies thereunder;

(d)     all Excluded Contracts (including all prepaid assets relating to the Excluded Contracts), other than the Assigned Contracts, to which any member of the Seller Group or any of their respective Affiliates is a party;

(e)     any (i) Attorney-Client Information arising from communications prior to the Closing Date between a member of the Seller Group (including any one or more officers, directors or stockholders of such Seller Group member), on the one hand, and its counsel, on the other hand, and (ii) claims under any director and officer, errors and omissions, fiduciary and commercial crime insurance policies; and

(f)     any rights of the Seller Group to Asset Tax refunds (or credits for overpayment of Taxes in lieu of a refund) attributable to any Pre-Closing Tax Period;

50307134.17

(g)     all Permits (including applications therefor and any trade or import/export Permits) that (i) are not materially related to the Business or (ii) are not transferable to Purchaser under Applicable Law;

(h)     the Excluded Books and Records;

(i)     any assets not otherwise designated as Transferred Assets or from time to time designated by the parties hereto as Excluded Assets;

(j)     the Avoidance Actions;

(k)     all of the Seller Group's rights, claims or causes of action against third parties relating to the assets, properties, business or operations of the Seller Group (including all guaranties, warranties, indemnities and similar rights in favor of the Sellers Group or any of their Affiliates) to the extent arising under the Bankruptcy Code or relating to any of the Excluded Assets or Excluded Liabilities, in each case, whether arising by way of counterclaim or otherwise, and whether arising out of transactions occurring prior to, on or after the Closing Date;

(l)     all of the Seller Group's right, title and interest to any the assets set forth on Schedule 2.2(n); and

(m)     all prepaid expenses, claims, deposits, prepayments, refunds, causes of action, demands, actions, suits, rights of recovery, rights under guarantees, warranties, indemnities and all similar rights against third parties, rights of setoff and rights of recoupment, in each case, to the extent exclusively related to or exclusively used in or held for use for the Excluded Assets listed in clauses (a) through (m) above.

Notwithstanding anything to the contrary contained in this Agreement or any of the other Related Documents, Purchaser acknowledges and agrees that all of the following are also Excluded Assets, and all right, title and interest in and to all Excluded Assets shall be retained by the Seller Group and shall remain the property of the Seller Group (and shall expressly be excluded from the sale, transfer, assignment and conveyance to Purchaser hereunder), and neither Purchaser nor any of its Affiliates shall have any interest therein: (x) all records and reports prepared or received by the Seller Group or any of their Affiliates in connection with the sale of the Business and the Transactions, including all analyses relating to the Business or Purchaser so prepared or received; and (y) all confidentiality agreements with prospective purchasers of the Business or any portion thereof and all bids and expressions of interest received from third parties with respect thereto.

2.3     **Assumption of Liabilities**. On the terms and subject to the conditions set forth in this Agreement, Purchaser shall, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms all Liabilities of the Seller Group arising from or related to the Business or the Transferred Assets as the same shall exist on the Closing Date and irrespective of whether the same shall arise prior to, on or after the Closing Date (collectively, the "**Assumed Liabilities**"), including:

(a)     all Liabilities relating to the Transferred Assets, whether incurred or arising prior to, at or after the Closing (other than those Liabilities relating to any breach, tort including

any tort based on a failure to warn, failure to comply with law, failure to comply with industry standards, Nitrosamine Liabilities, or other wrongful conduct);

(b)    subject to Section 2.4, all Liabilities arising under the Assigned Contracts, whether incurred or arising prior to, at or after the Closing (other than those Liabilities relating to any breach, tort including any tort based on a failure to warn, failure to comply with law, failure to comply with industry standards, Nitrosamine Liabilities, or other wrongful conduct), and all of the Determined Cure Costs;

(c)    all Taxes for which Purchaser is liable pursuant to this Agreement;

(d)    all accounts payable and other intercompany obligations of the Seller Group to the extent related to the Business and arising following the Petition Date; and

(e)    other Liabilities that are listed on Schedule 2.3(d).

2.4    **Excluded Liabilities**. Notwithstanding Section 2.3, Purchaser is assuming only the Assumed Liabilities of the Seller Group and will not assume or be liable for any Excluded Liabilities (including Seller Group Taxes), and the Seller Group shall retain and shall be responsible for, all Liabilities of that are not Assumed Liabilities, including all Liabilities related to Excluded Assets or any other liabilities of the Business (all such Liabilities not being assumed herein referred to as the "**Excluded Liabilities**").

2.5    **Excluded Contracts**. Pursuant to Section 5.3(b), Purchaser shall be entitled, in its sole discretion, by written notice to the Seller up to three Business Days prior to the Closing Date, to elect not to purchase or assume one or more Assigned Contract, in which case, notwithstanding anything in this Agreement or any Related Document to the contrary, such Assigned Contract shall be considered an excluded contract ("**Excluded Contract**") (and shall constitute an Excluded Asset and not be included in the Transferred Assets) for all purposes of this Agreement and Purchaser shall not have any obligation to satisfy or pay any Cure Costs or other Liabilities with respect to such Excluded Contract. Each assignable Assigned Contract that Purchaser does not elect to remove from the list of Assigned Contracts pursuant to Section 5.3(b) shall be an Assigned Contract.

2.6    **Nontransferable Assets and Liabilities**.

(a)    Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim, right or benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Governmental Authority) (after giving effect to the Sale Order or any other applicable order of the Bankruptcy Court that effects such transfer without any required Consents), would constitute a breach or other contravention thereof or a violation of Applicable Law (each, a "**Non-Transferred Asset**").

(b)    If, on the Closing Date, any third-party Consent is not obtained for a Non-Transferred Asset, or if an attempted transfer or assignment thereof would be ineffective or a violation of Applicable Law, then, until any requisite consent is obtained therefor and the same is transferred and assigned to Purchaser or its designee, each such Non-Transferred Asset shall be

50307134.17

held by the Seller as agent for the Purchaser, and the Seller shall, to the extent permitted by Applicable Law, provide to Purchaser the benefits and Purchaser shall assume the obligations and bear the economic burdens associated with such Non-Transferred Asset. The Seller and Purchaser shall use commercially reasonable efforts to enter into agreements (including subcontracting, sublicensing or subleasing, if permitted) by which (i) the Seller shall, at Purchaser's sole expense, without interruption of the Business, provide Purchaser with the economic and operational equivalent of obtaining the requisite third-party Consent and assigning the applicable Non-Transferred Asset to Purchaser (including, with the prior written consent of Purchaser, enforcing for the benefit of Purchaser, and at Purchaser's sole expense, all claims or rights arising thereunder) and (ii) Purchaser shall perform, at its sole expense, the obligations and assume the economic burdens of the Seller or its Affiliates to be performed after the Closing with respect to such Non-Transferred Asset. Purchaser shall promptly, upon receipt of a written request therefor from the Seller, reimburse the Seller for all monies paid by the Seller on Purchaser's behalf in connection with any Assumed Liability not assigned or transferred to Purchaser pursuant to this <u>Section 2.6</u>.

2.7    <u>**Closing**</u>. The closing of the Transactions (the "<u>**Closing**</u>") will take place remotely by electronic exchange of documents on the date (the "<u>**Closing Date**</u>") that is the second (2nd) Business Day after the date on which all of the conditions set forth in <u>ARTICLE 8</u> (excluding conditions that, by their terms, are to be satisfied at the Closing, but subject to the satisfaction or waiver of all such conditions at the Closing), have been satisfied or waived by the party hereto entitled the benefit of the same, unless another time or date is agreed to in writing by the parties hereto. Except as otherwise set forth herein, all proceedings to be taken and all documents to be executed and delivered by all parties hereto at the Closing will be deemed to have been taken and executed simultaneously and no proceedings will be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

2.8    <u>**Closing Deliveries of the Parties**</u>. At or prior to the Closing:

(a)    Purchaser and the Seller shall execute and deliver the Bill of Sale and Assignment and Assumption Agreement;

(b)    Purchaser and the Seller shall execute and deliver the Intellectual Property Assignment Agreement, in a form reasonably acceptable to Purchaser and the Seller;

(c)    Escrow Agent, Purchaser and the Seller shall execute and deliver the Escrow Agreement;

(d)    On the Closing Date, each Party shall transmit the Buyer's FDA Transfer Letters to the FDA and shall take any other actions reasonably necessary to effect the transfer of the Product from the Seller to Purchaser.

(e)    Purchaser shall deliver, or cause to be delivered, to the Seller or the applicable Person each of the following:

(i)    a certificate, dated as of the Closing Date, executed by or on behalf of Purchaser as to the satisfaction of the conditions set forth in <u>Section 8.3(a)</u> and <u>Section 8.3(b)</u>; and

50307134.17

(ii)      payment of the closing payments set forth in <u>Section 2.9</u>.

(f)      the Seller shall deliver, or cause to be delivered, to Purchaser or the applicable Person each of the following:

(i)      a certificate, dated as of the Closing Date, executed by or on behalf of the Seller as to the satisfaction of the conditions set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>; and

(ii)      an IRS Form W-9 with respect to the Seller, duly completed and executed, dated as of the Closing Date.

2.9      <u>**Purchase Price; Assumed Liabilities; Deposits**</u>.

(a)      At the Closing, upon the terms and subject to the conditions set forth herein, in full consideration for the sale, transfer, conveyance, assignment and delivery of the Transferred Assets to Purchaser and assumption of the Assumed Liabilities by Purchaser, Purchaser shall (i) pay to the Seller an aggregate amount equal to the Purchase Price <u>*minus*</u> the Deposit Escrow Amount, which shall be released to the Seller by the Escrow Agent pursuant to <u>Section 2.9(c)</u>, by irrevocable wire transfer of immediately available funds in accordance with payment instructions delivered by the Seller to Purchaser prior to the Closing; and (ii) assume the Assumed Liabilities.

(b)      At the Closing, on the terms and subject to the conditions set forth in this Agreement, Purchaser will assume and become responsible for the Assumed Liabilities. Purchaser agrees to pay, honor, perform, and discharge, or cause to be paid, performed, honored and discharged, all Assumed Liabilities in a timely manner in accordance with the terms hereof, including paying or causing to be paid, at or prior to the Closing, all Determined Cure Costs.

(c)      The Deposit Escrow Amount shall be distributed as follows:

(i)      if the Closing shall occur, (A) the Seller and Purchaser shall deliver a joint written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit Escrow Amount to the Seller, by irrevocable wire transfer of immediately available funds, to an account designated by the Seller to the Escrow Agent, and (B) the Deposit Escrow Amount shall be delivered to the Seller at Closing and credited against the amount required to be paid by Purchaser to the Seller at Closing in accordance with <u>Section 2.9(a)</u>;

(ii)      if this Agreement is terminated by the Seller pursuant to <u>Section 9.1(g)</u>, (A) the Seller and Purchaser shall deliver a joint written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit Escrow Amount to the Seller, by irrevocable wire transfer of immediately available funds, to an account designated by the Seller to the Escrow Agent and (B) the Deposit Escrow Amount, which shall constitute liquidated damages (and not a penalty), shall be delivered to the Seller within two Business Days following delivery of such joint written instruction; or

(iii)    if this Agreement is validly terminated for any reason in accordance with the terms of this Agreement other than by the Seller pursuant to Section 9.1(g) or Purchaser forfeits the Deposit Escrow Amount to the Seller pursuant to Section 8.5, (A) the Seller and Purchaser shall deliver a joint written instruction to the Escrow Agent in accordance with the Escrow Agreement instructing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit Escrow Amount to Purchaser, by irrevocable wire transfer of immediately available funds, to an account designated by Purchaser to the Escrow Agent, and (B) the Deposit Escrow Amount shall be delivered to Purchaser within two Business Days following delivery of such joint written instruction.

Any issue regarding the entitlement to the Deposit Escrow Amount shall be determined by the Bankruptcy Court, and Purchaser consents to the jurisdiction of the Bankruptcy Court for any issue related to this Agreement.

2.10    **Transfer Taxes**. Purchaser shall be solely responsible for, and shall indemnify, defend, and hold harmless the Seller Group for, any transfer, documentary, sales, use, excise, stock transfer, value-added, stamp, recording, registration and other similar taxes, levies and fees (including any penalties, fines and interest), together with any conveyance fees, recording charges and other similar fees and charges, incurred in connection with this Agreement and the Transactions (collectively, "**Transfer Taxes**"). Purchaser and the Seller shall cooperate in good faith to minimize, to the extent permissible under Applicable Law, the amount of any Transfer Taxes due with respect to the Transactions.

2.11    **Allocation of Purchase Price**.

(a)    The Purchase Price (including all other amounts treated as consideration for U.S. federal income tax purposes, including the Earn-out Payment) and Assumed Liabilities shall be allocated as set forth on Schedule 2.11 (the "**Preliminary Allocation Schedule**"). Within 90 days following the final determination of the Purchase Price, Purchaser shall deliver to the Seller a schedule allocating the Purchase Price (and all other amounts treated as consideration for U.S. federal income tax purposes) among the Transferred Assets (the "**Allocation Schedule**"). The Allocation Schedule shall be reasonable and shall be prepared in accordance with the Preliminary Allocation Schedule, and Purchaser and the Seller shall negotiate in good faith to resolve disputed items, if any, in the Allocation Schedule as promptly as practicable. If Purchaser and the Seller are unable to reach agreement with respect to the Allocation Schedule within 30 days after the delivery of the Allocation Schedule by Purchaser to the Seller, the parties shall be entitled to use their own Purchase Price allocations for Tax reporting purposes.

(b)    To the extent Purchaser and the Seller agree on the Allocation Schedule pursuant to Section 2.11(a), Purchaser and the Seller shall (i) timely file all Tax Returns required to be filed in connection with the Allocation Schedule, and (ii) prepare and file all Tax Returns and determine all Taxes in a manner consistent with the Allocation Schedule, except as may be required by Applicable Law and except as may be necessary to reflect adjustments to the Allocation Schedule resulting from post-Closing payments or events. Purchaser, on the one hand, and the Seller, on the other hand, shall notify the other if it receives notice that any Governmental Authority proposes any allocation different from Allocation Schedule.

22

2.12 **Escrow Accounts**. At the Closing, the Deposit Escrow Amount shall be used to satisfy a portion of the payment obligations of Purchaser pursuant to <u>Section 2.9(c)</u>, otherwise the Deposit Escrow Amount shall be released to Purchaser or the Seller pursuant to <u>Section 2.9(c)</u>. Upon the final release of all of the Deposit Escrow Amount pursuant to the terms of this Agreement and the Escrow Agreement, the Escrow Agreement shall automatically terminate. Any fees owed to the Escrow Agent and obligations under the Escrow Agreement shall be borne by Purchaser. The Deposit Escrow Amount shall be held in trust for the benefit of the Seller and shall not be subject to any encumbrance, attachment, trustee process or any other judicial process of any creditor of any party hereto, and shall be held and disbursed solely for the purposes of and in accordance with the terms of this Agreement and the Escrow Agreement.

2.13 **Additional Consideration.**

(a) <u>Earn-out Payments</u>. As additional consideration for the Transferred Assets, during the period beginning on the first date on which Purchaser or any of its Affiliates, licensees or sublicensees generates any Product Net Sales (the "**Purchaser Product Launch Date**") and continuing for eight (8) full fiscal years thereafter (the "**Earn-out Period**"), Purchaser shall pay Seller:

(i) Ten percent (10%) of the amount, if any, by which the annual Product Net Sales for each fiscal year exceeds $20,000,000 but are less than or equal to $45,000,000 during each fiscal year of the Earn-out Period (each such payment, a "**First Tier Earn-out Payment**");

(ii) Fifteen percent (15%) of the amount, if any, by which the annual Product Net Sales for each fiscal year exceeds $45,000,000 during each fiscal year of the Earn-out Period (each such payment, a "**Second Tier Earn-out Payment**");

(iii) A $4,000,0000 one-time payment when the annual Product Net Sales equal or exceed $65,000,000 for a fiscal year during the Earn-out Period (the "**Third Tier Earn-out Payment**");

(iv) A $8,000,000 one-time payment when the annual Product Net Sales equal or exceed $100,000,000 for a fiscal year during the Earn-out Period (the "**Final Tier Earn-out Payment**" and together with the First Tier Earn-out Payments, the Second Tier Earn-Out Payments and the Third Tier Earn-out Payment, the "**Earn-out Payments**", and each such payment, an "**Earn-out Payment**").

(b) <u>Licensing Payments</u>. During the Earn-out Period, Purchaser shall pay Seller thirty-three percent (33%) of the annual POD Technology Licensing Revenue (the "**POD Licensing Share**") generated during each fiscal year.

