**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re: | Chapter 11 |
| IMPEL PHARMACEUTICALS INC., *et al.*[1] | Case No. 23-80016 (SGJ) |
| Debtors. | (Jointly Administered) |

**DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION OF IMPEL
PHARMACEUTICALS INC. AND IMPEL NEUROPHARMA AUSTRALIA PTY LTD.**

SIDLEY AUSTIN LLP
Samuel A. Newman (admitted *pro hac vice*)
555 West Fifth Street
Los Angeles, California 90013
Telephone:     (213) 896-6000
Facsimile:     (213) 896-6600
Email:     sam.newman@sidley.com

SIDLEY AUSTIN LLP
Jackson T. Garvey (admitted *pro hac vice*)
One South Dearborn
Chicago, IL 60603
Telephone:     (312) 853-7000
Facsimile:     (312) 853-7036
Email:     jgarvey@sidley.com

SIDLEY AUSTIN LLP
Rakhee V. Patel (TX Bar No. 00797213)
Nathan C. Elner (admitted *pro hac vice*)
Parker G. Embry (TX Bar No. 24126826)
Chelsea M. McManus (TX Bar No. 24131499)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:     rpatel@sidley.com
     nelner@sidley.com
     parker.embry@sidley.com
     cmcmanus@sidley.com

*Counsel to the Debtors and Debtors in Possession*

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in this chapter 11 case, together with the last four digits of each Debtor's federal tax identification number, are:  Impel Pharmaceuticals Inc. (8238); and Impel NeuroPharma  Australia Pty Ltd (N/A).  The Debtors' service address is 201 Elliot Avenue West, Suite 260, Seattle, WA 98119.

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the *Joint Plan of Liquidation of Impel Pharmaceuticals Inc. and Impel NeuroPharma Australia Pty Ltd.* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>"),[2] for which the Debtors will seek confirmation by the Bankruptcy Court.  A copy of the Plan is attached hereto as <u>Exhibit A</u> and is incorporated herein by reference.  The Debtors are providing the information in this Disclosure Statement to certain holders of Claims for the purpose of soliciting votes to accept or reject the Plan.

[Pursuant to the PSA, the Plan is currently supported by the Debtors and certain Non-Company Parties that have executed the PSA.]

The Debtors urge each holder of a Claim or Interest to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage holders of Claims in Classes 3 and 4 to read this Disclosure Statement (including the Risk Factors described in Article XIV hereof) and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances of the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Combined Hearing.

---

<u>RECOMMENDATION BY THE DEBTORS</u>

EACH DEBTOR'S BOARD OF DIRECTORS HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST RECOVERY TO STAKEHOLDERS. EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT BY NO LATER THAN [March 28] AT [4]:00 P.M. (PREVAILING CENTRAL TIME) PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOT.

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between the Disclosure Statement and the Plan, the Plan will govern.**

THE DEBTORS ARE NOT PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT PLAN OF LIQUIDATION OF IMPEL PHARMACEUTICALS INC. AND IMPEL NEUROPHARMA AUSTRALIA PTY LTD*. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR THAT OR ANY OTHER PURPOSE.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN EVENTS AND ANTICIPATED EVENTS IN THE CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE PSA.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS OR INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE LIQUIDATION TRANSACTIONS CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE VIII OF THE PLAN. THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

**YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE HEREIN.**

## <u>TABLE OF CONTENTS</u>

ARTICLE I. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN ............................................................................................... 1

A.   What is chapter 11? ........................................................................................................ 1

B.   Why are the Debtors sending me this Disclosure Statement? ......................................... 1

C.   Am I entitled to vote on the Plan? .................................................................................. 1

D.   What will I receive from the Debtors if the Plan is consummated? ................................. 2

E.   What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim? ........................................................................................................ 2

F.   Are any regulatory approvals required to consummate the Plan? ..................................... 2

G.   What happens to my recovery if the Plan is not confirmed or does not go effective? ....... 2

H.   If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"? ......................................................................................................... 3

I.   What are the sources of Cash and other consideration required to fund the Plan? ............. 3

J.   Is there potential litigation related to the Plan? ............................................................. 3

K.   Does the Plan preserve Causes of Action? ..................................................................... 3

L.   Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan? ........................................................................................................................ 3

M.   When is the deadline to vote on the Plan? ...................................................................... 5

N.   How do I vote on the Plan? ............................................................................................ 5

O.   Why is the Bankruptcy Court holding a Combined Hearing? ......................................... 5

P.   What is the purpose of the Combined Hearing? .............................................................. 5

Q.   Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan? .................................................................................................................... 5

R.   Do the Debtors recommend voting in favor of the Plan? ................................................ 6

S.   Who supports the Plan? ................................................................................................. 6

ARTICLE II.  OVERVIEW OF THE PLAN ................................................................................. 6

A.   Introduction ................................................................................................................... 6

B.   The Plan ........................................................................................................................ 7

C.   The Adequacy of This Disclosure Statement .................................................................. 7

D.   Summary of Classes and Treatment of Claims or Interests ............................................ 8

E.   Solicitation Package ...................................................................................................... 9

F.   Voting and Confirmation of the Plan ............................................................................ 10

    1.   Certain Factors to be Considered Prior to Voting ....................................................... 10

2.    Voting Procedures and Requirements..................................................................... 10

3.    Plan Objection Deadline ........................................................................................ 11

4.    Combined Hearing .................................................................................................. 11

5.    Confirmation ........................................................................................................... 11

6.    Acceptance .............................................................................................................. 12

7.    Feasibility ............................................................................................................... 12

8.    Best Interests Test; Liquidation Analysis .............................................................. 12

9.    Compliance with Applicable Provisions of the Bankruptcy Code ......................... 13

10.   Alternatives to Confirmation and Consummation of the Plan................................ 13

G.   Releases by the Debtors Set Forth in the Plan ................................................................ 14

ARTICLE III. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS
OVERVIEW ...................................................................................................................... 14

A.   Corporate History ........................................................................................................... 14

B.   Business Operations ........................................................................................................ 14

C.   The Debtors' Prepetition Capital Structure..................................................................... 15

1.    The Revenue Interest Financing Agreement........................................................... 15

2.    The Senior Secured Loans ...................................................................................... 15

3.    Amendments to the RIFA and Senior Secured Credit Documents.......................... 16

4.    Secured Debt as of the Petition Date ...................................................................... 18

5.    Trade and Related Debt ........................................................................................... 19

6.    Net Operating Losses and Research and Development Credits................................ 19

7.    Equity ...................................................................................................................... 19

D.   Additional Compensation Plans ...................................................................................... 19

E.   Litigation ......................................................................................................................... 20

F.   Events Leading to the Chapter 11 Filings ....................................................................... 20

1.    Declining Liquidity and a Failed Sale .................................................................... 20

2.    Unsuccessful Investment Outreach ......................................................................... 21

3.    February 2023 Reduction in Force .......................................................................... 21

4.    Board Considers Strategic Alternatives and Hires Advisors .................................. 22

5.    Prepetition Sale Process .......................................................................................... 22

6.    Teneo Implements Cost Cutting Measures to Preserve Assets................................ 22

7.    Engagement with Key Stakeholders ........................................................................ 23

8.    Further Reductions In Force .................................................................................... 23

9.    Nasdaq Delisting..................................................................................................... 24

10.   Stalking Horse and Chapter 11 Filing..................................................................... 24

ARTICLE IV. EVENTS DURING THE CHAPTER 11 CASES ............................................... 25

  A.   Commencement of the Chapter 11 Cases and the Debtors' Professionals ..................... 25

  B.   First Day Relief............................................................................................................ 25

  C.   Second Day Relief ....................................................................................................... 26

  D.   The Proposed Bidding Procedures............................................................................... 27

  E.   Debtors' Use of Cash Collateral ................................................................................. 28

  F.   Bar Dates...................................................................................................................... 29

  G.   Proposed Confirmation Schedule ................................................................................ 29

ARTICLE V. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 30

  A.   Administrative Claims, Priority Tax Claims, and Statutory Fees.................................. 30

    1.   Administrative Claims ........................................................................................... 30

    2.   Professional Compensation Claims ....................................................................... 30

    3.   Priority Tax Claims ............................................................................................... 32

    4.   U.S. Trustee Statutory Fees .................................................................................. 32

  B.   Classification of Claims and Interests.......................................................................... 33

  C.   Treatment of Claims and Interests ............................................................................... 33

    1.   Class 1 – Other Secured Claims ........................................................................... 33

    2.   Class 2 – Other Priority Claims ............................................................................ 34

    3.   Class 3 – Prepetition Term Loan Claims .............................................................. 34

    4.   Class 4 – General Unsecured Claims .................................................................... 35

    5.   Class 5 – Intercompany Claims ............................................................................ 35

    6.   Class 6 –Existing Equity Interests ........................................................................ 36

  D.   Special Provision Governing Unimpaired Claims......................................................... 36

  E.   Elimination of Vacant Classes ..................................................................................... 36

  F.   Voting Classes, Presumed Acceptance by Non-Voting Classes.................................... 36

  G.   Controversy Concerning Impairment ........................................................................... 36

  H.   Subordination of Claims .............................................................................................. 36

  I.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ... 37

  J.   Insurance ...................................................................................................................... 37

ARTICLE VI. MEANS FOR IMPLEMENTATION OF THE PLAN ...................................... 37

  A.   General Settlement of Claims and Interests.................................................................. 37

  B.   Liquidation Transactions ............................................................................................. 37

    1.   Sale Transaction.................................................................................................... 38

    2.   Wind-Down........................................................................................................... 38

C.   Sources of Consideration for Plan Distributions ....................................................... 38

D.   Vesting of Assets ..................................................................................................... 39

E.   Preservation of Causes of Action ............................................................................ 39

F.   Corporate Action...................................................................................................... 39

G.   Cancellation of Existing Securities and Agreements................................................. 40

H.   Effectuating Documents; Further Transactions ........................................................ 40

I.   Section 1146 Exemption from Certain Taxes and Fees............................................. 40

J.   Sale Order ................................................................................................................ 40

K.   Authority to Act ....................................................................................................... 41

L.   Separate Plans ......................................................................................................... 41

M.   Registered form....................................................................................................... 41

ARTICLE VII. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
....................................................................................................................................... 41

A.   Assumption and Rejection of Executory Contracts and Unexpired Leases ................... 41

B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases ...................... 42

C.   Reservation of Rights................................................................................................ 42

D.   Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases
     42

E.   Indemnification Obligations ...................................................................................... 43

F.   D&O Liability Insurance Policies ............................................................................. 43

G.   Employment Agreements........................................................................................... 43

H.   Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 43

I.   Nonoccurrence of Effective Date............................................................................... 43

J.   Employee Compensation and Benefits ...................................................................... 43

ARTICLE VIII. PROVISIONS GOVERNING DISTRIBUTIONS ......................................... 44

A.   Distributions on Account of Claims Allowed as of the Effective Date........................... 44

B.   Compliance with Tax Requirements........................................................................... 44

C.   Date of Distributions ................................................................................................ 45

D.   Disbursing Agent ..................................................................................................... 45

E.   Rights and Powers of Disbursing Agent.................................................................... 45

F.   Surrender of Instruments........................................................................................... 45

G.   Delivery of Distributions and Undeliverable or Unclaimed Distributions ...................... 46

H.   Manner of Payment................................................................................................... 46

I.   Foreign Currency Exchange Rate .............................................................................. 46

J.   Setoffs and Recoupment ........................................................................................... 46

K.   Minimum Distribution ..................................................................................... 47

L.   Allocations ....................................................................................................... 47

M.   Distributions Free and Clear ............................................................................ 47

N.   Claims Paid or Payable by Third Parties ......................................................... 47

   1.   Claims Paid by Third Parties ..................................................................... 47

   2.   Claims Payable by Third Parties ................................................................ 47

   3.   Applicability of Insurance Policies ............................................................ 48

O.   No Postpetition Interest on Claims .................................................................. 48

ARTICLE IX. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS .................................................................................................... 48

A.   Allowance of Claims......................................................................................... 48

B.   Claims Administration Responsibilities ........................................................... 48

C.   Estimation of Claims and Interests .................................................................. 48

D.   Adjustment to Claims or Interests Without Objection...................................... 49

E.   Time to File Objections to Claims .................................................................... 49

F.   Disallowance of Claims or Interests ................................................................. 49

G.   Disallowance of Late Claims ........................................................................... 49

H.   Disputed Claims Process................................................................................... 49

I.   Amendments to Claims...................................................................................... 50

J.   No Distributions Pending Allowance ............................................................... 50

K.   Distributions After Allowance .......................................................................... 50

ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ............................. 50

A.   Conditions Precedent to the Effective Date ..................................................... 50

B.   Waiver of Conditions ........................................................................................ 51

ARTICLE XI. RELEASE, INJUNCTION, AND RELATED PROVISIONS............................ 52

A.   Releases by the Debtors .................................................................................... 52

B.   Releases by the Releasing Parties .................................................................... 54

C.   Exculpation ....................................................................................................... 56

D.   Injunction .......................................................................................................... 57

E.   No Discharge ..................................................................................................... 58

F.   Release of Liens ................................................................................................ 58

G.   Gatekeeper Provision ....................................................................................... 58

ARTICLE XII. RETENTION OF JURISDICTION ......................................................... 59

ARTICLE XIII. MISCELLANEOUS PROVISIONS ........................................................ 61

A.   Immediate Binding Effect................................................................................. 61

x

B.   Additional Documents ................................................................................. 61

C.   Substantial Consummation ......................................................................... 61

D.   Reservation of Rights .................................................................................. 61

E.   Successors and Assigns ............................................................................... 61

F.   Determination of Tax Liabilities ................................................................ 61

G.   Notices ........................................................................................................ 62

H.   Term of Injunctions or Stays ...................................................................... 63

I.   Entire Agreement ........................................................................................ 63

J.   Plan Supplement ......................................................................................... 63

K.   Governing Law ........................................................................................... 63

L.   Nonseverability of Plan Provisions ............................................................ 63

M.   Closing of the Chapter 11 Cases ................................................................ 64

ARTICLE XIV. RISK FACTORS ............................................................................... 64

A.   Bankruptcy Law Considerations ................................................................ 64

    1.   The Plan May Not Be Approved or Implemented ................................ 64

    2.   Parties in Interest May Object to the Plan's Classification of Claims and Interests ...... 65

    3.   The Debtors' Use of Cash Collateral May Be Terminated .......................... 65

    4.   The PSA May Be Terminated ............................................................... 65

    5.   The Conditions Precedent to the Effective Date of the Plan May Not Occur .............. 66

    6.   The Debtors May Fail to Satisfy the Vote Requirements ............................. 66

    7.   The Debtors May Not Be Able to Secure Confirmation of the Plan ............................ 66

    8.   The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes ................................................................ 66

    9.   The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code ............................................................................... 67

    10.   The Debtors May Object to the Amount or Classification of a Claim ......................... 67

    11.   Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan .. 67

    12.   Releases, Injunctions, and Exculpation Provisions May Not Be Approved ................. 67

B.   Allowance of Claims ................................................................................... 68

C.   Risks Related to Recoveries Under the Plan ............................................... 68

    1.   The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims ................................................................ 68

    2.   Any Valuation of Any Assets to be Distributed Under the Plan Is Speculative ........... 68

    3.   The Debtors Cannot Guarantee the Timing of Distributions ......................... 68

    4.   Certain Tax Implications of the Debtors' Bankruptcy ................................. 68

D.   Risks Related to the Debtors' Businesses ........................................................ 69

   1.   The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases ............................................................................................... 69

   2.   Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses 69

   3.   The Debtors' Business Is Subject to Various Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business ............................................ 70

   4.   The Loss of Key Personnel Could Adversely Affect the Debtors' Operations ............ 70

E.   Disclosure Statement Disclaimer ...................................................................... 70

   1.   The Financial Information Contained in This Disclosure Statement Has Not Been Audited ....................................................................................................................... 70

   2.   Information Contained in This Disclosure Statement Is For Soliciting Votes ............. 70

   3.   This Disclosure Statement Was Not Reviewed or Approved by the SEC .................... 70

   4.   This Disclosure Statement May Contain Forward Looking Statements ...................... 71

   5.   No Legal or Tax Advice Is Provided to You by This Disclosure Statement ................ 71

   6.   No Admissions Made ................................................................................................ 71

   7.   Failure to Identify Potential Objections ................................................................... 71

   8.   No Waiver of Right to Object or Right to Recover Transfers and Assets ................... 71

   9.   Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ..................................................................................................................... 71

   10.   Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update ............. 72

   11.   No Representations Outside This Disclosure Statement are Authorized ...................... 72

ARTICLE XV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN ......................................................................... 72

A.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ................... 74

   1.   U.S. Federal Income Tax Consequences to the Debtors ............................................. 74

   2.   Cancellation of Debt and Reduction of Tax Attributes .............................................. 74

B.   Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote on the Plan ............................................................................ 75

   1.   U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Voting Classes ....................................................................................................................... 75

   2.   Accrued Interest ........................................................................................................ 76

   3.   Market Discount ........................................................................................................ 76

   4.   Bad Debt Deduction ................................................................................................. 76

   5.   Medicare Surtax ........................................................................................................ 76

C.   Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote on the Plan ..................................................................... 77

　　　1.　Gain Recognition ........................................................................................ 77
　　　2.　Interest on Allowed Claims ........................................................................ 77
　　D.　Information Reporting and Back-Up Withholding ......................................... 79
　　E.　Importance of Obtaining Professional Tax Assistance .................................... 79
ARTICLE XVI. ADDITIONAL INFORMATION ......................................................... 79
ARTICLE XVII. RECOMMENDATION AND CONCLUSION ............................................. 80

## <u>EXHIBITS</u>

Exhibit A          Joint Plan of Liquidation of Impel Pharmaceuticals Inc. and Impel NeuroPharma
                   Australia Pty Ltd.