(c) <u>Payment Procedures</u>. Within ninety (90) calendar days of the end of each fiscal year during the Earn-out Period, Purchaser shall deliver to Seller (i) a statement (each, an "**Earn-out Statement**") setting forth the Product Net Sales for such fiscal year and the Earn-out Payment, if any, payable with respect to such period, (ii) a statement (each a "**Licensing Statement**") setting for the POD Technology Licensing Revenue for such fiscal year and the POD Licensing Share, if any, payable with respect to such period, (iii) the aggregate Earn-out Payment,

23

in cash by wire transfer of immediately available funds and (iv) the POD Licensing Share, in cash by wire transfer of immediately available funds.

(d)   <u>Earn-Out Covenants</u>. During the Earn-Out Period, Purchaser and its Affiliates shall (i) use commercially reasonable efforts to maximize the Earn-Out Payments and the POD Technology Licensing Revenue and (ii) not intentionally act in bad faith with the sole purpose of frustrating achievement of the Earn-out Payments or maximizing the POD Technology Licensing Revenue.

(e)   <u>Asset Sale</u>. If, at any time during the Earn-Out Period, Purchaser (i) sells, transfers, assigns or otherwise disposes of more than 50% the assets of the Business by value to a third party or substantially all of the Trudhesa Assets or (ii) enters into any exclusive licensing deal with respect to any of the foregoing, Purchaser shall cause such subsequent acquirer or licensor of said assets to assume the obligations set forth in this <u>Section 2.13</u>.

(f)   <u>Information Rights</u>. During the Earn-Out Period, Purchaser will provide the Seller with a written report within 60 days after the conclusion of each fiscal year setting forth the Product Net Sales during the preceding fiscal year (the "<u>**Net Sales Report**</u>"). If Purchaser determines that an Earn-Out Payment has been achieved during any fiscal year, Purchaser shall include a notice in the Net Sales Report that such Earn-Out Payment has been achieved. Purchaser shall keep, for so long as required under Purchaser's internal records retention policies, books and records pertaining to the Product Net Sales of the Products with respect to each fiscal year.

(g)   <u>Dispute Resolution</u>.

(i)   In the event that the Seller disputes the purported occurrence or non-occurrence of any Earn-Out Payment or Purchaser's compliance with <u>Section 2.13</u>, then the Seller shall provide written notice to Purchaser (the "<u>**Dispute Notice**</u>") specifying the amount disputed and the basis for the dispute, together with supporting documentation reflecting the analysis and justification thereof.  Purchaser and the Seller shall thereafter attempt to resolve the dispute as set forth in this <u>Section 2.13(g)</u>.

(ii)   The Seller and Purchaser shall attempt to resolve any dispute set forth in a Dispute Notice promptly by negotiation in good faith between the Seller and an officer of Purchaser who has authority to settle the dispute.  Each Party shall give the other Party involved written notice of any dispute not so resolved within 30 days following the Seller's delivery of the Dispute Notice.  Within 15 Business Days following delivery of such notice, the Party receiving notice shall submit to the other a written response thereto. The notice and the response shall include a statement of each Party's position(s) regarding the matter(s) in dispute and a summary of arguments in support thereof.

(iii)   Within 10 Business Days following delivery of the notice delivered pursuant to <u>Section 2.13(g)(ii)</u>, the designated officer of Purchaser and the Seller shall meet at a mutually agreed time and place, and thereafter, as often as they reasonably deem necessary, to attempt to resolve the dispute.  All negotiations conducted pursuant to this <u>Section 2.13(g)</u> (and any of the Parties' submissions in contemplation hereof) shall be kept confidential by the Parties and shall be treated by the Parties and their representatives as

50307134.17

compromise and settlement negotiations under the Federal Rules of Evidence and any similar state rules.

(iv)     In the event that the Seller and Purchaser are unable to resolve any dispute arising out of this Agreement in accordance with provisions (i), (ii) and (iii) of this Section 2.13(g) within 60 days after delivery of any Dispute Notice, Purchaser and the Seller agree to appoint a neutral, independent accountant who is mutually agreed upon by both parties. This accountant shall have the authority to examine all relevant documents, records, and financial statements and make a binding determination regarding the dispute. The decision of the neutral accountant shall be final and binding on both parties, subject only to manifest error.

(v)     The costs for the services of the neutral accountant shall be borne equally by the Seller and Purchaser, unless the neutral accountant determines that one party's position was substantially unjustified, in which case that party shall bear the full cost.

(h)     Earn-Out Termination.

(i)     At any time between the second and the third anniversaries of Closing, Purchaser, at its sole discretion, shall be entitled to pay Seller an amount equal to the Earn-out Termination Amount, and upon payment of such Earn-out Termination Amount, all Earn-out Payments payable pursuant to Section 2.13(a) shall be terminated. The "Earn-out Termination Amount" shall be equal to:

The greater of:

(X) $5,000,0000, and

(Y) The product of a) annualized Product Net Sales for the highest quarter of the four trailing quarters, b) the applicable First Tier Earnout Payment and Second Tier Earn-out Payments, and c) the remaining Earn-out Period, plus the Third Tier Earn-out Payment and the Fourth Tier Earn-out Payment, to the extent that annualized Product Net Sales are above those thresholds.

For example, if Purchaser exercises this right on the second anniversary of Closing and the highest trailing quarterly Net Sales are $17 million, the buyout amount would equal: $17M x 4 = $68M annualized Product Net Sales. First Tier Earn-out = $2.5M, Second Tier Earn-out = $3.45M. $5.95M total x 6 (remaining term) = $35.7M, plus Third Tier Earnout of $4M. Total Earn-Out Termination Amount of $39.7M.

(ii)     Upon Seller's receipt of the Earn-Out Termination Amount, Purchaser shall be released from any further obligations related to Earn-out Payments under this Agreement, and the Seller shall not be entitled to any additional payments beyond the Earn-Out Termination Amount for the Earn-Out Period.

50307134.17

(iii)     Upon written notice to Seller that the Earn-Out Termination Amount is being paid, Purchaser shall have thirty (30) days to make the payment in cash by wire transfer of immediately available funds.

## ARTICLE 3.
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as disclosed in a document herewith delivered by the Seller to Purchaser (the "**Schedules**"), the Seller hereby makes the representations and warranties contained in this <u>ARTICLE 3</u> to Purchaser.

3.1     <u>**Organization, Good Standing and Other Matters; Subsidiaries**</u>. Each member of the Seller Group is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has, subject to the necessary authority of the Bankruptcy Court, the requisite corporate power and authority to operate the Business and necessary to own, lease or operate the properties and assets owned, leased or operated by it to carry on the Business as now being conducted, except where the failure to be so duly organized, validly existing and in good standing, or to have such power and authority, would not, individually or in the aggregate, have a Material Adverse Effect. Each member of the Seller Group is duly qualified to do business as a foreign company in each jurisdiction in which the nature of the Business as currently conducted by it or the property owned or leased by it makes such qualification necessary, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2     <u>**Authority and Enforceability**</u>. Subject to Bankruptcy Court approval, the Seller has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and the each of the Related Documents to which the Seller is (or at Closing, will be) a party thereto, and the consummation by the Seller of the Transactions, has been duly authorized and approved by all necessary limited liability company action on the part of the Seller and are subject to the approval of the Bankruptcy Court. This Agreement has been, and each Related Document will be, at or prior to the Closing, duly executed and delivered by the Seller and, assuming the due execution and delivery by the other parties hereto or thereto, and subject to the approval of the Bankruptcy Court, constitutes a valid and binding obligation of the Seller, enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

3.3     <u>**No Conflict; Required Filings and Consents**</u>. Except (a)  such filings as may be required in connection with the Transfer Taxes described in <u>Section 2.10</u> and (b) as otherwise set forth on <u>Schedule 3.3</u>, the execution and delivery of this Agreement by the Seller does not and the execution and delivery of the Related Documents by the Seller will not, and the consummation of the Transactions hereby and thereby will not (i) violate the provisions of the Organizational Documents of any member of the Seller Group, (ii) subject to the entry of the Sale Order, violate any Applicable Law or Order to which any member of the Seller Group is subject or by which its properties or assets are bound, (iii) require any member of the Seller Group to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the

26

Closing Date (except as required by the Bankruptcy Code or the Sale Order), (iv) subject to the entry of the Sale Order, result in a breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any Assigned Contract or (v) subject to the entry of the Sale Order, result in the imposition or creation of any Lien upon or with respect to any of the assets or properties of the Seller Group; excluding from the foregoing <u>clauses (ii)</u> through <u>(v)</u> any Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, have a Material Adverse Effect.

3.4   **Compliance With Laws**. To the Seller's Knowledge, (i) the Seller Group is conducting the Business in compliance in all material respects with all material Applicable Laws applicable to the Business and (ii) no member of the Seller Group has received any written notice since the Petition Date of any material violations of any material Applicable Law applicable to their conduct of the Business. As of the Agreement Date, the Seller has and, to the Seller's knowledge, has obtained all permits, licenses, certifications, registrations, qualifications, authorizations, consents or approvals of the FDA or any other Governmental Authority, currently used in, necessary for and material to the operation of sale of the Product as presently conducted, all such permits, licenses, certifications, registrations, qualifications, authorizations, consents or approvals are included in the Trudhesa Assets and Seller has made available to Purchaser true and complete copies of all such permits, licenses, certifications, registrations, qualifications, authorizations, consents or approvals. As of the Agreement Date, neither Seller nor, to the Seller's knowledge, any other Person has received any communication from any Governmental Authority that threatens to withdraw or suspend any such permits, licenses, certifications, registrations, qualifications, authorizations, consents or approvals. Seller has filed with the applicable Regulatory Authorities all required filings, declarations, listings, registrations, reports or submissions, including adverse event reports, necessary for and material to the operation of sale of the Product as presently conducted.  All relevant filings, declarations, listings, registrations, reports or submissions were in material compliance with Applicable Law when filed, and no deficiencies have been asserted by any Governmental Authority with respect to any such filings, declarations, listing, registrations, reports or submissions. As of the Agreement Date, the Seller has not received or been subject to: (1) any FDA Form 483s directly relating to the Product; (2) any FDA notices of adverse findings relating to the Product; or (3) any warning letters or other correspondence from the FDA or any other Governmental Authority in which the FDA or such other Governmental Authority asserted that the actions of Seller, with respect to the Product, were not in compliance with Applicable Laws. There has not been any occurrence of any product recall, market withdrawal or replacement, or post-sale warning conducted by or on behalf of the Seller concerning the Product or, to the Seller's Knowledge, any product recall, market withdrawal or replacement conducted by or on behalf of any entity as a result of any alleged defect in the Product.

3.5   **Permits**. To the Seller's Knowledge, (i) the Seller Group possess all material Permits required for the operation of the Business as currently conducted (the "**Seller Permits**") and (ii) no member of the Seller Group has received as of the Agreement Date any written notice

of any cancellation, suspension, revocation, invalidation or non-renewal of any Permit since the Petition Date.

3.6 **Litigation**. As of the Agreement Date, there is no Action pending or, to the Seller's Knowledge, formally threatened in writing, against any member of the Seller Group before any Governmental Authority that would have a Material Adverse Effect or affect the Transferred Assets in any material respect after the entry of the Sale Order, if determined adversely and after taking into effect applicable insurance coverage.

3.7 **Real Property; Personal Property**.

(a) The Seller Group does not own any real property.

(b) Schedule 3.6(b) sets forth each parcel of real property leased by the Seller Group.

(c) Schedule 3.7(b) sets forth a list of all leases of tangible assets and other personal property of the Seller Group as of the Agreement Date involving annual payments in excess of $50,000. Each member of the Seller Group has good and valid title to, or in the case of leased tangible assets and other personal property, a valid leasehold interest in (or other right to use), all of the material tangible assets and other personal property that are necessary for such member of the Seller Group to conduct the Business, in each case, free and clear of all Liens to the maximum extent permitted by Section 363(f) of the Bankruptcy Code (other than Permitted Liens). All such material tangible assets and other personal property are in good condition and repair, normal wear and tear excepted.

3.8 **Assigned Contracts**. With respect to the Assigned Contracts, (i) except as a result of, or arising in connection with, the filing of the Bankruptcy Cases, no member of the Seller Group has received any written notice of any default or event that (with due notice or lapse of time or both) would constitute a default by the applicable member of the Seller Group under any Assigned Contract, other than defaults that have been cured or waived in writing or would not reasonably be expected to have a Material Adverse Effect, (ii) to the Seller's Knowledge, each Assigned Contract is a legal, valid and binding obligation of the applicable member of the Seller Group and is in full force and effect (except to the extent subject to, and limited by, the Enforceability Exceptions), (iii) to the Seller's Knowledge, no other party to any Assigned Contract is (with or without the lapse of time or the giving of notice, or both) in material breach of or in material default under any Assigned Contract and (iv) to the Seller's Knowledge, no member of the Seller Group has provided or received any notice of any intention to terminate any Assigned Contract. The Seller has made available to Purchaser true, correct and complete copies of each of the Assigned Contracts listed on Schedule 3.8, together with all amendments thereto.

3.9 **Financial Statements**. Schedule 3.9 sets forth the Seller's (i) balance sheet and the related financial statements of revenue, expenses, retained earnings, and cash flow for the fiscal year ending on December 31, 2022, (ii) balance sheet and the related financial statements of revenue, expenses, retained earnings, and cash flow for the quarter ending on September 30, 2022 and (iii) the Seller's internally prepared statements of revenue, expenses, retained earnings, and cash flow for the months ending October 31, 2023 (collectively, the "**Seller Financial**

28

**Statements**").  The Seller Financial Statements have been prepared in accordance with GAAP (except as may be indicated in the notes to such financial statements or, in the case of unaudited financial statements, except as permitted by the SEC on Form 10-Q under the Exchange Act, and except that the unaudited financial statements may not contain footnotes and are subject to normal and recurring year-end adjustments), have been prepared on a consistent basis throughout the periods covered thereby and presents fairly in all respects the financial condition of the Seller as of such dates and the results of operations of Seller for such periods, and are consistent with the books and records of Seller (which books and records are correct and complete in all material respects).

      3.10    **Absence of Material Developments**.  Except as disclosed on Schedule 3.10, since the Petition Date, there has occurred no fact, event, condition, change or circumstance which has had or would reasonably be expected to have a Material Adverse Effect.

      3.11    **Customers and Suppliers.**    Except as disclosed on Schedule 3.11(a), to the Knowledge of the Seller, since the Petition Date, no customer has or has threatened to stop or decrease the rate of, or as a result of the Bankruptcy Cases or the Transactions, purchasing materials, products or services from the Business.  Except as disclosed on Schedule 3.11(b), to the Knowledge of the Seller, no supplier has or has threatened to stop or decrease the rate of, or as a result of the Bankruptcy Cases or the Transactions. supplying materials, products or services to the Business.

      3.12    **Intellectual Property**.

        (a)    A true, correct and complete list of all Intellectual Property Registrations, material unregistered trademarks, and all material software included in the Owned Intellectual Property Assets is set forth on Schedule 3.12(b).

        (b)    The Seller Group exclusively owns all Owned Intellectual Property Assets and, pursuant to an Assigned Contract as of the Agreement Date, has valid and enforceable rights to use all material Business Intellectual Property that is not an Owned Intellectual Property Asset. Except as set forth on Schedule 3.12(b), no member of the Seller Group is a party to, or bound by, (i) any license, royalty agreement, or other agreement relating to the use of any material Business Intellectual Property (other than non-exclusive licenses grant to a member of the Seller Group for commercially available, unmodified, off-the-shelf software licensed for aggregate annual fees of less than $50,000), and (ii) agreements pursuant to which a member of the Seller Group settled any action, litigation, suit or other judicial or administrative proceeding, claim, assertion, or threat with respect to Intellectual Property, including settlement agreements, coexistence agreements, and consent agreements.

        (c)    Other than with respect to Excluded Contracts or Assigned Contracts that Purchaser does not ultimately assume, no current or former Affiliate, partner, director, stockholder, officer, member, manager, employee, consultant or contractor of the Seller Group will, after giving effect to the Transactions, own, license or retain any Business Intellectual Property.

        (d)    All material Intellectual Property Registrations remain pending or in full force and effect and have not expired or been abandoned or cancelled. The material Intellectual

Property Registrations are subsisting, valid and, to the to the Seller's Knowledge, enforceable. With respect to each item of the material Intellectual Property Registrations, all registration, issuance, renewal, maintenance and other payments that are or have become due with respect thereto have been timely paid by or on behalf of the Seller Group. No interference, opposition, reissue, reexamination, or other proceeding is or has been pending or, to Seller's Knowledge, threatened, in which the scope, validity, or enforceability of any material Owned Intellectual Property Assets is being, has been, or could reasonably be expected to be contested or challenged. To the Seller's Knowledge, there is no basis for a claim that any of the Owned Intellectual Property Assets is invalid or unenforceable.