Exhibit B          Liquidation Analysis [*to be filed subsequently with the Plan Supplement*]

Exhibit C          Plan Support Agreement

Exhibit D          Corporate Organization Chart

## ARTICLE I.
## QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

**A.      What is chapter 11?**

Chapter 11 is the principal business restructuring chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.      Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold and whether you held that Claim or Interest as of the Voting Record Date (*i.e.*, as of [February 23], 2024).  Each category of holders of Claims and Interests, pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth in Article III of the Plan and Article V of this Disclosure Statement.

Except as otherwise provided in the Plan, nothing in the Plan shall affect the Debtors' or the Plan Administrator's rights regarding any Unimpaired Claims, including all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**D.      What will I receive from the Debtors if the Plan is consummated?**

A summary of the anticipated recovery to holders of Claims or Interests under the Plan is set forth in Article II.D. of this Disclosure Statement.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

THE PROJECTED RECOVERIES SET FORTH IN ARTICLE II.D. HEREIN ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[3]

**E.      What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Compensation Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A description of these Claims and their treatment is included in Article II of the Plan and Article V of this Disclosure Statement.

**F.      Are any regulatory approvals required to consummate the Plan?**

At this time, the Debtors are evaluating which, if any, regulatory approvals are required to consummate the Plan.  To the extent any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, however, it is a condition precedent to the Effective Date that they be obtained.

**G.      What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance as to what precisely will happen. It is possible that any alternative may provide holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of potential consequences of extended Chapter 11 Cases, or of a liquidation scenario under chapter 7 of the Bankruptcy Code, see Article XIV of this Disclosure Statement, and the Liquidation Analysis to be filed subsequent to the Filing of this Disclosure Statement as part of the Plan Supplement.

---

[3] The recoveries set forth herein may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Sale Transaction.

**H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective. Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan. "Consummation" of the Plan refers to the occurrence of the Effective Date. See Article X of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date," for a discussion of conditions precedent to Consummation of the Plan.

**I.    What are the sources of Cash and other consideration required to fund the Plan?**

The Debtors and the Plan Administrator, as applicable, shall fund distributions under the Plan with proceeds from the Sale Transaction and any other Distributable Cash, if any, all in accordance with the terms of the Plan and the Wind Down Budget.

**J.    Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which objections potentially could give rise to litigation.

In the event that it becomes necessary to confirm the Plan over the rejection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such rejecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allows the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.

**K.    Does the Plan preserve Causes of Action?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled, as described in greater detail in Article IX of the Plan.

**L.    Will there be releases, exculpation, and injunction granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors will also seek findings of fact and conclusions of law with regards to officers' and directors' performance of their duties as officers and directors of the Debtors. The Debtors' releases, third-party releases, exculpation, and injunction provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts [and were an essential element of

the negotiations among the Debtors and the Non-Company Parties in obtaining their support for the Plan pursuant to the terms of the PSA].

The Released Parties, the Exculpated Parties, and the Debtors' directors and officers have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrant the benefit of the release and exculpation provisions.

**IMPORTANTLY, THE FOLLOWING PARTIES ARE INCLUDED IN THE DEFINITION OF "RELEASING PARTIES" AND WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, INDIVIDUALLY, AND COLLECTIVELY RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES: COLLECTIVELY, AND IN EACH CASE IN ITS CAPACITY AS SUCH:  (A) THE DEBTORS, (B) THE WIND-DOWN DEBTORS, (C) THE PREPETITION TERM LOAN SECURED PARTIES, (D) THE CONSENTING UNSECURED CREDITORS, (E) ANY STATUTORY COMMITTEE AND EACH OF ITS MEMBERS, (F) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN, (G) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT WHO DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH HEREIN, (H) THE HOLDERS OF ALL CLAIMS OR INTERESTS WHO VOTE, OR ARE DEEMED TO VOTE, TO REJECT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH HEREIN, (I) THE HOLDERS OF ALL CLAIMS AND INTERESTS WHO ARE UNIMPAIRED UNDER THE PLAN, (J) WITH RESPECT TO EACH OF THE FOREGOING PERSONS, IN CLAUSES (A) THROUGH (I), EACH OF THEIR AFFILIATES, AND (K) WITH RESPECT TO EACH OF THE FOREGOING PERSONS IN CLAUSES (A) THROUGH (J), EACH OF THEIR AND THEIR AFFILIATES' RESPECTIVE PREDECESSORS, SUCCESSORS, ASSIGNS, SUBSIDIARIES, AFFILIATES, CURRENT AND FORMER OFFICERS AND DIRECTORS, PRINCIPALS, EQUITY HOLDERS, MEMBERS, PARTNERS, MANAGERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS, AND OTHER PROFESSIONALS, AND SUCH PERSONS' RESPECTIVE HEIRS, EXECUTORS, ESTATES, AND NOMINEES, IN EACH CASE IN THEIR CAPACITY AS SUCH AND FOR WHICH SUCH ENTITY IS LEGALLY ENTITLED TO BIND SUCH PARTY TO THE RELEASES CONTAINED IN THE PLAN AND UNDER APPLICABLE LAW; PROVIDED THAT AN ENTITY SHALL NOT BE A RELEASING PARTY IF IT FILES WITH THE BANKRUPTCY COURT AN OBJECTION TO THE PLAN THAT IS NOT CONSENSUALLY RESOLVED BEFORE CONFIRMATION OR SUPPORTS ANY SUCH OBJECTION OR OBJECTOR. THE RELEASES ARE AN INTEGRAL ELEMENT OF THE PLAN.**

Based on the foregoing, the Debtors believe that the release, exculpation, and injunction provisions in the Plan are necessary and appropriate and meet the requisite legal

standard promulgated by the United States Court of Appeals for the Fifth Circuit.  Moreover, the Debtors will present evidence at the Combined Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.  The release, exculpation, and injunction provisions are contained in Article IX of the Plan and Article XI of this Disclosure Statement.

**M.**     **When is the deadline to vote on the Plan?**

The Voting Deadline is [March 28], 2024, at 4:00 p.m. (prevailing Central Time).

**N.**     **How do I vote on the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballot distributed to holders of Claims that are entitled to vote on the Plan (the "Ballot").  For your vote to be counted, the Ballot containing your vote must be properly completed, executed, and delivered as directed so that it is **actually received** by the Debtors' Notice and Claims Agent, Omni Agent Solutions, Inc. ("Omni"), **on or before the Voting Deadline of [March 28], 2024, at 4:00 p.m. (prevailing Central Time)**.

**O.**     **Why is the Bankruptcy Court holding a Combined Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Code to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.  The Debtors have requested that the Court hold the Combined Hearing on [April 1, 2024 at 9:30 a.m., prevailing Central Time].  All parties in interest will be served notice of the time, date, and location of the Combined Hearing once scheduled. The Combined Hearing may be adjourned from time to time without further notice.

**P.**     **What is the purpose of the Combined Hearing?**

The confirmation of a plan by a bankruptcy court binds the debtor, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Because the Debtors are liquidating, they are not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code with regard to any Holders of Claims or Interests.

**Q.**     **Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent via one of the following methods:

*By regular mail, hand delivery, or overnight mail at:*
Impel Ballot Processing
c/o Omni Agent Solutions, Inc.
5955 De Soto Ave., Suite 100
Woodland Hills, CA 91367

*By electronic mail at:*
impelinquiries@omniagnt.com

*By telephone (US & Canada toll-free) at:*
(888) 202-6183

*or*

*By telephone (international) at:*
(747) 288-6396

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Notice and Claims Agent at the address above or by downloading the documents from the Debtors' restructuring website at https://omniagentsolutions.com/impel (free of charge) or via PACER at https://www.pacer.gov (for a fee) upon filing.

**R.      Do the Debtors recommend voting in favor of the Plan?**

Yes. The Debtors believe that the Plan provides for a larger distribution to the Debtors' stakeholders than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of the Debtors' stakeholders, and that any alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**S.      Who supports the Plan?**

[The Plan is supported by the Debtors and the Non-Company Parties that have executed the PSA.]

**ARTICLE II.
OVERVIEW OF THE PLAN**

---

**RECOMMENDATION BY THE DEBTORS**

It is the Debtors' opinion that confirmation and implementation of the Plan is in the best interests of the Debtors' Estates and their creditors.  Therefore, the Debtors recommends that all creditors whose votes are being solicited submit a ballot to **accept** the Plan.

---

**A.      Introduction**

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as **Exhibit A**, and the exhibits thereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Confirmation of the Plan and the occurrence of the Effective Date are subject to certain conditions, which are summarized in Article X.  There is no assurance that these conditions will be satisfied or waived.  At the Combined Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the

requirements for confirmation of a chapter 11 plan are that the plan: (i) is accepted by the requisite holders of claims or interests in impaired classes under the plan; (ii) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan; (iii) is feasible; and (iv) complies with the applicable provisions of the Bankruptcy Code.  In this instance, only holders of Claims in Classes 3 and 4 are entitled to vote to accept or reject the Plan.  Because Class 6 will receive no distributions under the Plan, that Class is deemed to reject the Plan.  Because Classes 1 and 2 are unimpaired, they are deemed to vote to accept the Plan. Claims in Class 5 will either be reinstated or cancelled and thus will either be unimpaired or impaired under the Plan, respectively. Pursuant to section 1126(f) and section 1126(g) of the Bankruptcy Code, Claims in Class 5 will thus either be deemed to accept or reject the Plan and, accordingly, are not entitled to vote on the Plan.  *See* Article II.F.5. for a discussion of the Bankruptcy Code's requirements for Plan Confirmation.

### B.    The Plan

The Debtors filed for chapter 11 bankruptcy protection on December 19, 2023 (the "Petition Date").  The Debtors have sold substantially all of their assets pursuant to section 363(f) of the Bankruptcy Code prior to confirmation of the Plan.  Subsequent to confirmation, the Debtors intend to enter the next phase of these Chapter 11 Cases, which involves the (i) wind-down of the Debtors; and (ii) the liquidation and distribution of the Debtors' remaining assets after the consummation of the Sale Transaction, if any.

A chapter 11 bankruptcy case permits a debtor to resolve its affairs and distribute the proceeds of its estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors have filed the Plan, the terms of which are more fully described herein, contemporaneously with the filing of this Disclosure Statement.  The Plan contemplates a liquidation of the Debtors and their Estates and is therefore referred to as a "plan of liquidation."  The primary objective of the Plan is to maximize the value of recoveries to holders of Allowed Claims and to distribute all property of the Debtors' Estates that is or becomes available for distribution in accordance with the Bankruptcy Code and Plan.  The Debtors assert that the Plan accomplishes this objective and is in the best interests of their Estates, and therefore seek to confirm the Plan.  The Plan classifies holders of Claims or Interests according to the type and nature of the holder's Claim or Interest, as more fully described below.

The Plan designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (1) Impaired or Unimpaired by the Plan; (2) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; or (3) deemed to accept or reject the Plan.  Claims against the Debtors and Interests in the Debtors are classified in six (6) separate Classes, as described herein.

### C.    The Adequacy of This Disclosure Statement

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan.  The Debtors are providing this Disclosure

Statement in accordance with those requirements.  This Disclosure Statement includes, without limitation, information about:

- the Plan, including a summary, the procedures for voting on the Plan and projected recoveries thereunder (Article II hereof);

- the statutory requirements for confirming the Plan (Article II.F. hereof);

- the Debtors' organizational structures, business operations, and financial obligations (Article III hereof);

- the events leading to the filing of the Debtors' Chapter 11 Cases (Article III hereof);

- the major events during the Chapter 11 Cases, including significant pleadings filed in the Debtors' Chapter 11 Cases (Article III hereof);

- certain risk factors that holders of Claims should consider before voting to accept or reject the Plan (Article XIV hereof);

- the classification and treatment of Claims or Interests under the Plan, including identification of the holders of Claims entitled to vote on the Plan (Article V hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain holders of Claims pursuant to the Plan, the procedures for resolving Disputed Claims and other significant aspects of the Plan (Article VI hereof);

- the releases contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Article XI hereof); and

- certain United States federal income tax consequences of the Plan (Article XV hereof).

### D.      Summary of Classes and Treatment of Claims or Interests

The classification of Claims or Interests, the estimated aggregate amount of Claims in each Class, and the amount and nature of distributions to holders of Claims or Interests in each Class are summarized in the table below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified for purposes of voting or receiving distributions.  For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see Article II of the Plan.

Each amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated Cash or other assets to be distributed to holders of Allowed Claims in that Class, divided by the estimated aggregate amount of Allowed Claims in that Class.  In determining those amounts, the Debtors have assumed that the Plan is consummated as described herein.

For a discussion of various factors that could materially affect the amount of assets to be distributed pursuant to the Plan, see Article XIV of this Disclosure Statement.

| SUMMARY OF ESTIMATED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Interest | Treatment of Claim/Interest | Projected Allowed Amount of Claims[4] | Estimated % Recovery Under Plan |
| Class 1 | Other Secured Claims | Unimpaired; Not Entitled to Vote (Deemed to Accept) | $[●] | [●]% |
| Class 2 | Other Priority Claims | Unimpaired; Not Entitled to Vote (Deemed to Accept) | $[●] | [●]% |
| Class 3 | Prepetition Term Loan Claims | Impaired; Entitled to Vote | $[●] | [●]% |
| Class 4 | General Unsecured Claims | Impaired; Entitled to Vote | $[●] | [●]% |
| Class 5 | Intercompany Claims | Impaired/Unimpaired; Deemed to reject/Presumed to Accept | $[●] | [●]% |
| Class 6 | Existing Equity Interests | Impaired; Not Entitled to Vote (Deemed to Reject) | [●] | [●]% |

E.        **Solicitation Package**

The package of materials (the "Solicitation Package") to be sent to holders of Claims on the Plan will contain:

the Disclosure Statement (including the Plan and all other exhibits hereto);

the notice of the Combined Hearing;

an appropriate form of Ballot, together with detailed voting instructions and a pre-addressed, postage pre-paid return envelope; and

any additional documents that the Bankruptcy Court has ordered to be made available.

The Solicitation Package may also be obtained free of charge from Omni, the Debtors' Bankruptcy Court-appointed claims and noticing agent (the "Notice and Claims Agent") by: (1) visiting https://omniagentsolutions.com/impel; (2) emailing the Notice and Claims Agent at impelinquiries@omniagnt.com; or (3) calling (888) 202-6183.

---

[4] With respect to the Prepetition Term Loan Claims, amounts are not inclusive of any allowed accrued but unpaid interest, fees, or other expenses.

F.      **Voting and Confirmation of the Plan**

The Debtors seek entry of an order with respect to the motion for Combined Hearing, which will, among other things, (1) conditionally approve this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and (2) establish Plan voting tabulation procedures, which include certain vote tabulation rules that temporarily allow or disallow Claims for voting purposes (the "Tabulation Rules") pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.      Certain Factors to be Considered Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors assert that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Compensation Claims, which would likely reduce the recoveries to the holders of Claims.

2.      Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of Claims against or Interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of Claims or Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes of Claims or Interests that do not receive distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan. The classification of Claims or Interests is summarized, together with an indication of whether each Class of Claims or Interests is impaired or unimpaired, in Article II of the Disclosure Statement. [February 23], 2024 shall serve as the voting record date for administrative convenience, *provided* that any creditor who later files a valid and timely Proof of Claim is provided the appropriate Solicitation Package and right to vote or opt-out, as applicable, on a rolling basis (the "Voting Record Date"). The Voting Record Date shall be used for the purpose of determining which Holders of Filed or scheduled Claims in Classes 3 and 4 are entitled to receive a Solicitation Package.

Voting on the Plan by each Holder of a Claim in Classes 3 and 4 is important. Please carefully follow all of the instructions contained on the Ballot(s) provided to you. All

Ballots must be completed and returned in accordance with the instructions provided. To be counted, your ballot or ballots must be received by 4:00 p.m., prevailing Central Time, on [March 28], 2024 (the "Voting Deadline") at the address set forth on the preaddressed envelope provided to you.

If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call or email the Debtors' Notice and Claims Agent, at (833) 202-6183. Also, this Disclosure Statement, the Plan and all of the related exhibits and schedules are available, without charge, to any party in interest at https://omniagentsolutions.com/impel.

Ballots cannot be transmitted orally, by email or by facsimile. Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service, regular U.S. mail, or electronically via the Voting Agent's e-Ballot portal promptly, so that it is received by the Voting Agent before the Voting Deadline.

3.    Plan Objection Deadline

The deadline to file objections to the Confirmation of the Plan (the "Confirmation Objections") is [March 27], 2024, at 4:00 p.m. (prevailing Central Time) (the "Objection Deadline"). All Confirmation Objections must be in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any Confirmation Objection must be filed with the Bankruptcy Court and served on the Debtors, any official committee of unsecured creditors appointed in the Chapter 11 Cases (if any), and the Consenting Stakeholders on or before the Objection Deadline.