(e)     To the Knowledge of the Seller, the conduct of the Business does not infringe, misappropriate or otherwise violate (and, since January 1, 2021 has not infringed, misappropriated or otherwise violated) in any material respect any Person's Intellectual Property, and no member of the Seller Group has received written notice of any claim or demand since January 1, 2021 alleging any such infringement, misappropriation or other violation.

(f)     To the Knowledge of the Seller's, no Person is currently infringing, misappropriating or otherwise violating any material Owned Intellectual Property Assets.  No claim of such infringement, misappropriation or other violation of any material Owned Intellectual Property Assets has been asserted or threatened in writing against any Person since January 1, 2021 by any member of the Seller Group.

(g)     The Seller Group has taken commercially reasonable steps to safeguard and maintain the confidentiality of all trade secrets that constitute Owned Intellectual Property Assets, including by using good faith efforts to require all Persons having access thereto to execute written non-disclosure agreements. To the Knowledge of the Seller, there has not been unauthorized disclosure of material trade secrets by any member of the Seller Group that has resulted or is reasonably likely to result in the loss of trade secret or other rights in and to such information.

(h)     Each member of the Seller Group is in material compliance with the terms and conditions of all Contracts pursuant to which such member obtains or uses any Open Source Software in the Business and (ii) no member of the Seller Group has (A) incorporated Open Source Software into, or combined Open Source Software with, any material Technology included in the Owned Intellectual Property Assets; (B) distributed Open Source Software in conjunction with any such Technology; or (C) used Open Source Software, in each case ((A)-(C)), in such a way that requires any such Technology to be (1) disclosed or distributed in source code form, (2) licensed for the purpose of making derivative works or (3) redistributable at no charge.

(i)     Except as would not have a material impact on the Transferred Assets, the information technology systems used by, or on behalf of, the Seller Group are each in good working condition and are adequate for the operation of the Business. The Seller Group undertakes commercially reasonable efforts to maintain the security and integrity of its information technology systems. The Seller Group complies, and since January 1, 2021 has complied in all material respects, with all applicable Laws, internal policies and contractual obligations relating to privacy, data protection and cybersecurity. Since January 1, 2021, there have not been any security breaches in any information technology systems used by, or on behalf of, any member of the Seller Group or with respect to personally identifiable information contained therein, in each

case, relating to the Transferred Assets, for which notice to any Governmental Authority or individual was given or required to be given.

3.13 **Inventories.** Except as disclosed on <u>Schedule 3.13</u>, all inventories of each member of the Seller Group (whether or not reflected on the Seller Financial Statements) consist of a quality and quantity usable and, with respect to finished goods, saleable, in the ordinary course of business. No member of the Seller Group is in possession of any goods or inventory not owned by a member of the Seller Group, and the inventories (other than goods in transit) of a member of the Seller Group are located on the premises of the Seller Group. The reserve for obsolescence with respect to inventories is adequate and calculated consistent with past practice. Inventories that were purchased after the date of the balance sheet included in the Seller Financial Statements were purchased in the ordinary course of business at a cost not exceeding market prices prevailing at the time of purchase for items of similar quality and quantity. The quantities of each item of inventory are not excessive, but are reasonable for the continued operation of each member of the Seller Group in the ordinary course of business.

3.14 **Taxes.** The Seller Group has timely filed all Tax Returns that it was required to file with respect to Transferred Assets. All such Tax Returns were correct and complete in all material respects. All Taxes owed by the Seller Group (whether or not shown or required to be shown on any Tax Return) with respect to Transferred Assets have been paid. There are no liens on any of the Transferred Assets that arose in connection with any failure (or alleged failure) to pay any Tax. There is no dispute, examination, judicial proceeding or claim concerning any Taxes of the Seller Group with respect to the Transferred Assets.

3.15 **Product Liability.** Except as disclosed on <u>Schedule 3.15</u>, within the three (3) year period prior to the Closing Date there has not been any, and as of the Closing Date there is no pending, material litigation commenced against any member of the Seller Group relating to the sale, distribution or use of any item sold or used in the Business (the "**Goods**"), including litigation with respect to product liability or recall claims.

3.16 **Product Warranties; Product Returns.** Except for warranties arising solely pursuant to Applicable Law or in the ordinary course of business, (a) no member of the Seller Group has made any material warranties, express or implied, written or oral, to any third party with respect to any of the Goods within the three (3) year period prior to the Closing Date, and (b) there is no, and within the three (3) year period prior to the Closing Date there has not been any, material litigation pending or, to the Seller's Knowledge, threatened with respect to any such warranty.

3.17 **Accounts Payable**. The Seller has fully paid all accounts payable and related intercompany obligations of the Seller Group associated with the Business, incurred up to the Petition Date with respect to the suppliers or vendors set forth on Schedule 3.17.

3.18 **Brokers and Finders**. Except for Moelis & Company LLC, the Seller has not, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

50307134.17

3.19 __No Other Representations or Warranties__. Except for the representations and warranties contained in this ARTICLE 3, the Seller does not, nor do any other Persons on behalf of the Seller, make any other express or implied representation or warranty with respect to itself, the Business, the Transferred Assets or the Assumed Liabilities, or with respect to any other information provided to Purchaser or its representatives, and the Seller disclaims any other representations or warranties, whether made by or on behalf of the Seller or any other Person. The Seller will not, and no other Persons will, have or be subject to any Liability to Purchaser or any other Person resulting from the distribution to Purchaser, or Purchaser's use of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser or its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever (electronic or otherwise) or otherwise in expectation of the Transactions.

## ARTICLE 4.
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Except as disclosed in a document herewith delivered by Purchaser to the Seller (the "__Purchaser Schedules__"), Purchaser hereby makes the representations and warranties contained in this ARTICLE 4 to the Seller.

4.1 __Organization, Good Standing and Other Matters__. Purchaser is duly organized, validly existing and in good standing under the Applicable Laws of its jurisdiction of organization and has all requisite corporate power or other entity power and authority to own its properties and to carry on its business as now being conducted. Purchaser is duly qualified or licensed to conduct its business as currently conducted and is in good standing in each jurisdiction in which the location of the property owned, leased or operated by it or the nature of its business makes such qualification necessary, except where the failure to be so qualified or licensed would not, individually or in the aggregate, materially impair or delay Purchaser's ability to consummate the Transactions.

4.2 __Authority and Enforceability__. Purchaser has all requisite corporate power or other entity power and authority to execute and deliver this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party and to perform its obligations hereunder and thereunder and to consummate the Transactions. The execution, delivery and performance of this Agreement and each of the Related Documents to which it is (or at Closing, will be) a party, and the consummation of the Transactions, have been duly authorized and approved by its board of directors (or equivalent governing body) and no other action on the part of Purchaser or its members is necessary to authorize the execution, delivery and performance of this Agreement and the Related Documents by Purchaser and the consummation of the Transactions. This Agreement has been, and each Related Document will be at or prior to Closing, duly executed and delivered by Purchaser and, assuming the due execution and delivery by the other parties hereto or thereto, constitutes a valid and binding obligation of Purchaser enforceable against it in accordance with its respective terms, except to the extent that such enforceability may be subject to, and limited by, the Enforceability Exceptions.

50307134.17

4.3     **No Conflict: Required Filings and Consents**. Except (a) such filings as may be required in connection with the Transfer Taxes described in <u>Section 2.10</u> and (b) as set forth on <u>Schedule 4.3</u>, the execution and delivery of this Agreement and of the Related Documents and the consummation of the Transactions by Purchaser will not (i) violate the provisions of its Organizational Documents, (ii) violate any Applicable Law or Order to which it is subject or by which any of its properties or assets are bound, (iii) require it to obtain any Consent, or give any notice to, or make any filing with, any Governmental Authority on or prior to the Closing Date, (iv) result in a material breach of or constitute a default (with or without due notice or lapse of time or both), give rise to any right of termination, cancellation or acceleration under, or require the Consent of any third party to, any material Contract to which it is a party or (v) result in the imposition or creation of any Lien upon or with respect to any of its assets or properties; excluding from the foregoing <u>clauses (ii)</u> through <u>(v)</u> Consents, approvals, notices and filings the absence of which, and violations, breaches, defaults, rights of acceleration, cancellation or termination, and Liens, the existence of which would not, individually or in the aggregate, (A) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (B) otherwise prevent, hinder or delay the consummation of the Transactions.

4.4     **Financing**. Purchaser has, and at the Closing will have, (a) sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price in accordance with the terms hereof and any other payments required hereunder and any expenses incurred or required to be paid by Purchaser in connection with the Transactions, and (b) the resources and capabilities (financial or otherwise) to perform its obligations hereunder and under the Related Documents. Purchaser has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.

4.5     **Solvency**. Purchaser is not entering into this Agreement with the intent to hinder, delay or defraud either present or future creditors. Immediately after giving effect to all of the Transactions**,** including the making of the payments contemplated by <u>Section 2.9</u>, and assuming satisfaction of the conditions to Purchaser's obligation to consummate the Transactions as set forth herein, the accuracy of the representations and warranties of Purchaser set forth herein and the performance by Purchaser of its obligations hereunder in all material respects, Purchaser will be Solvent.

4.6     **Litigation**. There is no Action pending or, to Purchaser's Knowledge, formally threatened against Purchaser or involving any of its properties or assets that would be reasonably be expected to (a) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (b) otherwise prevent, hinder or delay the consummation of the Transactions.

4.7     **Brokers and Finders**. None of Purchaser or its Affiliates have, directly or indirectly, entered into any agreement with any Person that would obligate the Seller to pay any commission, brokerage fee or "finder's fee" in connection with the Transactions.

4.8    <u>**Investigation and Agreement by Purchaser; Non-Reliance of Purchaser; No Other Representations and Warranties**</u>.

(a)    Purchaser acknowledges that it and its representatives have received access to such books and records, facilities, equipment, contracts and other assets of the Business which it and its representatives have desired or requested to review. Purchaser acknowledges and agrees that it has made its own inquiry and investigation into, and, based thereon, have formed an independent judgment concerning the Seller Group, the Business, the Transferred Assets and the Assumed Liabilities.

(b)    Except for the specific representations and warranties expressly made by the Seller in <u>ARTICLE 3</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>ARTICLE 9</u> of this Agreement, Purchaser acknowledges and agrees that (i) the Seller is not making and have not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Business, the Transferred Assets, the Assumed Liabilities, or any of its operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any Liabilities, the prospects of the Business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Business furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the Transactions, or in respect of any other matter or thing whatsoever, and (ii) no officer, director, manager, stockholder, agent, Affiliate, advisor, representative or employee of the Seller Group has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in <u>ARTICLE 3</u> and subject to the limited remedies herein provided.

(c)    Other than the specific representations and warranties expressly set forth in <u>ARTICLE 3 3</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>ARTICLE 9</u> of this Agreement, Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and the Seller's Affiliates have specifically disclaimed and do hereby specifically disclaim, and shall not have or be subject to any Liability for reliance on any such other representation or warranty made by any Person. Purchaser specifically waives any obligation or duty by the Seller or the Seller's Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties expressly set forth in <u>ARTICLE 3</u> and disclaim reliance on any information not specifically required to be provided or disclosed pursuant to the specific representations and warranties set forth in <u>ARTICLE 3</u>.

(d)    Purchaser is acquiring the Business, the Transferred Assets and the Assumed Liabilities subject only to the specific representations and warranties expressly set forth in <u>ARTICLE 3</u> as further limited by the specifically bargained-for exclusive remedies as set forth in <u>Section 9</u> of this Agreement.

4.9     **No Other Representations or Warranties.** Except for the representations and warranties contained in this <u>ARTICLE 4</u>, neither Purchaser nor any other Person on behalf of Purchaser makes any other express or implied representation or warranty with respect to Purchaser or with respect to any other information provided to the Seller or its representatives, and Purchaser disclaims any other representations or warranties, whether made by Purchaser or any of its Affiliates, officers, directors, employees, agents or representatives.

**ARTICLE 5.**
**BANKRUPTCY COURT MATTERS**

5.1     **Competing Transaction**. This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller of higher or better competing bids in respect of all or any part of the Transferred Assets (whether in combination with other assets of the Seller Group or otherwise) in accordance with the terms of the Bid Procedures Order (each, a "**Competing Bid**"). From the Agreement Date (and any prior time) and until the Closing, the Seller is permitted to, and to cause its representatives to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any sale or other disposition of the Transferred Assets. In addition, the Seller shall have the authority to respond to any inquiries or offers to purchase all or any part of the Transferred Assets (whether in combination with other assets of the Seller Group or otherwise) and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bid Procedures Order or other Applicable Law, including supplying information relating to the Business and the assets of the Seller Group to prospective purchasers.

5.2     **Bankruptcy Court Filings**.

(a)     Subject to its right to pursue a Competing Bid in accordance with the Bid Procedures Order, the Seller shall diligently pursue the entry by the Bankruptcy Court of the Sale Order, which Sale Order shall provide for the transfer of the Transferred Assets and the Assumed Liabilities to Purchaser free from all successor or transferee Liability to the fullest extent permitted by Section 363 of the Bankruptcy Code. The Seller shall comply (or obtain an Order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules for the Bankruptcy Court in obtaining the entry of the Sale Order. The Seller further covenants and agrees that, after entry by the Bankruptcy Court of the Sale Order, and <u>provided</u>, that the Sale Order becomes a Final Order, the terms of any other proposed order submitted by the Seller to the Bankruptcy Court shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event, if the entry of the Sale Order shall be appealed, the Seller and Purchaser shall use their respective commercially reasonable efforts to defend such appeal.

35

(b)    Within five (5) days after the Petition Date, Seller will file the Bid Procedures Motion seeking the Bankruptcy Court's entry of the Bid Procedures Order substantially in the form and substance reasonably agreed to by the Buyer and Seller, among other things, (A) establishing the Bid Procedures, (B) approving payment of the Termination Fee and the Expense Reimbursement, to the extent payable by the terms of this Agreement and the Bid Procedures Order, and (C) providing that the Termination Fee and the Expense Reimbursement shall constitute superprioriry administrative expenses of the Seller with priority over any and all administrative expenses pursuant to section 503(b) of the Bankruptcy Code.

(c)    Seller shall use commercially reasonable efforts to provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the transactions contemplated by this Agreement prepared by Seller or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Bankruptcy Cases; provided that the foregoing shall not require the Seller to take any action that would, in Seller's reasonable business judgment, threaten to harm the overall value to be produced by the Seller's in-court sale process.

(d)    The form of Bid Procedures Order and form of Sale Order submitted by the Seller to the Bankruptcy Court for approval must be reasonably satisfactory in form and substance to the Purchaser; provided that an order approving the form of Bid Procedures Order is, and shall be deemed to be, acceptable to Purchaser.

(e)    Seller shall not seek any modification to the Bid Procedures, Bid Procedures Order, or Sale Order by the Bankruptcy Court that are materially adverse to the Purchaser without the prior written consent of Purchaser, which such consent shall not be unreasonably withheld.

(f)    Each of Purchaser and Seller will promptly take such actions as are reasonably requested by the other party to assist in obtaining entry of the Bid Procedures Order and, subject to the Bid Procedures Order, the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Seller of its obligations under this Agreement and demonstrating that Purchaser is a good faith buyer under section 363(m) of the Bankruptcy Code.

(g)    Seller shall use commercially reasonable efforts to provide appropriate notice of the hearings on the Sale Motion to all Persons entitled to notice, including, but not limited to, all Persons that have asserted Liens on the Transferred Assets, all parties to the Assigned Contracts and all taxing authorities in jurisdictions applicable to Seller and as otherwise required by the Bankruptcy Code and bankruptcy rules.

(h)    Within five (5) Business Days of the Auction (subject to the Bankruptcy Court's availability), if Purchaser is the successful bidder at the Auction (or if there is no Auction), Seller will seek entry of the Sale Order by the Bankruptcy Court.

(i)    The Seller and Purchaser agree that, in the event that Purchaser is not the winning bidder at an auction undertaken pursuant to the Bid Procedures Order (the "**Auction**"), and (i) Purchaser submits the Back-Up Bid at the Auction or (ii) the terms of this Agreement are

36

deemed to constitute a Back-Up Bid, then Purchaser shall be obligated to promptly consummate the Transactions upon the terms and conditions as set forth herein, including the payment of the Purchase Price as the same may be increased by Purchaser at the Auction; provided that, the Seller gives written notice to Purchaser on or before the Back-up Termination Date, stating that the Seller (A) failed to consummate the sale of the Transferred Assets with the winning bidder, and (B) terminated the purchase agreement with the winning bidder.