4.    Combined Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. The Debtors are requesting that the Bankruptcy Court conditionally approve this Disclosure Statement and set a Combined Hearing to approve this Disclosure Statement on a final basis and confirm the Plan. The Combined Hearing may, however, be continued or adjourned from time to time without further notice to parties in interest other than an adjournment announced in open court or a notice of adjournment Filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules. Subject to section 1127 of the Bankruptcy Code [and the PSA], the Plan may be modified, if necessary, prior to, during, or as a result of the Combined Hearing without further notice to parties in interest.

5.    Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:[5]

- the Plan has classified Claims and Interests in a permissible manner;

---

[5] The descriptions contained herein are only a summary of certain confirmation requirements; they are not exhaustive of all confirmation requirements and should not be construed as such.

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan that has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code, of creditors and equity interest holders the Plan is feasible;

- all U.S. Trustee Fees due and owing have been paid or the Plan provides for the payment thereof on the Effective Date; and

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class by providing to those holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that each holder would receive or retain in a chapter 7 liquidation, unless each holder of a Claim or Interest in that Class has accepted the Plan.

      6.    <u>Acceptance</u>

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims of that class vote to accept the plan. Only those holders of claims who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation.

      7.    <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor (unless liquidation or reorganization is proposed in the Plan). Because the Plan proposes a liquidation of all of the Debtors' assets, for purposes of this test the Debtors have analyzed the ability of the Plan Administrator to meet its obligations under the Plan. Based on the Debtors' analysis, including the information contained in **Exhibit B** regarding recoveries available to holders of Allowed Claims under the Plan, the Plan Administrator will have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtors have determined that their liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

      8.    <u>Best Interests Test; Liquidation Analysis</u>

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each holder of a Claim or Interest in any impaired Class who has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the

Bankruptcy Court find that the Plan provides to each member of that impaired Class a recovery on account of the holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that the holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

To address the best interests test, subsequent to the Filing of this Disclosure Statement, the Debtors will prepare and File the Liquidation Analysis as part of the Plan Supplement.

Because the Plan proposes a liquidation of all the Debtors' assets, the Debtors have analyzed factors that will impact recoveries (the "Recoveries") available to creditors in each scenario. These factors include professionals' fees and expenses, asset disposition expenses, applicable taxes, potential Claims arising during the pendency of the Plan or chapter 7 cases and trustee fees and expenses. The Liquidation Analysis will include a summary of the Recoveries under the Plan and in a hypothetical chapter 7 liquidation.

In summary, the Debtors will demonstrate in the Liquidation Analysis that a chapter 7 liquidation would result in diminution in the Recoveries to be realized by holders of Allowed Claims, as compared to the proposed distributions under the Plan. Consequently, the Debtors will demonstrate in the Liquidation Analysis that the Plan will provide a greater ultimate return to holders of Allowed Claims than would a chapter 7 liquidation of the Debtors.

9.      Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors considered each of these issues in the development of the Plan and have determined that the Plan complies with all provisions of the Bankruptcy Code.

10.      Alternatives to Confirmation and Consummation of the Plan

The Debtors evaluated alternatives to the Plan, including alternative structures and terms of the Plan. While the Debtors concluded that the Plan is the best alternative and will maximize recoveries by Holders of Allowed Claims, if the Plan is not confirmed, the Debtors, or (subject to the Debtors' exclusive periods under the Bankruptcy Code to file and solicit acceptances of a plan or plans) any other party in interest in the Chapter 11 Cases could attempt to formulate and propose a different plan. Further, if no plan under chapter 11 of the Bankruptcy Code can be confirmed, the Chapter 11 Cases may be converted to chapter 7 cases. In liquidation cases under chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the remaining assets of the Debtors and distribute proceeds to creditors. The proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code. For further discussion of the potential impact on the Debtors of the conversion of the Chapter 11 Cases to chapter 7 liquidation, see Article XIV.A of this Disclosure Statement. The Debtors have determined that confirmation and Consummation of the Plan is preferable to the available alternatives.

G.   **Releases by the Debtors Set Forth in the Plan**

Article IX of the Plan provides that each Released Party is deemed released by the Debtors and their Estate from any and all claims and Causes of Action except as set forth therein. The Debtors have determined that applicable law and the facts support those releases and that the Bankruptcy Court can and should approve them.

## ARTICLE III.
## THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

A.   **Corporate History**

Impel Pharmaceuticals Inc. ("Impel") was founded in 2008 as a pharmaceutical company in Washington, to pursue the development and research of pharmacokinetics and their application to treatments of central nervous system diseases. Impel is an innovator in acute migraine treatment space, with a focus on drugs and delivery mechanisms targeting the upper nasal cavity for effective, flexible treatment. Impel is incorporated under the laws of the State of Delaware, and its subsidiary, Impel NeuroPharma Australia Pty Ltd., is organized under the laws of Australia. The subsidiary historically supported the parent company's clinical trials, as recently as 2019.

Prior to April 2021, Impel was privately owned.  In April 2021, Impel conducted an initial public offering and began trading on the Nasdaq Global Select Market.

Impel's common stock was publicly traded and listed on the Nasdaq Stock Market ("Nasdaq") under the symbol "IMPLQ," until the trading of Impel's stock was suspended on December 18, 2023, and later delisted, effective as of January 8, 2024.  Impel's shares are currently traded on the over the counter on the OTC Pink market.

B.   **Business Operations**

As of the Petition Date, the Debtors were one of only a handful of publicly traded companies focused on development and commercialization of treatments of central nervous system diseases, and specifically the acute treatment of migraines, in the United States.  Combining product efficacy and safety, time to market, price, reduction of adverse side effects experienced, and convenience of administration and drug delivery created an opportunity for Impel to develop a strong market share for therapies targeting migraines.  Impel's market success was built on its valuable assets, including Trudhesa, its marquee migraine drug, and its proprietary Precision Olfactory Delivery device used to administer Trudhesa.  Impel built its business around such intellectual property, which it combined with a worldwide supply chain that can support at least 1.5 million doses a year. Impel's valuable patent portfolio contains 19 U.S.-issued patents and 89 patents issued in non-U.S. jurisdictions.  Impel also has 66 additional patent applications pending. Impel's intellectual property is rounded out by other brand rights, including trademarks protecting its drug and devices in the market.

As of the Petition Date, the Debtors employed approximately 36 employees, of which nearly all are full- or part-time salaried workers.  In addition, as of the Petition Date, the

Debtors supplement their employee workforce with an additional 2 independent contractors and consultants. None of the Debtors' employees are represented by a labor union or covered by collective bargaining agreements.

Further details regarding the Debtors' business and operations may be found in the Declaration of Brandon Smith, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Proceedings (the "First Day Declaration") [Docket No. 15].

### C. The Debtors' Prepetition Capital Structure

As of the Petition Date, Impel had approximately $121 million in funded, secured debt obligations.

#### 1. The Revenue Interest Financing Agreement

On March 17, 2022, Impel entered into that certain Revenue Interest Financing Agreement and related security agreements (the "RIFA") with certain purchasers party thereto (collectively, the "Revenue Purchasers") in the original principal amount of $50 million in exchange for tiered royalty payments on worldwide net sales from Trudhesa, as follows: 7.75% on annual United States net sales up to $150.0 million; 4.75% on annual United States net sales between $150 million and $300 million; 0.75% on annual United States net sales greater than $300.0 million; and 10% of any upfront payments, milestone payments and royalties received by Impel from licensing or partnerships relating to Trudhesa outside the United States.

The RIFA was collateralized by a perfected security interest in (i) accounts receivable arising from the net sales of Trudhesa and (ii) intellectual property that was claiming or covering Trudhesa, or any method of using, making, or manufacturing Trudhesa, including regulatory approvals, clinical data, and all other Trudhesa assets. The RIFA had no guarantors or other obligors other than Impel.

The RIFA was terminated on September 5, 2023 in connection with the Second Senior Secured Credit Agreement Amendment (defined below).

#### 2. The Senior Secured Loans

On March 17, 2022, Impel entered into that certain Credit Agreement and Guaranty (as from time to time amended and restated, the "Senior Secured Credit Agreement" and the loans made thereunder, the "Senior Secured Loans") and related security agreements (together with the Senior Secured Credit Agreement, the "Senior Credit Documents"), dated as of March 17, 2022, with Oaktree as administrative agent, and the lenders party thereto (collectively, the "Senior Secured Lenders") in the original principal amount of $50.0 million. The Senior Secured Loans mature on March 17, 2027, and bear interest at a rate of the Secured Overnight Financing Rate ("SOFR") + 10.75% (with a SOFR floor of 1.00%). Under the Senior Credit Documents, Impel is required to make quarterly interest-only payments, with the remaining balance of principal and interest due on maturity. Under the Senior Credit Documents, Impel is subject to a minimum liquidity requirement of $12.5 million unrestricted cash balance at all times (the "Minimum Liquidity Covenant").

15

The Senior Secured Loans are secured by substantially all real, personal, and mixed property of Impel, including equity interests.  The Senior Secured Loans have no guarantors or other obligors other than Impel.

On July 19, 2023, Impel provided notice to Oaktree that Impel was in breach of the Minimum Liquidity Covenant.  Impel's breach of the Minimum Liquidity Covenant constituted an event of default under the Senior Secured Credit Agreement and triggered, among other things, the application of a higher default rate of interest on the Senior Secured Loans.

3.      Amendments to the RIFA and Senior Secured Credit Documents

Subsequently, Impel, Oaktree, the Revenue Purchasers, and the Senior Secured Lenders entered into two amendments to both the Senior Secured Credit Agreement and the RIFA, the second of which resulted in the termination of the RIFA.  After the RIFA was terminated, Impel, Oaktree, and the Senior Secured Lenders entered into two additional amendments to the Senior Secured Credit Agreement and four letter agreements granting Impel certain relief and modifying the terms of the Senior Secured Credit Agreement.[6]

Pursuant to the *First Amendment to Credit Agreement and Guaranty and Revenue Interest Financing Agreement*, dated as of August 21, 2023 (the "First Senior Secured Credit Agreement Amendment"), the Senior Secured Lenders provided an incremental $12 million of aggregate principal amount of Senior Secured Loans, of which (i) $3 million consisted of new money Senior Secured Term Loans and (ii) $9 million was made pursuant to an exchange of $9 million of obligations owed to the Revenue Purchasers under the RIFA for $9 million of Senior Secured Loans.  Under the First Senior Secured Credit Agreement Amendment, the parties agreed that the Default Rate (as defined in the Senior Secured Credit Agreement) would no longer apply and the non-default interest rate under the Senior Secured Credit Agreement would be increased to SOFR + 10.75%.

On September 5, 2023, Impel entered into the *Second Amendment to Credit Agreement and Guaranty and Revenue Interest Financing Agreement* with Oaktree, the Revenue Purchasers, and the Senior Secured Lenders (the "Second Senior Secured Credit Agreement Amendment").  In connection with the Second Senior Secured Credit Agreement Amendment:

- The Senior Secured Lenders agreed to provide Impel with up to $20 million of Tranche B Term Loans (as defined in the Senior Secured Credit Agreement) under the Senior Secured Credit Agreement;

- Impel drew down $4.5 million of Tranche B Term Loans, which amount was placed into a blocked account, to be released to Impel upon Impel's board of directors (the "Board") notifying Oaktree that Impel, in good faith, expected to commence proceedings under

---

[6] Impel, Oaktree, and the Senior Secured Lenders entered into a letter agreement dated as of October 19, 2023, a letter agreement dated as of November 7, 2023, a letter agreement dated as of December 14, 2023 and a letter agreement dated as of December 16, 2023.

chapter 11 of the Bankruptcy Code and required such amounts to finance preparations for such chapter 11 filing (the "<u>Blocked Account</u>");

- Certain Senior Secured Lenders exchanged $3.0 million of previously-existing Senior Secured Loans on a dollar-for-dollar basis for Tranche B Term Loans;

- The Senior Secured Lenders exchanged (i) all of the then-accrued $51.4 million of Senior Secured Loans (inclusive of interest) attributable to the initial funding under the Senior Secured Credit Agreement and (ii) $9.1 million of Senior Secured Loans (inclusive of interest) made in connection with the First Senior Secured Credit Agreement Amendment, in each case on a dollar-for-dollar basis for Tranche A Term Loans (as defined in the Senior Secured Credit Agreement);

- The Revenue Purchasers exchanged $36.0 million of obligations under the RIFA on a dollar-for-dollar basis for Tranche A Term Loans, and the RIFA, including all remaining obligations of Impel as well as any rights of the Revenue Purchasers to future revenue interest payments, was terminated;

- Oaktree and the Senior Secured Lenders agreed to forbear from remedies with respect to Impel's failure to comply with the Minimum Liquidity Covenant until December 31, 2023, unless earlier terminated under the terms of the Senior Secured Credit Agreement (the "<u>Forbearance Period</u>") in exchange for Impel's payment to the Senior Secured Lenders of an in-kind $5 million forbearance fee in the form of Tranche A Term Loans;

- The Senior Secured Credit Agreement was amended to permit all interest on the Senior Secured Loans to be paid in kind through the Forbearance Period; and

- The as-amended Senior Secured Credit Agreement provided for up to an additional $12.5 million of Tranche B Loans to be made available to Impel over the remainder of 2023, subject to the satisfaction of certain strategic milestones and covenants (the "<u>Prepetition Milestones</u>" and the Senior Secured Loans to be made in connection therewith the "<u>Milestone Payments</u>").

On October 2, 2023, Impel entered into that certain *Third Amendment to Credit Agreement and Guaranty* with Oaktree and the Senior Secured Lenders (the "<u>Third Senior Secured Credit Agreement Amendment</u>").  Pursuant to the Third Senior Secured Credit Agreement Amendment, Oaktree and the Senior Secured Lenders waived certain events of default under the Senior Secured Credit Agreement and modified the terms of the Prepetition Milestones, including to permit $5 million of Milestone Payments to be made concurrently therewith, notwithstanding such events of default, and to modify the terms of certain later Prepetition Milestones.

On October 19, 2023, Impel entered into that certain letter agreement with Oaktree and the Senior Secured Lenders (the "<u>October 19 Letter Agreement</u>").  Pursuant to the October 19 Letter Agreement, Impel, Oaktree and the Senior Secured Lenders agreed to modify terms of the Senior Secured Credit Agreement relating to a requirement that Impel cause an independent director to be appointed to the Board.

17

On November 3, 2023, Impel entered into that certain *Fourth Amendment to Credit Agreement and Guaranty* with Oaktree and the Senior Secured Lenders (the "Fourth Senior Secured Credit Agreement Amendment").  Pursuant to the Fourth Senior Secured Credit Agreement Amendment, the timing of certain Prepetition Milestones was modified.

On November 7, 2023, Impel entered into that certain letter agreement with Oaktree and the Senior Secured Lenders (the "November 7 Letter Agreement").  Pursuant to the November 7 Letter Agreement, Impel, Oaktree and the Senior Secured Lenders agreed to modify certain terms of the Senior Secured Credit Agreement restricting Impel from making payments to any directors, officers, equityholders or other persons who are "insiders" pursuant to Section 101(31) of the Bankruptcy Code or any affiliates thereof.

On December 14, 2023, Impel entered into that certain letter agreement with Oaktree and the Senior Secured Lenders (the "December 14 Letter Agreement").  Pursuant to the December 14 Letter Agreement, Impel, Oaktree and the Senior Secured Lenders agreed to further modify certain terms of the Senior Secured Credit Agreement restricting Impel from making payments to any directors, officers, equityholders or other persons who are "insiders" pursuant to Section 101(31) of the Bankruptcy Code or any affiliates thereof.

On December 16, 2023, Impel entered into that certain letter agreement with Oaktree and the Senior Secured Lenders (the "December 16 Letter Agreement and, together with the First Senior Secured Credit Agreement Amendment, Second Senior Secured Credit Agreement Amendment, Third Senior Secured Credit Agreement Amendment, October 19 Letter Agreement, Fourth Senior Secured Credit Agreement Amendment, November 7 Letter Agreement, and December 14 Letter Agreement, the "Senior Secured Credit Agreement Amendments").  Pursuant to the December 16 Letter Agreement, Impel, Oaktree and the Senior Secured Lenders agreed that the Senior Secured Lenders would fund an additional $2.5 million in Tranche B Term Loans notwithstanding (i) the occurrence and continuation of certain Events of Default (as defined in the Senior Secured Credit Agreement) and (ii) the non-satisfaction of certain conditions precedent to the availability of such Tranche B Term Loans.

4.    Secured Debt as of the Petition Date

As of the Petition Date, the amount outstanding under the Senior Secured Credit Agreement was approximately $127 million, as follows:

|  | **Principal** | **Interest** | **Total** |
|---|---|---|---|
| **Tranche A** | $101,505,257.60 | $4,892,109.99 | $106,397,367.59 |
| **Tranche B** | $20,020,022.95 | $609,073.11 | $20,629,096.06 |
| **Total** | $121,525,280.55 | $5,501,183.10 | $127,026,463.65 |

5.      Trade and Related Debt

As of the Petition Date, the Debtors estimate that they had approximately $2.1 million in obligations to trade and other general unsecured creditors.  These amounts consist primarily of accounts payable to various trade creditors and other third-party service providers as of the Petition Date.

6.      Net Operating Losses and Research and Development Credits

Impel has incurred significant net operating losses ("NOLs") and research and development credits ("R&D Credits") since its inception.  As of December 31, 2022, Impel had generated federal NOLs of $271.3 million and $153.4 million of state NOLs.  Impel also had $8.4 million of R&D Credits. Further, Impel estimates that they may generate additional NOLs and R&D Credits in the 2023 tax year.  The NOLs and R&D Credits are potentially of significant value as they may be used, under certain circumstances, to offset future taxable income or federal tax liabilities in future years.