5.3     **Assumption of Assigned Contracts**.

(a)     On or before the date that is five Business Days following the date on which the Bid Procedures Order is entered by the Bankruptcy Court, the Seller shall file (or cause to be filed) a notice of assumption (the "**Assumption Notice**") with the Bankruptcy Court and serve such notice on each counterparty to an Assigned Contract listed thereon. The Assumption Notice shall identify all Assigned Contracts that the Seller and Purchaser believe may be assumed and assigned in connection with the sale of the Transferred Assets and set forth a good faith estimate of the amount of Cure Costs applicable to each such Assigned Contract (and if no Cure Cost is estimated to be applicable with respect to any particular Assigned Contract, the amount of such Cure Cost designated for such Assigned Contract shall be "$0.00"). In accordance with the Bid Procedures Order, the Seller reserves the right to supplement such list of Assigned Contracts and provide additional notice of assumption, and to remove an Assigned Contract from the list of Assigned Contracts, up to five days prior to the hearing by the Bankruptcy Court with respect to the Sale Motion.

(b)     On or before the date that is five Business Days before the Closing Date (the "**Designation Deadline**"), Purchaser shall provide to the Seller a list of those Assigned Contracts that it elects to have assumed and assigned to Purchaser on the Closing Date (the "**Designated Contracts**"). Purchaser shall be entitled to remove certain Assigned Contracts from the list of Designated Contracts at any time prior to the Designation Deadline by providing the Seller written notice of such removal. In the event that Purchaser removes any of such Assigned Contracts from such list, the Seller will provide the relevant counterparty written notice that the applicable Assigned Contract is no longer identified as a Designated Contract. For the avoidance of doubt, only those executory Assigned Contracts that remain identified as Designated Contracts as of the Closing Date will constitute Assigned Contracts and will be assumed by the Seller and assigned to Purchaser pursuant to the Sale Order. The Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assigned Contracts and to determine the amount of the Cure Costs; provided, that nothing herein shall preclude the Seller from filing one or more motion to reject any Contracts that are not Assigned Contracts.

(c)     Notwithstanding any provision in this Agreement to the contrary, a Contract shall not be a Designated Contract hereunder and shall not be assigned to, or assumed by, Purchaser to the extent that such Contract is (i) deemed rejected under Section 365 of the Bankruptcy Code, (ii) the subject of an objection to assignment or assumption or requires the consent of any Governmental Authority or other third party (other than, and in addition to, the Bankruptcy Court) in order to permit the assumption and assignment by the applicable Seller to Purchaser of such Contract pursuant to Section 365 of the Bankruptcy Code, and such objection has not been resolved or such consent has not been obtained prior to the thirtieth day following the Closing Date (as such period may be extended by mutual agreement of Seller and Purchaser), or (iii) is terminated by

37

any party thereto other than Seller, or terminates or expires by its terms, on or prior to such time as it is to be assumed by Purchaser as a Designated Contract hereunder and is not continued or otherwise extended upon assumption. In no event shall the failure to assign to Purchaser any Contract in accordance with subsections (i) through (iii) above reduce the Purchase Price payable to Seller or constitute a failure to satisfy the conditions precedent of Seller under Section 8.3.

(d)    Subject to the terms of <u>Section 2.5</u>, <u>Section 2.8</u>, <u>Section 5.3(a)</u> and <u>Section 5.3(b),</u> Purchaser shall make provision for the payment of the Determined Cure Costs in cash at Closing in accordance with the Sale Order.

(e)    Notwithstanding any provision in this Agreement to the contrary, from and after the date of the Assumption Notice through the Closing Date, the Seller will not reject or take any action (or fail to take any action that would result in rejection by operation of Applicable Law) to reject, withdraw, repudiate or disclaim any Assigned Contract unless (i) Purchaser has provided its prior written consent or (ii) Purchaser has removed such Assigned Contract from the list of Designated Contracts.

## ARTICLE 6.
## PRE-CLOSING COVENANTS

6.1    <u>**Conduct of Business**</u>. Except (i) as set forth on <u>Schedule 6.1,</u> (ii) as may be approved by Purchaser (which approval will not be unreasonably withheld, delayed or conditioned; <u>provided, however</u>, that the consent of Purchaser shall be deemed to have been given if Purchaser does not object within 48 hours after written request for such consent is provided by the Seller to Purchaser), (iii) for actions taken or omitted to be taken by any member of the Seller Group in response to any Public Health Measure, or (iv) as is otherwise permitted, contemplated or required by this Agreement, any Assigned Contract, by Applicable Laws or by order of the Bankruptcy Court, from the Agreement Date through the earlier of the Closing Date or the termination of this Agreement in accordance with its terms:

(a)    The Seller Group shall use their commercially reasonable efforts to carry on the Business in all material respects in the ordinary course of business as it has been conducted since the Petition Date; and

(b)    The Seller shall not, and shall cause its Subsidiaries not to:

(i)    sell, license, abandon or otherwise dispose of any material asset or property constituting Transferred Assets other than, in each case, in the ordinary course of business or for the purpose of disposing of obsolete or worthless assets;

(ii)    except in the ordinary course of business, acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of any business or any corporation, partnership or other business organization or otherwise acquire any assets (except inventory), that as of the Closing would constitute Transferred Assets, except for the acquisition of assets in the ordinary course of business;

(iii)    change its present accounting methods or principles in any material respect, except as required by GAAP or Applicable Law; or

50307134.17

(iv)    make or change any Tax election, change an annual accounting period, adopt or change any Tax accounting method, file any amended Tax Return, enter into any closing agreement, settle any material Tax claim or assessment or surrender any right to claim a refund of Taxes, other than in the ordinary course of business or as required by the Code or Applicable Law, and in each case that could have a material effect on the amount of Taxes due from the Business or due as a result of the Transferred Assets for a taxable period (or portion thereof) beginning after the Closing Date.

(c)    Notwithstanding anything to the contrary, nothing contained in this Agreement shall give Purchaser or any of its Affiliates, directly or indirectly, any right to control or direct the Business, assets and operations prior to the Closing. Prior to the Closing, the Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its Business, assets and operations.

6.2    **Access to Information; Confidentiality**.

(a)    From the Agreement Date until the earlier of the Closing Date and the termination of this Agreement, the Seller shall grant Purchaser and its representatives (at Purchaser's sole cost and expense) reasonable access, during normal business hours and upon reasonable notice (and in the event of a facility visit request, at least 48 hours prior notice), and subject to any limitations resulting from any Public Health Measures, to the personnel, facilities, book and records of the Seller Group related to the Business or the Transferred Assets that are in the possession or under the control of the Seller Group; provided, however, that (i) all requests for access shall be directed to such other person(s) as the Seller may designate in writing from time to time (the "**Seller Access Contact**"), (ii) such activities do not unreasonably interfere with the ongoing business or operations of the Seller Group, (iii) the Seller shall have the right to have one or more of its representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 6.2(a), (iv) Purchaser shall have no right to perform invasive or subsurface investigations or conduct any sampling or analysis of environmental media of the nature commonly referred to as a "Phase II Environmental Investigation," such as any soil or groundwater testing, (v) such access or related activities would not cause a violation of any agreement to which any Seller is a party, (vi) no Personal Information shall be disclosed or used other than in compliance with applicable privacy law and (vii) nothing herein shall require any member of the Seller Group or their representatives to furnish to Purchaser or provide Purchaser with access to information that (A) is subject to an attorney-client or an attorney work-product privilege, (B) legal counsel for the Seller Group reasonably concludes may give rise to antitrust or competition law issues or violate a protective order or otherwise may not be disclosed pursuant to Applicable Law (including any Public Health Measure) or (C) would cause significant competitive harm to the Seller Group if the Transactions are not consummated.

(b)    Notwithstanding anything to the contrary contained in this Agreement, from the Agreement Date until the Closing Date, Purchaser shall not, and shall cause its representatives not to, have any contact or discussions concerning any member of the Seller Group, the Business, the Transaction or any other matters with any lender, borrower, creditor, guarantor, business partner, bank, landlord, tenant, supplier, customer, employee, manager, franchisee, distributer, noteholder, independent contractor, consultant or other material business relation of any Seller, in each case, without the prior written consent of the Seller Access Contact (which consent may be

39

withheld in the Seller's sole discretion and, if given, may be conditioned on the Seller Access Contact or his or her designee having the right to participate in any meeting or discussion).

(c)    Any information provided to or obtained by Purchaser or its representatives, including pursuant to this Section 6.2 is confidential information and subject to the terms of, and the restrictions contained in, the Confidentiality Agreement. Purchaser agrees to be bound by and comply with the provisions set forth in the Confidentiality Agreement as if such provisions were set forth herein, and such provisions are hereby incorporated herein by reference. Effective upon (and only upon) the Closing, the Confidentiality Agreement shall automatically terminate and none of the parties thereto shall have any further Liability or obligation thereunder except with respect to any confidential information provided to or obtained by Purchaser or its representatives concerning the Seller Group, which information shall remain subject to the terms and conditions of the Confidentiality Agreement after the Closing Date. If this Agreement is terminated prior to Closing for any reason, the duration of the confidentiality of the Confidentiality Agreement shall be deemed extended, without any further action by the parties, for a period of time equal to the period of time elapsed between the date such Confidentiality Agreement was initially signed and the date of termination of this Agreement.

6.3    **Efforts to Consummate.** Except as otherwise provided in this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts to cause the Closing to occur as soon as possible after the Agreement Date, including satisfying the conditions precedent set forth in ARTICLE 8 applicable to such party including (a) defending against any Actions, judicial or administrative, challenging this Agreement or the consummation of the Transactions, (b) seeking to have any preliminary injunction, temporary restraining order, stay or other legal restraint or prohibition entered or imposed by any court or other Governmental Authority that is not yet final and nonappealable vacated or reversed, and (c) and executing any additional instruments reasonably requested by another party hereto (without cost or expense to the executing party) necessary to carry out the Transactions and to fully carry out the purposes of this Agreement; provided, however, that, for purposes of "commercially reasonable efforts" standard as required by this Section 6.3, Section 6.4 or Section 6.5, neither the Seller nor its Affiliates or representatives shall be required to offer or grant any accommodation or concession (financial or otherwise) to any third party or to otherwise expend any money or suffer any detriment, to expend any money to remedy any breach of any representation or warranty hereunder, to commence any Action, to waive or surrender any right, to modify any agreement (including any Assigned Contract) or to provide financing to Purchaser for the consummation of the Transactions.

6.4    **Notices and Consents.** Reasonably promptly following the execution of this Agreement, the Seller will give, or cause to be given, applicable notices to third parties and thereafter will use commercially reasonable efforts (as limited by Section 6.3) to obtain the third-party consents set forth on Schedule 6.4; provided, however, that no representation, warranty, covenant or agreement of the Seller shall be breached or deemed breached, and no condition shall be deemed not satisfied, as a result of (a) the failure to obtain any such third-party consent, (b) any termination of a Contract as a result of the failure to obtain such third-party consent or (c) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such consent or any such termination; provided, further, that nothing in this Section 6.4 shall require the Seller to expend any money or grant any concessions to obtain any

40

such third-party consent (unless Purchaser provides the funds for or reimburses the Seller for such payment).

6.5     **Regulatory Matters**.

(a)     Purchaser and the Seller will establish a mutually acceptable and prompt communication and interaction process to ensure the orderly transfer of the NDA for the Product. Promptly after Closing, the Parties shall file with the FDA, and any other relevant Governmental Authority all information required in order to transfer the NDA from the Seller to Purchaser, including the information required pursuant to 21 C.F.R. § 314.72, or any successor regulation thereto, any authorization letters or notices, and letters of acceptance. Seller shall file the information required of a former owner, and Purchaser shall file the information required of a new owner, at each Party's own expense. Both Purchaser and the Seller also agree to use all commercially reasonable efforts to take any actions required by the Governmental Authority or other government/health agencies to effect the transfer of the NDAs from the Seller to Purchaser, and hereby further agree to cooperate with each other in order to effectuate the foregoing transfer of the Product. The Parties agree to use all commercially reasonable efforts to complete the filing of the transfer of the NDAs within ten (10) days from the Closing Date.  The Seller may retain an archival copy of the NDAs, including supplements and records that are required to be kept under 21 C.F.R. § 314.81.

(b)     From and after the Closing Date until the Seller is dissolved, the Seller shall cooperate with Purchaser in preparing, disclosing and providing any relevant records, reports, responses or any other documentation that are required to be made, maintained and reported pursuant to the Governmental Authority in the Territory. The Parties agree to use their commercially reasonable efforts to take any other actions required by the FDA or any other Governmental Authority to effect the transaction.

(c)     Until the completion of the transfer of the Product to Purchaser, the Seller shall take all reasonably necessary or advisable actions to maintain the relevant NDA.

6.6     **Public Announcements**. Between the Agreement Date and the Closing Date, except to the extent required by any Applicable Law or Action (including the Bankruptcy Cases), neither Purchaser nor the Seller shall, and Purchaser and the Seller shall cause their respective Affiliates and representatives not to, directly or indirectly, issue any press release or public announcement of any kind without the prior written consent of Purchaser and the Seller; provided, however, that the Seller and its Affiliates may make announcements from time to time to their respective employees, customers, suppliers, and other business relations and otherwise as the Seller may reasonably determine is necessary to comply with Applicable Law or the requirements of this Agreement or any other agreement to which any Seller or any such Affiliate is a party. Purchaser and the Seller shall cooperate in good faith to prepare a joint press release to be issued on the Closing Date, the terms of which shall be mutually agreed upon by the parties.

6.7     **Update of Schedules; Knowledge of Breach**. From time to time prior to the Closing, the Seller may supplement or amend the Schedules with respect to any matter first arising after the Agreement Date that would have been required to be set forth or described in such Schedules. Any such supplemental or amended disclosure shall not be deemed to have cured any

50307134.17

such breach of representation or warranty for purposes of determining whether or not the conditions set forth in <u>Section 8.2(a)</u> have been satisfied. From and after the Closing, references to the Schedules shall be references to the Schedules as supplemented, modified and/or updated. If, prior to the Closing, Purchaser shall have reason to believe that any breach of a representation or warranty of the Seller has occurred (other than through notice from the Seller), Purchaser shall promptly so notify the Seller, in reasonable detail. Nothing in this Agreement, including this <u>Section 6.7</u>, shall imply that the Seller is making any representation or warranty as of any date other than the Closing Date (other than representations and warranties that are expressly made as of an earlier date).

**ARTICLE 7.**
**POST-CLOSING COVENANTS**

7.1     <u>**Access to Information; Books and Records**</u>. From and after the Closing, and without prejudice to the obligations of Purchaser pursuant to <u>Section 7.3(g)</u>, Purchaser and its Affiliates shall (i) afford the Seller Group and their respective representatives reasonable access, during normal business hours, upon reasonable advance notice and under reasonable circumstances, to the books and records of Purchaser and the Business shall permit the Seller Group and their respective representatives to examine and copy such books and records to the extent reasonably requested by such party and (ii) cause their representatives to furnish all information reasonably requested by any member of the Seller Group or their representatives in connection with financial or regulatory reporting, audit, third party litigation, preparing or filing of any Tax Return or the defense of any Tax claim or assessment or any other business purpose; <u>provided</u>, <u>however</u>, that nothing in this <u>Section 7.1</u> shall require Purchaser or its Affiliates to furnish to the Seller Group or their respective representatives any material that is subject to an attorney-client or solicitor-client privilege or an attorney or solicitor work-product privilege or which may not be disclosed pursuant to Applicable Law. For a period of six (6) years following the Closing Date, or such longer period as may be required by Applicable Law or necessitated by applicable statutes of limitations, Purchaser shall, and shall cause its Affiliates to, maintain all such books and records in the jurisdiction in which such books and records were located prior to the Closing Date and shall not destroy, alter or otherwise dispose of any such books and records. On and after the end of such period, Purchaser shall, and shall cause its Affiliates to, provide the Seller with at least ten Business Days prior written notice before destroying, altering or otherwise disposing any such books and records, during which period the Seller may elect to take possession, at its own expense, of such books and records.

7.2     <u>**Post-Closing Receipt and Possession of Assets**</u>.

(a)     After the Closing Date, the Seller shall transfer promptly to Purchaser from time to time (but in any event on a monthly basis) any payments constituting Transferred Assets received by the Seller. After the Closing Date, Purchaser shall transfer promptly to the Seller, from time to time (but in any event on a monthly basis), any payments constituting Excluded Assets, including any accounts receivable constituting Excluded Assets, received by Purchaser after the Closing.