7.      Equity

Impel's equity is publicly traded over the counter, with Impel authorized to issue 10 million shares of preferred stock and 300 million shares of common stock.  As of December 14, 2023, Impel had no preferred shares issued or outstanding and approximately 23.9 million shares of common stock issued and outstanding.

**D.      Additional Compensation Plans**

The Debtors maintain certain employee programs to motivate, reward, and retain certain of their non-insider Employees and consultants (the "Additional Compensation Plans"). The Debtors offer every full-time employee, both exempt and non-exempt, the benefit of equity ownership in the company through stock option grants (the "Stock-Based Compensation").  Stock options granted generally become exercisable over a four-year period from the grant date, and options generally expire 10 years after the grant date.  As of the Petition Date, all stock options have strike prices significantly below the current publicly traded share price deeming them almost worthless.

As of September 30, 2023, the Company's equity incentive plans authorized a total of 7,776,500 shares, of which 3,285,815 shares were available for future grant, and 4,490,685 shares are outstanding.  As of the Petition Date, none of the shares in the equity incentive plan

19

could be exercised for a profit. The Debtors will not issue any Stock-Based Compensation during these Chapter 11 Cases.

Further, the Debtors' sales representatives are eligible for sales incentive bonuses, or commissions, that are calculated based on sales numbers of each employee and paid quarterly (the "Commissions"). The sales representatives are paid Commissions based on their sales each month paid in arrears. The Debtors estimate that, as of the Petition Date, they pay approximately $170,000 monthly on account of the Commissions. As of the Petition Date, the Debtors estimate they owe approximately $225,000 on account of Commissions, which includes amounts due for November and an estimate for the accrued amount for December through the Petition Date. The Debtors have received authorization from the Bankruptcy Court [Docket No. 50] to pay the Commissions in the ordinary course and consistent with past practice during the administration of these chapter 11 cases.

### E.    Litigation

The Debtors are not currently party to or otherwise involved any litigation.

### F.    Events Leading to the Chapter 11 Filings

Impel launched Trudhesa in October of 2021 with a lean sales team, and by the end of the fourth quarter of 2021, had secured the key managed care contracts needed to support the launch of Trudhesa and bring it to market. Initial uptake of Trudhesa by prescribing physicians and patients was promising, and Impel met its sales guidance for the fourth quarter of 2021.

Following the initial aggressive growth of Trudhesa, Impel saw the effort needed to partner with new potential prescribers of Trudhesa begin to increase and sales growth slowed. However, following an increase in the size of Impel's sales team in the third quarter of 2022, sales growth picked back up in the fourth quarter of 2022.

#### 1.    Declining Liquidity and a Failed Sale

Since its inception, Impel has incurred losses from operations and generated negative cash flows from operating activities. In 2022, Impel achieved 55% of its corporate sales goals and the trend continued into the first half of 2023. Impel has therefore been dependent on its ability to raise additional capital to continue business operations.

From Impel's inception, Impel consummated a number of successful capital raise efforts, including:

- Initial Public Offering: In April 2021, Impel issued and sold approximately 5.33 million shares of common stock through its initial public offering, which brought in net proceeds of approximately $72.0 million.

- Follow-On Public Offering:  In September 2021, Impel issued and sold approximately 3.45 million shares of common stock through a follow-on public offering, which brought in net proceeds of approximately $48.3 million.

From its inception, Impel has raised a total of $405.3 million in proceeds from issuance of its common stock, proceeds pursuant to the RIFA, sale and issuance of redeemable convertible preferred stock, convertible notes, debt, and warrants as of September 30, 2023.

Beginning in August 2022, Impel began talks with a potential strategic purchaser of Impel's assets. Those discussions continued until approximately January 2023 and the potential acquirer submitted a letter of intent to acquire Impel. However, as discussions continued, the potential acquirer terminated discussions and the transaction did not close.

2.     Unsuccessful Investment Outreach

At the time the contemplated sale collapsed, Impel had less than twelve months of cash on hand. Facing diminishing liquidity, the Board determined to pursue an additional round of financing to meet Impel's liquidity needs and worked with Cowen and Company, LLC ("TD Cowen"), its investment banker from previous financings, to assist with a potential public offering in September 2022. Impel and TD Cowen continued to reach out to potential investors to determine the feasibility of an equity transaction into December 2022.

In first quarter of 2023, after extensive discussions and consideration of several presentations from Impel's advisors and TD Cowen, the Board determined that it was in the best interest of Impel to continue investing in sales and marketing efforts to support growth of Trudhesa and demonstrate the attractiveness of the product to potential financing sources and strategic partners.

In June 2023, the Board determined to again pursue an equity financing transaction and engaged SVB Securities LLC ("Leerink"). Leerink developed a targeted investor list, prepared marketing materials, and conducted extensive outreach to targeted investors. Leerink progressed the financing search with a number of interested parties, and Leerink reported that it had received contingent orders from a number of interested parties, but all of them were dependent on finding a "lead" investor. After multiple rounds of diligence with potential lead investors, ultimately no investor agreed to the role and, the Debtors were ultimately unable to secure incremental financing.

3.     February 2023 Reduction in Force

In mid-2022, Impel decided to investigate potential cost cutting measures to preserve its liquidity. On February 2, 2023, Impel announced its decision to implement an operational streamlining plan that would result in a reduction in force of approximately 16% of Impel's workforce at the time (the "RIF"). The goal of the RIF was to reprioritize Impel's spending to focus on promoting Trudhesa, and as a result, the Board made the decision to halt research and development efforts on INP105. The Board approved the RIF following extensive discussions on February 14, 2023.

As a result of the RIF, Impel incurred approximately $1 million in severance obligations and payroll taxes and reduced annual employee salary costs by approximately $3.6 million.

4.    <u>Board Considers Strategic Alternatives and Hires Advisors</u>

In July 2023, Impel was not in compliance with the Minimum Liquidity Covenant of its Senior Credit Documents.

In July 2023, the Board met to consider next steps to address the ongoing liquidity crisis.  In August 2023, Impel's cash flow forecast indicated that its liquidity runway would run out by the first week of September 2023.  The Board instructed management to engage advisors to help review and evaluate various strategic alternatives available to Impel so that Impel could maintain its optionality while preserving assets and maximizing value for creditors and other parties in interest.

On August 7, 2023, the Board engaged Teneo Capital LLC ("Teneo"), to serve as financial advisor to Impel.  On August 16, 2023, Impel engaged Sidley Austin LLP ("Sidley"), as legal counsel, to assist it in evaluation of potential restructuring transactions, including through a section 363 sale, strategic alternative process, or the amendment of its existing debt.  On September 15, 2023, the Board approved the retention of Moelis & Company LLC ("Moelis"), as investment banker, to assist in marketing the Debtors' assets and soliciting potential purchasers.

Given the Debtors' liquidity position, the Board tasked Impel's management team and advisors with the evaluation of all strategic alternatives, including potential bridge financing, alternative capital raises, and a sale of the Debtors' assets so that the Debtors could maintain optionality while preserving assets and maximizing value for creditors and other parties in interests.

5.    <u>Prepetition Sale Process</u>

Beginning in September 2023, Impel—through Moelis—began canvassing the market for capital raise opportunities and developed a marketing strategy.  Additionally, the Debtors issued a press release on October 5, 2023 announcing the initiation of an exploration of strategic alternatives, including a potential sale of the Debtors' assets (in part or in whole), a merger, or other strategic transaction.  Shortly after Moelis was engaged, they contacted or received inbound interest from approximately 93 strategic and financial parties regarding a potential transaction, including certain of Impel's existing lenders.  Following this display of interest, Moelis held calls or exchanged emails with 84 of the interested parties and ultimately granted data room access to approximately 22 of those interested.  Moelis then conducted functional area presentations with 15 parties in connection with this process.

Ultimately, Impel received four non-binding offers (the "NBOs").  All of the NBOs required the transaction to be completed pursuant to sections 105, 363 and 365 of the Bankruptcy Code.

6.    <u>Teneo Implements Cost Cutting Measures to Preserve Assets</u>

Simultaneously with the prepetition marketing and sale process, Impel engaged Teneo to evaluate its financial situation and recommend cost cutting measures that would preserve the company's liquidity while the strategic alternative process was underway.  From August 2023 through the Petition Date, Teneo and management repeatedly met to establish an understanding

of the major categories of expenses, Impel's upcoming payables, and the consequences of deferring payment to some or all of Impel's vendors.  During this time, Impel continued to engage with its vendors to maximize the liquidity available.

Upon its retention in August 2023, Teneo developed a cash forecasting tool that was updated on a weekly basis and reported to the company as well as Oaktree every week.  Teneo, along with management, also began presenting to key stakeholders with regular updates on Impel's liquidity management recommendations.  Impel then implemented a number of measures to preserve liquidity and minimize unnecessary disbursements while maintaining flexibility as it explored various strategic alternatives.  Teneo also regularly attended Impel Board meetings to report on liquidity in the context of various strategic alternatives discussions.

7.    Engagement with Key Stakeholders

From August 2023 to the Petition Date, Impel, including its management team and advisors evaluated various strategic options, including both in-court and out-of-court solutions.  In sum, Impel evaluated a number of potential options, including: (a) a chapter 11 reorganization transaction proposal and (b) a section 363 sale process with the Stalking Horse Purchaser (as defined below).  Ultimately, the Debtors were able to successfully negotiate a sale process with the Stalking Horse Purchaser and their key stakeholders, including the Senior Secured Lenders, who support a sale of the Debtors' assets and a prompt confirmation of the Plan, as detailed below.

a.    Senior Credit Agreement Amendments

In July 2023, Impel proactively began negotiating with Oaktree and the Senior Secured Lenders to obtain incremental financing.  As a result of these negotiations, Impel was able to secure incremental financing to extend its liquidity runway to support the sales process via the Secured Senior Credit Agreement Amendments.  Collectively, the Senior Secured Credit Agreement Amendments provided Impel with up to an incremental $20 million of runway with which to evaluate its strategic alternatives.

In addition to these incremental financing discussions, Impel engaged with the Senior Secured Lenders regarding potential long term solutions, but by early December 2023, Impel had still not received an acceptable transaction proposal from the Senior Secured Lenders that would provide a long term solution.

8.    Further Reductions In Force

On August 25, 2023, Impel announced the second reduction in force, resulting in approximately $130,000 in severance, PTO and payroll taxes and reduced annual employee salary costs by approximately $2.6 million.

On December 13, 2023, Impel announced the third reduction in force, resulting in approximately $180,000 in severance costs and reduced annual employee salary costs by approximately $7.2 million.[7]

### 9.    Nasdaq Delisting

On April 17, 2023, Impel received two notices of non-compliance from Nasdaq indicating that it was not in compliance because, for the preceding 30 days, the Market Value of Publicly-held Securities was below the minimum $15 million required for continued listing on Nasdaq and Impel failed to maintain a minimum Market Value of Listed Securities of $50 million. The letters indicated that Impel had until October 9, 2023, to regain compliance.

On October 10, 2023, Impel received a letter indicating that it had not regained compliance, and its common stock would be suspended from Nasdaq on October 19, 2023, unless Impel requested an appeal.  Impel submitted an appeal to the Nasdaq hearings panel on October 16, 2023, which stayed such delisting until the hearing could occur.  This hearing was scheduled for December 14, 2023.  However, due to this impending chapter 11 filing, Impel withdrew its appeal on December 14, 2023.  Therefore Impel's common stock was suspended from trading on Nasdaq as of December 18, 2023 and has been formally delisted as of January 8, 2024.

### 10.    Stalking Horse and Chapter 11 Filing

Since July 2023, the Board has received consistent updates from Impel's management and professionals on the status of Impel's evaluation of strategic alternatives.  On December 18, 2023, after a careful examination of the strategic alternatives available to the Debtors and after discussions with Impel's advisors, the Board concluded that selecting JN Bidco LLC ("JN Bidco") as the stalking horse bidder for the Debtors' assets (the "Stalking Horse Purchaser") and executing an in-court sale process pursuant to Section 363 of the Bankruptcy Code would be the best path to maximize the value of the Debtors' assets.

Prior to filing these Chapter 11 Cases, the Debtors negotiated and entered into an agreement with the Stalking Horse Purchaser, whereby the Stalking Horse Purchaser has agreed to serve as the Stalking Horse Purchaser pursuant to the terms of that certain asset purchase agreement, dated December 18, 2023 (the "Stalking Horse APA") for the sale of all of the Debtors' assets.  The Stalking Horse APA provided for the acquisition of the Debtors' assets as a going concern and marketing process in these Chapter 11 Cases, with the Stalking Horse APA subject to higher and better offers.

The Stalking Horse APA was the culmination of the prepetition marketing process and provided the necessary momentum to launch a post-petition marketing and auction process to maximize the value of the Debtors' assets.

---

[7] Contemporaneously therewith, Impel implemented a retention program with respect to 10 employees.  The majority of eligible employees, including insiders, received payments equal to approximately 5% of their respective salaries. The cost under such retention program was approximately $780,000.

To facilitate a competitive post-petition auction process, the Debtors filed the Bidding Procedures Motion (as defined below), with the bid from the Stalking Horse Purchaser serving as an initial opening bid (the "Stalking Horse Bid"). Pursuant to the Bidding Procedures (as defined below), interested parties—including those contacted by the Debtors and their advisors prepetition—had the opportunity to submit bids for the purchase of the Debtors' assets along a sale timeline established by the Bidding Procedures (as defined below).

Pursuant to the Bidding Procedures (as defined below), interested parties had approximately 35 days from the Petition Date to submit bids in accordance with the Bidding Procedures (as defined below). The Court approved this timeline as sufficient to run a comprehensive sale process—particularly in light of the extensive marketing process conducted by the Debtors prepetition. Further, the Court approved the entirety of the Sale Transaction on February 2, 2024, via the Sale Order.

**The Debtors have determined that an expeditious sale process and resolution of these Chapter 11 Cases is necessary to preserve their limited liquidity and ensure the greatest possible recovery for its stakeholders.**

## ARTICLE IV.
## EVENTS DURING THE CHAPTER 11 CASES

### A.     Commencement of the Chapter 11 Cases and the Debtors' Professionals

On December 19, 2023 (the "Petition Date"), the Debtors filed petitions for relief under chapter 11 of the Bankruptcy Code.

The Debtors have retained Omni as their Notice and Claims Agent, effective as of the Petition Date. The Debtors have additionally retained Sidley, as Debtors' counsel, Fenwick & West LLP, as special corporate counsel, Teneo, as financial advisor, and Moelis, as investment banker.

### B.     First Day Relief

On or soon after the Petition Date, the Debtors filed a number of motions and other pleadings (collectively the "First Day Motions") to ensure an orderly transition into chapter 11, including the following:

- motion to jointly administer these Chapter 11 Cases for procedural purposes only [Docket No. 3];

- motion to authorize the Debtors' use of cash collateral [Docket No. 14];

- motion relating to the continued use of the Debtor's existing cash management system and certain related relief [Docket No. 6];

25

- motion for authority to pay certain prepetition employee-related obligations and certain related relief [Docket No. 13];

- motion for authority to pay certain prepetition taxes and fees and certain related relief [Docket No. 5];

- motion to establish procedures for determining adequate assurance for the provision of utility services and to prohibit utility service providers from altering, refusing, or discontinuing service and certain related relief [Docket No. 7];

- motion for authority to maintain certain insurance policies and programs, to honor insurance obligations and for certain related relief [Docket No. 8];

- motion for entry of an order approving notification and hearing procedures for certain transfers of common stock [Docket No. 9];

- motion to authorize the Debtor to redact certain personally identifiable information and waive the requirements to file a list of all equity security holders [Docket No. 12];

- motion to pay certain prepetition claims of 503(b)(9) claimants and lien and foreign claimants [Docket No. 11];

- application to retain Omni as the Debtors' Notice and Claims Agent [Docket No. 16]; and

- motion to continue prepetition customer programs [Docket No. 10].

The Debtors have received orders granting the relief requested in all of the First Day Motions on a final basis from the Bankruptcy Court.

**C.     Second Day Relief**

On or around  December 27, 2023, the Debtors filed a number of motions and other pleadings (collectively the "Second Day Motions") to ensure the preservation of value of the Debtors' assets through the Chapter 11 Cases:

- motion to approve bid procedures and authorizing the sale of the Debtors' assets free and clear [Docket No. 18];

- motion to set bar dates for filing proofs of claim [Docket No. 95];

- motion to employ and retain Sidley as Debtors' counsel [Docket No. 94];

- motion to employ and retain Fenwick as special corporate counsel [Docket No. 93];

- motion to retain Teneo [Docket No. 92];

- motion to employ and retain Moelis [Docket No. 91];

- motion to establish interim compensation procedures [Docket No. 90]; and

- motion to retain and compensate ordinary course professionals [Docket No. 89].

The Debtors have received orders granting the relief requested in the Second Day Motions on a final basis from the Bankruptcy Court.