(b)     In the event that, after the Closing Date, Purchaser receives or otherwise is in possession of any other Excluded Asset, Purchaser shall promptly notify the Seller of its receipt

42

or possession of such other Excluded Asset and transfer, at the Seller's expense, such Excluded Asset to the Seller. In the event that, after the Closing Date, the Seller receives or otherwise is in possession of any other Transferred Asset, the Seller shall promptly notify Purchaser of its receipt or possession of such other Transferred Asset and transfer, at Purchaser's expense (unless the Seller was required to transfer such Transferred Asset to Purchaser at Closing, in which case, and without limitation of any other remedies available to Purchaser, such transfer will be at the Seller's expense), such Transferred Asset to Purchaser.

7.3 **Tax Matters**.

(a)    The Seller shall be responsible for preparing or causing to be prepared all Asset Tax Returns for itself for the Pre-Closing Tax Period that are required to be filed after the Closing. After the Closing, Purchaser will assist and cooperate with the Seller in preparing such Asset Tax Returns. The Seller shall provide Purchaser with completed drafts of such Asset Tax Returns for Purchaser's review and reasonable comment at least thirty days prior to the due date for the filing thereof, taking into account extensions (or, if such due date is within thirty days following the Closing Date, as promptly as practicable following the Closing Date) and shall make such revisions to such Asset Tax Returns as are reasonably requested by Purchaser; provided, that Purchaser's requests are consistent with the prior practice of the Seller (to the extent relevant) and comply with Applicable Law. Purchaser shall cause all such Asset Tax Returns received from the Seller to be duly executed (as may be required) and timely filed (taking into account all extensions properly obtained).

(b)    Purchaser shall prepare and timely file or cause to be prepared and timely filed (taking into account all extensions properly obtained) all Tax Returns that are required to be filed for any taxable period that begins on or before the Closing Date and ends after the Closing Date (a "**Straddle Period**") and shall timely pay (subject to Purchaser's right to reimbursement of Seller Taxes), or cause to be timely paid, the amount of any Taxes due thereon. Purchaser shall prepare such Tax Returns in a manner consistent with past practice to the extent relevant and consistent with Applicable Law and shall provide the Seller with completed drafts of such Tax Returns for the Seller's review and reasonable comment at least thirty days prior to the due date for filing thereof, taking into account extensions (or, if such due date is within thirty days following the Closing Date, as promptly as practicable following the Closing Date) and shall make such revisions to such Tax Returns as are reasonably requested by the Seller, provided such requests are consistent with the prior practice of the Seller (to the extent relevant) and comply with Applicable Law.

(c)    The Seller shall be liable for, and shall indemnify and hold Purchaser harmless against, any Asset Taxes with respect to a Pre-Closing Tax Period and the portion of any Straddle Period ending on the Closing Date ("**Seller Taxes**"). For purposes of this Agreement, in the case of any Straddle Period, (a) the amount of any Asset Taxes based on or measured by income or receipts, sales or use, employment, or withholding allocated to the portion of such Straddle Period ending on the Closing Date shall be determined based on an interim closing of the books as of the end of the day on the Closing Date and (b) any other Asset Taxes shall be allocated to the portion of such Straddle Period ending on the Closing Date by prorating the amount of such Tax for the entire premium or taxable period per diem.

50307134.17

(d)     Purchaser and its Affiliates shall not make or change any Tax election, amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) any Asset Tax Return.

(e)     Purchaser shall promptly notify the Seller in writing upon receipt by Purchaser or any of its Affiliates of notice of any pending or threatened federal, state, local or foreign Tax audits, proceedings or assessments relating to Pre-Closing Tax Period, Straddle Period or otherwise relating to a Tax for which the Seller may be liable, in each case, solely with respect to Seller Group Taxes or any Asset Taxes (a "**Seller Tax Claim**").

(f)     The Seller shall have the sole right to control the defense or resolution of any Seller Tax Claim, and to employ counsel of its choice at the Seller's expense; provided, however, that Purchaser and its representatives shall be permitted, at their expense, to observe and participate in any defense or resolution of such Seller Tax Claim. Neither Purchaser nor any of its Affiliates shall be entitled to settle, either administratively or after the commencement of litigation, any Seller Tax Claim without the prior written consent of the Seller, which shall not be unreasonably conditioned, denied or delayed. Notwithstanding anything herein to the contrary, Purchaser shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Person such amounts as are required to be deducted and withheld under the Code or applicable Tax law.  To the extent that amounts are so deducted or withheld and remitted to the applicable Tax authority, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction or withholding was made.  Purchaser shall use commercially reasonable efforts to notify the Seller at least five (5) Business Days prior to the Closing if any payment would be subject to deduction or withholding for Taxes and reasonable cooperate with the Seller to reduce or eliminate such withholding in a manner consistent with Applicable Law.

(g)     After the Closing, each of the Seller and Purchaser shall (and shall cause their respective Affiliates to):

(i)     timely sign and deliver such certificates or forms as may be necessary or appropriate to establish an exemption from (or otherwise reduce), or file Tax Returns or other reports with respect to, Transfer Taxes;

(ii)     cooperate fully in preparing for and defending any audits or proceedings of or disputes with Governmental Authorities regarding any Tax Returns required to be filed by, or Taxes related to the Transferred Assets due from, the Seller for any Pre-Closing Tax Period or Straddle Period;

(iii)     maintain and preserve until the expiration of the applicable statutes of limitations, and make available to the other parties as reasonably requested and to any Governmental Authority as reasonably required, all information, records and documents relating to Taxes related to the Transferred Assets for any Pre-Closing Tax Period or Straddle Period, and make employees available to the other parties as reasonably requested during business hours to supplement or explain such information, records and documents; and

44

(iv)     furnish the other parties with copies of all correspondence received from any Governmental Authority in connection with any Tax audit, proceeding, assessment or information request relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period, and furnish the other parties with copies of all records and documents relating to Taxes related to the Transferred Assets for a Pre-Closing Tax Period or Straddle Period that are proposed to be destroyed (and not otherwise in the possession of such other party).

(h)     Purchaser shall pay, or cause to be paid, to the Seller the amount of any refunds of Taxes related to the Transferred Assets from a Pre-Closing Tax Period or the portion of a Straddle Period ending on the Closing Date to the Seller within five days of receipt of the refund in cash (or through offset against other cash Taxes payable).

## ARTICLE 8.
## CONDITIONS PRECEDENT

8.1     **Conditions to Each Party's Obligation**. The respective obligations of the parties hereto to effect the Transactions are subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller and Purchaser), at or prior to the Closing, of the following conditions:

(a)     No Injunctions or Restraints. No Order or Applicable Law preventing the consummation of the Transactions shall be in effect.

(b)     Sale Order. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall be a Final Order (unless such Final Order requirement is waived by the Seller and Purchaser in their respective sole discretion).

8.2     **Conditions to Obligation of Purchaser**. The obligations of Purchaser to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by Purchaser), at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of the Seller set forth in ARTICLE 3 shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality", "Material Adverse Effect" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not have, individually or in the aggregate, a Material Adverse Effect.

(b)     Performance of Covenants and Obligations. The Seller shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c)     Closing Deliverables. The Seller shall have delivered to Purchaser the closing deliveries required to be delivered by the Seller pursuant to Section 2.8(a), Section 2.8(b)

45

and Section 2.8(f). The Escrow Agent shall have delivered its duly executed signature page of the Escrow Agreement to Purchaser pursuant to Section 2.8(b).

8.3     **Conditions to Obligations of the Seller**. The obligation of the Seller to effect the Transactions is subject to the satisfaction (or, to the extent permitted by Applicable Law, waiver by the Seller), at or prior to the Closing, of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of Purchaser set forth in ARTICLE 4 shall be true and correct in all respects (without giving effect to any qualifications or limitations as to "materiality" or words of similar import set forth therein) as of the Closing as though made at and as of such time (other than such representations and warranties as are made as of an earlier date, which shall be so true and correct as of such date), except where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, (i) have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or (ii) otherwise prevent, hinder or delay the consummation of the Transactions.

(b)     Performance of Covenants and Obligations of Purchaser. Purchaser shall have performed or complied in all material respects with all obligations and covenants required to have been performed or complied with by it under this Agreement at or prior to the Closing, except to the extent of changes or developments contemplated by the terms of this Agreement or caused by the Transactions.

(c)     Closing Deliverables. Purchaser shall have delivered to the Seller the closing deliveries required to be delivered by Purchaser pursuant to Section 2.8(a), Section 2.8(b) and Section 2.8(e). The Escrow Agent shall have delivered its duly executed signature page of the Escrow Agreement to the Seller pursuant to Section 2.8(b).

8.4     **Waiver of Condition; Frustration of Conditions**. All conditions to the Closing shall be deemed to have been satisfied or waived from and after the Closing. Neither Purchaser nor the Seller may rely on the failure of any condition set forth in this ARTICLE 8, as applicable, to be satisfied if such failure was caused by such party's failure to use, as required by this Agreement, its reasonable best efforts to consummate the Transactions.

8.5     **Delivery of a Notice of Readiness to Close**. At any time after the Seller's satisfaction of its conditions to Closing in accordance with the terms of Section 8.1 and Section 8.3 of this Agreement, the Seller may deliver a notice to the Purchaser (a "**Notice of Readiness to Close**"). The Purchaser shall have three (3) Business Days from delivery of a Notice of Readiness to Close to satisfy its conditions to Closing in accordance with the terms of Section 8.1 and Section 8.2 of this Agreement and consummate the Transactions. If Purchaser does not satisfy its conditions to Closing and consummate the Transaction within three (3) Business Days, Purchaser shall forfeit the entire Deposit Escrow Amount to the Seller.

## ARTICLE 9.
## TERMINATION

9.1     **Events of Termination**. Notwithstanding anything to the contrary, this Agreement may be terminated and the Transactions may be abandoned at any time prior to the Closing:

50307134.17

(a)    by mutual written consent of Purchaser and the Seller;

(b)    automatically, upon (i) the consummation of a sale or other disposition of all or substantially all of the Transferred Assets to a Person other than Purchaser (each, an "**Alternate Transaction**"), (ii) if, at close of the Auction, Purchaser's bid has not been selected as either the winning bid or the Back-Up Bid or (iii) if, at the close of the Auction, Purchaser's bid was selected as the Back-Up Bid, upon the consummation of a Competing Bid or Alternative Transaction;

(c)    by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(d)    by Purchaser or the Seller by written notice to Purchaser or the Seller from the other, if Purchaser is not selected as having the winning bid or Back-Up Bid at Auction, if any;

(e)    by Purchaser if the Seller (i) withdraws the motion for the Sale Order, or publicly announces its intention to withdraw such motion, (ii) moves to voluntarily dismiss the Bankruptcy Cases, (iii) moves for conversion of the Bankruptcy Cases to Chapter 7 of the Bankruptcy Code, or (iv) moves for appointment of an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code or a trustee in the Bankruptcy Cases;

(f)    by Purchaser, by written notice from Purchaser to the Seller, if there has been a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement, such that the conditions in Section 8.1 or Section 8.2 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by the Seller prior to the earlier of (i) 20 Business Days after receipt of written notice from Purchaser requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(f) shall not be available to Purchaser if the failure of Purchaser to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement;

(g)    by the Seller, by written notice from the Seller to Purchaser, if there has been a breach or inaccuracy of a covenant, representation or warranty made by Purchaser in this Agreement, such that the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied and which breach is incapable of being cured or, if capable of being cured, has not been cured by Purchaser prior to the earlier of (i) 20 Business Days after receipt of written notice from the Seller requesting such breach be cured or (ii) the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(g) shall not be available to the Seller if the failure of the Seller to fulfill any of its obligations under this Agreement has been the primary cause of, or resulted in, such breach, or if the conditions in Section 8.1 or Section 8.3 are not capable of being satisfied because there is then a breach or inaccuracy of a covenant, representation or warranty made by the Seller in this Agreement;

50307134.17

(h)    by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if any Governmental Authority of competent jurisdiction shall have issued an Order, enacted any Applicable Law or taken any other action restraining, enjoining or otherwise prohibiting the consummation of the Transactions and, in the case of Orders and other actions, such Order or other action shall have become Final Orders; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1(h) shall not be available to the party seeking to terminate if any action of such party or any failure of such party to act has contributed to such Order or other action and such action or failure constitutes a breach of this Agreement; or

(i)    by Purchaser or the Seller, by written notice from Purchaser or the Seller to the other, if the Closing has not occurred on or prior to March 13, 2023 (the "**Outside Date**"); provided, however, that the party exercising the right to terminate this Agreement pursuant to this Section 9.1(i) shall not have been responsible for such failure of the Closing to occur through a breach or inaccuracy of a covenant, representation or warranty contained in this Agreement.

(j)    by Purchaser by written notice to the Seller if the Bankruptcy Court does not approve the Bid Procedures Order without any material modifications (other than such modifications reasonably acceptable to Purchaser) to the protections to Purchaser set forth in Section 9.3(a) and Section 9.3(b).

9.2    **Effect of Termination**.

(a)    In the event that this Agreement shall be terminated pursuant to Section 9.1, (a) Purchaser and its representatives shall promptly return all documents, work papers and other materials of the Seller including any confidential information and (b) all further obligations of the parties hereto under this Agreement shall terminate without further Liability or obligation to the other parties hereto; provided, however, that, notwithstanding the foregoing, the Liabilities and obligations under (i) the Confidentiality Agreement, and (ii) Section 2.9(c), Section 6.2(c), this Section 9.2 and ARTICLE 10 shall continue in full force and effect.

(b)    Notwithstanding anything to the contrary in this Agreement, in the event of valid termination of this Agreement pursuant to Section 9.1, (i) the Seller's Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement shall be capped at an amount equal to the Deposit Escrow Amount, and (ii) no such termination shall relieve Purchaser from any Liability hereunder for any and all breaches of this Agreement prior to such termination of this Agreement (including if this Agreement is terminated by the Seller pursuant to Section 9.1(g)) and the Seller shall be entitled to all remedies available at law or in equity, including payment of the Deposit Escrow Amount pursuant to Section 2.9(c).

9.3    **Termination Fee and Expense Reimbursement**.

(a)    Subject to limitations set forth in the Bid Procedures Order, in consideration of Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Transferred Assets, and to compensate Purchaser as a stalking-horse bidder, the Seller shall pay in cash to Purchaser, by wire transfer of immediately available funds to the account specified by Purchaser to the Seller in writing, an amount equal to the Termination Fee in the event that this

48

Agreement is terminated pursuant to Section 9.1(b), in which case the Termination Fee shall be due and payable simultaneously with any termination of this Agreement; provided, that, Purchaser shall not be entitled to the fee described in this Section 9.3(a) to the extent Purchaser is in material breach of this Agreement at the time this Agreement is terminated pursuant to Section 9.1(b) if Seller has provided notice of such material breach to Purchaser and such material breach has remained uncured for more than five (5) Business Days after Purchaser's receipt of such notice. The Termination Fee shall be payable solely from the proceeds of such Competing Bid or Alternative Transaction. The Seller's obligation to pay the Termination Fee pursuant to this Section 9.3(a) shall survive termination of this Agreement and shall constitute an administrative expense of the Seller under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.

(b) Subject to limitations set forth in the Bid Procedures Order, in consideration of Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof, and the identification and quantification of assets to be included in the Transferred Assets, if this Agreement is terminated in accordance with the terms set forth in Section 9.1(b), then the Seller shall pay to Purchaser in cash not later than two Business Days following receipt of documentation supporting the request for reimbursement of costs, fees and expenses, the Expense Reimbursement, in an amount not to exceed $300,000, by wire transfer of immediately available funds to an account specified by Purchaser to the Seller in writing; provided, that, Purchaser shall not be entitled to the fee described in this Section 9.3(a) to the extent Purchaser is in material breach of this Agreement at the time this Agreement is terminated pursuant to Section 9.1(b) if Seller has provided notice of such material breach to Purchaser and such material breach has remained uncured for more than five (5) Business Days after Purchaser's receipt of such notice. The Expense Reimbursement shall be payable solely from the proceeds of such Competing Bid or Alternative Transaction. The Seller's obligation to pay the Expense Reimbursement pursuant to this Section 9.3(b)9.3(b) shall survive termination of this Agreement and shall constitute an administrative expense of Seller under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.

(c) The Seller agrees and acknowledges that Purchaser's due diligence, efforts, negotiation, and execution of this Agreement have involved substantial investment of management time and have required significant commitment of financial, legal, and other resources by Purchaser, and that such due diligence, efforts, negotiation, and execution have provided value to the Seller and, in the Seller's reasonable business judgment, is necessary for the preservation of the value of the Seller's estate. The Seller further agrees and acknowledges that the Termination Fee and the Expense Reimbursement are not a penalty, but rather represent liquidated damages that are reasonable in relation to Purchaser's efforts, Purchaser's lost opportunities from pursuing the Transactions, and the magnitude of the Transactions. The provision of the Termination Fee and the Expense Reimbursement is an integral part of this Agreement, without which the Purchaser would not have entered into this Agreement.