### D.    The Proposed Bidding Procedures

On the Petition Date, the Debtors filed a combined motion seeking approval of the bidding procedures (the "Bidding Procedures") and the Stalking Horse APA, the *Debtors' Motion for Entry of an Order (I)(a) Approving the Bid Procedures; (b) Authorizing the Debtors to Select JN Bidco LLC as the Stalking Horse Purchaser Substantially Along the Terms Defined in the Stalking Horse APA and Approving Bid Protections; (c) Establishing Bid Deadlines, an Auction, and a Sale Hearing; (d) Approving the Form and Manner of Sale Notice; (e) Approving Assignment and Assumption Procedures; (f) Approving the Form and Manner of Potential Assumption and Assignment Notice; (II)(a) Authorizing the Sale of the Assets Free and Clear; and (b) Approving the Assumption and Assignment of Designated Contracts; and (III) Granting Related Relief Filed by Debtor Impel Pharmaceuticals Inc.* [Docket No. 18] (the "Bidding Procedures Motion"). The Debtors sought prompt approval of the Bidding Procedures Motion on an expedited basis, consistent with the milestones embodied in the Cash Collateral Order (as defined below). The Bidding Procedures Motion, and the Bidding Procedures therein, were approved by the Bankruptcy Court on a final basis on January 10, 2024 in the *Order (I)(a) Approving the Bid Procedures; (b) Authorizing the Debtors to Select JN Bidco LLC as the Stalking Horse Purchaser Substantially Along the Terms Defined in the Stalking Horse APA and Approving Bid Protections; (c) Establishing Bid Deadlines, an Auction, and a Sale Hearing; (d) Approving the Form and Manner of Sale Notice; (e) Approving Assignment and Assumption Procedures; (f) Approving the Form and Manner of Potential Assumption and Assignment Notice; (II)(a) Authorizing the Sale of the Assets Free and Clear; and (b) Approving the Assumption and Assignment of Designated Contracts; and (III) Granting Related Relief* [Docket No. 137].

As more fully described in the Bidding Procedures Motion, the Bidding Procedures contain provisions relating to, among other things, (a) participation requirements, (b) access to due diligence, (c) requirements for Qualified Bids (as defined in the Bidding Procedures Motion), (d) designation of Qualified Bidders (as defined in the Bidding Procedures Motion), (e) credit bids, (f) auction procedures (as applicable); and (g) the selection of any Winning Bid, Back-Up Bid, or Stalking Horse Bid (each as defined in the Bidding Procedures Motion).

In addition, as noted in the Bidding Procedures, the sale process is governed by the following proposed dates and deadlines:

| Sale Process Milestones | |
| --- | --- |
| **Date and Time** | **Event or Deadline** |
| January 5, 2024 | Initial Cure Notice Deadline |
| January 10, 2024 at 9:30 a.m. CT | Bid Procedures Hearing |
| January 11, 2024 | Service and Publication of Sale Notice |
| January 23, 2024 at 4:00 p.m. CT | Bid Deadline |
| As soon as reasonably practicable following the Bid Deadline | Determination of Qualified Bids |
| January 25, 2024, at 4:00 p.m. CT | Sale Objection Deadline |
| January 26, 2024, at 4:00 p.m. CT | Cure Objection Deadline |
| January 29, 2024 at 9:00 a.m. CT | Auction (if necessary) |
| As soon as reasonably practicable following the Auction | Deadline to File Notice of Winning Bid |
| January 30, 2024 at 4:00 p.m. CT | Post-Auction Objection Deadline |
| February 1, 2024 at 9:30 a.m. CT | Sale Hearing |

## E.     Debtors' Use of Cash Collateral

On the Petition Date, the Debtors filed a motion seeking approval of their use of cash collateral [Docket No. 14] (the "Cash Collateral" and such motion the "Cash Collateral Motion"). The Bankruptcy Court granted the Cash Collateral Motion and the requested relief therein in an interim order [Docket No. 73] at the First Day Hearing. The Bankruptcy Court granted the Cash Collateral Motion on a final basis in a final order [Docket No. 149] (the "Cash Collateral Order") at the Second Day Hearing.

As more fully described in the Cash Collateral Order, the Debtors' use of Cash Collateral is governed by  provisions (a) setting forth an Approved Budget (as defined in the Cash Collateral Motion; (b) setting forth events of default and procedures for termination of the use of Cash Collateral; (c) granting adequate protection liens, priority and superpriority claims, and professional fees and expenses to the Holders of Prepetition Term Loan Claims; and (d) related protections to facilitate the Debtors' access to cash collateral.

In addition, as noted in the Cash Collateral Order and authorized in the Cash Collateral Order, the use of Cash Collateral is governed by the following milestones:

| Cash Collateral Order Milestones | |
| --- | --- |
| **Date and Time** (all in Central Time) | **Event or Deadline** |
| December 20, 2023 | Deadline to File First Day Motions |
| December 22, 2023 | Deadline for the Court to enter an Interim Order Approving the Use of Cash Collateral |
| January 11, 2024 | Deadline for Court to enter an Order Approving Bid Procedures |

28

| January 23, 2024 | Deadline for Court to enter a Final Order Approving the Use of Cash Collateral |
| February 5, 2024 | Deadline for Court to enter an Order Approving the Sale |
| February 14, 2024 | Deadline to Close Sale |
| February 27, 2024 | Deadline to obtain Approval of a Disclosure Statement in Accordance with a Chapter 11 Plan |
| April 2, 2024 | Deadline for Court to enter an Order Approving Disclosure Statement and Plan |
| April 17, 2024 | Effective Date Deadline |

### F.    Bar Dates

The Debtors have filed a motion to establish bar dates, which was approved on a final basis in an order [Docket No. 142] (the "Bar Date Order") by the Bankruptcy Court. The General Bar Date (as defined in the Bar Date Order) is **February 18, 2024 at 4:00 p.m** (prevailing Central Time).  The Governmental Bar Date (as defined in the Bar Date Order) is **June 16, 2024 at 4:00 p.m.** (prevailing Central Time).

### G.    Proposed Confirmation Schedule

Pursuant to the Debtors' motion seeking conditional approval of this Disclosure Statement, solicitation procedures, and the scheduling of the Combined Hearing (the "DS Motion"), filed contemporaneously herewith, and the milestones set forth in the Cash Collateral Order, the proposed schedule and deadlines for Confirmation include:

| Event | Date |
|---|---|
| Voting Record Date | February [23], 2024 |
| Solicitation Commencement Date | No later than three (3) Business Days after entry of this Order. |
| Objection Deadline | March [27], 2024 at 4:00 p.m., CST |
| Voting Deadline | March [28], 2024 at 4:00 p.m., CST |
| Release Opt-Out Deadline | March [28], 2024 at 4:00 p.m., CST |
| Combined Hearing | April [1], 2024 at [9:30 a.m.] CST |

## ARTICLE V.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.    Administrative Claims, Priority Tax Claims, and Statutory Fees**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Compensation Claims) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

1.    <u>Administrative Claims</u>

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim (other than a Professional Compensation Claim) shall receive, in full and final satisfaction of such Claim, (1) Cash in an amount equal to such Allowed Administrative Claim in accordance with the following: (i) if Allowed on or prior to the Effective Date, then on the Effective Date or as soon as reasonably practicable thereafter, (ii) if not Allowed as of the Effective Date, then no later than forty-five (45) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; or (2) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

Except for Professional Compensation Claims, and notwithstanding any prior Filing or Proof of Claim, Proofs of Claim seeking the allowance and payment of Administrative Claims must be Filed and served on the Debtors or the Plan Administrator (as applicable) and their counsel by no later than the Administrative Claims Bar Date pursuant to the procedures set forth in the Confirmation Order and the notice of the occurrence of the Effective Date.  The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claims.

**Except as otherwise provided in Articles II.B, II.C, or II.D herein, holders of Administrative Claims that do not File and serve a Proof of Claim or application for payment of administrative expenses requesting the allowance of an Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Claims against the Debtors, the Plan Administrator, the Estates, or the Debtors' assets and properties, and any Administrative Claims shall be deemed disallowed as of the Effective Date unless otherwise ordered by the Bankruptcy Court.**

2.    <u>Professional Compensation Claims</u>

a.    Final Fee Applications and Payment of Professional Compensation Claims

All Professionals (other than OCPs) seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (1) file, on or before the date that is forty five (45) days after the Confirmation Date, their respective applications for final allowances of

compensation for services rendered and reimbursement of expenses incurred; and (2) be paid in full, in Cash, from the Professional Fee Reserve Account in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Compensation Claim. Objections to Professional Compensation Claims must be Filed and served no later than twenty-one (21) days after the Filing of the Professional Compensation Claim.

        **b.**        Administrative Claims of OCPs

All requests for payment of Professional Compensation Claims of OCPs shall be made pursuant to the OCP Order.  To the extent any Professional Compensation Claims of the OCPs have not been Allowed pursuant to the OCP Order on or before the Effective Date, the amount of Professional Compensation Claims owing to the OCPs shall be paid in Cash to such OCPs by the Debtor or the Plan Administrator (as applicable) from the Professional Fee Reserve Account as soon as reasonably practicable after such Professional Compensation Claims are Allowed pursuant to the OCP Order.

        **c.**        Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or Plan Administrator (as applicable) shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Plan Administrator (as applicable).  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Plan Administrator (as applicable) may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall pay, within ten business days after submission of a detailed invoice to the Debtors such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals of the Debtors. If the Debtors, in consultation with the Prepetition Term Loan Administrative Agent, dispute the reasonableness of any such invoice, the Debtors or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

        **d.**        Professional Fee Reserve Account

On the Effective Date, the Debtors shall fund an amount in Cash into the Professional Fee Reserve Account equal to (a) the aggregate accrued and unpaid Professional Compensation Claims as of the Effective Date (which shall be estimated by each applicable Professional in its reasonable discretion based on the amount of then-accrued Professional Compensation Claims plus a reasonable estimate of fees and expenses that will accrue up until the Effective Date), less (b) any amount then held in the Professional Fee Reserve Account.

Funds held in the Professional Fee Reserve Account shall be held for the benefit of the Professionals and shall not be property of the Estates. The Professionals shall reasonably and in good faith estimate their Professional Compensation Claims before and as of the Effective Date, taking into account any prior payments, and shall deliver such estimates to the Debtors no later than five (5) Business Days prior to the anticipated Effective Date.

Professional Compensation Claims shall be paid in full without interest or earning therefrom, in Cash, from the Professional Fee Reserve Account, in such amounts as are Allowed by the Bankruptcy Court as soon as reasonably practicable after such Professional Compensation Claims are allowed. The obligations of the Estates with respect to Professional Compensation Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Reserve Account. To the extent that funds held in the Professional Fee Reserve Account are insufficient to satisfy the amount of accrued Professional Compensation Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency. No Liens, claims, or interests shall encumber the Professional Fee Reserve Account in any way, other than customary liens in favor of the depository bank at which the Professional Fee Reserve Account is maintained.

All requests for payment of Professional Compensation Claims for services rendered and reimbursement of expenses incurred through the Effective Date shall be filed no later than forty-five (45) days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Compensation Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. To the extent any Cash is remaining in the Professional Fee Reserve Account following irrevocable payment in full of all Allowed Professional Compensation Claims (including Allowed Professional Compensation Claims arising after the Confirmation Date), such Cash shall be transferred to the Wind-Down Debtors for payment in accordance with the terms of the Plan.

3.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code, which treatment shall be reasonably acceptable to the Prepetition Term Loan Administrative Agent.

4.      U.S. Trustee Statutory Fees

All U.S. Trustee Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Plan Administrator shall pay any and all U.S. Trustee Statutory Fees when due and payable, and shall file with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each of the Debtors and the Plan Administrator, as applicable, shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

B.      **Classification of Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Class to the extent that any portion of the Claim or Interest qualifies within the description of such other Class.  A Claim also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been otherwise paid, released, or satisfied at any time.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept)/Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

C.      **Treatment of Claims and Interests**

1.      <u>Class 1 – Other Secured Claims</u>

i.      *Classification*:  Class 1 consists of all Other Secured Claims against the Debtors.

ii.      *Treatment*:  Except to the extent the Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, at the Debtors' option and with the consent (in each case not to be unreasonably withheld or delayed) of the Prepetition Term Loan Administrative Agent: (a) payment in full in cash; (b) the collateral

securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

iii.     *Voting*:  Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.     Class 2 – Other Priority Claims

i.     *Classification*:  Class 2 consists of all Other Priority Claims against the Debtors.

ii.     *Treatment*:  Except to the extent the Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, which treatment shall be reasonably acceptable to the Prepetition Term Loan Administrative Agent.

iii.     *Voting*:  Class 2 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.     Class 3 – Prepetition Term Loan Claims

i.     *Classification*:  Class 3 consists of the Prepetition Term Loan Claims against the Debtors.

ii.     *Treatment*:  On the Effective Date, the Prepetition Term Loan Claims shall be Allowed and deemed to be Allowed Claims in the full amount due and payable under the Prepetition Term Loan Documents, including all principal, any accrued and unpaid interest at the applicable rate through the Effective Date, and all accrued and unpaid fees, expenses, and non-contingent indemnity payable under the Prepetition Term Loan Documents (including the fees and expenses of the Prepetition Term Loan Advisors).  Except to the extent the holder of an Allowed Prepetition Term Loan Claim agrees to less favorable treatment, each Holder of an Allowed Prepetition Term Loan Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, on the Effective Date or as soon as reasonably practicable thereafter:

a.     its *pro rata* share of all Distributable Cash of the Debtors or the Wind-Down Debtors (as applicable), less (i) an amount of Cash required to pay Administrative Claims and Priority Tax Claims Allowed as of the Effective Date, and the funding of the Wind-Down Budget, (ii) Cash required to fund the Professional Fee Reserve Account in accordance with the Plan; (iii) the General Unsecured Creditor Distribution, and (vi) an amount of Cash

34

required to pay Claims in Classes 1 and 2 as provided in the Plan;[8] and

     b.  its *pro rata* share of the Contingent Sale Proceeds.

     iii.    *Voting*: Class 3 is Impaired, and Holders of Allowed Prepetition Term Loan Claims are entitled to vote to accept or reject the Plan.

    4.    <u>Class 4 – General Unsecured Claims</u>

     i.    *Classification*: Class 4 consists of the General Unsecured Claims against the Debtors.

     ii.    *Treatment*: Except to the extent the holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on the Effective Date, each holder of an Allowed General Unsecured Claim shall receive its *pro rata* share of the General Unsecured Creditor Distribution. The Prepetition Term Loan Secured Parties will not participate in the General Unsecured Creditor Distribution on account of any deficiency claim.

     iii.    *Voting*: Class 4 is Impaired, and Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

    5.    <u>Class 5 – Intercompany Claims</u>

     i.    *Classification*: Class 5 consists of Intercompany Claims between and among the Debtors.

     ii.    *Treatment*: On the Effective Date, each Allowed Intercompany Claim shall be, at the option of the applicable Debtor, either:

     a.  Reinstated;

     b.  cancelled, released, and extinguished, rendering such claim without further force or effect; or

     c.  otherwise addressed at the option of each applicable Debtor such that Holders of Intercompany Claims will not receive any distribution on account of such Intercompany Claims.

     iii.    *Voting*: Class 5 is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 5 Intercompany Claims are not entitled to vote to accept or reject the Plan.

---

[8] Pursuant to paragraph 28 of the Cash Collateral Order, cash proceeds of the Sale Transaction will be distributed to the Prepetition Term Loan Administrative Agent for the benefit of Class 3 as provided in the Cash Collateral Order as soon as practically possible following closing of the Sale Transaction.

6.    <u>Class 6 –Existing Equity Interests</u>

i.    *Classification*:  Class 6 consists of all Existing Equity Interests in the Debtors.

ii.    *Treatment*: On the Effective Date, each holder of each Existing Equity Interest in any of the Debtors shall have such Interest cancelled, released, and extinguished and without any distribution or compensation.

iii.    *Voting*:  Class 6 is Impaired, and Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6 Existing Equity Interests are not entitled to vote to accept or reject the Plan.

**D.    Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Plan Administrator with respect to any Unimpaired Claims, including all legal rights in respect of and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**E.    Elimination of Vacant Classes**

Any Class that, as of the commencement of the Combined Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**F.    Voting Classes, Presumed Acceptance by Non-Voting Classes**

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

**G.    Controversy Concerning Impairment**

If a controversy arises as to whether any Claim or any Class of Claims is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Combined Hearing.

**H.    Subordination of Claims**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, section 510(b) of the Bankruptcy Code, or

otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Plan Administrator (as applicable) reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### I. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to this Article III of the Plan. The Debtors hereby request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any voting Class that votes to reject the Plan.

### J. Insurance

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

### ARTICLE VI.
### MEANS FOR IMPLEMENTATION OF THE PLAN

### A. General Settlement of Claims and Interests

Pursuant to section 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

### B. Liquidation Transactions

On or before the Effective Date, the Debtors or the Plan Administrator shall enter into and take any actions that may be necessary or appropriate to effectuate the Sale Transaction or the Wind-Down of the Debtors, as applicable, including but not limited to: (1) the execution and delivery of appropriate agreements or other documents of consolidation, conversion, disposition, transfer, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of any appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right,

liability, debt, duty, or obligation on terms consistent with the Plan; (3) the filing of appropriate documents with the appropriate governmental authorities pursuant to applicable law; and (4) any and all other actions that the Debtors or the Plan Administrator determine are necessary or appropriate to effectuate the Plan.

1.    Sale Transaction

The Debtors have engaged in a process for the sale of substantially all of their assets, on the terms set forth in the Transaction Documents.  On February 2, 2024, the Court entered the Sale Order approving the terms of the Sale Transaction.  The Debtors have closed the Sale Transaction in advance of the hearing to approve this Disclosure Statement on a conditional basis.