## ARTICLE 10.
## GENERAL PROVISIONS

49

10.1    **Survival of Representations, Warranties and Covenants.** All covenants and agreements contained in this Agreement that by their term are to be performed in whole or in part, or which prohibit actions, subsequent to Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to Closing, survive the Closing in accordance with their terms until fully performed or satisfied. All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder shall not survive Closing and shall therefor terminate, including any Action for damages in respect of any breach or inaccuracy thereof. Notwithstanding the foregoing, the provisions of Section 2.9(c), Section 6.2, Section 9.2, this Article 10 and the Confidentiality Agreement shall survive the Closing.

10.2    **Entire Agreement**. This Agreement, including the Exhibits and Schedules hereto, the Confidentiality Agreement and the Related Documents, contain the entire understanding of the parties hereto with respect to the subject matter contained herein and therein. This Agreement supersedes all prior and contemporaneous agreements, arrangements, contracts, discussions, negotiations, undertakings and understandings (including any letters of intent or term sheets), whether written or oral, among the parties with respect to such subject matter (other than, for the avoidance of doubt, the Confidentiality Agreement and the Related Documents) or any prior course of dealings. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the Transactions exclusively in contract pursuant to the express terms and conditions of this Agreement, the Confidentiality Agreement and the Related Documents, and the parties hereto expressly disclaim that they are owed any duties or entitled to any remedies not expressly set forth in this Agreement, the Confidentiality Agreement and the Related Documents. Furthermore, the parties each hereby acknowledge that this Agreement, the Confidentiality Agreement and the Related Documents embody the justifiable expectations of sophisticated parties derived from arm's-length negotiations, and all parties to this Agreement, the Confidentiality Agreement and the Related Documents specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary purchaser and an ordinary seller in an arm's-length transaction. The sole and exclusive remedies for any Related Claims shall be those remedies available at law or in equity for breach of contract only (as such contractual remedies have been further limited or excluded pursuant to the express terms of this Agreement); and the parties hereby agree that neither party hereto shall have any remedies or cause of action (whether in contract or in tort or otherwise) of any statements, communications, disclosures, failures to disclose, representations or warranties not set forth in this Agreement.

10.3    **Amendment; No Waiver**. This Agreement and the Related Documents may be amended, supplemented or changed, and any provision hereof or thereof can be waived, only by a written instrument making specific reference to this Agreement (and, if applicable, the Related Documents) executed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought. The waiver by any party of a breach of any provision of this Agreement or the Related Documents shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any party to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall a single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.4    **Severability; Specific Versus General Provisions**. Whenever possible, each provision of this Agreement and the Related Documents shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any term or other provision of this Agreement or the Related Documents is invalid, illegal, or incapable of being enforced by any Applicable Law or public policy, all other terms or provisions of this Agreement and the Related Documents shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, in whole or in part, such term or provision is hereby deemed modified to give effect to the original written intent of the parties to the greatest extent consistent with being valid and enforceable under Applicable Law. No party hereto shall assert, and each party shall cause its respective Affiliates or related parties not to assert, that this Agreement or any part hereof is invalid, illegal or unenforceable. Notwithstanding anything to the contrary, to the extent that a representation, warranty, covenant or agreement of the Seller contained in this Agreement or the Schedules (each, a "**Provision**") addresses a particular issue with specificity (a "**Specific Provision**"), and no breach by the Seller exists under such Specific Provision, the Seller shall not be deemed to be in breach of any other Provision (with respect to such issue) that addresses such issue with less specificity than the Specific Provision, and if such Specific Provision is qualified or limited by the Seller's Knowledge, or in any other manner, no other Provision shall supersede or limit such qualification in any manner.

10.5    **Expenses and Obligations**. Except as otherwise provided in this Agreement, all costs and expenses incurred by the parties hereto in connection with the Transactions, including the costs, expenses and disbursements of counsel and accountants, shall be borne solely and entirely by the party that has incurred such expenses; provided, however, that Purchaser shall pay, or promptly reimburse the Seller for, any filing fees which relate to any required governmental filing or notification and Purchaser shall pay any Transfer Taxes.

10.6    **Notices**. All notices, consents, waivers, and other communications under this Agreement or the Related Documents must be in writing and will be deemed to have been duly given (a) if personally delivered, on the date of delivery, (b) if delivered by express courier service of national standing for next day delivery (with charges prepaid), on the Business Day following the date of delivery to such courier service, (c) if delivered by electronic mail (unless the sender receives an automated message that the email has not been delivered) on the date of transmission if on a Business Day before 5:00 p.m. local time of the business address of the recipient party (otherwise on the next succeeding Business Day) and (d) if deposited in the United States mail, first-class postage prepaid, on the date of delivery, in each case to the appropriate addresses or email addresses set forth below (or to such other addresses as a party may designate by notice to the other parties in accordance with this Section 10.6):

If to Purchaser:

JN Bidco LLC
c/o Honigman LLP
660 Woodward Ave #2290

50307134.17

Detroit, MI 48226
Attention: Nick Gorga; Nicholas Pedersen; Scott Kitei
Email: ngorga@honigman.com; npedersen@honigman.com;
skitei@honigman.com


with a copy to (which will not constitute notice):

Honigman LLP
660 Woodward Ave #2290
Detroit, MI 48226
Attention: Nick Gorga; Nicholas Pedersen; Scott Kitei
Email: ngorga@honigman.com; npedersen@honigman.com;
skitei@honigman.com

If to the Seller:

Impel Pharmaceuticals Inc.
201 Elliott Avenue West
Suite 260
Seattle, WA 98101
Attention: Len Paolillo
Email: lpaolillo@impelpharma.com

with a copy to (which will not constitute notice):

Fenwick & West LLP
401 Union Street
5th Floor
Seattle, WA 98101
Attention: Alan Smith; Ethan Skerry
Email: acsmith@fenwick.com; eskerry@fenwick.com

and

Sidley Austin LLP
2021 McKinney Ave.
Suite 2000
Dallas, TX 75201
Attention: Rakhee Patel
            Samuel Newman
            Jeri Leigh Miller
Email: rpatel@sidley.com
       sam.newman@sidley.com
       jeri.miller@sidley.com

10.7 **Counterparts**. This Agreement may be executed in two or more counterparts (any of which may be delivered by electronic transmission), each of which shall constitute an original, and all of which taken together shall constitute one and the same instrument. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format, or other agreed format shall be sufficient to bind the parties to the terms and conditions of this Agreement. Minor variations in the form of the signature page, including footers from earlier versions of this Agreement or any Related Document, shall be disregarded in determining the party's intent or the effectiveness of such signature.

10.8 **Governing Law.** This Agreement, the Related Documents and all Related Claims shall be governed by the internal laws of the State of Delaware (including its statute of limitations), without giving effect to any choice or conflict of law principles or rules that would cause the application of the Applicable Laws of any other jurisdiction.

10.9 **Submission to Jurisdiction; Consent to Service of Process**.

(a) Without limiting any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any Related Document, any breach or default hereunder or thereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, that if the Bankruptcy Cases have closed, the parties agree to irrevocably submit to the exclusive jurisdiction of the of the Court of Chancery of the State of Delaware or, to the extent the Court of Chancery of the State of Delaware does not have subject matter jurisdiction, the federal courts of the United States of America and the courts of the State of Delaware, in each case, located within the City of Wilmington in the State of Delaware over all Related Claims, and each party hereto hereby irrevocably agrees that all Related Claims may be heard and determined in such courts. The parties hereto hereby irrevocably and unconditionally waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Related Claim brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Applicable Law.

(b) Each of the parties hereto hereby consents to process being served by any party to this Agreement in any Related Claim by the delivery of a copy thereof in accordance with the provisions of Section 10.6 (other than by email) along with a notification that service of process is being served in conformance with this Section 10.9(b). Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by Applicable Law.

10.10 **Waiver of Jury Trial**. EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED CLAIMS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY

50307134.17

IRREVOCABLY AND UNCONDITIONALLY EXPRESSLY WAIVES ANY RIGHT IT MAY
HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING OR RELATED CLAIM
BROUGHT BY OR AGAINST IT, DIRECTLY OR INDIRECTLY ARISING OUT OF OR
RELATING TO THIS AGREEMENT, THE RELATED DOCUMENTS OR ANY RELATED
CLAIMS.

10.11  **Rights Cumulative**. All rights and remedies of each of the parties under this
Agreement and the Related Documents will be cumulative, and the exercise of one or more rights
or remedies will not preclude the exercise of any other right or remedy available under this
Agreement, the Related Documents or Applicable Law.

10.12  **Assignment**. Except as otherwise provided herein, the provisions hereof shall inure
to the benefit of, and be binding upon, the successors by operation of law and permitted assigns of
the parties hereto. No assignment of this Agreement or any of the rights, interests or obligations
under this Agreement may be made by any party hereto at any time, whether or not by operation
of law, without the prior written consent of the Seller and Purchaser, and any attempted assignment
without the required consent shall be void; provided, however, that (a) Purchaser may assign (i)
any of its rights or delegate any of its duties under this Agreement to any of its Affiliates, and (ii)
its rights, but not its duties, under this Agreement to any of its financing sources and (b), the Seller
may assign any of its rights or delegate any of its duties under this Agreement (i) to any of its
Affiliates, (ii) to any creditor or group of creditors pursuant to an order of the Bankruptcy Court
entered in the Bankruptcy Cases, including Seller's rights to payment hereunder and rights and
ability to enforce the terms of this Agreement and (iii) for collateral security purposes to any lender
of the Seller or its Affiliates; provided, further, however, that, in each case, such assignment shall
not release Purchaser from its obligations under this Agreement and the Seller shall have no
obligation to pursue remedies against any assignee of Purchaser before proceeding against
Purchaser for any breach of Purchaser's obligations hereunder.

50307134.17

10.13  **Specific Enforcement; Remedies**. The parties hereto agree that irreparable damage (for which monetary relief, even if available, would not be an adequate remedy) would occur in the event that any of the provisions of this Agreement were not performed by the parties hereto in accordance with their specific terms or were otherwise breached. It is accordingly agreed that (i) Purchaser, on the one hand, and the Seller, on the other hand, shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of competent jurisdiction without proof of damages or otherwise and that this shall include the right of the Seller to cause Purchaser to fully perform the terms of this Agreement to the fullest extent permissible pursuant to this Agreement and Applicable Laws and to thereafter cause this Agreement and the Transactions to be consummated on the terms and subject to the conditions thereto set forth in this Agreement, and (ii) the right of specific performance and other equitable relief is an integral part of the Transactions and without that right, neither the Seller nor Purchaser would have entered into this Agreement. Remedies shall be cumulative and not exclusive and shall be in addition to any other remedies which any party may have under this Agreement. Each of the parties hereto hereby (A) waives any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, (B) waives any requirement under any Applicable Law to post a bond or other security as a prerequisite to obtaining equitable relief and (C) agrees not to assert that a remedy of specific performance or other equitable relief is unenforceable, invalid, contrary to law or inequitable for any reason, and not to assert that a remedy of monetary damages would provide an adequate remedy or that the parties otherwise have an adequate remedy at law. Notwithstanding anything to the contrary, in no event shall this Section 10.13 be used, alone or together with any other provision of this Agreement, to require the Seller to remedy any breach of any representation or warranty of the Seller.

10.14  **Third-Party Beneficiaries**. Except as set forth in ARTICLE 2 (with respect to the Seller), Section 10.15 (with respect to the Nonparty Affiliates), Section 10.16 (with respect to the released parties identified therein), Section 10.17 (with respect to the Sellers' Group Members) and the next sentence, nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties hereto any rights or remedies of any nature whatsoever under or by reason of this Agreement. From and after the Closing, all of the Persons identified as third-party beneficiaries in the first sentence of this Section 10.14 shall be entitled to enforce such provisions and to avail themselves of the benefits of any remedy for any breach of such provisions, all to the same extent as if such Persons were parties to this Agreement. The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto. Any inaccuracies in such representations and warranties are subject to waiver by the parties hereto in accordance with this Agreement without notice or Liability to any other Person. In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the knowledge of any party hereto. Consequently, Persons other than the parties hereto may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the Agreement Date or as of any other date.

10.15  **No Personal Liability of Directors, Officers and Owners**. All Related Claims may be made only against (and are those solely of) the entities that are expressly identified as parties in the preamble to this Agreement (the "**Contracting Parties**"). No Person who is not a Contracting Party, including any current, former or future director, officer, employee, incorporator,

50307134.17

member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any Contracting Party, or any current, former or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, representative or assignee of, or any financial advisor or lender to, any of the foregoing (collectively, "**Nonparty Affiliates**"), shall have any Liability pursuant to any Related Claim; and, to the maximum extent permitted by Applicable Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates. Without limiting the foregoing, to the maximum extent permitted by Applicable Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at Applicable Law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose Liability of a Contracting Party on any Nonparty Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon any Nonparty Affiliates with respect to the performance of this Agreement or any representation or warranty made in, in connection with, or as an inducement to this Agreement or the Related Documents.

10.16   **General Release**.

(a)    Effective as of the Closing, the Seller, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "**Seller Releasing Party**"), hereby fully, irrevocably and unconditionally releases and forever discharges Purchaser and its respective past and present directors, managers, officers, employees, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, any and all claims, Actions, causes of action, suits, rights, agreements, Liabilities and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Seller Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. The foregoing sentence shall not be deemed to be a release or waiver by a Seller Releasing Party of any Action it may have under this Agreement or any of the other Related Documents.

(b)    Effective as of the Closing, Purchaser, on behalf of itself, its Affiliates and each of their respective successors and assigns (each of the foregoing, a "**Purchaser Releasing Party**"), hereby fully, irrevocably and unconditionally releases and forever discharges the Seller, the Seller's Affiliates and its and their respective past and present directors, managers, officers, agents, stockholders, members, representatives and Affiliates from and against, and covenants that it will not (directly or indirectly) assert any claim or proceeding of any kind before any Governmental Authority based upon, all claims, Actions, causes of action, suits, rights, agreements, Liabilities and demands whatsoever and all consequences thereof, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, both in law and in equity, whether existing as of the Closing or arising thereafter, that a Purchaser Releasing Party has or may have, now or in the future, arising out of, relating to, or resulting from any act or

50307134.17

omission, error, negligence, breach of contract, tort, violation of law, matter or cause whatsoever from the beginning of time to the Closing Date. The foregoing sentence shall not be deemed to be a release or waiver by a Purchaser Releasing Party of any Action it may have under this Agreement or any of the other Related Documents.

10.17 **Legal Representation**. Purchaser and the Seller acknowledge and agree that the Law Firms have represented the Seller Group in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the Related Documents and the consummation of the Transactions, and that the Seller, its Affiliates and its partners, officers, directors and representatives (the "**Seller Group Members**") have a reasonable expectation that the Law Firms will represent them in connection with any Action involving any Seller Group Member, on the one hand, and Purchaser or any of its Affiliates and representatives (the "**Purchaser Group Members**"), on the other hand, arising under this Agreement, the Related Documents or the Transactions. Purchaser hereby, on behalf of itself and the other Purchaser Group Members, irrevocably: (a) acknowledges and agrees that any attorney-client privilege, solicitor-client privilege, work product or other attorney-client or solicitor-client confidential information ("**Attorney-Client Information**") arising from communications prior to the Closing between any Seller (including any one or more officers, directors or stockholders of such Seller), on the one hand, and the Law Firms, on the other hand, are not included in the property, rights, privileges, powers, franchises and other interests that are possessed by or vested in the Business or the Transferred Assets, that any such Attorney-Client Information shall be deemed property of, and controlled solely by, such Seller for the benefit and on behalf of the Seller Group Members and, upon request, convey and transfer any Attorney-Client Information to the Seller; (b) acknowledge and agree that the Seller Group Members shall have the right to retain, or cause the Law Firm to retain, any such documentation or information in the possession of the Law Firms or such Seller Group Members at the Closing; (c) agree not to access, retain or use any documentation or information constituting Attorney-Client Information and that no Purchaser Group Member shall have any right to waive any attorney-client privilege or other right to confidentiality with respect to such Attorney-Client Information; (d) disclaim the right to assert a waiver by any Seller Group Member with regard to the attorney-client privilege, solicitor-client privilege or other right to confidentiality with respect to such Attorney-Client Information solely due to the fact that such documentation or information is physically in the possession of Purchaser after the Closing; (e) consent to the Law Firms' representation after the Closing of any Seller Group Member in any Action that may relate to a Purchaser Group Member or the Transactions and consent to and waive any conflict of interest arising therefrom without the need for any future waiver or consent; and (f) consent to the disclosure by the Law Firms to any Seller Group Member of any documentation or information obtained by the Law Firms during the course of its representation of Seller or any Affiliate prior to the Closing, whether related to this Agreement, the Related Documents, the Transactions or otherwise, whether or not such disclosure is made prior to or after the Closing and whether or not the documentation or information disclosed is subject to any attorney-client privilege, solicitor-client privilege or confidentiality obligation to any Seller, any Affiliate of such Seller or any other Person. In the event that any Action arises after the Closing between any Purchaser Group Member and a Person other than a Seller Group Member, such Purchaser Group Member shall not disclose any documentation or information referenced in this Section 10.17 without the prior written consent of the applicable Seller; provided, however, that if such Purchaser Group Member is required by judicial order or other legal process to make such disclosure, such Purchaser Group

Member shall promptly notify the applicable Seller in writing of such requirement (without making disclosure) and shall provide such Seller with such cooperation and assistance as shall be necessary to enable such Seller to prevent disclosure by reason of such attorney-client privilege, solicitor-client privilege or other rights of confidentiality. This Section 10.17 is for the benefit of the Seller Group Members and such Persons are intended third-party beneficiaries of this Section 10.17.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

58

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**PURCHASER**:

JN BIDCO LLC

By: _____
      Name: Ray Canole
      Title:  Authorized Signatory

*Signature Page to Asset Purchase Agreement*

**SELLER:**

IMPEL PHARMACEUTICALS INC.