2.    Wind-Down

Following the Effective Date, the Plan Administrator shall wind-down the affairs and operations of the Debtors and their Estates (the "Wind-Down") including, but not limited to: (i)liquidating the Debtors' assets remaining after consummation of the Sale Transaction, if any, including through the prosecution of any claims or causes of action of the Debtors preserved herein and (ii) distributing the Distributable Cash and other assets of the Debtors pursuant to the terms of the Plan.  The Debtors shall consult with the Prepetition Term Loan Administrative Agent on all aspects of the Wind-Down.

The responsibilities and authority of the Plan Administrator shall include the following rights and responsibilities:   (i) preserving and liquidating the Debtors' remaining assets; (ii) administering and paying taxes, including, among other things, (a) filing tax returns (to the extent not the obligation of any Purchaser), and (b) representing the interest and account of the Debtors before any taxing authority in all matters; (iii) retaining and paying, without the need for retention or fee applications, professionals in connection with the Plan Administrator's performance of its duties under the Plan; (iv) distributing information statements as required for U.S. federal income tax and other applicable tax purposes; (v) Filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases; (vi) making distributions to Professionals for Allowed Professional Compensation Claims from the Professional Fee Reserve Account; (vii) making distributions of the Distributable Cash; (viii) procuring the necessary insurance to facilitate the Wind-Down, including appropriate D&O Liability Insurance Policies; and (ix) such other responsibilities as may be vested in the Plan Administrator pursuant to the Plan or an order of the Bankruptcy Court (including, without limitation, the Confirmation Order), or as may be necessary and proper to carry out the provisions of the Plan.

C.    **Sources of Consideration for Plan Distributions**

Subject to the provisions of the Plan concerning the Professional Fee Reserve Account and the Wind-Down Budget, the Debtors or the Plan Administrator (as applicable) shall fund distributions under the Plan with the remaining proceeds from the Sale Transaction and the Distributable Cash, if any, all in accordance with the terms herein.

### D.    Vesting of Assets

Except as otherwise provided in the Plan or the Sale Order, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Estates not sold pursuant to the Sale Transaction, including all claims, rights, and Causes of Action and any property acquired by the Debtors under or in connection with the Plan, shall vest in each respective Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests.  Subject to the terms of the Plan, on or after the Effective Date, the Plan Administrator may use, acquire, and dispose of such unsold assets, and may prosecute, compromise, or settle any Claims and Causes of Action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.

### E.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors that are not otherwise transferred or sold pursuant to the Sale Transaction or distributed pursuant to the Plan, whether arising before or after the Petition Date, and the Plan Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article IX of the Plan, which shall be deemed released and waived by the Debtors and the Plan Administrator as of the Effective Date.  No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Plan Administrator, as applicable, will not pursue any and all available Causes of Action of the Debtors against it.

### F.    Corporate Action

On the Effective Date and following satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, the Debtors shall be dissolved for all purposes unless the Plan Administrator determines that dissolution can have any adverse impact on the Value of the Debtors' assets; *provided*, that neither the Debtors nor any party released pursuant to Article IX of the Plan shall be responsible for any liabilities that may arise as a result of non-dissolution of the Debtors; *provided further*, that nothing in the Plan shall be construed as relieving the Debtors or the Plan Administrator (as applicable) of their duties to pay U.S. Trustee Statutory Fees as required by the Bankruptcy Code and applicable law until such time as a final decree is entered in the Debtors' Chapter 11 Cases or the cases are dismissed or converted to cases under chapter 7 of the Bankruptcy Code.  The Plan Administrator shall submit with the appropriate governmental agencies a copy of the Confirmation Order, which Confirmation Order shall suffice for purposes of obtaining a Certificate of Dissolution from the applicable Secretary of State or equivalent body.

Without limiting the foregoing, on the Effective Date and following satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, the Debtors shall have no further duties or responsibilities in connection with implementation of the Plan, and the directors and officers of the Debtors shall be deemed to have resigned.  From and after the Effective Date,

the Plan Administrator shall be authorized to act on behalf of the Estates, provided that the Plan Administrator shall have no duties other than as expressly set forth in the Plan or the Confirmation Order.

### G.     Cancellation of Existing Securities and Agreements

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, securities and other documents evidencing any Claim or Interest, and any rights of any Holder in respect thereof, shall be deemed cancelled and of no further force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Plan Administrator.  The holders of or parties to such cancelled instruments, securities, and other documentation shall have no rights arising from or related to such instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

### H.     Effectuating Documents; Further Transactions

Upon entry of the Confirmation Order, the Debtors or the Plan Administrator (as applicable) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of the Plan and any transactions described in or contemplated by the Plan.  The Debtor, the Plan Administrator, all Holders of Claims receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### I.     Section 1146 Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation all such instruments or other documents governing or evidencing such transfers without the payment of any such tax, recordation fee, or governmental assessment.

### J.     Sale Order

Notwithstanding anything to the contrary herein, nothing in the Plan shall affect, impair or supersede the Sale Order or Transaction Documents, each of which remains in full force and effect and governs in the event of any inconsistency with the Plan.

### K.      Authority to Act

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, security holders, officers, directors, or other owners of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) pursuant to the applicable law of the state(s) in which the Debtors are formed, without any further vote, consent, approval, authorization, or other action by such stockholders, security holders, officers, directors, or other owners of the Debtor or notice to, order of, or hearing before, the Bankruptcy Court.

### L.      Separate Plans

Notwithstanding the combination of separate plans of liquidation for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

### M.      Registered form

Any assignment of rights to Contingent Sale Proceeds shall be made only through a book entry system maintained by Debtor (on its own behalf and as an agent of the buyer of the assets sold in the Sale Transaction). The foregoing sentence shall be construed so that the obligation to pay any Contingent Sale Proceeds shall be treated as an obligation that is maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code of 1986, as amended.

## ARTICLE VII.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein (which exclusion includes the Indemnification Obligations, the D&O Liability Insurance Policies, and the Employment Agreements), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code other than those Executory Contracts or Unexpired Leases that (i) are the subject of a motion to assume that is pending on the Confirmation Date; or (ii) have been identified on the Assumed Contracts Schedule.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Transaction Documents or the Plan, and payment of any cure amounts relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

**B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases**

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by the Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties unless a Proof of Claim is Filed with the Notice and Claims Agent and served upon counsel to the Plan Administrator within thirty (30) days of the Effective Date.

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable.  Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with the provisions herein.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order that are not timely Filed within thirty (30) days of the Effective Date will be disallowed automatically, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Plan Administrator, or any of their respective assets and properties.**

**C.      Reservation of Rights**

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors, the Plan Administrator, or their respective affiliates has any liability thereunder.  Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Plan Administrator under any executory or non-executory contract or unexpired or expired lease.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Liquidating Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**D.      Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnity or continued maintenance obligations.

### E.      Indemnification Obligations

Each of the Debtors' Indemnification Obligations shall not be discharged, impaired, or otherwise affected by the Plan.  The Indemnification Obligations shall be deemed Executory Contracts assumed or assumed and assigned by the Debtors under the Plan.

### F.      D&O Liability Insurance Policies

Each D&O Liability Insurance Policy to which the Debtors are a party as of the Effective Date shall be deemed an Executory Contract and shall be automatically assumed or assumed and assigned by the applicable Debtor, effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code.  For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies.  In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

### G.      Employment Agreements

Any Employment Agreement not assumed and assigned pursuant to the Transaction Documents as part of the Sale Transaction shall be assumed by the Plan Administrator on the Effective Date of the Plan.

### H.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Modifications, amendments, supplements, and restatements to a prepetition Executory Contract and/or Unexpired Lease that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

### I.      Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### J.      Employee Compensation and Benefits

All employment policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and nonemployee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are

deemed to be, and shall be treated as, Executory Contracts under the Plan and, on the Effective Date, shall be rejected pursuant to sections 365 and 1123 of the Bankruptcy Code.

## ARTICLE VIII.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Distributions on Account of Claims Allowed as of the Effective Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Disbursing Agent shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date. The Disbursing Agent shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; *provided further*, that to the extent a Proof of Claim has been filed, the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder. The Disbursing Agent shall make all distributions for Class 3 Claims to the Prepetition Term Loan Administrative Agent, who shall then distribute such individual amounts to the Prepetition Term Loan Secured Parties in accordance with the Prepetition Term Loan Documents.

### B.     Compliance with Tax Requirements

In connection with the Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (1) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (2) pay the withholding tax using its own funds and retain such withheld property.  The distributing party shall have the right not to make a distribution under the Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Plan Administrator the appropriate IRS Form requested by the Plan Administrator to reduce or eliminate any required federal, state, or local withholding.  If the party entitled to receive such property as

an issuance or distribution fails to comply with any such request for a one hundred eighty (180) day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the Plan Administrator and any Claim in respect of such distribution under the Plan shall be discharged and forever barred from assertion against such Debtor, the Plan Administrator, or their respective property.

Notwithstanding the above, each Holder of an Allowed Claim or Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

### C.    Date of Distributions

Distributions made after the Effective Date to holders of Allowed Claims shall be deemed to have been made on the Effective Date and no interest shall accrue or be payable with respect to such Claims or any distribution related thereto.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### D.    Disbursing Agent

Except as may be otherwise provided in the Sale Order or Cash Collateral Order, all distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date and as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. The Debtors shall use commercially reasonable efforts to provide the Disbursing Agent with the amounts of Claims and the identities and addresses of Holders of Claims, in each case, as set forth in the Debtors' books and records.  The Debtors shall cooperate in good faith with the Disbursing Agent to comply with the reporting and withholding requirements outlined in the Plan.

### E.    Rights and Powers of Disbursing Agent

The Disbursing Agent may (1) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of the Plan; (2) make all distributions contemplated hereby; and (3) perform such other duties as may be required of the Disbursing Agent pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### F.    Surrender of Instruments

As a condition precedent to receiving any distribution under the Plan, each holder of a certificated instrument or note must surrender such instrument or note held by it to the Plan Administrator or its designee.  Any holder of such instrument or note that fails to (1) surrender the instrument or note; or (2) execute and deliver an affidavit of loss or indemnity reasonably satisfactory to the Plan Administrator and furnish a bond in form, substance, and amount reasonably satisfactory to the Plan Administrator within six (6) months of being entitled to such

45

distribution shall be deemed to have forfeited all rights and claims and may not participate in any distribution hereunder.

### G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

Subject to applicable Bankruptcy Rules, all distributions to Holders of Allowed Claims shall be made by the Disbursing Agent, who shall transmit such distributions to the applicable Holders of Allowed Claims or their designees.

If any distribution to a holder of an Allowed Claim (1) is returned as undeliverable for lack of a current address or otherwise; or (2) is not cashed or otherwise presented for collection by the holder of the Allowed Claim within ninety (90) calendar days after the mailing of such distribution, the Plan Administrator shall be authorized to cancel such distribution check and file with the Bankruptcy Court the name and last known address of the holder of undeliverable distribution or uncashed distribution, as applicable.  If, after the passage of thirty (30) calendar days after such Filing, the payment or distribution on the Allowed Claim still cannot be made, then (1) the holder of such Claim shall cease to be entitled to the undeliverable distribution or uncashed distribution, which will revert to the Plan Administrator for distribution in accordance with the terms of the Plan; and (2) the Allowed Claim of such holder shall be deemed disallowed and expunged for purposes of further distributions under the Plan.

### H.    Manner of Payment

Except as specifically provided herein, at the option of the Debtors or the Plan Administrator, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### I.    Foreign Currency Exchange Rate

As of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, on the Petition Date.

### J.    Setoffs and Recoupment

The Debtors and the Plan Administrator, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), and applicable bankruptcy and/or non-bankruptcy law, without the approval of the Bankruptcy Court and upon no less than fourteen (14) calendar days' notice to the applicable Holder of a Claim, or as may be agreed to by the Holder of a Claim, may, but shall not be required to, set off against or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims of any nature whatsoever that the Debtors or their Estates may have against the Holder of such Allowed Claim; *provided*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Plan Administrator of any such claim the Debtors or their Estates may have against the holder of such Claim.

K.      **Minimum Distribution**

No payment of Cash in an amount of less than one hundred U.S. dollars ($100.00) shall be required to be made on account of any Allowed Claim.  Such undistributed amount may instead be used in accordance with the Plan and the Wind-Down Budget.  If the Cash available for the final distribution is less than the cost to distribute such funds, the Plan Administrator may donate such funds to the unaffiliated charity of its choice.

L.      **Allocations**

Except as otherwise provided in the Plan or as otherwise required by law, distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

M.      **Distributions Free and Clear**

Except as otherwise provided in the Plan, any distribution or transfer made under the Plan, including distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges, and other interests, and no other entity shall have any interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to the Plan.

N.      **Claims Paid or Payable by Third Parties**

1.      Claims Paid by Third Parties

If a Holder of a Claim receives a payment or other satisfaction of its Claim other than through the Debtors or Plan Administrator on account of such Claim, such Claim shall be reduced by the amount of such payment or satisfaction without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, and if the Claim was paid or satisfied in full other than through the Debtors or the Plan Administrator, then such Claim shall be disallowed and any recovery in excess of a single recovery in full shall be paid over to the Plan Administrator without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment or satisfaction from a party that is not the Debtors or the Plan Administrator on account of such Claim, such Holder shall, within fourteen (14) calendar days of receipt thereof, repay or return the distribution to the Debtors or the Plan Administrator, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the

applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except as set forth in Article IX of the Plan, nothing in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including the Plan Administrator, may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**O.      No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the DIP Orders, the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

# ARTICLE IX.
# PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

**A.      Allowance of Claims**

After the Effective Date, the Plan Administrator shall have and retain any and all rights and defenses that the Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

**B.      Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan, after the Effective Date, the Plan Administrator shall have the sole authority to: (1) File, withdraw, or litigate to judgment, objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

**C.      Estimation of Claims and Interests**

Before or after the Effective Date, the Debtors or the Plan Administrator may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.

Notwithstanding any provision to the contrary herein, a Claim that has been expunged or disallowed from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars ($0.00) unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Plan Administrator (as applicable) may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

### D.     Adjustment to Claims or Interests Without Objection

Any Claim that has been paid, satisfied, or assumed by the Stalking Horse Purchaser in the Sale Transaction, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Plan Administrator (as applicable) without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### E.     Time to File Objections to Claims

Except as otherwise provided herein, any objections to Claims shall be Filed on or before the Claims Objection Bar Date (as such date may be extended upon presentment of an order to the Bankruptcy Court by the Plan Administrator or the Debtors).

### F.     Disallowance of Claims or Interests

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Plan Administrator allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (1) the Entity, on the one hand, and the Debtors or the Plan Administrator on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (2) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or final order.

### G.     Disallowance of Late Claims

Except as provided herein or otherwise agreed to by the Debtors or Plan Administrator, as applicable, any holder of a Claim Filed via Proof of Claim after the Bar Date shall not receive any distributions on account of such Claims, unless on or before the Combined Hearing such late Claim has been deemed timely Filed by a Final Order.

### H.     Disputed Claims Process

All Claims held by Persons or Entities against whom or which the Debtor has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed Disputed Claims pursuant

to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan. A Claim deemed Disputed pursuant to Article VII.H. of the Plan shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtor or the Plan Administrator from such holder have been paid.

### I.    Amendments to Claims

Except as provided herein, on or after the Effective Date, without the prior authorization of the Bankruptcy Court or the Plan Administrator, a Claim may not be Filed or amended and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

### J.    No Distributions Pending Allowance

If an objection to a Claim, Proof of Claim, or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim, Proof of Claim, or portion thereof unless and until the Disputed Claim becomes an Allowed Claim.

### K.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim. No interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim.

## ARTICLE X.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.    Conditions Precedent to the Effective Date

The occurrence of the Effective Date of the Plan is subject to each of the following conditions precedent (the "Conditions Precedent to the Effective Date"):

1.  the Bankruptcy Court shall have entered the Confirmation Order, which shall:

    a.  authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

    b.  decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

50

    c.  authorize the Debtors, as applicable/necessary, to implement the Liquidation Transactions and make all distributions and issuances as required under the Plan;

    d.  authorize the implementation of the Plan in accordance with its terms; and

    e.  provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax to the fullest extent permissible;

2. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

3. the final version of each of the Plan and all documents contained in any supplement to the Plan, including the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed and in a form reasonably acceptable to the Prepetition Term Loan Administrative Agent;

4. the Debtors shall have fully funded the Professional Fee Reserve Account and Wind-Down Budget;

5. all reasonable and documents professional fees and expenses of the Prepetition Term Loan Advisors shall have been paid in full;

6. to the extent invoiced, the payment in cash in full of all Liquidation Expenses;

7. the Sale Transaction shall have been consummated substantially on the terms described in the Bid Procedures Order; and

8. the Debtors shall have implemented the Liquidation Transactions and all transactions contemplated in the Plan in a manner consistent with the Plan.

### B.    Waiver of Conditions

      The Debtors, with the express prior written consent of the Prepetition Term Loan Administrative Agent and, with respect solely to conditions (c) and (e), above, the Required Unsecured Creditor Plan Sponsors (in each case not to be unreasonably withheld or delayed) solely to the extent the Consenting Unsecured Creditors are materially and adversely affected, may waive any one or more of the Conditions Precedent to the Effective Date.