By:___*Leonard Paolillo*_____
      Name: Leonard Paolillo
      Title:  Interim Chief Executive Officer

## **Exhibit 3**

**Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| IMPEL PHARMACEUTICALS INC., et al.[1] | Case No. 23-80016 (SGJ) |
| Debtors. | (Jointly Administered) |

## NOTICE OF SALE, BID PROCEDURES, AUCTION, AND SALE HEARING

**PLEASE TAKE NOTICE**:

On December 19, 2023 (the "Petition Date"), the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas (the "Court").

On December 20, 2023, the Debtors filed a motion [Docket No. 18] (the "Bid Procedures Motion") with the Court seeking entry of orders, among other things: (i)(a) approving procedures for the solicitation of bids in connection with the proposed sale of substantially all of the Debtor's assets, (the "Bid Procedures"), (b) authorizing the Debtors to select JN Bidco LLC as the Stalking Horse Purchaser substantially along the terms defined in the Stalking Horse APA and approving Bid Protections, (c) establishing the dates and deadlines set forth in these Bid Procedures, including the Bid Deadline, Auction, and Sale Hearing, (d) approving the form of Sale Notice, (e) approving the Assumption and Assignment Procedures for the Designated Contracts (if any), (f) approving the form of Assignment Notice, and (ii)(a) authorizing the sale of the Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests except to the extent otherwise set forth in the purchase agreement executed by the Debtors and the Winning Bidder and (b) approving the assumption and assignment of Designated Contracts (if any), and (iii) granting related relief.

On [●], 2024, the Court entered the *Order (I)(A) Approving the Bid Procedures; (B) Authorizing the Debtors to Select JN Bidco LLC as the Stalking Horse Purchaser Substantially Along the Terms Defined in the Stalking Horse APA and Approving Bid Protections; (C) Establishing Bid Deadlines, an Auction, and a Sale Hearing;(D) Approving the Form and Manner of Sale Notice; (E) Approving Assignment and Assumption Procedures; (F) Approving the Form and Manner of Potential Assumption and Assignment Notice; and (II)(A) Authorizing the Sale of Assets Free and Clear; (B) Approving the Assumption and Assignment of Designated Contracts;*

---

[1] The Debtors in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, are: Impel Pharmaceuticals Inc. (8238); and Impel NeuroPharma Australia Pty Ltd (N/A). The Debtors' service address is 201 Elliot Avenue West, Suite 260, Seattle, WA 98119.

*and (III) Granting Related Relief* [Docket No. [●]] (the "Bid Procedures Order"),[2] which, among other things, establishes key dates and deadlines related to the Auction for, and the Sale of, the Assets. **All interested bidders and parties in interest in the chapter 11 case should carefully read the Bid Procedures Order and the Bid Procedures in their entirety.**

## Participation in the Sale Process

The Bid Procedures set forth the requirements for submitting a Qualified Bid and any person interested in making an offer to purchase the Assets must strictly comply with the Bid Procedures. Only Qualified Bids will be considered by the Debtors in accordance with the Bid Procedures.

Any interested bidder should contact Moelis & Company LLC as soon as practicable.

## Important Dates and Deadlines[3]

The Bid Procedures include a number of dates and deadlines that must be strictly complied with, only a few of which are highlighted here:

- **Bid Deadline.** The deadline to submit a qualified Bid is **January 23, 2024**, at **4:00 p.m.** (prevailing Central Time).

- **Auction.** The Auction (if any) will commence on **January 29, 2024**, at **9:00 am** (prevailing Central Time) (which date may be modified by the Debtors in their business judgment with the consent of the Administrative Agent) virtually or at such other place as agreed by the Debtors, the Administrative Agent, and Committee, or approved by order of the Court, and of which the Debtors will notify the Auction Participants.

- **Deadline to Object to the Sale.** Objections to the Sale (or the assumption and assignment of any Designated Contract) must be filed with the Court by **January 25, 2024**, at **4:00 p.m.** (prevailing Central Time) and otherwise meet the requirements set forth in the Bid Procedures Order.

- **Sale Hearing.** A hearing to consider approval of the proposed Sale will be held before the Court on **February 1, 2024**, at **9:30 a.m.** (prevailing Central Time) in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas, 75242. **Participation in the hearing may be in person or by an audio and video connection, as set forth in the Bid Procedures Motion**.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion, the Bid Procedures, and the Bid Procedures Order, as applicable.

[3] The following dates and deadlines may be extended by the Debtors by filing a notice with the Court, pursuant to the Bid Procedures.

## **Consequences of Failing to Timely Assert an Objection**

Except as otherwise ordered by the Court, any party or entity that fails to timely make an objection to the Sale on or before the objection deadline in accordance with the Bid Procedures Order and this notice shall be forever barred from asserting any objection to the Sale, including with respect to the transfer of the assets free and clear of all liens, claims, encumbrances, and other interests.

## **No Successor Liability**

By the Bid Procedures Motion, the Debtors are seeking to transfer the Assets to the Winning Bidder free and clear of, among other things, any claim arising from any conduct of the Debtors prior to the closing of the Sale, whether known or unknown, due or become due, accrued, absolute, contingent or otherwise, so long as such claim arises out of or relates to events occurring prior to the closing of the Sale. The Debtors are requesting the Court order that, as a result of the Sale, the Winning Bidder will not be a successor to the Debtors by reason of any theory of law or equity and the Winning Bidder will have no liability, except as expressly provided in the definitive documentation for the Sale, for any liens, claims, encumbrances, and other interests against or in the Debtors or their assets under any theory of law including successor liability theories.

Dated: December [●], 2024
Dallas, Texas

**SIDLEY AUSTIN LLP**

/s/ [*DRAFT*]

Samuel A. Newman (admitted *pro hac vice*)
555 West Fifth Street
Los Angeles, California 90013
Telephone:    (213) 896-6000
Facsimile:    (213) 896-6600
Email:         sam.newman@sidley.com

Rakhee V. Patel (TX Bar No. 00797213)
Nathan C. Elner (admitted *pro hac vice*)
Parker G. Embry (TX Bar No. 24126826)
Chelsea M. McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:         rpatel@sidley.com
               nelner@sidley.com
               parker.embry@sidley.com
               cmcmanus@sidley.com

Jackson T. Garvey (admitted *pro hac vice*)
One South Dearborn
Chicago, IL 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:         jgarvey@sidley.com

*Proposed Counsel to the Debtors and Debtors in
Possession*

## **Exhibit 4**

**Assumption and Assignment Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| IMPEL PHARMACEUTICALS INC., et al.[1] | Case No. 23-80016 (SGJ) |
| Debtors. | (Jointly Administered) |

**ASSUMPTION AND ASSIGNMENT PROCEDURES**

On December 20, 2023, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") filed with the United States Bankruptcy Court for the Northern District of Texas (the "Court") a motion (the "Bid Procedures Motion") seeking entry of orders, among other things: (i)(a) approving procedures for the solicitation of bids in connection with the proposed sale of substantially all of the Debtor's assets, (the "Bid Procedures"), (b) authorizing the Debtors to select JN Bidco LLC as the Stalking Horse Purchaser substantially along the terms defined in the Stalking Horse APA and approving Bid Protections, (c) establishing the dates and deadlines set forth in these Bid Procedures, including the Bid Deadline, Auction, and Sale Hearing, (d) approving the form of Sale Notice, (e) approving the Assumption and Assignment Procedures for the Designated Contracts (if any), (f) approving the form of Assignment Notice, and (ii)(a) authorizing the sale of the Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests except to the extent otherwise set forth in the purchase agreement executed by the Debtors and the Winning Bidder and (b) approving the assumption and assignment of Designated Contracts (if any), and (iii) granting related relief. On [●], 2024, the Court entered the *Order (I)(A) Approving the Bid Procedures; (B) Authorizing the Debtors to Select JN Bidco LLC as the Stalking Horse Purchaser substantially along the terms defined in the Stalking Horse APA and Approving Bid Protections, (C) Establishing Bid Deadlines, an Auction, and a Sale Hearing;(D) Approving the Form and Manner of Sale Notice; (E) Approving Assignment and Assumption Procedures; (F) Approving the Form and Manner of Potential Assumption and Assignment Notice; and (II)(A) Authorizing the Sale of Assets Free and Clear; (B) Approving the Assumption and Assignment of Designated Contracts; and (III) Granting Related Relief* [Docket No. [●]] (the "Bid Procedures Order"),[2] approving, among other things, the procedures in connection with the assumption and assignment of Designated Contracts (if any) set forth below (the "Assumption and Assignment Procedures").

1.      The Assumption and Assignment Procedures are as follows:

---

[1] The Debtors in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, are: Impel Pharmaceuticals Inc.. (8238); and Impel NeuroPharma Australia Pty Ltd (N/A).  The Debtors' service address is 201 Elliot Avenue West, Suite 260, Seattle, WA 98119.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion, the Bid Procedures, and the Bid Procedures Order, as applicable.

a.   **The Cure Notice**.  On or before January 5, 2024 (the "<u>Initial Cure Notice</u> <u>Deadline</u>"), the Debtors shall file with the Court and serve on each counterparty (each, a "<u>Counterparty</u>," and collectively, the "<u>Counterparties</u>") to an executory contract or unexpired lease that potentially could be assumed and assigned in connection with the sale of Assets (collectively, the "<u>Executory Contracts or</u> <u>Unexpired Leases</u>") a notice setting forth (a) each of the Executory Contracts and Unexpired Leases that potentially could be assumed and assigned in connection with the sale of Assets, including the name of each Counterparty (the "<u>Potential</u> <u>Assumed Contracts</u>"), and (b) the amount of cure owed thereunder according to the Debtors' books and records (the "<u>Cure Notice</u>").

b.   **The Cure Objection**.  The Cure Notice shall include, without limitation, (a) a list of the Potential Assumed Contracts, (b)  the cure amount (each, a "<u>Cure Amount</u>"), if any, that the Debtors reasonably believe is required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code for each of the Potential Assumed Contracts listed, (c) an express disclaimer that the assumption or assignment of any Executory Contracts or Unexpired Leases is not guaranteed and is subject to Court approval, (d) the Cure Objection Deadline (as defined below), and (e) the date, time, and location of the Sale Hearing.  If a Counterparty objects to (i) the Cure Amount for its Potential Assumed Contract or (ii) the provision of adequate assurance of future performance, the Counterparty must file with the Court and serve on the Objection Notice Parties (as defined below) a written objection (such objection to adequate assurance of future performance, an "<u>Adequate Assurance Objection</u>" and any other such objection, a "<u>Cure Objection</u>").   If a Potential Assumed Contract is designated by the Winning Bidder (or Stalking Horse Bidder, as applicable) as an executory contract or unexpired lease it wishes to have assumed and assigned in connection with the Sale (the "<u>Designated Contracts</u>"), then unless a Counterparty properly and timely files and serves a Cure Objection pursuant to the Cure Notice, the Counterparty will receive payment from the Winning Bidder of the Cure Amount (if any) as set forth in the Cure Notice consistent with the terms and procedures set forth in the Stalking Horse Bidder's or Winning Bidder's asset purchase agreement, as applicable.

c.   **The Cure Objection Deadline**.  Any Cure Objection shall: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) be filed with the Clerk of the Court, by electronic submission through PACER (Public Access to Court Electronic Records at https://ecf.txnb.uscourts.gov/), or if submitted through non- electronic means, by U.S. Mail or other hand delivery system at the following address: United States Bankruptcy Court, 1100 Commerce St, #5300, Dallas, TX 75242, **on or before 4:00 p.m. (CT) on January 26, 2024** (the "<u>Cure Objection Deadline</u>"); (iv) be served, so as to be actually received on or before the Cure Objection Deadline, upon the Objection Notice Parties (as defined below) by email; and (v) state with specificity the legal and factual grounds for such objection, including, without limitation, the Cure Amounts the Counterparty believes is required to cure defaults under the relevant Executory Contracts or Unexpired Leases. Any objections to adequate assurance of performance by such Stalking Horse Bidder shall be filed by the Cure Objection Deadline.  Any Adequate

Assurance Objection must be filed and in the same manner as a Cure Objection no later than **4:00 p.m. (CT) on January 30, 2024**.

d. **The Objection Notice Parties**.  The "Objection Notice Parties" are as follows: (i) proposed counsel to the Debtors, Sidley Austin LLP, Attn: Rakhee V. Patel (rpatel@sidley.com) and Jackson T. Garvey (jgarvey@sidley.com), (ii) proposed special corporate counsel to the Debtors, Fenwick & West, LLP, Attn: Alan Smith (acsmith@fenwick.com), Ethan Skerry (eskerry@fenwick.com), and Matthew McCabe (mmccabe@fenwick.com); (iii) counsel to any official committee of unsecured creditors appointed in the Debtors' chapter 11 cases; (iv) the Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242, Attn: Lisa L. Lambert (Lisa.L.Lambert@usdoj.gov) and Erin Schmidt (erin.schmidt2@usdoj.gov); and (v) counsel to the Stalking Horse Bidder, Honigman LLP, Attn: Scott Kitei (skitei@honigman.com) and Gray Reed, Attn: Aaron Kaufman (akaufman@grayreed.com).

e. **The Supplemental Cure Notice**.  If after the Initial Cure Notice Deadline additional executory contracts or unexpired leases of the Debtors are determined to be Designated Contracts (such additional contracts, the "Additional Contracts"), as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties a supplemental notice (the "Supplemental Cure Notice"), and such Counterparties shall file a Cure Objection to the Supplemental Cure Notice (the "Supplemental Cure Objection") not later than **fourteen (14) days following the date of service of such Supplemental Cure Notice.**  The Debtors may file with the Court and serve Supplemental Cure Notices until such time as the closing of the Sale.

f. **The Notice of Winning Bid**.  As set forth in the Bid Procedures, as soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file with the Court a notice identifying the Winning Bidder (a "Notice of Winning Bid"), which shall set forth, among other things, the Designated Contracts and applicable Cure Amounts and a certification by the Debtors that the Debtors have provided, or will provide, in coordination with the proposed assignee, the Winning Bidder's Adequate Assurance Information to each affected Counterparty on a confidential basis.

g. **The Assignment Notice**.  As soon as reasonably practicable after filing the Notice of Winning Bid, the Debtors will cause to be served by overnight mail upon each affected Counterparty and its counsel (if known) a notice, substantially in the form attached to the Bid Procedures Order as **Exhibit 5** (the "Assignment Notice"), which shall: (i) identity the Winning Bidder(s); (ii) identify the Designated Contracts; (iii) identify the applicable Cure Amounts for each Designated Contract; (iv) expressly state that assumption or assignment of an Executory Contract or Unexpired Lease is not guaranteed and is subject to Court approval; (v) prominently display the deadline to object *solely on the basis of adequate assurance of future performance* by no later than the Post-Auction Objection Deadline, or January 30,

2024, at 4:00 p.m. (prevailing Central Time); and (vi) prominently display the time, date, and location of the Sale Hearing.

h.     **Reservation of Rights**.  At the Sale Hearing, the Debtors will seek Court approval of their assumption and assignment to any Winning Bidder of only those Executory Contracts or Unexpired Leases that have been selected by any Winning Bidder to be Designated Contracts.   The Debtors and their estates reserve any and all rights with respect to any Executory Contracts or Unexpired Leases that are not ultimately designated as Designated Contracts.

i.     **No Cure Objections**.  If no Cure Objection or Supplemental Cure Objection is timely received with respect to an Executory Contract or Unexpired Lease designated by the Stalking Horse Bidder, if any, or Winning Bidder as a Designated Contract: (i) the Counterparty to such Designated Contract shall be deemed to have consented to the assumption by the Debtors and assignment to the Winning Bidder of the Designated Contract, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Stalking Horse Bidder or Winning Bidder, as applicable); (ii) any and all defaults under the Designated Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code; and (iii) *the Cure Amount for such Designated Contract shall be controlling, notwithstanding anything to the contrary in such Designated Contract, or any other related document, and the Counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Designated Contract against the Debtors and their estates or any Winning Bidder, or the property of any of them, that existed prior to the entry of the Sale Order*.

j.     **Dispute Resolution**.  To the extent that the parties are unable to consensually resolve any Cure Objection or Supplemental Cure Objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the cure amount required to be paid to the applicable Counterparty under section 365(b)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), such Cure Objection or Supplemental Cure Objection will be adjudicated at the Sale Hearing or at such other date and time as may be determined by the Debtors or fixed by the Court; *provided, however,* that to the extent that any Cure Dispute cannot be resolved by the parties, such Designated Contract shall be assumed and assigned only upon satisfactory resolution of the Cure Dispute, to be determined in the Stalking Horse Bidder's (if applicable) or other Winning Bidder's reasonable discretion. To the extent a Cure Dispute exists, the Designated Contract may be conditionally assumed and assigned, subject to the consent of the Stalking Horse Bidder, if any, or other Winning Bidder, pending a resolution of the Cure Dispute after notice and a hearing. If a Cure Dispute is not satisfactorily resolved, the Stalking Horse Bidder, if any, or other Winning Bidder may determine that such Designated Contract should be rejected and not assigned, in which case the Stalking Horse Bidder, if any, or other Winning Bidder will not be responsible for any Cure

Amounts in respect of such contract unless otherwise provided in the applicable asset purchase agreement.