## ARTICLE XI.
## RELEASE, INJUNCTION, AND RELATED PROVISIONS

**A.      Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, as of the Effective Date, each of the Released Parties is unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged by the Debtors, the Wind-Down Debtors, and each of their Estates, including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Causes of Action, including any Avoidance Actions or derivative Causes of Action asserted or assertable by or on behalf of a Debtor, a Wind-Down Debtor, or any of their Estates, any Causes of Action that any Debtor, Wind-Down Debtor, or any of their Estates would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against or Interest in a Debtor or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Debtors, Wind-Down Debtors, or their Estates (whether individually or collectively) ever had, now has, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part:  (a) the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Marketing Process, intercompany transactions, the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, any Sale Transaction, the formulation, preparation, dissemination, negotiation, or filing of the Transaction Documents, PSA, the Disclosure Statement, or the Plan, including the Plan Supplement; (b) any Liquidation Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Sale Transaction, the PSA, the Disclosure Statement, or the Plan, including the Plan Supplement; (c) the business or contractual arrangements between any Debtor and any Released Party, whether before or during the Debtors' Chapter 11 Cases, or the restructuring of Claims and Interests before or during the Chapter 11 Cases; (d) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan; (e) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including any issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or (f) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing, including, without limitation, the Prepetition Loan Documents, any Interests, and all matters relating thereto.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release:  (a) to the extent that any Claims or other Causes of Action against the Debtors are not released pursuant to the Plan, are not discharged pursuant to the Plan, or are Disputed, any rights of the Debtors and the Wind-Down Debtors to assert any and all counterclaims, crossclaims, offsets, indemnities, claims for contribution,

defenses, and similar claims or other Causes of Action in response to such Causes of Action; (b) any commercial Cause of Action arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed; (c) any post-Effective Date obligations of any party or Entity under the Plan, any Liquidation Transaction, or any other document, instrument, or agreement executed to implement the Plan (including those set forth in the Plan Supplement); (d) the Retained Causes of Action, or (e) any obligations of any party or Entity under the Transaction Documents.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) essential to the Confirmation of the Plan; (b) an exercise of the Debtors' business judgment; (c) in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (d) a good faith settlement and compromise of the Causes of Action released by the Debtor Release; (e) in the best interests of the Debtors and all Holders of Claims and Interests; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Debtors, the Wind-Down Debtors, and the Estates, including any successors to the Debtors or any Estate's representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, asserting any Cause of Action released pursuant to the Debtor Release.

Each of the Debtors expressly acknowledges that although ordinarily a general release may not extend to Claims or Causes of Action that each Debtor does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered, and taken into account in determining to enter into the above releases described in this Plan, the possible existence of such unknown losses or Claims or Causes of Action. Without limiting the generality of the foregoing, each Debtor expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to Claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released Claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Debtors expressly acknowledges that the releases and covenants not to sue contained in the Plan are effective regardless of whether those released matters or

released Claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.

Notwithstanding anything herein to the contrary, the Prepetition Term Loan Secured Parties shall not be deemed to release any direct claims they may have against former directors and officers of the Debtors who were not directors or officers as of the Petition Date.

B.      Releases by the Releasing Parties

As of the Effective Date, each of the Releasing Parties other than the Debtors shall, and shall be deemed to have, expressly, absolutely, unconditionally, irrevocably, generally, individually, and collectively, released, acquitted, and discharged each of the Released Parties from any and all Causes of Action, including any Avoidance Actions or derivative Causes of Action asserted or assertable by or on behalf of a Debtor, Wind-Down Debtor, or any of their Estates, and any Causes of Action asserted or assertable by or on behalf of the Holder of any Claim or Interest or other Entity, whether known or unknown, foreseen or unforeseen, asserted or unasserted, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise that the Releasing Parties (whether individually or collectively) ever had, now have, or thereafter can, shall, or may have, based on or relating to, or in any manner arising from, in whole or in part: (a) the Debtors, the Debtors' in- or out-of-court restructuring efforts, the Marketing Process, intercompany transactions, the Chapter 11 Cases, the purchase, sale, or rescission of any security of the Debtors, the formulation, preparation, dissemination, negotiation, or filing of the Transaction Documents, the PSA, the Disclosure Statement, or the Plan, including the Plan Supplement; (b) any Liquidation Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Sale Transaction, the PSA, the Disclosure Statement, or the Plan, including the Plan Supplement; (c) the business or contractual arrangements between any Debtor and any Releasing Party, whether before or during the Debtors' restructuring, or the restructuring of Claims and Interests before or during the Chapter 11 Cases; (d) the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is affected by or classified in the Plan; (e) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including any issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or (f) any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing, including, without limitation, the Prepetition Loan Documents, and all matters relating thereto.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above shall not release, prejudice, limit, impact, or otherwise impair: (a) to the extent that any Causes of Action against any Releasing Party are not released or discharged

54

pursuant to the Plan, any rights of such Releasing Party to assert any and all counterclaims, crossclaims, offsets, indemnities, claims for contribution, defenses, and similar claims in response to such Causes of Action; (b) any rights of the Prepetition Term Loan Administrative Agent to (i) payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders of Claims under the Prepetition Term Loan Credit Agreement, respectively, including any rights to priority of payment and/or to exercise charging liens or (ii) seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan and Confirmation Order, as applicable; (c) any Prepetition Term Loan Secured Party from pursuing claims in its own name against Adrian Adams; (d) any commercial Cause of Action arising in the ordinary course of business, such as accounts receivable and accounts payable on account of goods and services being performed; (e) any post-Effective Date obligations of any party or Entity under the Plan, any Liquidation Transaction, or any document, instrument, or agreement executed to implement the Plan (including those set forth in the Plan Supplement); (f) any obligations of any party or Entity under the Transaction Documents; or (g) any direct claims the Prepetition Term Loan Secured Parties may have against former directors and officers of the Debtors who were not directors or officers as of the Petition Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) essential to the Confirmation of the Plan; (b) given in exchange for the good and valuable consideration and substantial contributions provided by the Released Parties; (c) a good faith settlement and compromise of the Causes of Action released by the Third-Party Release; (d) in the best interests of the Debtors and their Estates; (e) fair, equitable, and reasonable; (f) given and made after due notice and opportunity for hearing; (g) consensual; and (h) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

Each of the Releasing Parties expressly acknowledges that although ordinarily a general release may not extend to Claims or Causes of Action that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered, and taken into account in determining to enter into the above releases described in this Plan, the possible existence of such unknown losses or Claims or Causes of Action. Without limiting the generality of the foregoing, each Releasing Party expressly waives and relinquishes any and all rights and benefits such party may have or conferred upon it under any federal, state, or local statute, rule, regulation, or principle of common law or equity that provides that a release does not extend to Claims or Causes of Action that the claimant does not know or suspect to exist in its favor at the time of providing the release or that may in any way limit the effect or scope of the releases with respect to released Claims or Causes of Action that such party did not know or suspect to exist in such party's favor at the time of providing the release, which in each case if known by it may have materially affected its settlement with any Released Party, including, without limitation, California Civil Code § 1542, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

**Each of the Releasing Parties expressly acknowledges that the releases and covenants not to sue contained in the Plan are effective regardless of whether those released matters or released Claims or Causes of Action are presently known or unknown, suspected or unsuspected, or foreseen or unforeseen.**

**C.      Exculpation**

**To the fullest extent permitted by applicable law, no Exculpated Party will either have or incur any liability to any person or Entity for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Debtors' restructuring efforts, the Chapter 11 Cases, preparation for the Chapter 11 Cases, the filing of the Chapter 11 Cases, formulation, preparation, dissemination, negotiation, filing, or termination of the Transaction Documents, the Plan Support Agreement, the Disclosure Statement, or the Plan, including the Plan Supplement, or any Liquidation Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with any of the foregoing, the Sale Transaction, the funding of the Plan, the occurrence of the Effective Date, the pursuit of Confirmation, the pursuit of consummation, the administration and implementation of the Plan, the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, gross negligence, or willful misconduct, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The foregoing shall not be deemed to release, affect, or limit any post-Effective Date rights or obligations of the Exculpated Parties under the Plan, any Liquidation Transaction, or any other document, instrument, or agreement executed to implement the Plan (including those set forth in the Plan Supplement).**

**The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of consideration pursuant to, the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

56

The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

Notwithstanding anything herein to the contrary, the Prepetition Term Loan Secured Parties shall not be deemed to release any direct claims they may have against former directors and officers of the Debtors who were not directors or officers as of the Petition Date.

D.    Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan provisions setting forth the releases granted by the Debtors or the Releasing Parties, or discharged pursuant to the Plan, or are subject to exculpation pursuant to the article of the Plan which provides for the exculpation of the Exculpated Parties, shall be permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, Wind-Down Debtors, the Exculpated Parties, or the Released Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has, on or before the Effective Date, asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan by the Debtors, the Plan Administrator, and their respective affiliates, employees, advisors, officers and directors, or agents.

E.    **No Discharge**

**Because the Debtors are liquidating and will not engage in business after consummation of the Plan, they are not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code with regard to any holders of Claims or Interests.**

F.    **Release of Liens**

**Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date in accordance with the terms of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns.**

If any Holder of an Other Secured Claim or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Other Secured Claim, as soon as practicable on or after the date such Holder has been satisfied in full pursuant to the Plan, such Holder (or the agent for such holder) shall take any and all steps requested by the Plan Administrator that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Plan Administrator shall be entitled to make any such filings or recordings on such holder's behalf.

G.    **Gatekeeper Provision**

No party may commence, continue, amend, or otherwise pursue, join in, or otherwise support any other party commencing, continuing, amending, or pursuing, a Cause of Action of any kind against the Debtors, the Plan Administrator, the Exculpated Parties, or the Released Parties that relates to, or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of, a Cause of Action subject to Article IX.A, Article IX.B, and Article IX.C of the Plan without first (a) requesting a determination from the Bankruptcy Court, after notice and a hearing, that such Cause of Action represents a colorable claim against a Debtor, Plan Administrator, Exculpated Party, or Released Party and is not a Claim that the Debtors released under the Plan, which request must attach the complaint or petition proposed to be filed by the requesting party and (b) obtaining from the Bankruptcy Court specific authorization for such party to bring such Cause of Action against any such Debtor, Plan Administrator, Exculpated Party, or Released Party.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a Cause of Action is colorable and, only to the extent legally permissible, will have jurisdiction to adjudicate the underlying colorable Cause of Action.

## ARTICLE XII.
## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests.

2.      Resolve any cases, controversies, suits, or disputes that may arise in connection with Claims, including Claim objections, allowance, disallowance, subordination, estimation and distribution.

3.      Decide and resolve all matters related to the granting and denying, in whole or in part of, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan.

4.      Resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any cure amount arising therefrom; and/or (b) any dispute regarding whether a contract or lease is or was executory or expired.

5.      Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date.

6.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code.

7.      Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters.

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement.

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

10.     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan.

11.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions.

12.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

13.     Determine any other matters that may arise in connection with or related to the Cash Collateral Order and the Debtors' use of Cash Collateral, the Transaction Documents, the Plan Support Agreement, this Disclosure Statement, the Plan, and the Confirmation Order.

14.     Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan.

15.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by any holder for amounts not timely repaid.

16.     Adjudicate any and all disputes arising from or relating to distributions under the Plan.

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order.

18.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order.

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

20.     To recover all assets of the Debtors and property of the Debtors' Estates, wherever located.

21.     To hear and determine any Causes of Action that may be brought by the Plan Administrator.

22.     To hear and determine any other rights, claims, or Causes of Action held by or accruing to the Debtors or the Plan Administrator pursuant to the Bankruptcy Code or any applicable state or federal statute or legal theory.

23.     Enter an order or final decree concluding or closing the Chapter 11 Cases.

24.     Enforce all orders previously entered by the Bankruptcy Court.

25.     Hear any other matter over which the Court has jurisdiction.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

### A.      Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Plan Administrator, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

### B.      Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Plan Administrator (as applicable) and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### C.      Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

### D.      Reservation of Rights

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

### E.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

### F.      Determination of Tax Liabilities

As of the Effective Date, the Plan Administrator (to the extent not the responsibility of the Stalking Horse Purchaser) will be responsible for preparing and filing any tax forms or returns on behalf of the Debtors' Estates; *provided*, that the Plan Administrator shall not be responsible for preparing or filing any tax forms for Holders of Interests in the Debtors (which Interests shall be

cancelled pursuant to the Plan), but shall provide such Holders with any information reasonably required to prepare such forms. The Debtors and the Plan Administrator shall have the right to request an expedited determination of any tax liability pursuant to section 505 of the Bankruptcy Code, including on any unpaid liability of the Debtors' Estates for any tax incurred during the administration of these Chapter 11 Cases.

### G.    Notices

In order for all notices, requests, and demands to or upon the Debtors and the Plan Administrator, as the case may be, to be effective such notices, requests and demands shall be in writing (including by electronic mail) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, and served on or delivered to the following parties:

| Debtors | Counsel to the Debtors |
|---|---|
| Impel Pharmaceuticals Inc.<br>c/o Teneo<br>280 Park Avenue<br>New York, NY 10017<br><br>Attention: Brandon Smith,<br>Chief Restructuring Officer<br>Email: brandon.smith@teneo.com | Sidley Austin LLP<br>2021 McKinney Ave. Suite 2000<br>Dallas, Texas 75201<br>Facsimile: (214) 981-3400<br><br>Attn: Samuel A. Newman<br>        Rakhee V. Patel<br>        Jackson T. Garvey<br>Email: sam.newman@sidley.com<br>        rpatel@sidley.com<br>        jgarvey@sidley.com |
| **Plan Administrator** | **Counsel to the Plan Administrator** |
| To be included in the Plan Supplement. | To be included in the Plan Supplement. |
| **Counsel to the Prepetition Term Loan Administrative Agent** | |
| Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, NY 10004<br>Facsimile: (212) 558-3588<br><br>Attn: Ari B. Blaut<br>        Benjamin S. Beller<br>Email: blauta@sullcrom.com<br>        bellerb@sullcrom.com | |

After the Effective Date, Persons or Entities that wish to continue to receive documents pursuant to Bankruptcy Rule 2002 must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Plan Administrator is authorized to limit the

list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that Filed such renewed requests.

**H.      Term of Injunctions or Stays**

Except as otherwise provided in the Plan, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under the Plan (1) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, and in existence on the date the Confirmation Order is entered, shall remain in full force and effect until such property is no longer property of the Debtors or the Debtors' Estates; and (2) all other injunctions and stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of (i) the date that the Chapter 11 Cases are closed pursuant to a final order of the Bankruptcy Court, or (ii) the date that the Chapter 11 Cases are dismissed pursuant to a final order of the Bankruptcy Court.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect indefinitely.

**I.      Entire Agreement**

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**J.      Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel or the Plan Administrator's counsel (as applicable) at the address above or by downloading such exhibits and documents free of charge from the Notice and Claims Agent's website.  All documents in the Plan Supplement are considered an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

**K.      Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters.

**L.      Nonseverability of Plan Provisions**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or

provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Administrator (as applicable); and (3) nonseverable and mutually dependent.

### M.      Closing of the Chapter 11 Cases

After the full administration of the Chapter 11 Cases, the Plan Administrator shall promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, a motion pursuant to Local Rule 3022-1(a), and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

## ARTICLE XIV.
## RISK FACTORS

Prior to voting on the Plan, Holders of Claims in Classes 3 and 4, as well as entities in non-voting Classes, should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto.  These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. See Article XV of this Disclosure Statement for a discussion of tax law considerations.

### A.      Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

1.      <u>The Plan May Not Be Approved or Implemented</u>

The Plan may not be approved by the Bankruptcy Court, or if approved, the Conditions Precedent to the Effective Date may not occur. If the Liquidation Transactions are not implemented, the Debtors will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, and any other transaction that would maximize the value of the Debtors' Estates. The terms of any alternative restructuring proposal may be less favorable to holders of Claims against and Interests in the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the Confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- The Debtors' ability to raise additional capital;

- The Debtors' liquidity;

- How the Debtors' businesses are viewed by regulators, investors, lenders, and credit ratings agencies;

- The Debtors' enterprise value; and

- The Debtors' business relationships with customers and vendors.

2.      Parties in Interest May Object to the Plan's Classification of Claims and Interests

There is no guarantee that the Bankruptcy Court will agree with the classification of Claims and Interests as proposed by the Plan. Section 1122 of the Bankruptcy Code provides that a chapter 11 plan may place a claim or an equity interest in a particular class only if that claim or interest is substantially similar to the other claims or interests in that class. As is described herein, the Debtors believes that the Plan's classification of Claims and Interests complies with the requirements under the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

3.      The Debtors' Use of Cash Collateral May Be Terminated

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection in accordance with the terms of the Cash Collateral Motion [and PSA]. Such access to cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to obtain further postpetition financing and/or use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

4.      [The PSA May Be Terminated

As more fully described in the PSA, the PSA may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to filing, confirmation, and consummation of the Plan, and breaches by the

Debtors and/or the Non-Company Parties of their respective obligations under the PSA. In the event that the PSA is terminated, the Debtors may seek a non-consensual restructuring alternative.]

5.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article VIII of the Plan, the confirmation and Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the confirmation and Effective Date of the Plan will not take place. In the event that the Effective Date does not occur, the Debtors may seek confirmation of a new plan or be forced to pivot to a chapter 7 liquidation.