2. Notwithstanding anything to the contrary herein, if after the Sale Hearing or the entry of the Sale Order additional executory contracts or unexpired leases of the Debtors are determined to be Designated Contracts, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the Counterparties a supplemental Assignment Notice (the "Supplemental Assignment Notice"), and such Counterparties shall file any objections not later than twenty-one (21) days thereafter. If no objection is timely received, the Debtors shall be authorized to assume and assign such Designated Contracts included on the Supplemental Assignment Notice to the Stalking Horse Bidder, if any, or any Winning Bidder, without further notice to creditors or other parties in interest and without the need for further order of the Court, and such assumption and assignment shall be subject to the terms of the Sale Order.

3. Counterparties to the Designated Contracts may request adequate assurance of future performance by the Winning Bidder or Backup Bidder by contacting counsel to the Debtors, Sidley Austin LLP, 2021 McKinney Ave #2000, Dallas, TX 75201, Attn: Rakhee V. Patel (rpatel@sidley.com) and Jackson T. Garvey (jgarvey@sidley.com). Such adequate assurance may be provided on a confidential basis for all nonpublic information.

4. The Winning Bidder will pay undisputed cure amounts consistent with the terms and procedures set forth in the Winning Bidder's asset purchase agreement.

5. Except as otherwise ordered by the Court, any party or entity that fails to timely object to the assumption and assignment of a Designated Contract on or before the objection deadline in accordance with the Bid Procedures Order shall be forever barred from asserting any objection to the assumption and assignment of such Designated Contract, the proposed cure cost, or adequate assurance of future performance. Any counterparty to a Designated Contract that fails to object to the proposed assumption and assignment by the applicable objection deadline will be deemed to assent to the assumption of the Designated Contract on the terms set forth in the Assignment Notice.

6. The inclusion of an Executory Contract or Unexpired Lease, or Cure Amounts with respect thereto on a Cure Notice, a Supplemental Cure Notice, or an Assignment Notice, shall not constitute or be deemed a determination or admission by the Debtors, the Stalking Horse Purchaser, if any, the Winning Bidder(s), or any other party in interest that such contract or lease is an executory contract or unexpired lease within the meaning of the Bankruptcy Code. The Debtors reserve all of their rights, claims, and causes of action with respect to each Executory Contract and Unexpired Lease listed on a Cure Notice, a Supplemental Cure Notice, or an Assignment Notice. The Debtors' inclusion of any Executory Contract or Unexpired Lease on the Cure Notice, a Supplemental Cure Notice, or an Assignment Notice shall not be a guarantee that such Executory Contract or Unexpired Lease, Potential Assumed Contract, or Designated Contract, ultimately will be assumed or assumed and assigned.

7. **Assumption and assignment of any Designated Contract shall result in the full release and satisfaction of any cures, claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption.  Any and all proofs of claim based upon executory contracts or unexpired leases that have been assumed in the chapter 11 cases, including pursuant to the Sale Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Court (including the Sale Order) approving such assumption and (2) the effective date of such assumption without the need for any objection or any further notice to or action, order, or approval of the Court.**

Dated: [●], 2024
Dallas, Texas

**SIDLEY AUSTIN LLP**

/s/ *[DRAFT]*

Samuel A. Newman (admitted *pro hac vice*)
555 West Fifth Street
Los Angeles, California 90013
Telephone:     (213) 896-6000
Facsimile:     (213) 896-6600
Email:          sam.newman@sidley.com

Rakhee V. Patel (TX Bar No. 00797213)
Nathan C. Elner (admitted *pro hac vice*)
Parker G. Embry (TX Bar No. 24126826)
Chelsea M. McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:          rpatel@sidley.com
                nelner@sidley.com
                parker.embry@sidley.com
                cmcmanus@sidley.com

Jackson T. Garvey (admitted *pro hac vice*)
One South Dearborn
Chicago, IL 60603
Telephone:     (312) 853-7000
Facsimile:     (312) 853-7036
Email:          jgarvey@sidley.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## Exhibit 5

**Assignment Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| IMPEL PHARMACEUTICALS INC., et al.[1] | Case No. 23-80016 (SGJ) |
| Debtors. | (Jointly Administered) |

<u>**NOTICE OF ASSUMPTION AND ASSIGNMENT OF DESIGNATED CONTRACTS**</u>

**PLEASE TAKE NOTICE:**

On December 20, 2023, the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>") filed with the United States Bankruptcy Court for the Northern District of Texas (the "<u>Court</u>") a motion (the "<u>Bid Procedures Motion</u>") seeking entry of orders, among other things: (i)(a) approving procedures for the solicitation of bids in connection with the proposed sale of substantially all of the Debtor's assets, (the "<u>Bid Procedures</u>"), (b) authorizing the Debtors to select JN Bidco LLC as the Stalking Horse Purchaser substantially along the terms defined in the Stalking Horse APA and approving Bid Protections, (c) establishing the dates and deadlines set forth in these Bid Procedures, including the Bid Deadline, Auction, and Sale Hearing, (d) approving the form of Sale Notice, (e) approving the Assumption and Assignment Procedures for the Designated Contracts (if any), (f) approving the form of Assignment Notice, and (ii)(a) authorizing the sale of the Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests except to the extent otherwise set forth in the purchase agreement executed by the Debtors and the Winning Bidder and (b) approving the assumption and assignment of Designated Contracts (if any), and (iii) granting related relief.

On [●], 2024, the Court entered the *Order (I)(A) Approving the Bid Procedures; (B) Authorizing the Debtors to Select JN Bidco LLC as the Stalking Horse Purchaser Substantially Along the Terms Defined in the Stalking Horse APA and Approving Bid Protections (C) Establishing Bid Deadlines, an Auction, and a Sale Hearing;(D) Approving the Form and Manner of Sale Notice; (E) Approving Assignment and Assumption Procedures; (F) Approving the Form and Manner of Potential Assumption and Assignment Notice; and (II)(A) Authorizing the Sale of Assets Free and Clear; (B) Approving the Assumption and Assignment of Designated Contracts; and (III) Granting Related Relief* [Docket No. [●]] (the "<u>Bid Procedures Order</u>"),[2] approving, among other things, the Assumption and Assignment Procedures, which establish the process by

---

[1] The Debtors in this chapter 11 case, together with the last four digits of the Debtor's federal tax identification number, are: Impel Pharmaceuticals Inc. (8238); and Impel NeuroPharma Australia Pty Ltd (N/A). The Debtors' service address is 201 Elliot Avenue West, Suite 260, Seattle, WA 98119.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Motion, the Bid Procedures, and the Bid Procedures Order, as applicable.

which any executory contracts designated by the Winning Bidder shall be assumed and assigned to the Winning Bidder.  **All recipients of this notice should carefully read the Bid Procedures Order and the Assumption and Assignment Procedures in their entirety.**

On [●], 2024, the Debtors filed with the Court the notice attached as **Schedule 1**, disclosing the Winning Bid [and Backup Bid], which included a list of Designated Contracts (the "Notice of Winning Bid").  The inclusion of a contract shall not (a) obligate the Debtors to assume or assign such contract or (b) constitute any admission or agreement by the Debtors that such contract is an executory contract.   Only those contracts that are included on a schedule of assumed and acquired contracts attached to definitive documentation in the Sale that is approved by the Sale Order will be assumed and assigned.

**<u>Assignment of Designated Contracts to the Winning Bidder</u>**

You are receiving this notice (the "Assignment Notice") because you are a counterparty to the executory contract(s) listed on **Schedule 2**, which the Debtors are proposing to assume and assign to the Winning Bidder in connection with the Sale.

A.    **Cure Amounts**

Section 365(b)(1) of the Bankruptcy Code requires a debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under executory contracts and unexpired leases at the time of assumption.

In accordance with the assumption and assignment procedures authorized by the Court pursuant to the Bid Procedures Order (the "Assumption and Assignment Procedures"), on January 5, 2024, the Debtors filed with the Court and served upon the non-Debtor counterparties to the Designated Contracts, one or more notices (each, a "Cure Notice") setting forth that such executory contract or unexpired lease may be assumed or assigned to the Purchaser and the applicable cure amount the Debtors believe is necessary to satisfy to assume such executory contract or unexpired lease in accordance with section 365 of the Bankruptcy Code.  The deadline to object to that Cure Notice was on January 26, 2024 (the "Cure Objection Deadline").

**Schedule 2** sets forth the cure amount (if any) of Designated Contracts according to the Debtors' records that is required pursuant to section 365(a) of the Bankruptcy Code.   The cure amounts set forth in **Schedule 2** shall be controlling as of the date of this Assignment Notice; the non-debtor party to each unexpired lease set forth on **Schedule 2** stipulated that the Cure Amount set forth in this Assignment Notice is correct in accordance with the Assignment and Assumption Procedures; the non-debtor party shall be forever barred, estopped, and enjoined from asserting or claiming that any additional amounts are due or other defaults exist.

**Schedule 3** sets forth the proposed cure amount (if any) of Designated Contracts not previously included on a Cure Notice according to the Debtors' records that is required pursuant to section 365(a) of the Bankruptcy Code.  **The proposed cure amount represents all monetary defaults of any nature that the Debtors believe are or may be outstanding under the Designated Contract prior to the closing of the Sale.  If you believe the proposed cure amount is listed with an incorrect amount, you must object in accordance with the procedures**

described in this notice by no later than the objection deadline set forth below under the heading "Important Dates and Deadlines."

        B.          **Adequate Assurance of Future Performance**

Section 365(a) of the Bankruptcy Code conditions assignment on the Winning Bidder providing "adequate assurance of future performance." Counterparties to Designated Contracts may request adequate assurance of future performance by the Winning Bidder or Backup Bidder by contacting counsel to the Debtors, Sidley Austin LLP, 2021 McKinney Ave #2000, Dallas, TX 75201, Attn: Rakhee V. Patel (rpatel@sidley.com) and Jackson T. Garvey (jgarvey@sidley.com). Such adequate assurance may be provided on a confidential basis for all nonpublic information. **If you object to assumption and assignment of your Designated Contract based solely on the adequate assurance of future performance, you must object in accordance with the procedures described in this notice by no later than the objection deadline set forth below under the heading "Important Dates and Deadlines."**

To the maximum extent permitted by law, to the extent any provision in any Designated Contract assumed and assigned pursuant to the Sale Order restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Designated Contract (including any "change in control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Sale Order and any definitive documentation for the Sale shall not entitle the non-Debtor party to terminate such Designated Contract or to exercise any other default-related rights with respect, unless such non-Debtor party properly and timely files an objection and such objection is not overruled, withdrawn or otherwise resolved.

### **<u>Important Dates and Deadlines</u>[3]**

The Bid Procedures Order and Assumption and Assignment Procedures include a number of dates and deadlines, only a few of which are highlighted here:

- **Deadline to Object to the Sale.** Objections to the Sale (or the assumption and assignment of any Designated Contract, including objections to the proposed cure amount of the Designated Contracts on **<u>Schedule 3</u>** must be filed with the Court by **January 25, 2024**, at **4:00 p.m.** (prevailing Central Time) and otherwise meet the requirements set forth in the Bid Procedures Order. Objections solely based on the adequate assurance of future performance by the Winning Bidder or Backup Bidder must be filed with the Court by **January 30, 2024**, at **4:00 p.m.** (prevailing Central Time).

- Any objection to the assumption and assignment of a Designated Contract ***must***: (a) be in writing; (b) comply with the Bankruptcy Code, Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court; (c) state the name and address of the objecting party and identify the Designated Contract at issue; (d) state, with particularity, the basis and nature of any objection to the assumption and assignment, cure cost, and/or adequate assurance of future

---

[3] The following dates and deadlines may be extended by the Debtors by filing a notice with the Court, pursuant to the Bid Procedures.

performance; and (e) be filed with the Court with proof of service thereof so as to be actually received on or before the objection deadline.

- **Sale Hearing.**  A hearing to consider approval of the proposed Sale (including assignment of Designated Contracts) will be held before the Court on **February 1, 2024**, at **9:30 a.m.** (prevailing Central Time) in Courtroom #1, 14th Floor, Earle Cabell Federal Building, 1100 Commerce Street, Suite 1254, Dallas, Texas, 75242.  Participation in the hearing may be in person or by an audio and video connection, as set forth in the Bid Procedures Motion.

## <u>Consequences of Failing to Timely Assert an Objection</u>

Except as otherwise ordered by the Court, any party or entity that fails to timely make an objection to the Sale on or before the objection deadline in accordance with the Bid Procedures Order and this notice shall be forever barred from asserting any objection to the Sale, including with respect to (a) the transfer of the assets free and clear of all liens, claims, encumbrances, and other interests and (b) the assumption and assignment of a Designated Contract, proposed cure amount, or adequate assurance of future performance.  Any counterparty to a Designated Contract that fails to object to the proposed assumption and assignment by the objection deadline will be deemed to assent to the assumption of the Designated Contract on the terms defined in this Notice.

**Assumption and assignment of any Designated Contract shall result in the full release and satisfaction of any cures, claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or any bankruptcy-related defaults, arising at any time prior to the effective date of assumption.  Any and all proofs of claim based upon executory contracts or unexpired leases that have been assumed in the chapter 11 cases, including pursuant to the Sale Order, shall be deemed disallowed and expunged as of the later of (1) the date of entry of an order of the Court (including the Sale Order) approving such assumption and (2) the effective date of such assumption without the need for any objection or any further notice to or action, order, or approval of the Court.**

Dated: [●], 2024
Dallas, Texas

**SIDLEY AUSTIN LLP**

/s/ [*DRAFT*]

Samuel A. Newman (admitted *pro hac vice*)
555 West Fifth Street
Los Angeles, California 90013
Telephone:    (213) 896-6000
Facsimile:    (213) 896-6600
Email:        sam.newman@sidley.com

Rakhee V. Patel (TX Bar No. 00797213)
Nathan C. Elner (admitted *pro hac vice*)
Parker G. Embry (TX Bar No. 24126826)
Chelsea M. McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        rpatel@sidley.com
              nelner@sidley.com
              parker.embry@sidley.com
              cmcmanus@sidley.com

Jackson T. Garvey (admitted *pro hac vice*)
One South Dearborn
Chicago, IL 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
Email:        jgarvey@sidley.com

*Proposed Counsel to the Debtors and Debtors in*
*Possession*

## **SCHEDULE 1**

**Notice of Winning Bid**

**<u>SCHEDULE 2</u>**

| Designated Contract(s) Title and/or Description | Counterparty Name and Address | Proposed Cure Cost (if any) |
|---|---|---|
| | | |

## **SCHEDULE 3**

[Forthcoming]