6.    The Debtors May Fail to Satisfy the Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction[, subject to the terms of the PSA]. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interests and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

7.    The Debtors May Not Be Able to Secure Confirmation of the Plan

There is no guarantee that the Plan will be confirmed.  If the Plan, or a substantially similar plan, is not confirmed, the terms and timing of any plan of liquidation ultimately confirmed in the Chapter 11 Case, and the treatment of Claims and Interest will be unknown.  In addition, if the Plan is not confirmed, a significant risk exists that the Chapter 11 Cases may be converted to cases under chapter 7.   In that event, the Debtors believe that creditor recoveries would be substantially diminished.

8.    The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

9.      The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the
        Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

10.     The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan[, subject to the terms of the PSA]. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

11.     Contingencies Could Affect Votes of Impaired Classes to Accept or Reject
        the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

12.     Releases, Injunctions, and Exculpation Provisions May Not Be Approved

The Debtors understand that certain parties may believe that they have valid objections to the release and exculpation provisions in the Plan. The Debtors believe that any such objection is without merit; however, in the event that such objection is sustained by the Bankruptcy Court and such release and/or exculpation provisions are modified or stricken from the Plan, the

other Parties to the Plan Support Agreement may withdraw their support for the Plan, which may result in the Debtors being unable to confirm the Plan or any other chapter 11 plan.

### B.    Allowance of Claims

This Disclosure Statement has been prepared based on preliminary information concerning the Debtors' books and records.  The actual amount of Allowed Claims may differ from the Debtors' current estimates.

### C.    Risks Related to Recoveries Under the Plan

1.    The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims

The distributions available to Holders of Allowed Claims in Classes 3 and 4 under the Plan can be affected by a variety of contingencies, including, without limitation, the amount of Allowed Administrative Claims, Priority Tax Claims, Other Secured Claims, and Other Priority Claims, thereby reducing the amount of distributions available for other Holders of Allowed Claims. Additionally, the allowance of more claims in Classes 3 and 4 will reduce recoveries in those Classes, respectively, because the distribution is an amount split *pro rata* among the Claims in those Classes. The Debtors cannot determine with any certainty at this time the number or amount of such Claims that will ultimately be Allowed.  Thus, the projected recoveries for Holders of Allowed Claims in Classes 3 and 4 disclosed in this Disclosure Statement are highly speculative.

2.    Any Valuation of Any Assets to be Distributed Under the Plan Is Speculative

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative.  Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Holders of Allowed Claims in Classes 3 and 4.

3.    The Debtors Cannot Guarantee the Timing of Distributions

The timing of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

4.    Certain Tax Implications of the Debtors' Bankruptcy

Holders of Allowed Claims should carefully review Article XV of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences of Consummation of the Plan," for a description of certain tax implications of the Plan and the Debtors' Chapter 11 Cases.

D.     **Risks Related to the Debtors' Businesses**

1.     <u>The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases</u>

For the duration of the Chapter 11 Cases, the Debtors' ability to consummate the Liquidation Transactions will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following: (a) ability to develop, confirm, and consummate the Liquidation Transactions specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions Filed in the Chapter 11 Cases from time to time; (c) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (d) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Sale Transaction. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

2.     <u>Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses</u>

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Sale Transaction and the Debtors' liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the restructuring instead of focusing exclusively on maximizing the value of the assets through a sale. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success of the Debtors' sale process.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. The chapter 11 proceedings also require the Debtors to draw on cash collateral to finance the case. If the Debtors are unable to fully maximize their draw under the Cash Collateral Order and/or fail to comply with a provision thereof, which failure consequently reduces the Debtors' access to funding for the Chapter 11 Cases, the chances of conversion to a chapter 7 proceeding may be increased, and, as a result, creditor recoveries may be significantly impaired.

3.      The Debtors' Business Is Subject to Various Laws and Regulations That
        Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to various federal, state and local laws and regulations, including occupational health and safety laws. The Debtors may be required to make large expenditures to comply with such regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Debtors to administrative, civil and criminal penalties, which could have a material adverse effect on the recoveries set forth in the Plan.

4.      The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly-skilled employee base. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses for the benefit of maximizing value until consummation of the Sale Transaction.

**E.      Disclosure Statement Disclaimer**

1.      The Financial Information Contained in This Disclosure Statement Has Not
        Been Audited

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from that financial information, provided in this Disclosure Statement, and although the Debtors believe that the financial information herein fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any conclusions or estimates drawn therefrom, is without inaccuracies.

2.      Information Contained in This Disclosure Statement Is For Soliciting Votes

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      This Disclosure Statement Was Not Reviewed or Approved by the SEC

This Disclosure Statement was not filed with the SEC under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4.      This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended. Statements containing words such as "may," "believe," "anticipate," "expect," "intend," "plan," "project," "projections," "business outlook," "estimate," or similar expressions constitute forward-looking statements and may include, without limitations, information regarding the Debtors' expectations with respect to future events.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those risks described in this Article.

5.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement

This Disclosure Statement is not legal advice to you.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his, her or its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.      No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

7.      Failure to Identify Potential Objections

No reliance should be placed on the fact that a particular Cause of Action or potential objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Plan Administrator may, pursuant to the Plan, object to applicable Claims or Interests after the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies a particular Cause of Action or objection to a Claim.

8.      No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

9.      Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have

performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

          10.    <u>Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update</u>

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

          11.    <u>No Representations Outside This Disclosure Statement are Authorized</u>

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

## ARTICLE XV.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Allowed Claims. The following summary is based on the Internal Revenue Code of 1986, as amended (the "<u>IRC</u>"), Treasury Regulations promulgated thereunder, judicial decisions, administrative rules and pronouncements as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein.  This summary addresses certain U.S. federal income tax consequences only to Holders of Claims that are entitled to vote (i.e., Holders of Claims in Classes 3 and 4) and it does not address the U.S. federal income tax consequences to Holders of Interests or to Holders of Claims that are not entitled to vote on the Plan.  The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of an Allowed Claim in light of such Holder's particular facts and circumstances (such as the effects of Section 451(b) of the IRC conforming the timing of certain income accruals to financial statements).  In addition, this summary addresses only U.S. federal income taxes.  Thus, the following discussion does not address foreign, state, or local tax

consequences, or any estate, gift, or other non-income tax consequences, of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to Holders of Allowed Claims that are subject to special treatment under the IRC (such as Persons who are related to the Debtors within the meaning of the IRC, Holders liable for the alternative minimum tax, Holders whose functional currency is not the U.S. dollar, Holders that received their Claims as compensation, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships or S corporations and investors therein, and Holders of Claims who are themselves in bankruptcy). Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds an Allowed Claim, the tax treatment of a partner or other investor in such partnership will generally depend upon the status of the partner or investor and the activities of the partnership. If you are a partner or other investor in a partnership holding an Allowed Claim, you should consult your tax advisors.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of Allowed Class 3 or 4 Claims that is: (A) an individual citizen or resident of the United States for U.S. federal income tax purposes; (B) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (C) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (D) a trust (1) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (as defined in the IRC), and a "Non-U.S. Holder" is a Holder (other than an entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

The following discussion assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out. Furthermore, this discussion assumes that Holders of Allowed Claims only hold Claims in a single Class. This discussion further assumes that the various debt and other arrangements to which a Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form. In addition, a substantial amount of time may elapse between the confirmation date and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service ("IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement. The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive and the U.S. federal income tax consequences to each Holder of an Allowed Claim will differ and will depend on factors specific to each such Holder, including (A) whether the Holder's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (B) the origin of the Holder's Allowed Claim; (C) whether the Holder reports income using the accrual or cash basis method; (D) whether the Holder receives distributions under the Plan in more than one taxable year; (E) whether the Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Claim; and (F) whether the Holder has previously taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed Claim. The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of an Allowed Claim. Accordingly, each Holder of an Allowed Claim is strongly urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

### A.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.

#### 1.    U.S. Federal Income Tax Consequences to the Debtors

The proposed Sale Transaction contemplated by the Plan is expected to be treated as a taxable sale of the Debtors' assets for U.S. federal income tax purposes. As a result, the Debtors generally will recognize taxable gain or loss equal to the "amount realized" on the Sale Transaction, less the aggregate adjusted basis in the assets that are subject to the Sale Transaction. The amount realized will be equal to (i) the cash proceeds from the Sale Transaction plus (ii) the fair market value of the right to receive the Contingent Sale Proceeds.

The Debtors do not anticipate that the Sale Transaction will generate material taxable gain.

Furthermore, the Debtors estimate that, as of December 30, 2022, they had approximately $271.3 million of federal net operating losses ("NOLs") and it is expected that the Debtors generated additional NOLs during the 2023 and 2024 tax years. The Debtors believe that at least some of the NOLs will be available to offset a significant portion of any such gain. The Debtors continue to analyze their tax liability for the 2024 tax year and may hold back a small amount of the proceeds from the Sale Transaction in reserve until the final tax liability amount is determined.

#### 2.    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. Under section 108 of the IRC, a taxpayer will not, however, be required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding (the "Bankruptcy Exception"). The Debtors expect the consummation of the Plan will produce COD Income. Because the cancellation of the Debtors' indebtedness will occur in a case brought under the Bankruptcy Code, the Debtors will be under the jurisdiction of the Bankruptcy Court in such case and the cancellation of the Claims will be

74

pursuant to the Plan, the Debtors will not be required to include any COD income realized as a result of the implementation of the Plan in taxable income under the Bankruptcy Exception.

Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. Such reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. In general, tax attributes will be reduced in the following order: (a) net operating losses and carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credits carryovers. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.

As discussed above, the Debtors estimate that as of December 30, 2022 they had approximately $271.3 million of NOLs and it is expected that the Debtors generated additional losses during the 2023 and 2024 tax years. These losses and certain other of the Debtors' tax attributes may be subject to reduction by reason of COD Income realized upon consummation of the Plan. The Debtors have not yet determined the amount of their tax attributes that will be reduced by COD Income. If the Debtors are liquidated following consummation of the Plan, however, any such tax attributes are not expected to have meaningful value.

**B.**     **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims Entitled to Vote on the Plan**

1.     <u>U.S. Federal Income Tax Consequences to U.S. Holders of Allowed Claims in Voting Classes</u>

In accordance with the Plan, each Holder of Allowed Claims in Classes 3 and 4 will receive the proceeds from the Sale Transaction, or, in the event that such Holder determines to exercise its right to credit bid resulting in the sale of the assets of Impel, as the case may be, to the Holder under the Stalking Horse APA, ownership of such assets. Each U.S. Holder of an Allowed Claim in Classes 3 and 4 will recognize gain or loss upon consummation of the Plan equal to the difference between the "amount realized" by such U.S. Holder and such U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued original issue discount ("<u>OID</u>")). The amount realized will include (a) the amount of any Cash received from the Debtor (or, if such Holder receives the ownership of the assets of Impel, the fair market value of such assets received), and (b) the fair market value of the Holder's pro rata share of the Contingent Sale Proceeds, if any, less the amount (if any) allocable to accrued but unpaid interest, as discussed below under the heading "Accrued Interest." Any such gain or loss realized by a U.S. Holder generally should constitute capital gain or loss to such U.S. Holder, unless such Claim is not a capital asset in the hands of such U.S. Holder. If an Allowed Claim in Classes 3 or 4, as applicable, is a capital asset and it has been held for more than one year, the U.S. Holder will realize long-term capital gain or loss. The deductibility of capital losses is subject to limitations.

2.      Accrued Interest

A U.S. Holder of an Allowed Claim generally will recognize ordinary income to the extent that such Holder receives Cash or property that is allocable to accrued but unpaid interest that such Holder has not yet included in its income.  If an Allowed Claim includes interest, and if the U.S. Holder receives less than the amount of the Allowed Claim pursuant to the Plan, the U.S. Holder must allocate the Plan consideration between principal and interest.  The Plan provides that all distributions to a U.S. Holder of an Allowed Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any interest accrued on such Claim prior to the Petition Date, and the remaining portion of such distributions, if any, shall apply to any interest accrued on such Claim after the Petition Date. There is no assurance, however, that the IRS will respect this treatment and will not determine that all or a portion of amounts distributed to such U.S. Holder, and attributable to principal under the Plan, is properly allocable to interest.  U.S. Holders of Allowed Claims are urged to consult their own tax advisors in this regard.  If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the U.S. Holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

3.      Market Discount

A U.S. Holder of an Allowed Claim that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the IRC. In general, a debt instrument is considered to have been acquired with "market discount" if the holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount.

Under the market discount rules, the U.S. Holder is required to treat any gain on the sale, exchange, retirement or other disposition of the Allowed Claim (other than in respect of a Claim for accrued but unpaid interest) as ordinary income to the extent of the market discount that the U.S. Holder has not previously included in income and which is treated as having accrued on the Allowed Claim at the time of its payment or disposition.

4.      Bad Debt Deduction

A U.S. Holder who receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under IRC Section 166(a).  The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

5.      Medicare Surtax

Subject to certain limitations and exceptions, U.S. Holders who are individuals, estates or trusts may be required to pay a 3.8% Medicare surtax on all or part of that U.S. Holder's "net investment income," which includes, among other items, dividends on stock and interest

(including original issue discount) on debt, royalties and capital gains from the sale or other taxable disposition of stock or debt. U.S. Holders should consult their own tax advisors regarding the effect, if any, of this surtax on their receipt of distributions pursuant to the Plan.

**C.     Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims Entitled to Vote on the Plan**

Whether a Non-U.S. Holder of Allowed Claims in Classes 3 and 4 realizes gain or loss on the consummation of the Plan and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders under the Article VI.B.

1.     Gain Recognition

Any gain recognized by a Non-U.S. Holder of Allowed Claims in Classes 3 and 4 generally will not be subject to U.S. federal income tax with respect to property (including Cash) received in exchange for such Claim, unless:

- such Non-U.S. Holder is engaged in a trade or business in the United States to which such gain is "effectively connected" for U.S. federal income tax purposes (and, if required, by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment or fixed base in the United States to which gain is attributable); or

- if such Non-U.S. Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

Gain described in the first situation above generally will be subject to U.S. federal income tax on a net income basis at the regular rates.  A Non-U.S. Holder that is a foreign corporation also may be subject to a branch profits tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty) on such effectively connected gain, as adjusted for certain items.

Gain described in the second situation above will be subject to U.S. federal income tax at a rate of 30 percent (or such lower rate specified by an applicable income tax treaty), which may be offset by certain U.S. source capital losses of the Non-U.S. Holder (even though the individual is not considered a resident of the United States), provided the Non-U.S. Holder has timely filed U.S. federal income tax returns with respect to such losses.

Non-U.S. Holders should consult their tax advisors regarding any applicable income tax treaties that may provide for different rules.

2.     Interest on Allowed Claims

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest on its Claim generally will not be subject to U.S. federal income or withholding tax, provided that

77

the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(i)     the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtors' stock entitled to vote (after application of certain attribution rules);

(ii)    the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors as described in Section 881(c)(3)(C) of the IRC;

(iii)   the Non-U.S. Holder is a bank receiving interest described in Section 881(c)(3)(A) of the IRC; or

(iv)    such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment or fixed base of the Non-U.S. Holder (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax pursuant to clauses (i)–(iv) above generally will be subject to withholding of U.S. federal income tax on such interest or imputed interest at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty). To claim such treaty exemption, the Non-U.S. Holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable documentation) claiming a reduction in or exemption from withholding tax under the benefit of an income tax treaty between the United States and the country in which the Non-U.S. Holder resides or is established. For purposes of providing a properly executed IRS Form W-8BEN or W-BENE, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under any applicable income tax treaty.

### D.    Information Reporting and Back-Up Withholding

Generally, information reporting requirements will apply to all payments or distributions under the Plan, unless you are an exempt recipient.  Additionally, a U.S. Holder may be subject to backup withholding at applicable rates, unless the U.S. Holder (1) is a person exempt from backup withholding and, when required, demonstrates this or (2) timely provides a correct taxpayer identification number ("TIN") (generally in the form of a properly executed IRS Form W-9 (or a suitable substitute form) for a U.S. Holder, or applicable IRS Form W-8 (or a suitable substitute form) and timely provides the other information, makes the representations required by such form and complies with the other requirements of the backup withholding rules. A U.S. Holder may become subject to backup withholding if, among other things, the U.S. Holder (1) fails to properly report interest and dividends for U.S. federal income tax purposes or (2) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN.  A U.S. Holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS.  Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is properly furnished to the IRS.

Under Sections 1471 to 1474 of the Tax Code (commonly referred to as the Foreign Account Tax Compliance Act ("FATCA")), unless otherwise subject to an exception, foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to 30% withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including interest).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules, including the availability of an exemption on such Non-U.S. Holder's ownership of the consideration being received under the Plan.

### E.    Importance of Obtaining Professional Tax Assistance

The foregoing is intended to be only a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The U.S. federal, state, local, and foreign income and other tax consequences of the Plan are complex and in some cases uncertain.  Such consequences may also vary based on the individual circumstances of each Holder of an Allowed Claim.  Accordingly, each Holder of an Allowed Claim is strongly urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

### ARTICLE XVI.
### ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement

have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement.  The Debtors will file all exhibits to the Plan with the Bankruptcy Court and make them available for review by no later than seven days before the deadline to object to Confirmation.

## ARTICLE XVII.
## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believes that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all Holders of Claims in Classes 3 and 4, the only Classes entitled to vote on the Plan, to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

Dated: February 12, 2024

Respectfully submitted,

/s/

By: Brandon Smith
Chief Restructuring Officer
Impel Pharmaceuticals Inc. and its direct and
indirect subsidiaries